```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF MARYLAND

 3                          SOUTHERN DIVISION

 4

 5  UNITED STATES OF AMERICA,      ) CRIMINAL
                                   ) NO. PJM-16-403
 6            Plaintiff,           )
                                   )
 7  v.                             )
                                   )
 8  TIBA SAKURI CONLEY,            )
                                   )
 9            Defendant.           )

10          TRANSCRIPT OF JURY TRIAL PROCEEDINGS - DAY 3
               BEFORE THE HONORABLE PETER J. MESSITTE
11             UNITED STATES DISTRICT JUDGE, AND A JURY
              WEDNESDAY, SEPTEMBER 23, 2020; 11:15 A.M.
12                      GREENBELT, MARYLAND

13  FOR THE PLAINTIFF:

14            OFFICE OF THE UNITED STATES ATTORNEY
              BY:  JOSEPH R. BALDWIN, ESQUIRE
15            BY:  DWIGHT J. DRAUGHON, JR., ESQUIRE
              6406 Ivy Lane
16            Suite 800
              Greenbelt, Maryland  20770
17            (301) 344-4433

18  FOR THE DEFENDANT:

19            BURNHAM & GOROKHOV, PLLC
              BY:  CHARLES BURNHAM, ESQUIRE
20            1424 K Street NW
              Washington, DC  20005
21            (202) 386-6920

22

23
    OFFICIAL COURT REPORTER:
24  Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

25    ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
```

1            THE COURT:  All right, folks.  Have a seat, please.

2            All right.  It's 11:15.  A bit of a late start, but there

3    are some issues to discuss, so let's start with you,

4    Mr. Baldwin.

5            MR. BALDWIN:  Thank you, Your Honor.

6            Your Honor, the government would request that, in open

7    court, that we -- that Mr. Burnham be questioned -- two

8    questions with respect to the stipulations that have been

9    discussed.  One would be will your client sign the stipulation

10   with respect to prior conviction that was offered on the first

11   day of trial?  Yes or no?  And if no, does your client agree to

12   let you sign the stipulation on his behalf in your capacity as

13   defense counsel?

14           THE COURT:  Would you respond to that, please,

15   Mr. Burnham?

16           MR. BURNHAM:  With due regard to privilege issues, I

17   can say that -- sorry, sorry -- I can say that I -- I don't

18   expect to be able to produce a signature from Mr. Conley or any

19   other indication of an authorization for me to sign on his

20   behalf with respect to either the original stipulation agreeing

21   to both the prior conviction and knowledge elements or the

22   government's revised stipulation offered this morning, which

23   just applies to the fact of the prior conviction.

24           My position on that issue remains substantially as I

25   stated it to the Court yesterday.

1          THE COURT:  And that was what?

2          MR. BURNHAM:  And that was that I -- my preference

3    would have been to sign -- sign a stipulation covering both

4    issues on Mr. Conley's behalf even in the absence of some

5    positive indication on the record of his authorization for me

6    to do that.

7          THE COURT:  Okay.  Now, I just note again that

8    Mr. Conley is here in prison garb.  If you want a further

9    instruction today on that, I can give it, or we can leave it as

10   was given yesterday.

11         MR. BURNHAM:  I am not requesting another

12   instruction.  Yesterday's was satisfactory to me.

13         THE COURT:  All right.  Now, this is addressed to

14   you, Mr. Conley, and, really, all I want from you is a

15   yes-or-no answer.

16         One of the charges that you face is being a felon in

17   possession of a firearm.  There has been evidence offered by

18   the government that could lead the trier of fact, the jury, to

19   determine that you were in possession of a firearm.  The

20   government is also prepared to prove that, at the time you

21   possessed the firearm, that you were -- had been convicted of a

22   felony previously that was punishable by more than one year

23   incarceration.  That's the -- one of the two elements of the

24   crime of felon in possession of a firearm.

25         Now, what we do in virtually all cases, and I cannot

1   remember one in my lifetime, frankly, where it wasn't done, the

2   defendant, in his or her own interest, agrees that he or she

3   was convicted of a felony punishable by a crime of more than

4   one year, and that simply goes into the record without any

5   indication of what the crime was or what the punishment was.

6          That stipulation, in effect, has been offered by the

7   government in this case as it is in all cases.

8          Mr. Burnham, as I understand it, believes and is prepared

9   on his own behalf to, for your behalf but by himself, to

10  stipulate to this.  Why?  Because the theory is that the

11  government, in your interest -- sorry, the jury, in your

12  interest, probably ought not to hear about a specific crime

13  that you were convicted of previously or what the penalty was.

14         It's not really relevant to whether, on this occasion,

15  when there was the search and seizure and the drugs and the

16  guns and so on, it's not really relevant to hear about whether

17  you were convicted of armed robbery or distribution of drugs on

18  prior occasions.  It doesn't help you.  In fact, it hurts you.

19  That's why most, on virtually all, in my experience, defendants

20  agree that they will stipulate simply to say I was convicted of

21  a felony punishable by more than one year prior to the events

22  in question.

23         I am advised by Mr. Burnham that he's told you this and

24  that you are not willing to sign or authorize him to make that

25  stipulation on your behalf.

1        So my first question to you is, is that accurate, you are

2   not willing to sign or authorize him to make that statement?

3              THE DEFENDANT:  I talked to him about it already.

4              THE COURT:  I'm sorry?

5              THE DEFENDANT:  We talked about it.

6              THE COURT:  You talked about it, but is the answer

7   that you are not authorizing him to do that on your behalf?

8              THE DEFENDANT:  It's up to him.

9              THE COURT:  It's up to him?

10             THE DEFENDANT:  Yeah.  We talked about it already.

11             THE COURT:  No.  No.  But that's a different

12  statement.  If you say it's up to him, that's different from

13  saying I won't authorize it.  When you say it's up to him, you

14  are saying that he can make the stipulation and you are not

15  going to jump back and say, Woe, you did this without my

16  authorization.  That's what I am trying to clarify now.

17        It is in your best interest to stipulate, but I can't

18  make you do that, and that's -- I will have to make a

19  determination if you don't.  Fair enough.  That's where we are.

20        Again, if you will please repeat your answer to me.  Do

21  you authorize him to make this stipulation in your behalf?

22             THE DEFENDANT:  We talked about it, yeah.

23             THE COURT:  I know you talked about it.  I am asking

24  you a different question.  Do you authorize him now, in the

25  course of this proceeding, to make the stipulation on your

1   behalf?  If you don't, then you understand, because the

2   government has the burden of proving each element of the crime,

3   they will have to put in evidence of specific prior crimes and

4   what the penalties were showing that they were punishable by

5   more than a year.

6          To avoid that, the stipulation would simply say, in

7   effect, you -- that you stipulate or that you were convicted of

8   a felony prior to the events in question that was punishable by

9   more than one year, but you need to be specific with me.  Don't

10  talk around in circles.

11         Are you authorizing him or not?  Because if you are not

12  authorizing him, I am going to let the government go forward

13  and put on the proof that I don't think helps you, but you need

14  to -- you need to be clear.

15         Are you authorizing Mr. Burnham to make the stipulation

16  on your behalf, and it's a simple yes or no?

17              THE DEFENDANT:  I told him he can do it.  We already

18  talked.

19              THE COURT:  I'm -- I didn't catch that answer.

20              THE DEFENDANT:  We talked about it already.

21              MR. BURNHAM:  He just said, "I told him he can do

22  it."  If that's sufficient for Your Honor, I can go ahead and

23  sign it.

24              THE COURT:  Did you tell him he could do it?

25              THE DEFENDANT:  Yeah.  We talked about it.

1        THE COURT:  Can you answer my question:  Did you tell

2   him he could do it?

3        THE DEFENDANT:  I said, Yeah, we talked about it.

4        THE COURT:  Okay.  Is the government satisfied with

5   his response?  It's ambiguous.  I don't know what -- he's not

6   really answering my question, which is, did you authorize him?,

7   and he's saying we talked about it, which is not the same

8   response.

9        MR. BALDWIN:  Your Honor, I think that could be

10  understood in the sense did you authorize him to do it and he

11  said, Yeah, we talked about it, and now he's -- he also said

12  that it is up to him.  I think that, essentially, he's

13  indicated that he would -- well, you are right, Your Honor, it

14  is a bit ambiguous.

15       THE COURT:  Mr. Burnham, what do you say?  This needs

16  to be done with his authorization.  It's not whether you think

17  it's in his best interest.  The question is do you understand

18  his answer to be we talked about it?  He did say "it's up to

19  him" just now.  Do you take that to mean that, yes, you should

20  -- you would go ahead and enter the stipulation?

21       MR. BURNHAM:  Yes, I do.

22       THE COURT:  All right.  What exactly would the

23  stipulation be then?

24       MR. BURNHAM:  The stipulation would be that

25  Mr. Conley has been convicted of a crime carrying at least one

1   year incarceration, and that as of March of 2016, he was aware

2   that he had been convicted of such a crime and had not been

3   pardoned or his civil rights restored.

4            THE COURT:  All right.  That would be the

5   stipulation, Mr. Conley.

6        So I am understanding you to say now that you are leaving

7   it up to Mr. Burnham to decide whether to do that.  And if you

8   don't want to do that, you need to tell me that now.  I think

9   he's nodding his head.  I will accept that.  I think we have

10  covered that issue, Mr. Baldwin, Mr. Burnham.

11       There was more.  Mr. Burnham, you had another matter?

12           MR. BURNHAM:  I do have another issue.

13           THE COURT:  Go ahead.

14           MR. BURNHAM:  It is -- it came to my attention after

15  jury selection had already been completed that there was a

16  witness that we may wish to call in Mr. Conley's defense who

17  has information that could be used to support a defense to one

18  of the charges.  That would be his mother, Donna Conley Shaw.

19  I realize her name was not included in the list in the jury

20  questioning, but given that none of the prospective jurors or

21  the jurors that were selected knew Mr. Conley, it seems

22  unlikely that any of them would know his mother.  And even in

23  the extremely unlikely chance that they did, we do have three

24  alternates, and we are getting close to the end.

25       I have also inquired on whether there would be any rule

1   on witness issues with her.  And she was, to my knowledge,

2   present in the public room for jury selection but not for

3   yesterday during the actual first day of the government's case

4   in chief.

5        Her testimony would be, just in summary, that there was a

6   threat communicated to Mr. Conley to his life and safety which

7   could be a motive to possess firearms other than the

8   government's allegation, which is that they were -- had

9   something to do with drug trafficking.  So her testimony could

10  provide a defense to that charge, and so we'd ask permission to

11  call her as a witness in our case.

12        THE COURT:  Are you saying that the threat to him was

13  made in her presence?

14        MR. BURNHAM:  No, I am not.  She was told by a third

15  party that there was -- from law enforcement that there was a

16  threat to him, so we'd be offering that statement not for the

17  truth but just to show that she learned that.

18        And then she could also testify that she communicated

19  that to Mr. Conley, which would be her testifying to her own

20  statement, which would not be hearsay, as far as I can tell.

21  And then that would be -- that evidence would be potentially a

22  defense to the 924(c) charge, which is just charged as use of a

23  firearm in connection with a drug trafficking offense, so this

24  would be an explanation for the presence of the firearms.  It

25  had nothing to do with drug trafficking.

1          THE COURT:  Mr. Baldwin.

2          MR. BALDWIN:  Your Honor, the government objects to

3     the late identification of the witness.  I don't know what the

4     defendant's mother heard or didn't hear when the jury was being

5     selected.  Now, that might affect her ability to direct her

6     testimony in any particular way to any of the jurors.

7          With respect to the substance of what's alleged, I think

8     that there is a probability that cross could lead to additional

9     questions, or rebutting that claim could lead to an expansion

10    of -- of the case to look into if there were any drug

11    connections in -- in the violence that is alleged or the

12    reasons for the threat, but beyond that, Your Honor, and more

13    fundamentally, possession in furtherance of a drug trafficking

14    crime, it's not a one type of knowledge requirement.

15         The defendant may have more than one reason to have a

16    firearm at any given time, and if one of those reasons to have

17    a firearm was in furtherance of the drug trafficking crime,

18    then there could be any number of any other reasons that one

19    might also have a firearm.  It doesn't have to be the reason

20    that a firearm was held.  It has to be a reason.  I believe

21    that's what the law says on the question.  And so I don't think

22    it's a perfect defense for this.

23         And so I think that given that this is going to expand

24    the scope of the trial and be -- and it's late announced, that

25    it would be prejudicial to the government's case to introduce

1    it, and I don't think it's as irrelevant as Mr. Burnham

2    believes it is given that there can be more than one reason

3    someone has a firearm.

4            THE COURT:  Anything in reply, Mr. Burnham?

5            MR. BURNHAM:  Just I think the arguments made by

6    Mr. Baldwin about the relevance go to weight.  They are good

7    issues for closing argument, not so much bearing on

8    admissibility.

9            THE COURT:  Well, here is my take on this.  I thought

10   we were going to finish the evidence today, so we already are

11   through trial with the jury selection and a full day of

12   testimony.  And we were, at least it's late now, but had we

13   started around ten, we would be on track to finish the

14   testimony.  So to hear this prospect now is late in the game

15   and sort of causes us to lose control, I think, of the way the

16   proceeding is going.

17           As far as the proposed witness, the mother of the

18   defendant is concerned, it is true that she, as unlike any

19   other witness, was here during the jury selection and would not

20   ordinarily have been, and the rule on witnesses would have

21   excluded her from being present.

22           Those are, I guess, more or less technical objections

23   because I am inclined to agree that it's unlikely that any

24   prospective juror would know Mr. Conley's mother, although it's

25   possible.

1          The more serious problem, I think, in the case is that if

2     you do have her come in, you are right that the suggestion that

3     maybe a threat was communicated to Mr. Conley is relevant.  The

4     problem is it opens the door to very broad cross-examination of

5     the witness, and the calling of other witnesses, quite frankly,

6     to testify that Mr. Conley may have been involved in extensive

7     other drug activities involving weapons and not just in this

8     occasion.

9          She says, Well, there were threats; that's why he had

10    guns.  He may have had guns because he was involved on a

11    regular basis in drug distribution.  I don't know that, but

12    that could be the argument that's made.  There may be witnesses

13    that say there was gang violence and that's why -- that he

14    participated in or was suspected to participate in and that's

15    why he had guns.  Of course, the government's burden here is to

16    show that he simply had the gun in connection with the

17    distribution of drugs.

18         So she adds one possibility, but you open the door to

19    some very serious cross-examination which can only be to the

20    detriment of your client, and that is both part of and

21    independent of the fact that it expands the trial considerably,

22    and I am just not prepared to do that at this point.

23         We are trying to keep our focus on the main event here,

24    which is what happened on that occasion.  And certainly it's

25    argument to be made, even without her testimony, that these

1  guns may well have been for self defense.  You can argue that.

2  I mean, that -- you don't necessarily have anybody who said it,

3  but you can certainly argue that without losing that

4  opportunity.

5      But, as I say, if you get into this with her, you open

6  the door to not only cross-examination of her, such as, but did

7  you know or have you heard about this activity of the defendant

8  or that activity or yet a third activity, and then calling

9  other witnesses to say, yes, he was known to have guns and a

10  lot that he did.  That really is not helpful to your client but

11  expands the case considerably, and I can't afford to do that

12  right now.

13      So, on balance, it seems to me that it is proper to deny

14  her as a witness now because it's late in the game, it's going

15  to expand considerably the trial on issues that I think are,

16  frankly, harmful to the defendant, but, in any event, are out

17  there.  So I am not going to permit her to testify now, but I

18  won't preclude you from arguing that there are other possible

19  explanations as to why he may have had guns.  And that is my

20  ruling.

21      Anything else?

22      MR. BURNHAM:  No, Your Honor.  I think, just for

23  scheduling, Your Honor alluded to scheduling, where we are.

24  Mr. Conley may end up testifying himself.

25      THE COURT:  Well, all right.  We will advise him as

1  to what -- I think you better talk to your client, Mr. Burnham.

2  He's raising his hand and he wants to chat with you.  So do

3  that, please.

4          THE DEPUTY CLERK:  Please use the communication

5  devices you were provided.  Thank you.

6      Please hold down those buttons on your microphones to

7  mute your microphones.  Thank you.

8      (Counsel conferring with client.)

9          MR. BURNHAM:  Mr. Conley just wanted me to add that

10 the threat that was communicated were that people were going to

11 kill him that very night, and that is -- so it was a real

12 threat.  That's the point of emphasis he wanted to make.

13         THE COURT:  It was something that his mother told him

14 that day?

15         MR. BURNHAM:  Yes.

16         THE COURT:  That he was going to be killed that

17 night?

18         MR. BURNHAM:  That she had heard from a detective or

19 a police officer, I can't remember which.

20         THE COURT:  Okay.  Mr. Baldwin, anything further you

21 want to say under the circumstances?

22         MR. BALDWIN:  Your Honor, my only response to that is

23 one of the proffers we heard earlier today in chambers was that

24 the -- was that the notion was that someone had told the

25 defendant's mother that -- that there was a threat on

1  Mr. Conley's life and that's what caused him to move to that

2  apartment.  That apartment lease, which will come into

3  evidence, was signed in February of 2016.  That's -- so we have

4  heard another proffer today about that.  I just, I am dubious

5  about that, the strength of what was just offered to the Court.

6          THE COURT:  Are you asking for a response from

7  Mr. Burnham?

8          MR. BALDWIN:  No, Your Honor.

9          THE COURT:  Is the lease in evidence?

10          MR. BALDWIN:  The lease is going to come in -- I'm

11  sorry, Your Honor.  The lease is going to come in with a

12  witness.

13          THE COURT:  There is evidence that there were

14  documents with the defendant's name at the premises, but I

15  don't recall the lease coming in.

16          MR. BALDWIN:  It will be coming in, Your Honor.  It

17  was one of the things that was certified, we had a certified

18  authentication for it, and it will be brought in through a

19  witness this morning.

20          THE COURT:  Well, I don't think that really changes

21  my ruling, Mr. Burnham, Mr. Conley.  I think the suggestion may

22  well be, as far as you knew, he could have been threatened that

23  very night.

24          THE DEFENDANT:  We are not in conversation --

25          THE COURT:  I'm sorry.  You are represented by

1    counsel now.  I am not going to get into discussions with you.

2    I need to control this case and we need to go forward as I

3    decide it.

4         Now, I don't -- again, Mr. Burnham, I stress to you you

5    are opening the door to a lot of other evidence about why the

6    defendant may have been under a threat.  He may have threatened

7    other people.  And, frankly, in terms of the evidence that can

8    come in, it would be a fair question to say, Have you heard,

9    not to prove it, simply, Have you heard all these other things

10   that he's alleged to have done?, because that's what she did.

11   She heard.  And it can be rebutted that way.  It just, as I

12   say, gets into a different trial, and we are not going to do

13   that.

14        Anything else?

15             MR. BALDWIN:  No, Your Honor.

16             THE COURT:  Are you ready to go?  We need to get

17   started with some witnesses here.

18             MR. BALDWIN:  Yes.  We are ready for our first

19   witness.

20             THE COURT:  Ready to bring the jury in?

21             MR. BALDWIN:  Yes, Your Honor.  Thank you.

22             THE COURT:  All right.  Let's go.

23        (The jury panel enter the courtroom at 11:38 a.m.)

24             THE COURT:  Good morning, ladies and gentlemen.

25   Apologies for the delay.  Sometimes in trials, counsel and the

1    Court need to discuss legal issues, which obviously bear on the

2    evidence in the case, and you are not to be involved or hear

3    about those, and so it's easier for us to discuss those at

4    length when you are not present.

5         So, again, apologies for the delay.  I think we will be

6    able to move a little more quickly at this point, but, again,

7    it's always in the nature of things that that happens.  So

8    please bear with us.  You have got your notes.

9         Call your first witness, please.

10        MR. DRAUGHON:  Thank you, Your Honor.  The government

11   calls Andrew Grill.

12        THE COURT:  All right, sir.  If you will step around

13   front and stand right alongside the witness box.  Don't go in

14   yet.  Step alongside right there.  Madam Clerk.

15        ANDREW GRILL, GOVERNMENT'S WITNESS, SWORN

16        THE DEPUTY CLERK:  Please have a seat in the witness

17   box.  Watch your step as you enter.

18        Please speak loudly and clearly into the microphone.

19        THE WITNESS:  Yes, ma'am.

20        THE DEPUTY CLERK:  State your name for the record and

21   spell each name.

22        THE WITNESS:  My name is Andrew, A-N-D-R-E-W, Grill,

23   G-R-I-L-L.

24        THE DEPUTY CLERK:  Thank you.

25                         DIRECT EXAMINATION

BY MR. DRAUGHON:

Q.     Good morning, sir.

A.     Good morning.

Q.     In 2016, were you employed?

A.     Yes, sir, I was.

Q.     Who were you employed by?

A.     I was a Prince George's County police officer in the
state of Maryland.

Q.     And what was your role as a Prince George's County police
officer?

A.     I was a crime scene investigator assigned to the crime
scene investigation division.

Q.     How long had you been in that role?

A.     For five years.

Q.     And how long have you been in law enforcement overall?

A.     At that point, it was 19 years.

Q.     What were your duties as a crime scene investigator?

A.     We assisted detectives and officers that were
investigating major crimes through our Criminal Investigation
Division.  We would assist with the processing of crime scenes,
collection of evidence, photographing evidence, and processing
evidence for latent prints and/or DNA.

Q.     Did you have any training as it relates to crime scene
investigations?

A.     Yes, sir.  I had training through the Prince George's

1  County Police Academy and also on-the-job training throughout

2  my 20-year career.  We also yearly had in-service training

3  throughout -- through our department, which they did cover

4  crime scenes and evidence processing.

5  Q.    In your role as a crime scene investigator, how many

6  crime scenes have you assisted with?

7  A.    Throughout my career -- throughout the five years with

8  the crime scene investigation division, I would say easily over

9  200.

10  Q.    Sir, are you familiar with the investigation of Tiba

11  Conley?

12  A.    Other than the part that I had with processing several

13  items, that's the only thing I am familiar with.

14  Q.    And what did you do with regard to processing several

15  items in this matter?

16  A.    On April 25th, 2016, I was working a day work shift.  I

17  was in our office which was located in Landover, Prince

18  George's County, Maryland, when Prince George's County Police

19  Sergeant Chaney arrived at our unit with four firearms,

20  numerous items of ammunition, and a few firearm magazines.  He

21  was requesting processing, specifically photographs, DNA

22  processing, and fingerprint processing of these items.  He

23  filled out a request form, and I was assigned this case.

24  Q.    When you received those items, the firearms, the

25  ammunition, and the magazines, what were the condition of those

1    items?

2    A.    They were all prepackaged when they were brought to our

3    station.

4    Q.    Was there any indication that those items had been

5    tampered with?

6    A.    No, sir.

7    Q.    And you mentioned earlier that you processed the items.

8          What did you end up doing to process the items?

9    A.    Processing the items for this case, the items were

10   brought back into our processing rooms.  Craft paper was laid

11   down on a stainless steel table.  Each item was photographed

12   the way I received it in the packaging.  It was then removed

13   from the packaging, photographed at several different angles,

14   and then they were -- each item was DNA swabbed for the

15   recovery of any possible DNA on the item using two swabs, one

16   wet and then one dry.

17         After the processing for DNA, the items were placed into

18   a fuming chamber which helps develop latent prints on items.

19   Q.    Sir, I'd like to ask you to now step down to look at

20   physical exhibits.

21   A.    Yes, sir.

22         (Witness exits the witness stand.)

23   BY MR. DRAUGHON:

24   Q.    I'd like to first direct your attention to Government

25   Exhibits Gun 1, 1A, Gun 1B, Gun 2, Gun 2A, Gun 2B, Gun 3, Gun

1   3A, Gun 3B, Gun 4, A1, and A2.

2       Do you see those physical exhibits on the table?  And you

3   can open up the larger boxes to see the physical exhibits

4   inside of those.

5   A.    Yes, sir, I do.

6   Q.    And do you recognize those government exhibits?

7   A.    Yes.  These are some of the items that I processed on the

8   April 25th of 2016 at the request of Sergeant Chaney.

9   Q.    And how do you recognize those objects?

10  A.    The way the packaging is, the evidence tape on it has my

11  initials and also my I.D. number on them all, and they also

12  have property stickers that I printed out for the items.

13  Q.    You said these are the exhibits, the items that you

14  processed that day?

15  A.    Yes, sir, they are.

16  Q.    I'd like to direct your attention to -- there are some

17  envelopes up there, Government Exhibit DNA 13 through DNA 19.

18      Let me know if you see those exhibits?

19  A.    Yes, sir, I do.

20  Q.    Do you recognize Government Exhibits 13 -- DNA 13 through

21  19?

22  A.    Yes, sir.  These are the envelopes that I placed the

23  sterile swabs after swabbing different items for possible DNA

24  evidence.

25  Q.    And when you say "sterile swabs," what were you swabbing

1    for?

2    A.    Possible DNA evidence on the items that were brought in

3    to be processed: the firearms, the ammunition, and the

4    magazines.

5    Q.    And are you able to describe which item the DNA swab

6    would have been recovered for for each exhibit?

7    A.    Oh, yes.  On the -- on the envelope, it says the property

8    sticker, and on the property sticker, it has the recovery

9    location, which would have been the item that the swabs were

10   recovered from.

11   Q.    So let's start with Government Exhibit DNA 13.

12         What item was that recovered from?

13   A.    That item is recovered from item No. 21, which was a

14   Springfield XD handgun.

15   Q.    Next, can you tell us what the swab for Government

16   Exhibit DNA 14 would have come from?

17   A.    Yes, sir.  That was recovery location from item No. 22,

18   which were two magazines.

19   Q.    The same question for Government Exhibit DNA 15?

20   A.    Yes, sir.  Recovery location from No. 27, which was one

21   Masterpiece Arms .45 ACP handgun.

22   Q.    Can you tell us about Government Exhibit DNA 16, where

23   that came from?

24   A.    Yes, sir.  Recovery location from No. 28, one 5.56 DTI-16

25   rifle.

1   Q.     And next for DNA 16?  I'm sorry, DNA 17?

2   A.     Yes, sir.  Recovery location from No. 29, which was one

3   MDL 59/66, 7.26 by 39 rifle.

4   Q.     And Government Exhibit DNA 18?

5   A.     Recovery location was from No. 32, which was one .45

6   caliber magazine.

7   Q.     And, finally, Government Exhibit DNA 19?

8   A.     Recovery location was from No. 35, two Mac-10 magazines.

9   Q.     And what did you do with these envelopes once you

10  submitted the swabs that you recovered?

11  A.     Once I put the swabs inside and they were sealed -- if I

12  may pick one up?

13  Q.     Sure.

14  A.     They were sealed with evidence tape on the back so they

15  could not be opened.  I then initialled on it and put my -- put

16  our I.D. number or badge number on the back to seal the

17  envelopes.

18         MR. DRAUGHON:  Let the record reflect that the

19  witness pointed to a tape on the back side of the envelope and

20  pointed to his initials that was on top of the tape.

21         THE COURT:  All right.

22  BY MR. DRAUGHON:

23  Q.     Sir, you mentioned earlier that you also processed the

24  items for prints.

25         Did you recover any prints?

```
 1   A.    Yes.  One latent print was recovered from one of the
 2   magazines.
 3   Q.    You can go back to your seat.
 4   A.    Yes, sir.
 5              THE DEPUTY CLERK:  Mr. Grill.
 6              MR. DRAUGHON:  The government has no further
 7   questions, Your Honor.
 8              THE COURT:  Cross.
 9                         CROSS-EXAMINATION
10   BY MR. BURNHAM:
11   Q.    Good morning, Mr. Grill.  I am Charles Burnham.
12   A.    Good morning, sir.
13   Q.    You testified a moment ago on direct examination that you
14   had been to over -- investigated over 200 crime scenes.
15         Do you recall that?
16   A.    Yes, sir, I do.
17   Q.    I assume in at least some proportion of those cases you
18   actually went to the crime scene yourself; would that be
19   correct?
20   A.    Yes, sir.
21   Q.    How often -- how often, if you could estimate, are you
22   actually at the crime scene as opposed to getting things given
23   to you later?
24   A.    It kind of depends on when I am working.  If crimes occur
25   during that time and they are requesting a crime scene
```

1   investigator out, I process both crime scenes at different

2   locations and items of evidence in our unit quite frequently.

3   Q.    And I assume, if you are present at a crime scene with

4   the police, you can provide the police with guidance on how

5   best to process those scenes to make it as easy as possible for

6   you to do your work.  Right?

7   A.    That's correct.

8   Q.    What would be some examples of guidance you would give

9   law enforcement about how to preserve DNA fingerprint evidence

10  and so on?

11  A.    Just proper collection techniques, trying to handle the

12  items as minimal as possible, making sure you have clean,

13  sterile gloves on, and proper packaging pending any processing.

14  Q.    And some officers are probably more conscientious than

15  others about observing those best practices.  Is that fair?

16  A.    That's fair.

17  Q.    So then when -- you, in this case, received four guns,

18  right?  You testified to that?

19  A.    Yes, sir.

20  Q.    And then when you -- then you had to place -- what were

21  they in?  Were they in a container?  Were they in these boxes

22  when you received them?

23  A.    They were in some type of packaging.  Being over four

24  years ago, I don't quite remember how they came in, but I did

25  document the way they came in with photographs that day.

1  Q.    But at any rate, you removed them yourself from whatever

2  package they were in and placed them on the tables for

3  photographs and swabbing.  Right?

4  A.    Yes, sir.

5  Q.    And did you wear gloves when you did that?

6  A.    Yes, sir.  They are changed constantly, any time I touch

7  a new item of evidence.

8  Q.    Why is it so important to change the gloves in between

9  touching one item to the next?

10  A.    Cross-contamination.

11  Q.    What would happen if you didn't change gloves from one

12  item to the next?

13  A.    There is a possibility of cross-contamination.

14          MR. BURNHAM:  Thank you.  No further questions.

15          THE COURT:  Redirect.

16                    REDIRECT EXAMINATION

17  BY MR. DRAUGHON:

18  Q.    Sir, you mentioned that if you don't change gloves, there

19  is a possibility for cross-contamination.  Do you recall that?

20  A.    Yes, sir, I do.

21  Q.    How easy would it be for that cross-contamination to

22  happen?

23  A.    I mean, it's -- that would be just -- I would have to

24  guess on it.

25          MR. BURNHAM:  Objection.

27

 1              THE COURT:  All right.  I didn't hear the response.

 2              MR. BURNHAM:  He said he is guessing, which is the

 3    basis of my objection.

 4              THE COURT:  Counsel, I need to hear your objection.

 5              MR. BURNHAM:  I am objecting because the witness

 6    said -- he said, "I would have to guess," and so I object to

 7    any further testimony following that statement.

 8              THE COURT:  Fair enough.  Sustained.  Sustained.

 9    BY MR. DRAUGHON:

10    Q.    So you don't know how easy it would be for the

11    cross-contamination to happen.  Is that right?

12    A.    That's correct.

13              MR. DRAUGHON:  I have no further questions.

14              THE COURT:  Thank you.  Thank you, sir.  You may step

15    down.

16         Call your next witness.

17              MR. BALDWIN:  Thank you, Your Honor.  The government

18    calls Howard Perkins.

19         Your Honor, can we have a brief bench conference before

20    the next --

21              THE COURT:  All right.  Link up, please.

22              THE DEPUTY CLERK:  Hold on.

23         (The following took place at sidebar outside the presence

24    of the jury; all counsel present.)

25              MR. BALDWIN:  Thank you, Your Honor.

```
 1              THE COURT:  I am getting a lot of feedback.  We need
 2   an I.T. person here.  Where is Theresa?  Theresa?  I can't hear
 3   myself.  I am getting a loud echo.  Can counsel hear me?
 4              MR. BALDWIN:  I can hear you, Your Honor.
 5              THE COURT:  Are you getting a lot of feedback?
 6              MR. BURNHAM:  I can hear, but there is feedback.
 7              THE COURT:  Theresa, I am getting a lot of echo in my
 8   ear.  Let's do our best.  I am having a lot of trouble hearing
 9   myself.
10        Who is speaking?
11             MR. BALDWIN:  This is Joseph Baldwin, Your Honor.  I
12   just wanted to notify the Court that this witness is the one
13   who is going to rely on -- we authenticated Miscellaneous No. 7
14   which had two recordings from Howard County Detention Center.
15             THE COURT:  I'm sorry, Mr. Baldwin.  You need to call
16   I.T. to get them up here.  Please call I.T. and get them up
17   here.
18             THE DEPUTY CLERK:  I will.
19             THE COURT:  Mr. Baldwin, go ahead.  I will try and
20   follow you if I can.  You need to start again.
21             MR. BALDWIN:  Thank you, Your Honor.  This is Joseph
22   Baldwin for the government.
23        There was just two issues.  One, I wanted to make the
24   Court aware that this is a witness who we certified an exhibit
25   based on certification yesterday, it's Miscellaneous 7.  It has
```

1   -- it has recordings on it, Recording 1 and Recording 2, that

2   were just for identification.  We have the complete recordings

3   from the detention center.  I just want to make the Court aware

4   of that.

5       The second thing is, Your Honor, is I am going to have to

6   ask this witness where does he work.  He's going to say, The

7   detention center.  I am going to ask him if they make

8   recordings of detainees, and he's going to say, Yes, they do.

9           THE COURT:  I'm sorry.  Okay.  Mr. Burnham, do you

10  have something to say in response?

11          MR. BURNHAM:  No response.

12          THE COURT:  I'm sorry.  I can't hear you.

13          THE DEPUTY CLERK:  You have to speak into that

14  microphone.

15          MR. BURNHAM:  No, Your Honor.  I am aware that that's

16  how the government intends to proceed.

17          THE COURT:  But do you have any objection of any

18  sort?  I need to know that in advance.

19          MR. BURNHAM:  No objection.

20          THE COURT:  All right.  Call him.

21          MR. BALDWIN:  Thank you, Your Honor.

22      (End of sidebar discussion.)

23          THE COURT:  Mr. Baldwin, are you ready to go?  Is the

24  husher still on?  Why is that -- okay.

25      If you will go ahead -- all right, Madam Clerk, swear the

1    -- hold on.

2              THE DEPUTY CLERK:  Please raise your right hand.

3              HOWARD PERKINS, GOVERNMENT'S WITNESS, SWORN

4              THE DEPUTY CLERK:  You may have a seat in the witness

5    box.  Please watch your step as you enter.

6         Please speak loudly and clearly into the microphone.

7    State your name for the record and spell each name.

8              THE WITNESS:  My name is Howard Perkins, H-O-W-A-R-D,

9    P-E-R-K-I-N-S.

10             THE DEPUTY CLERK:  Thank you.

11             MR. BALDWIN:  May I proceed, Your Honor?

12             THE COURT:  All right.  Go ahead.

13                       DIRECT EXAMINATION

14   BY MR. BALDWIN:

15   Q.   Good afternoon, sir.

16        Where do you work, sir?

17   A.   I work at the Howard County Detention Center.

18   Q.   Sir, can you lean a little closer to the microphone?  I

19   am not sure if the jury could hear you.  Could you repeat that?

20   Where do you work?

21   A.   I work at the Howard County Detention Center.

22   Q.   And do you manage a system that makes recordings of phone

23   calls and video visits?

24   A.   Yes, I do.

25   Q.   And is -- is that system accessible by detainees?

1   A.    Yes, it is.

2   Q.    How do detainees access systems that are recorded?

3   A.    The detainees register through the system by saying

4   several phrases, their booking number, and a unique I.D. that

5   they create that's used.

6   Q.    Okay.  Were you asked to search records for recordings

7   associated with a detainee named Tiba Conley?

8   A.    Yes.

9   Q.    Did you review the records associated with the recording

10  No. 63087122 that was marked for identification as R1, and that

11  recording was made on April 25th, 2016?

12  A.    Yes, I did.

13  Q.    And what detainee's pin was used to create that

14  recording?

15  A.    The -- the pin that the detainee created.

16  Q.    And was that Tiba Conley?

17  A.    Yes.

18  Q.    Did you review the records associated with the recording

19  No. 631255655 marked for identification as R2 that was made on

20  May 8th, 2016?

21  A.    Yes.

22  Q.    And what detainee's pin was used to create that

23  recording?

24  A.    The pin that the detainee created.

25  Q.    The same, Tiba Conley?

Perkins - Direct

```
 1  A.    Yes, it was.

 2  Q.    That was among the recordings that you found when you

 3  searched for Tiba Conley's name?

 4  A.    I'm sorry.  Could you repeat that?

 5  Q.    So that was -- both of the recordings we have just

 6  mentioned, were they recordings that you found when you

 7  searched the system for Tiba Conley?

 8  A.    Yes, they were.

 9        MR. BALDWIN:  Thank you.  No further questions, Your

10  Honor.

11        THE COURT:  Cross.

12        MR. BURNHAM:  No cross-examination.

13        THE COURT:  Thank you, sir.  You may step down.  You

14  are excused.

15     Next witness?

16        MR. BALDWIN:  Yes, Your Honor.  The government calls

17  Joshua Rothman.

18        THE COURT:  Sir, if you will come alongside -- don't

19  go in the witness box yet.  Hold on.  Step alongside and the

20  clerk will swear you.  Stand right where you are.  Madam Clerk.

21        THE DEPUTY CLERK:  Please raise your right hand.

22        JOSHUA ROTHMAN, GOVERNMENT'S WITNESS, SWORN

23        THE DEPUTY CLERK:  Please have a seat in the witness

24  box.  Watch your step as enter.

25     Please speak loudly and clearly into the microphone.
```

1    State your name for the record and spell each name.

2              THE WITNESS:  Joshua Rothman, J-O-S-H-U-A,

3    R-O-T-H-M-A-N.

4              THE DEPUTY CLERK:  Thank you.

5                        DIRECT EXAMINATION

6    BY MR. BALDWIN:

7    Q.    Good afternoon, sir.

8    A.    Good afternoon.

9    Q.    Where do you work, sir?

10   A.    Federal Bureau of Investigation, Washington field office.

11   Q.    How long have you worked there?

12   A.    Approximately 12 years.

13   Q.    What is your position with the Federal Bureau of

14   Investigations?

15   A.    I am a special agent.

16   Q.    Are you assigned to any particular squad?

17   A.    I am.

18   Q.    What does that squad do?

19   A.    I am assigned to a Safe Streets gang task force which

20   investigates violent crime.

21   Q.    Have you ever executed search warrants in drug

22   trafficking investigations?

23   A.    I do.

24   Q.    About how many search warrants have you executed in drug

25   trafficking investigations?

Roehman - Direct

1  A.     Rough guess would be well over 100.

2  Q.     When you are executing narcotics search warrants, what

3  are you searching for?

4  A.     Searching for anything that indicates involvement in the

5  actual trade of narcotics trafficking, which could include

6  firearms, parts of firearms, the narcotics themselves, ledgers

7  indicating transactions, packaging used in packaging illegal

8  narcotics, as well as money and cellular telephones or anything

9  else involved in the drug trade.

10 Q.     Were you involved in an investigation of Tiba Conley?

11 A.     I was.

12 Q.     As part of that investigation, did you help conduct

13 surveillance of Mr. Conley at 3016 Oak Green Court, Apartment

14 C, in Ellicott City?

15 A.     I did.

16 Q.     During your surveillance, did you observe Mr. Conley at

17 any point?

18 A.     I did.

19 Q.     And what did you observe?

20 A.     I observed Mr. Conley exiting Building 3016 and entering

21 his vehicle.

22 Q.     So were you present for execution of a search warrant at

23 Apartment C at 3016 Oak Green Court in Ellicott City on April

24 21st, 2016?

25 A.     I was.

Roehman - Direct

1   Q.    For what time period before the execution of the search

2   warrant were you doing surveillance?

3   A.    I was performing surveillance several weeks before the

4   actual execution of the warrant itself.

5   Q.    Now, on the day of the execution of the warrant, April

6   21st, 2016, did you enter the residence?

7   A.    I did.

8   Q.    When you entered the residence, what was happening at the

9   time?

10  A.    I had entered the residence shortly after the tactical

11  team had secured the residence.  As I walked through the door,

12  I observed Mr. Conley secured in handcuffs in the seat to the

13  right of the kitchenette and processed -- began the entry

14  photographs by the photographer was occurring.

15  Q.    Was evidence being physically collected at that point?

16  A.    It was not.  Evidence usually isn't collected until

17  everything is photographed in place to give a picture of what

18  the residence looks like prior to conducting the search.

19  Q.    Who other than law enforcement was in the apartment when

20  you entered?

21  A.    The only other individual who was not law enforcement in

22  the apartment at the time that I entered was Mr. Conley.

23  Q.    Do you see Mr. Conley here in the courtroom today?

24  A.    I do.

25  Q.    And can you identify him by where he is located and what

1    he's wearing?

2    A.    I do.  He is sitting to my right wearing a orange

3    jumpsuit.

4    Q.    During the day on April 21st, 2016, did you walk

5    throughout the residence?

6    A.    I did.

7    Q.    What rooms did you have a chance to observe?

8    A.    I had the opportunity to observe all the rooms in the

9    apartment, which included the living room space, the

10   kitchenette, and the single bedroom in the apartment itself.

11   Q.    Did you see any items of evidentiary interest in the

12   kitchen?

13   A.    I did.

14   Q.    And what did you see there?

15   A.    I saw multiple items that appeared consistent with

16   illegal narcotics.  I saw scales.  I saw -- and I saw a

17   handgun.

18   Q.    Okay.  Anything else that you saw in there that you can

19   remember?

20   A.    There were also several cellular telephones.

21   Q.    Okay.  I am going to show you what's been marked as

22   Government Exhibit P44.

23         Do you recognize what's depicted in this picture?

24   A.    I do.

25   Q.    And where was this taken?

1   A.     This was taken physically inside the kitchenette area

2   facing what would have been generally towards the front door to

3   enter the apartment.

4   Q.     Okay.  And can you see any items of evidentiary interest

5   in this photograph, P44?

6   A.     I do.

7   Q.     Could you please describe them?

8   A.     Starting from the left of the picture, particularly here

9   (indicating), there is a box of baking soda.  That's an item

10  that's commonly used in converting cocaine in powder format

11  into crack cocaine.  At the bottom of the picture are two

12  scales with white powdery residue on them.  Following over to

13  the right of the picture are two bags, one with a more white

14  powdery substance, another with an off-white hard substance,

15  both which were consistent with the appearance of powder

16  cocaine and crack cocaine.

17         And, finally, in this picture located over here, the

18  Pyrex container with the white hard residue is an item that's

19  commonly used to convert powder cocaine to crack cocaine.

20  Q.     Thank you.

21         I am showing you what's been marked as Government's P12.

22         Do you recognize this picture, what's in this picture?

23  A.     I do.

24  Q.     Where was this taken?

25  A.     This was also taken within the confines of the

Rothman - Direct

1   kitchenette, although this time, it's facing the opposite

2   direction away from the front door.

3   Q.    And is this how -- how the scene looked when you entered

4   the residence?

5   A.    It was.

6   Q.    Are there any items of evidentiary interest in this

7   photograph, P12?

8   A.    There are.

9   Q.    Could you please identify them?

10  A.    Microwave oven, which is also commonly used in addition

11  to cooking, of course, with the conversion of powder cocaine to

12  crack cocaine, and also on the right side of the picture right

13  here (indicating) is a black handgun.

14  Q.    Can you tell what's -- what, if anything, is in the --

15  the drawer at the lower end of the picture?

16  A.    I do.  I know from my experience what was in the drawer

17  because we did, in fact, search the drawer because I believe it

18  becomes more apparent in the follow-on picture next.

19  Q.    I will show you what's been marked as Government's P46.

20        Do you recognize this, sir?

21  A.    I do.  This is, in fact, a close-up picture of the open

22  drawer that was in the prior picture.

23  Q.    Are there any items of evidentiary interest in this --

24  depicted in P46?

25  A.    There are.

1    Q.    Could you identify those, please?

2    A.    I do.  Starting at the top of the picture, once again, we

3    see two scales which were in addition to the other scales

4    previously mentioned.  There is a bag of white powder

5    consistent with cocaine, another smaller bag of white powder,

6    also consistent in appearance with cocaine, a third bag of hard

7    rock-like substances, which is consistent with crack cocaine,

8    and then, finally, at the bottom of the picture is a clear bag

9    with a leafy green substance.

10   Q.    In the top left-hand corner of the drawer, do you make

11   anything out there?

12   A.    It was.  That was another item that appeared hard,

13   off-white, and consistent in appearance with crack cocaine.

14   Q.    Did you have a chance to look in the bedroom while you

15   were in the apartment?

16   A.    I did.

17   Q.    Did you observe any items of evidentiary interest there?

18   A.    I did.

19   Q.    And what did you observe?

20   A.    Upon entering the apartment at the time I initially

21   walked in, the closet was on the right side of the room, there

22   were two rifles leaning up against the closet, as well as a

23   drawer pulled out in the closet and a Mac-10 style pistol.

24   Q.    I am going to show you what's been marked as Government

25   Exhibit P39.

1      THE DEPUTY CLERK:  I'm sorry.  Would you say that

2  again?

3      MR. BALDWIN:  Government Exhibit P39.

4      THE DEPUTY CLERK:  Thank you.

5  BY MR. BALDWIN:

6  Q.   Do you recognize what's depicted in Government's P39,

7  sir?

8  A.   I do.

9  Q.   And what is shown there?

10 A.   As I mentioned before, right here on the left of the

11 picture is a AR style assault rifle.  On the right side of the

12 picture here is a, what's known as an SKS style assault rifle.

13 Closest to this is a magazine for the AR style assault rifle

14 loaded with ammunition.  And next to that is a magazine for the

15 SKS style assault rifle, which, at that time, was also loaded.

16 Q.   And you observed that second magazine to the right in

17 this picture was also loaded that day?

18 A.   That is correct.

19 Q.   I am going to show you what's been previously marked as

20 Government's P47.

21      Do you recognize what's in this picture, sir?

22 A.   I do.

23 Q.   And what is that?

24 A.   This is a close-up picture of one of the drawers that was

25 open in the closet at the time.  The bottom of the picture,

Rothman - Direct

1    right here (indicating) is a Mac-10 style pistol.  Both of

2    these items up above that pistol are magazines which had

3    ammunition in them that were capable of being used by that

4    pistol.

5    Q.    How many people appeared -- did you have a chance to look

6    around the bedroom and the closets?

7    A.    I did.

8    Q.    And did you make any observations of what was in the

9    closets?

10   A.    I did.

11   Q.    Based on what you saw there, did you come to any

12   conclusion about how many people appeared to be living in the

13   apartment?

14           MR. BURNHAM:  Objection.

15           THE COURT:  I will permit it.

16   BY MR. BALDWIN:

17   Q.    You may answer, sir.

18   A.    By the amount of clothes in that apartment appeared

19   consistent with a single person occupying it, and the clothes

20   that I observed appeared consistent with a male to be wearing

21   those clothes.

22   Q.    Did you seize any evidence during the search warrant or

23   that night?

24   A.    Yes.

25   Q.    I am going to -- and what area did you seize -- where did

1  that evidence come from in the -- in the apartment?

2  A.    The evidence that I personally seized came from the

3  kitchen.

4  Q.    Okay.  And what type of evidence was it?

5  A.    Three cellular telephones.

6  Q.    I am going to show you what's been marked as Government's

7  P13.

8        Do you recognize this picture, sir?

9  A.    I do.

10  Q.    Do you see any of the items that you seized depicted in

11  P13?

12  A.    I do.  Circled here is one of those three cellular

13  telephones.

14  Q.    Now I am showing you Government's P16.

15        I am now showing you what's been marked as Government's

16  P16.

17        Do you recognize any of the items you seized in this

18  picture?

19  A.    I do.  There are two additional cellular telephones, one

20  here (indicating), and then a flip phone laying adjacent to it

21  right here (indicating).

22  Q.    Thank you.

23        I am going to ask you to step down briefly and look at

24  some of the evidence that's here on the table.

25        (Witness exits the witness stand.)

1    BY MR. BALDWIN:

2    Q.    Special Agent Rothman, do you see there before you on the

3    table on the left-hand side corner Exhibits SW6, SW7, and SW8?

4    A.    I do.

5    Q.    Do you recognize those exhibits?

6    A.    I do.

7    Q.    What are they?

8    A.    They are three cellular telephones consistent with the

9    appearance that I seized from that apartment, and they also

10   bear my signature and evidence tape in addition.

11   Q.    Would you mind just one by one -- or, actually, take two

12   at a time and hold them up for the jury here and then walk over

13   to the jury on this side so they can see the phones.

14   A.    (Witness complies.)

15            THE DEPUTY CLERK:  Actually, if you would move closer

16   to the Plexiglas, please.

17            MR. BALDWIN:  Just walk around, sir.

18            THE DEPUTY CLERK:  And then please walk around.

19            MR. BALDWIN:  Thank you.

20   BY MR. BALDWIN:

21   Q.    And which exhibits were those you just held up for the

22   jury, sir?

23   A.    These exhibits were SW7, SW6, and this particular exhibit

24   will be SW8.

25   Q.    Thank you.

1          MR. BALDWIN:  And just for the record, the agent is

2   displaying them to the jury.

3   BY MR. BALDWIN:

4   Q.    Thank you, sir.

5          I would ask you to stay up here, and there is several

6   other exhibits there in front of you.  If you could look at

7   Government's Exhibits D6, D7, D8, D9, D10, D11, and D12.

8   A.    Yes.

9   Q.    Do you see those there on the table, sir?

10  A.    I do.

11  Q.    Do you recognize those exhibits?

12  A.    I do.

13  Q.    What are they?

14  A.    Those exhibits are packaging the narcotics were contained

15  in at the time of the seizure.

16  Q.    And how did the packaging become separated from the --

17  from the substances that were in them?

18  A.    When narcotics were seized at the time of the search

19  warrant, they were placed into evidence envelopes.  Those

20  evidence envelopes were then transported over to my evidence

21  control unit where they were checked in.  They were then sent

22  over to the DEA Laboratory for testing.  Once they are taken to

23  the DEA Laboratory, the DEA Laboratory separates the original

24  packaging from the narcotics themselves in order to determine

25  if there are fingerprints or any other evidence of value on

Rothman - Direct

```
 1    there.  The narcotics are then tested and the packaging is sent

 2    separately back to the FBI.

 3    Q.    And when the packaging is sent back, is that when a new

 4    exhibit is created of that packaging?

 5    A.    Correct.  It's called a split exhibit.

 6    Q.    Would you gather those exhibits for me?  I think I will

 7    just show them on the ELMO here rather than have you walk

 8    around with them.

 9          I am showing on the monitor -- excuse me.  For the

10    record, I am showing on the monitor what's been marked as --

11              THE DEPUTY CLERK:  I'm sorry.  Would you get close to

12    that microphone?

13    BY MR. BALDWIN:

14    Q.    Agent, would you return to the witness box and we can

15    just maybe ask you some questions about this because you can

16    see the monitor as well.  Thank you, sir.

17          So now I am looking at Government's Exhibit D6, and

18    this -- I am going to flip it over.  And is the packaging --

19    could you indicate where the packaging is?  Could you just

20    point out where the packaging is in this exhibit?

21    A.    It's located there.

22    Q.    Thank you.

23          Now, for the record, I am showing you what's been marked

24    as -- and I'm clearing it -- what's been marked as Government's

25    Exhibit No. D10, and I am going to flip it over so you can see
```

1    it better.

2        Could you just indicate the packaging that's -- that you

3    are referring to?

4    A.    Sure.  (Indicating.)  I have just circled it.

5    Q.    Again, this is Government's Exhibit D11.  And I am going

6    to flip it over again.  And could you indicate the packaging in

7    this exhibit?

8    A.    (Indicating.)

9    Q.    Thank you.

10       Now I am showing you what's been marked as Government's

11   Exhibit D7.  And flipping it over --

12           THE DEPUTY CLERK:  Mr. Baldwin, please move that

13   microphone.

14   BY MR. BALDWIN:

15   Q.    Showing you what's been marked as Government's Exhibit

16   D7.

17       And if you could please indicate on your monitor where

18   the packaging is in this exhibit?

19   A.    Of course.  (Indicating.)

20   Q.    I am showing you what's been marked as Government Exhibit

21   D12.  I am flipping it over so you can see the back.  Could you

22   indicate -- this is out of focus.  Here we go.  Could you

23   indicate the packaging in this exhibit?

24   A.    Of course.  (Indicating.)

25   Q.    Thank you.

```
 1          I am showing you what's been marked as Government's D8.
 2   I am going to flip it over again.
 3          And could you indicate where the packaging is in this
 4   picture?
 5   A.   (Indicating.)
 6   Q.   Finally, I am putting on the ELMO Government's Exhibit
 7   No. D9.  And I am flipping it over.  And could you please
 8   indicate where the packaging is in this exhibit?
 9   A.   (Indicating.)
10          THE COURT:  Let the record reflect that the ELMO is
11   showing circling yellow when the indication is made.
12          MR. BALDWIN:  Yes, Your Honor.
13          THE COURT:  The record needs to reflect that.
14          MR. BALDWIN:  Yes.
15   BY MR. BALDWIN:
16   Q.   And Agent Rothman, for each of these exhibits, when I
17   flipped them over, did you circle the evidence within the
18   envelope to indicate to the jury where the packaging was?
19   A.   I did.
20   Q.   And are you familiar with this type of packaging?
21   A.   I am.
22   Q.   Have you seen this in narcotics investigations before?
23   A.   Often.
24   Q.   What is -- what is the packaging made of?
25   A.   The packaging can be made of any number of things.
```

Rothman - Direct

```
1   Often, it's just clear plastic, Saran Wrap that can be bought
2   at a grocery store or other place, pouring a sheet off, twist
3   it, or tie it over the top.
4   Q.    Thank you.  I have a few more exhibits for you.
5         If you could step down again -- actually, one moment.  I
6   think this will speed things up.  One moment.
7             MR. BALDWIN:  May I approach the witness, Your Honor?
8   Thank you.
9   BY MR. BALDWIN:
10  Q.    Now, Special Agent Rothman, I just handed you some
11  exhibits.
12        Did you have an opportunity to review Exhibits DNA 13
13  through 19 before your testimony today?
14  A.    I did.
15  Q.    Are those the exhibits with you in the witness box?
16  A.    Those are.
17  Q.    Do you recognize those exhibits?
18  A.    I do.
19  Q.    How do you recognize them?
20  A.    These particular exhibits are envelopes in which DNA
21  swabs were stored that were taken from the firearms that you
22  observed in the pictures and provided through myself to Prince
23  George's County Police Department.
24  Q.    When you received those envelopes, were they sealed?
25  A.    They were.
```

Rothman - Direct

1    Q.    What did you do with them?

2    A.    After receiving them, I entered them into our own chain

3    of custody and checked them into our evidence control unit and

4    directed our evidence control unit to send them down to the

5    laboratory at Quantico to send to the FBI laboratory for

6    further testing.

7    Q.    Thank you.  I am going to take back those exhibits from

8    you.

9          Sir, for the benefit of the jury, I am showing you what's

10   been marked as DNA 13.

11         This is one of the exhibits you just looked at.  Correct?

12   A.    Correct.

13   Q.    And now showing you Exhibit DNA 14.

14         This is the one -- one of the ones you just looked at.

15   Correct?

16   A.    That is correct.

17   Q.    And now showing you DNA 15.

18         This is one of the ones you just looked at and just

19   referred to.  Correct?

20   A.    That is correct.

21   Q.    Showing you DNA 16.

22         This is one of the exhibits you just looked at and

23   referred to.  Correct?

24   A.    That is correct.

25   Q.    Showing you DNA 17.

1    Q.   This is one of the exhibits you just looked at.  Correct?

2    A.   That is correct.

3    Q.   And showing you DNA 18.

4         This is another exhibit you just looked at.  Correct?

5    A.   Correct.

6    Q.   And showing you Exhibit DNA 19.

7         This is another exhibit you looked at.  Correct?

8    A.   That is correct.

9    Q.   And each of these exhibits I just showed you, they have

10   an evidence label that came from, looks like Prince George's

11   County.  Correct?

12   A.   That is correct.

13   Q.   And it has recovery location written on the envelope?

14   A.   Correct.

15   Q.   With respect to these, are you familiar with this sticker

16   that says, "Packaging only"?

17   A.   Correct.

18   Q.   What does that mean in the context of a DNA envelope?

19   A.   When DNA is recovered by a swab and sent down to the FBI

20   laboratory, the swab itself is usually consumed in the process

21   of testing the DNA so the actual swab itself is not returned

22   because it's being consumed or taken up and gotten rid of as a

23   result of the testing process.

24        The laboratory still returns the original packaging in

25   which it was sent in, so what that sticker in particular is

Rothman - Direct

1    saying is that the swabs containing the DNA are no longer in

2    that package because they were tested and consumed, but the

3    original package is still there with the evidence tape and the

4    other items so everyone knows how it was originally presented

5    and stored.

6    Q.    Okay.  So there were -- there may be sticks in here but

7    not the swabs that contain the actual sample.  Correct?

8    A.    Correct.

9    Q.    Now, you also have with you there another exhibit.

10         Could you read the exhibit number off of that?

11   A.    DNA 20.

12   Q.    Okay.  Did you execute a search warrant to get a sample

13   of DNA from Tiba Conley?

14   A.    I did.

15   Q.    What -- what procedure did you use to take the sample?

16   A.    I brought with me a FBI DNA collection kit.  I opened

17   that kit and placed latex gloves on.  I then took a collection

18   sponge, opened that up.  The buccal DNA was collected from the

19   inside of the cheek and the gum line.  After collecting that

20   collection, I closed the applicator again, put it back in an

21   envelope, put it in a evidence bag, which is this evidence bag,

22   and then entered that into the FBI evidence system.

23   Q.    So you are referring to Exhibit DNA 20 as that evidence

24   envelope?

25   A.    That is correct.

1  Q.    And I am going to come get that from you and publish it.
2        For the record, I am showing on the ELMO exhibit marked
3  DNA 20.
4        Is this the exhibit you were just testifying about,
5  Special Agent Rothman?
6  A.    It is.
7  Q.    Okay.  And there is some data written on the top of the
8  envelope.
9        Does that show the date and time that it was collected,
10 the sample?
11 A.    Correct.
12 Q.    And who you collected it from?
13 A.    It does.
14 Q.    Special Agent Rothman, as part of this investigation,
15 were copies of a lease application and lease obtained for
16 Apartment C at 3016 Oak Green Court in Ellicott City?
17 A.    There were.
18 Q.    And did you review those documents?
19 A.    I did.
20 Q.    I am showing you what's been marked as Government Exhibit
21 L1, and I will show you some of it.
22       Can you just read the title of the exhibit, sir?
23 A.    "Rental application for residents and occupants."
24 Q.    And can you tell us -- can you read the name in the
25 "about you" section of the application?  Can you read the name

1    of the individual?

2    A.    Tiba Conley.

3    Q.    And also in this section, is there a -- a spot for a

4    Social Security Number?

5    A.    There is.

6    Q.    And what are the last four digits of the Social Security

7    Number?

8    A.    4120.

9    Q.    And also on the second line under Tiba Conley, is there

10   an address there?

11   A.    There is.

12   Q.    Could you indicate that by circling it on the screen?

13   A.    (Witness complies.)  I circled the address.

14   Q.    And under your street address, could you just read what

15   that street address says?

16   A.    5739 5th Street, Northeast, NE, Wash, D.C.  20011.

17   Q.    I am going to show you --

18            THE COURT:  How much more do you have on direct,

19   Mr. Baldwin?

20            MR. BALDWIN:  These and some recordings, Your Honor.

21   We ought to be able to get it done before 1:00.

22            THE COURT:  The next five minutes?

23            MR. BALDWIN:  It's probably going to take another 20

24   minutes, Your Honor.

25            THE COURT:  The jurors' lunch is here.  We could

Rothman - Direct

```
 1   recess now for an appropriate time; otherwise, the lunch gets
 2   cold.
 3           MR. BALDWIN:  That's okay, Your Honor.  We can recess
 4   now.
 5           THE COURT:  Are we working with 45 minutes; is that
 6   appropriate, Theresa?
 7           THE DEPUTY CLERK:  I'm sorry?
 8           THE COURT:  45 minutes for the duration?  Well, it's
 9   25 of one now, so it would be 20 after one that you'd come
10   back, folks.  So we will take a slightly earlier lunch so that
11   it doesn't get cold, and then we will pick up with that
12   witness.
13        Do you want to step down first, Agent, and go back to
14   your waiting area?  And then the rest of you, if you will leave
15   your materials on your -- actually, on your -- you want to
16   leave them here.  Leave them in this room.  Go back with
17   Theresa and she will set you up as far as lunch is concerned.
18   All right.
19        Anything else, then?  Ready to go?  If you will follow
20   Theresa, then, into the next room.
21           (The jury panel exit the courtroom at 12:36 p.m.)
22           THE COURT:  All right, folks.  Just to get some idea
23   of where we are, you have got about, you say, another 20
24   minutes or so with this witness.  What approximate cross,
25   Mr. Burnham?
```

Rothman - Direct

```
1            MR. BURNHAM:  Oh, so far, I don't think there is a
2     lot.  Maybe five to ten minutes.
3            THE COURT:  Okay.  Next witness then?
4            MR. BALDWIN:  Your Honor, if we get the stipulation
5     signed, I believe, as we discussed, then that will knock out
6     the next couple witnesses we were doing, so the next one would
7     be the DNA expert.
8            THE COURT:  Who is that?
9            MR. BALDWIN:  Brandon McCollum, Your Honor.
10           THE COURT:  You put about 60 minutes down for him?
11           MR. BALDWIN:  Yes, Your Honor.  I think that's about
12    it.
13           THE COURT:  About 15, I think, from you, Mr. Burnham,
14    something of that order?
15           MR. BURNHAM:  Yes.
16           THE COURT:  Okay.  Any other witnesses beyond him?
17           MR. BALDWIN:  Beyond him, there is Tiffany
18    Van De Mark from DEA.
19           THE COURT:  You have about 30 minutes?
20           MR. BALDWIN:  And then after that, Your Honor, would
21    be, I believe, Fernando Jaramillo.  I need to look at my list
22    to make sure we hit everybody there.
23           THE COURT:  I think you initially indicated Sean
24    Watson yesterday.
25           MR. BALDWIN:  Yes, Your Honor.  I think if we sign
```

Rothman - Direct

1   the stipulation, he was going to testify as to there not having

2   been a pardon in one of those certifications, but if the

3   stipulation is signed, then we are not going to need

4   Mr. Watson.

5          THE COURT:  Why don't you get the stipulation --

6   Mr. Burnham, would you sign the stipulation, please, and get

7   that to him?

8          MR. BURNHAM:  Will do.  I have to print out a copy,

9   but I can do that downstairs.

10         THE COURT:  And then Sean Watson is your last

11  witness?

12         MR. BALDWIN:  Say it again.

13         THE COURT:  Sean Watson would not be a witness then?

14         MR. BALDWIN:  He would not be a witness.

15         THE COURT:  That would be the end of the government's

16  case?

17         MR. BALDWIN:  Yes, Your Honor.  I believe so.

18         THE COURT:  Okay.  Very good.  We will still push

19  hard to finish up today, so let's be back at 20 after.

20      Do you need any further setup for this witness?

21         MR. BALDWIN:  Yes.  There are some -- we are going to

22  play recordings, Your Honor, so I need to make sure that the

23  recording sound thing is appropriate.

24         THE COURT:  Well, specifically on the evidence table,

25  you need to put anything out for that?

 1              MR. BALDWIN:  No, Your Honor.

 2              THE COURT:  We will see you, then, at 20 after.

 3         (Recess taken from 12:39 p.m. until 1:31 p.m.)

 4              THE COURT:  Have a seat, folks.

 5         All right.  Ready to pick up?  Are you ready to pick up,

 6  Mr. Baldwin?

 7              MR. BALDWIN:  Yes, Your Honor.  Just pulling the

 8  exhibit up now.

 9              THE COURT:  Do you want to call your witness back in,

10  Mr. Rothman?

11              MR. BALDWIN:  We need the jury still, Your Honor.

12              THE COURT:  I keep forgetting that.  Of course.

13              THE DEPUTY CLERK:  He can take the stand while I am

14  bringing the jury in.

15              THE COURT:  They are sort of coming through the same

16  door.  Is he first up?

17              THE DEPUTY CLERK:  Yes.

18              THE COURT:  Have him come in.

19              MR. BALDWIN:  Your Honor, I just want to note for the

20  record that we have a signed stipulation that I would like to

21  read after Agent Rothman gets off the stand.

22              THE COURT:  All right.  Are you satisfied that that

23  covers all the issues about the element of prior --

24              MR. BALDWIN:  Yes, Your Honor.  It covers the -- the

25  term exceeding one year, that he knew that he had been

Rothman - Direct

```
 1   convicted of a crime exceeding one year, and that his civil
 2   rights had not been restored.  Those three things.
 3            THE COURT:  All right.  Is it signed by Mr. Burnham
 4   or by the defendant or both?
 5            MR. BURNHAM:  By Mr. Burnham and myself, Your Honor.
 6   Would you like me to pass it up?
 7            THE COURT:  No, that's all right.
 8        Mr. Burnham, you are satisfied that that adequately
 9   represents what we spoke about?
10            MR. BURNHAM:  Yes, Your Honor.
11            THE COURT:  All right.  All right, sir.  Take the
12   stand if you would.
13            THE WITNESS:  Yes, Your Honor.
14            THE COURT:  All right.  Bring the other folks in.
15        (Witness retakes the witness stand.)
16        (The jury panel enter the courtroom at 1:33 p.m.)
17            THE COURT:  All right, folks.
18        Mr. Baldwin.
19            MR. BALDWIN:  Thank you, Your Honor.
20   BY MR. BALDWIN:
21   Q.   Special Agent Rothman, if I recall, we were looking at
22   Exhibit L1, at the top of the second page of that exhibit.
23        If I could direct your attention to this portion at the
24   top of page 2 of Exhibit L1, did you -- in the first -- on the
25   left side of the page, there is a set of bullet points.  Could
```

Rothman - Direct

1   you read the first bullet point?

2   A.    Names of all residents who will sign lease contract.

3   Q.    Is there something written there under that language?

4   A.    There is.

5   Q.    And what does it read?

6   A.    The name Tiba Conley.

7   Q.    Are there any other names on the contract?

8   A.    There are not.

9   Q.    I have scrolled down to the bottom of page 2 of Exhibit

10  L1.

11        Do you see something written next to "Applicant's

12  Signature"?

13  A.    I do.

14  Q.    Can you make out the name?

15  A.    I can.

16  Q.    What is it?

17  A.    Once again, Tiba Conley.

18  Q.    And what's the date of that signature?

19  A.    February 19th, 2016.

20  Q.    Now I am directing your attention to the bottom of page 3

21  of the exhibit.

22        Do you see where it says, "Applicant's printed name"?

23  A.    I do.

24  Q.    And also a signature?

25  A.    There is.

```
 1   Q.     Can you make out the -- the printed name?

 2   A.     Once again, Tiba Conley.

 3   Q.     And the signature?

 4   A.     The same, Tiba Conley.

 5   Q.     Okay.  And what's the date there?

 6   A.     February 19th, 2016.

 7   Q.     Just for the record, what is the -- what is this portion

 8   of the document titled?

 9   A.     This portion is titled, "Statement of rental policy."

10   Q.     Thank you.

11          I am showing you Government Exhibit L2.

12               THE COURT:  A little closer to the mike if you would,

13   please.

14               MR. BALDWIN:  Yes, Your Honor.

15   BY MR. BALDWIN:

16   Q.     I am showing you what's been marked as Government Exhibit

17   L2.

18          Have you reviewed this document?

19   A.     I have.

20   Q.     What's it entitled?

21   A.     "Apartment lease contract."

22   Q.     And what is the date of the lease contract as shown here?

23   A.     February 20th, 2016.

24   Q.     And in the block that's labeled number one, the

25   "parties," can you read the name of the party?
```

1  A.    I can.  Tiba Conley.

2  Q.    And who is the other party to this contract?

3  A.    The other party to the contract are the apartment

4  themselves, UDR, Inc., doing business as Ellicott Grove

5  Apartments.

6  Q.    Now, immediately under that, do you see an apartment

7  number specified?

8  A.    Correct.

9  Q.    And what is the apartment number?

10  A.    The full number is the full number of the Building

11  3016TC, and then -- but the second section is more legible

12  where it describes the exact apartment building, 3016 dash the

13  apartment, Apartment C, Oak Green Court.

14  Q.    And it's also in Ellicott City?

15  A.    That is.

16  Q.    And I am asking you to look at paragraph 3.

17        And what is the lease term that this contract is being

18  entered into for?

19  A.    The beginning term of the lease began on February 20th,

20  2016 and terminated on midnight, April 16th, 2017.

21  Q.    I also ask you to look at the paragraph 6 that's to the

22  right, "rent and charges," do you see that?

23  A.    I do.

24  Q.    Do you see an amount of rent there per month?

25  A.    I do.

1   Q.    And what is the amount?

2   A.    $1,236.

3   Q.    I am going to go to the last page of this document, and

4   it appears to be the sixth page of the document.

5         I am going to ask you if you can identify the signature

6   at the bottom, at the foot of that sixth page?

7   A.    I can.

8   Q.    Do you see a signature on the left-hand side?

9   A.    I do.

10  Q.    And it says, "Docusigned."  Do you see that?

11  A.    It does.

12  Q.    What is the signature?

13  A.    Tiba Conley.

14  Q.    Agent Rothman, are you familiar with the voice of Tiba

15  Conley?

16  A.    I am.

17  Q.    How are you familiar with his voice?

18  A.    Familiar in two manners:  First, for him speaking when I

19  entered the apartment on the night of the search warrant, and I

20  have also listened to the recordings where he identifies

21  himself in his voice.

22  Q.    And you have listened to recordings Tiba Conley

23  participating -- participated in with others?

24  A.    I have.

25  Q.    Does the substance of some of the conversations provide

1    information that confirms Conley as a participant?

2    A.    It does.

3    Q.    And have you listened to a recording No. 63087122 made on

4    April 25th, 2016?

5    A.    I have.

6    Q.    And have you listened to a recording No. 631255655 made

7    on May 8th, 2016?

8    A.    I have.

9    Q.    Are clips taken from both those recordings contained on a

10   disk marked "Miscellaneous 8"?

11   A.    They are.

12          THE COURT:  Are you going to play those now?

13          MR. BALDWIN:  Yes, Your Honor.  I am going to play

14   them in just a moment.

15   BY MR. BALDWIN:

16   Q.    Agent Rothman, I am showing on the ELMO here a

17   Miscellaneous 8.

18          Do you recognize this?  Oh, sorry.

19          Do you recognize this disk, Miscellaneous 8?

20   A.    I do.

21   Q.    And, in fact, we looked at this disk this morning to

22   ensure the -- the correct recordings were on there.  Is that

23   correct?

24   A.    That's correct.

25   Q.    And we noticed that the disk was mislabeled with R1, R2,

Rothman - Direct

1  and that was scratched out and you initialled it.  Correct?

2  A.    I did.

3  Q.    And the actual recordings on here are R11, R12, R21, R22,

4  and R23.  Correct?

5  A.    Those are.

6  Q.    Okay.  In particular, are clips R11 and R12 from

7  recording 63087122?

8  A.    They are.

9  Q.    And are clips R21, R22, and R23 portions from the

10  recording numbered 631255655?

11  A.    They are.

12  Q.    Are the -- the clips -- have you listened to the clips to

13  ensure that they are accurate portions of the larger

14  recordings?

15  A.    I have.

16  Q.    And are they accurate?

17  A.    They are.

18        MR. BALDWIN:  I am now going to play clip R11, an

19  approximately eight-second clip from the larger recording, Your

20  Honor.

21        THE COURT:  Well, before you do that, it would be

22  helpful for the witness to describe what, particularly if the

23  defendant is in conversation with somebody, the context of what

24  you are playing.  Then you can play it and it can be heard, but

25  just to put on voices back and forth, I am not sure that's

1  going to be clear.

2          MR. BALDWIN:  Yes, Your Honor.  I can -- I can

3  provide a little bit of foundation for each one.

4          THE COURT:  Well, you say you have or you will?

5          MR. BALDWIN:  I will.  And then I am going to ask him

6  questions about it afterwards.  I am going to ask him, for each

7  one, if he has listened to it and confirmed that Tiba Conley's

8  voice is on this, and then after it plays, I am going to ask

9  him --

10         THE COURT:  You may have to play it a second time.  I

11  think the jury needs to know what you are asking about.  Go

12  ahead, do it your way as long as there is some context.

13         MR. BALDWIN:  Thank you, Your Honor.

14  BY MR. BALDWIN:

15  Q.   Now, Special Agent Rothman, I am going play clip R11.

16  It's approximately an eight-second clip.

17         Before I do so, you have listened to this clip, R11?

18  A.   I have.

19  Q.   And does -- is there a male voice on the clip?

20  A.   There is.

21  Q.   Did you recognize the voice as being Tiba Conley's voice?

22  A.   I did.

23         MR. BALDWIN:  I am now going play R11, Your Honor.

24         THE COURT:  You are or are not?

25         MR. BALDWIN:  I am.

Rothman - Direct

```
1        I apologize, Your Honor.  I think it's getting blocked by

2   another program.  Your Honor, this is clip R11.

3        (Audiotape was played to the jury.)

4   BY MR. BALDWIN:

5   Q.    Were you able to hear the clip from recording R11?

6   A.    I was.

7   Q.    And what was stated on that clip?

8   A.    This was an outgoing call where a recorded voice

9   requested the speaker to state their name, and the name stated

10  was Tiba Conley.

11  Q.    I am going to play you clip R12, which is another --

12  another portion of the same larger recording.  It's

13  approximately a 21-second clip from the larger recording.

14        In this recording, did you hear a male voice when you

15  listened to it?

16  A.    I did.

17  Q.    And did you recognize the male voice?

18  A.    A male voice was consistent with Mr. Tiba Conley's voice.

19  Q.    I am now going to play clip R12.

20        (Audiotape was played to the jury.)

21  BY MR. BALDWIN:

22  Q.    Agent Rothman --

23            THE COURT:  Stop.  Did the jury understand any of

24  that?  Raise your hand if you did not.  Well, there you are.  I

25  couldn't make it out either.  I don't know what you want to do.
```

Rothman - Direct

```
1        Do you want to have the witness repeat what actually was
2   said because it was very unintelligible?
3            MR. BALDWIN:  Your Honor, I could try to hook a
4   speaker up and drop the mike down to the speaker.
5            THE COURT:  It might help some.  And I couldn't
6   follow it, and, obviously, none of the jurors could either.
7            MR. BALDWIN:  Yes, Your Honor.  I'd prefer to attempt
8   that, Your Honor.
9            THE COURT:  You can attempt that.  Go as you will,
10  but you need to repeat it.  It's confusing at this point.
11       Which tape is this now?
12           MR. BALDWIN:  I am going to play it again -- I am
13  going to play again clip R12, Your Honor.
14           THE COURT:  All right.
15       (Audiotape was played to the jury.)
16  BY MR. BALDWIN:
17  Q.   Agent Rothman, do you recall listening to this recording?
18  A.   I do.
19  Q.   And how many participants appear to be involved in the
20  conversation?
21  A.   Two.
22  Q.   And what type of voices are on the recording?
23  A.   One female voice and one male voice.
24           THE COURT:  Let me ask again whether the jury
25  understood that?  Were you able to make that out?  If you were
```

1   not, please raise your hand.  All -- you still were not able to

2   understand it.

3          MR. BALDWIN:  Your Honor --

4          THE COURT:  Is there a transcript of that, for

5   example?  Do you want to help him out?

6          I.T. TECHNICIAN:  Yes.

7          THE COURT:  All right.  Go ahead.  Try it again.

8          MR. BALDWIN:  Thank you, Your Honor.

9      Playing again R12.

10     (Audiotape was played to the jury.)

11         MR. BALDWIN:  I think, Your Honor, I submit that we

12  are -- we are providing this recording to go to the male voice

13  and not the female voice.  I understand that that is muffled,

14  but we are just addressing what the male voice says.

15         THE COURT:  Well, perhaps the witness can tell us

16  what he -- will the disk go back to the jury and can they hear

17  it?

18         MR. BALDWIN:  Your Honor, I believe -- well, we could

19  send the disk back, Your Honor.  If they got a computer and

20  earphones, they could piece it out.

21         THE COURT:  That would be the way to do it and make

22  their own determination about what's said, but it may

23  facilitate presentation if the witness can characterize what's

24  being said so we can move along with the case and not having to

25  keep trying to understand what's being said.

Rothman - Direct

```
 1                MR. BALDWIN:  Yes, Your Honor.
 2   BY MR. BALDWIN:
 3   Q.    Agent Rothman, do you recall the nature of the
 4   conversation?
 5   A.    I do.
 6   Q.    And what -- did Mr. Conley make any references to the
 7   events that occurred in his apartment?
 8   A.    He was (sic).
 9   Q.    And what were those references?
10   A.    He was saying they, referring to the police, came in and
11   took all his money and they were posing with his guns.
12   Q.    All right.
13                THE COURT:  Let me say, ladies and gentlemen, you
14   will have the disk back there.  That's the main evidence in the
15   case.  That's what you need to listen to.  If there is any
16   difference between what the witness says and what the disk
17   says, it's the disk that controls.
18                All right.  Move along.
19                MR. BALDWIN:  Thank you, Your Honor.
20   BY MR. BALDWIN:
21   Q.    Now, did you also review clip R21, which is a portion of
22   the recording R2 which is from the call that has the long
23   number at the end of it, 5565?
24   A.    I did.
25   Q.    And R2 is for identification.
```

1          R21 is the clip we are going to be -- we are going to be

2    listening to.

3          (Audiotape was played to the jury.)

4    BY MR. BALDWIN:

5    Q.    Agent Rothman, did you hear that?

6    A.    I did.

7    Q.    And do you recognize the voice?

8    A.    I do.

9    Q.    Whose voice is that?

10   A.    The voice was consistent with Mr. Tiba Conley.

11   Q.    And did you understand what he was referring to?

12   A.    I did.

13   Q.    And what was he referring to?

14   A.    He was saying there was a car in his parking lot that had

15   been there for three weeks, referring to surveillance on him.

16   Q.    Had there been surveillance in his -- in his apartment

17   building prior to the search warrant being executed?

18   A.    There was.

19   Q.    I am going to play clip R22.  R22, again, is a portion in

20   the call with the longer last four digits 5655.

21         R22, have you listened to this call, Mr. Rothman?

22   A.    I have.

23   Q.    And I am going to play it for you now.

24         (Audiotape was played to the jury.)

25   BY MR. BALDWIN:

1   Q.    Mr. Rothman, did you hear the voice on that recording?

2   A.    I did.

3   Q.    And was that a male voice?

4   A.    It is.

5   Q.    Do you recognize the voice?

6   A.    That voice, again, consistent with Mr. Tiba Conley.

7   Q.    And what was he referring to in the call?

8   A.    He was saying that night, he should have never gone into

9   his house because he was only given 15 minutes after he entered

10  his house before that search warrant was executed and the

11  police kicked his door open.

12  Q.    Is that approximately correct in terms of what happened

13  the night the search warrant was executed?

14  A.    That is.

15  Q.    I am now going to play for you clip R23.  And this is --

16  this is -- this clip is, again, a portion from the same larger

17  recording.  Is that correct?

18  A.    It is.

19        (Audiotape was played to the jury.)

20  BY MR. BALDWIN:

21  Q.    Agent Rothman, how many participants are in this

22  conversation?

23  A.    Three.

24  Q.    And are the voices male voices or female voices?

25  A.    One of the voices is female.  Two of the voices are male.

1   Q.    And does one of those male voices belong to Tiba Conley?

2   A.    One of the male voices is consistent with Mr. Tiba

3   Conley's voice.

4   Q.    And what is he referring to in terms of the timing of the

5   -- withdrawn.

6         What is he describing based on your knowledge of the

7   case?

8   A.    It's obviously much clearer when listening to it over a

9   month or closer, but the female asks, "Was you cooking?"

10  "Cooking" is a street term referring to the process when powder

11  cocaine is turned into crack cocaine.  And he said -- he

12  laughed and said, "Yeah.  They caught me cooking."

13  Q.    And is there any other reference in the -- anything else

14  of interest in that portion of the call?

15  A.    There is.  First, he said, "They got me," and he ended

16  the call by saying, "They seen it on the counter."  On the

17  counter, when I entered that apartment where the evidence as

18  you have seen in the pictures of the illegal narcotics, the

19  baking soda and the Pyrex container.

20  Q.    And there was also a gun on the counter, too.  Correct?

21  A.    There was.

22        MR. BALDWIN:  Thank you, Your Honor.  No further

23  questions.

24        THE COURT:  Are you offering the disk now?

25        MR. BALDWIN:  Yes, Your Honor.  I am offering it into

1    evidence, Your Honor.  I believe he's already identified it.

2              THE COURT:  Anything further?

3              MR. BALDWIN:  No, Your Honor.

4              THE COURT:  All right.  Cross.  Leave the disk there

5    just in case he wants to play it.

6         All right, Mr. Burnham.

7                           CROSS-EXAMINATION

8    BY MR. BURNHAM:

9    Q.   Good afternoon, Agent Rothman.  I am Charles Burnham.

10   A.   Good afternoon.

11             THE DEPUTY CLERK:  Mr. Burnham, would you move that

12   microphone, please?

13             MR. BURNHAM:  Sure.

14             THE DEPUTY CLERK:  Thank you.

15             THE COURT:  Lean in a little bit if you would.  Lean

16   in a little bit if you would.

17             MR. BURNHAM:  Lean in, okay.

18   BY MR. BURNHAM:

19   Q.   Were you the agent in charge of this investigation?

20   A.   I was one of two agents in charge of this investigation.

21   Q.   And that means you had overall responsibility, shared

22   with this other individual, for directing the investigation?

23   A.   That is correct.

24   Q.   You mentioned ledgers before as one of the things you

25   look for in a drug search warrant.

1        The fact is you did not find any ledgers in this case.

2   Correct?

3   A.     That is correct.

4   Q.     And you didn't find a safe or any other similar secure

5   storage device?

6   A.     That is correct.

7   Q.     All right.  And to your knowledge, there was no effort

8   made to do DNA testing of any of the alleged controlled

9   substances or paraphernalia recovered in the search?

10  A.     To my knowledge, there was not.

11  Q.     And that means there was no swabs taken at the scene and

12  they were never sent after the fact to any lab to be swabbed

13  there?

14  A.     Correct.

15  Q.     All right.  And you know that's actually what happened at

16  least with the firearms is nobody swabbed them at the scene,

17  but later on, they found someone to do the DNA work on the

18  guns.  Correct?

19  A.     Correct.

20  Q.     This apartment complex in Ellicott City was a relatively

21  nice apartment complex; would you agree with that?

22  A.     It was.

23  Q.     And that part of Maryland, that part of the county is a

24  relatively nice part of the county?  And by "nice," I mean, to

25  be more clear, not high crime?

```
 1   A.    Correct.
 2             MR. BURNHAM:  No further questions.
 3             THE COURT:  Redirect?
 4             MR. BALDWIN:  None, Your Honor.  Thank you.
 5             THE COURT:  All right.  Thank you, Mr. Rothman.  You
 6   may step down.
 7             THE WITNESS:  Thank you, Your Honor.
 8             THE COURT:  Your next witness.
 9             MR. BALDWIN:  Yes, Your Honor.  The government calls
10   Brandon McCollum.
11        Your Honor, before we do that, I'd like to read a
12   stipulation into the record.
13             THE DEPUTY CLERK:  Mr. Baldwin, hold on just a
14   moment.
15             THE COURT:  Ladies and gentlemen, when parties read a
16   stipulation as to a particular matter, you take that matter as
17   proven.  The parties have agreed that that's so.  So
18   Mr. Baldwin is going to read a stipulation which is agreed to
19   by the -- by the plaintiff and the defendant -- by the
20   government and the defendant.  All right.  Go ahead.
21             MR. BALDWIN:  Thank you, Your Honor.
22        I am placing the stipulation on the document camera, Your
23   Honor.  And at the bottom, it's marked Stip. 1, and it -- with
24   the case caption "United States of America vs. Tiba Sakuri
25   Conley."
```

1      "Stipulation regarding prior conviction.  It is agreed

2  and stipulated between the parties that:  1, before April 21,

3  2016, the defendant present in court, Tiba Conley, had been

4  convicted of a, quote, crime punishable by imprisonment for a

5  term exceeding one year, unquote, as defined in 18, U.S.C.,

6  Section 921.  Before April 21st, 2016, the defendant knew he

7  had been convicted of a crime punishable by imprisonment for a

8  term exceeding one year.  And the defendant's civil rights

9  following that conviction - including his right to possess a

10  firearm or ammunition - had not and have not been restored.

11      "2, this stipulation is admissible into evidence."

12      And it's signed by Mr. Burnham and myself.

13          THE COURT:  Okay.

14          MR. BALDWIN:  Thank you, Your Honor.

15          THE COURT:  Ready to go with Mr. McCollum?

16          THE DEPUTY CLERK:  Yes, Your Honor.  He's right

17  outside.

18          THE COURT:  I don't see him.  All right, sir.  If you

19  will step right up alongside the witness stand -- not in the

20  witness box yet.  A little closer.  Come up a little more.

21  That's fine.  Right there.

22          THE DEPUTY CLERK:  Please raise your right hand.

23          BRANDON McCOLLUM, GOVERNMENT'S WITNESS, SWORN

24          THE DEPUTY CLERK:  Please have a seat in the witness

25  box.  Watch your step as you enter.

1          Please speak loudly and clearly into the microphone.

2    State your name for the record and spell each name.

3               THE WITNESS:  My name is Brandon McCollum.  First

4    name is spelled B-R-A-N-D-O-N.  Last name, M-C-C-O-L-L-U-M.

5               THE DEPUTY CLERK:  Mr. McCollum, would you please

6    move a little bit closer to that microphone in front of you?

7               THE WITNESS:  You bet.

8               THE DEPUTY CLERK:  Thank you.

9               MR. BALDWIN:  Your Honor, may I proceed?

10              THE COURT:  All right.

11                         DIRECT EXAMINATION

12   BY MR. BALDWIN:

13   Q.    Good afternoon, Mr. McCollum.

14   A.    Good afternoon.

15   Q.    Where do you work, sir?

16   A.    I work for the FBI in a team known as the Cyber

17   Intelligence Program Unit.

18   Q.    And how long have you worked for the Cyber Intelligence

19   Examination Unit?

20   A.    I just transferred there about one month ago.

21   Q.    And what were you doing before that?

22   A.    For 11 years, I was also with the FBI, but I was working

23   in a unit known as the DNA Case Work Unit performing forensic

24   DNA testing.

25   Q.    What was your position with that unit?

1   A.     Forensic examiner.

2   Q.     How long were you a forensic examiner?

3   A.     For a total of nine years.

4   Q.     And did you -- did you have a position with that unit

5   prior to being a forensic examiner?

6   A.     Yes.  So before I became a forensic examiner in DNA

7   casework, I was known as a biologist or a technician.

8   Q.     Okay.  What were your duties as a forensic examiner?

9   A.     As an examiner, you can think of my job as someone who

10  directs and manages DNA evidence for FBI case work.  And the

11  way that would look like is if I receive a case that's assigned

12  to me and it has DNA evidence in it, I then will go over that

13  case file, I look at what evidence needs to be tested, and then

14  that evidence goes back into the laboratory for the biologists

15  to begin their examinations on that evidence.

16  Q.     And when you were a biologist/technician for three years,

17  were you doing work you now sign -- or you previously signed

18  out to biological technicians?

19  A.     Yes.

20  Q.     How many DNA samples did you process as a

21  biologist/technician?

22  A.     Thousands if not tens of thousands.

23  Q.     And approximately how many cases have you analyzed the

24  results of DNA testing?

25  A.     I have independently managed over 600 cases of DNA cases

1   for the FBI at this point.

2   Q.    That was as a forensic examiner?

3   A.    Yes.  That's right.

4   Q.    What is the analysis that a -- well, withdrawn.

5         In those 600 cases where you did an analysis, how many

6   items of DNA were processed?

7   A.    I would say also in the thousands.

8   Q.    How did you become qualified as a biologist/technician

9   with the FBI?  Your job before a forensic examiner, how did you

10  become qualified as that?

11  A.    In the first job, it looks a little bit something like

12  being under the mentorship of a qualified biologist where I am

13  watching those -- that biologist perform the -- the

14  examinations independently.  And then at that point, once I

15  have been under the mentorship long enough, I will take a

16  series of examinations and a final competency test, and that

17  basically allows me to independently work FBI evidence exams by

18  myself.

19  Q.    And what did the competency test consist of?

20  A.    The competency test would have been a series of mock-like

21  evidence items that would have tested my ability in different

22  types of examinations that we do at the lab.

23  Q.    Were you ever -- did you have to maintain proficiency

24  testing during your time as a biologist/technician?

25  A.    Yes.  So one of the quality assurance requirements the

1    FBI has is something known as proficiency testing, and you can

2    think of that as a way to test me as either a biologist or a

3    forensic examiner where an outside agency will provide me with

4    evidence-like items and I will do the same testing procedures,

5    and I will report those results out the same way that I would

6    as if it were actual FBI evidence to make sure that I get the

7    right and proper results from that exam.

8    Q.     Okay.  Now, with respect to a -- with respect to your --

9    how long did it take to become qualified as a

10   biologist/technician?

11   A.     I would say around -- somewhere around six to eight

12   months.

13   Q.     Let me ask you:  After qualifying as a

14   biologist/technician, did you become qualified as a forensic

15   examiner?

16   A.     Yes.

17   Q.     What's the qualification process for becoming a forensic

18   examiner?

19   A.     Certainly much more extensive.  To give you an idea, that

20   program took me two years to complete, and very similar to the

21   biologist position except much more intense.  But I was under

22   the mentorship of a qualified forensic examiner, had to take a

23   number of different world board examinations, written tests,

24   and mock -- mock testimony exercises to prepare me for my

25   responsibilities as an examiner.

1    Q.    Did you have to take a final competency test?

2    A.    Yes.

3    Q.    And what did that consist of?

4    A.    So, very similar to my work as a biologist, but in this

5    case, I inherited multiple cases.  I had to run that evidence,

6    that mock-like evidence through our system, interpret those

7    results, and then issue reports and ensure that I obtained the

8    results that would be consistent with what the FBI would report

9    if it were actual FBI casework.

10   Q.    Was there any sort of oral board included in your -- in

11   your testing to become a forensic examiner?

12   A.    Yes.  Multiple -- on multiple topics.

13   Q.    And what is an oral board like?

14   A.    A pretty intense situation where, essentially, I was

15   sitting at a table, and I had 15 of my colleagues all around me

16   and they were just peppering me with questions for about two

17   hours to see how I could handle that line of questioning.

18   Q.    How many -- how many of your colleagues were there?

19   A.    Fifteen at least.

20   Q.    How long did you serve as a forensic examiner after your

21   qualification?

22   A.    The qualification took two years, and then -- so nine

23   years on my own independently as an examiner.

24   Q.    And did you also undergo intermittent proficiency testing

25   as a forensic examiner?

1    A.    Yes.

2    Q.    How often was that?

3    A.    Twice a year.

4    Q.    What did that consist of?

5    A.    Same -- same aspect as the biology proficiency test, just

6    geared more towards the interpretation and the reporting.

7    Q.    Is that a pass/fail system?

8    A.    It is.

9    Q.    Did you ever fail a proficiency test?

10   A.    No.

11   Q.    Is there a quality control program at the lab where the

12   FBI tests DNA samples?

13   A.    Yes, sir.  I think it's important to understand,

14   obviously, the integrity of the evidence is very important to

15   the FBI in our testing, so we have an entire quality assurance

16   program that dictates everything from the education of our

17   people to the security of our evidence to the types of

18   instrumentation that we use.  Everything that the FBI does and

19   engages in is qualified underneath -- underneath this quality

20   umbrella, insurance umbrella just to make sure that we are

21   consistently doing the same thing every single time every

22   single day in the same way between different people.

23   Q.    Were you familiar with those protocols and procedures as

24   a forensic examiner?

25   A.    Yes, very much so.  I am required to as part of the

1    responsibilities of the job.

2    Q.    In your -- in your work as a forensic examiner, what is

3    your work product when you do a DNA comparison?

4    A.    At the very end, I will issue a report of my findings and

5    a laboratory report of examination.

6    Q.    Are your laboratory reports peer reviewed?

7    A.    Yes, they are, which means that a second independently

8    qualified examiner would have reviewed my work to agree with

9    all of my work and the contents in the file before we would

10   release those results to the contributor.

11   Q.    Other than the certification and review process as we

12   have already discussed, what other training have you had in the

13   area of forensic science?

14   A.    As part of the requirements as an examiner, we are

15   required to continuously have continuous education, so that can

16   look like different things.  It can be internal training at the

17   FBI.  It could be an international symposium conference

18   somewhere else.  It could be myself reading peer-reviewed

19   journals to stay current with technology.  So there is a number

20   of different ways, but the point is to make sure that I am

21   staying ahead of technology and trends in forensic DNA.

22   Q.    Do you act as a faculty member in any capacity at the

23   FBI?

24   A.    Yes.  I am currently considered a FBI instructor for the

25   FBI's evidence response team as it relates to biological

1  evidence collection and preservation.

2  Q.    As a forensic examiner, did you supervise others in DNA

3  casework?

4  A.    Yes.  So I don't hold the title "supervisor," but because

5  I dictate and manage what the biologists do in the laboratory,

6  you can think of that as a supervisory role.

7  Q.    What is your formal educational background?

8  A.    I have two different degrees.  I have a Master's degree

9  in forensic science from Penn State, and I also have an

10  undergraduate degree in life science also from Penn State.

11  Q.    Have you ever testified before in federal court as a DNA

12  forensic examiner?

13  A.    Yes.  Many times.

14  Q.    Approximately how many times?

15  A.    Today is my 19th.

16  Q.    Have Courts accepted your opinion testimony regarding DNA

17  testing and analysis based on your education, training, and

18  experience?

19  A.    Yes.

20  Q.    Have Courts qualified you as an expert?

21  A.    Yes.

22  Q.    Has any Court ever refused to qualify you as an expert?

23  A.    No.

24         MR. BALDWIN:  Your Honor, the government proffers

25  Mr. Brandon McCollum as an expert qualified to offer opinions

1   as a DNA forensic examiner.

2            THE COURT:  Any objection?

3            MR. BURNHAM:  No objection.

4            THE COURT:  All right.  So declared.

5            MR. BALDWIN:  One moment, Your Honor.

6   BY MR. BALDWIN:

7   Q.    Were you asked -- Mr. McCollum, were you asked to analyze

8   DNA samples with respect to an investigation involving Tiba

9   Conley?

10  A.    Yes.

11  Q.    Just speaking in general terms, how do you determine

12  whether a sample of DNA came from a particular individual?

13  A.    So, DNA testing is a pretty lengthy multistep process,

14  and that process is to design so at the very end, a DNA profile

15  will be available for me to compare to any known individuals in

16  the case.

17          So, forensic DNA is a pattern-based discipline, which

18  means that if I have DNA from known individuals, I can compare

19  that individual's DNA to the DNA that I obtained from any

20  forensic evidence in the case.

21  Q.    Now, could you -- I want to get a little bit into the

22  details of what you test for.

23          Could you explain for the jury what a short tandem repeat

24  is?

25  A.    A short tandem repeat is basically for all areas that are

1   examined in forensic DNA analysis.  STRs are basically these

2   sequences in all of our DNA that will repeat back to back to

3   back in our DNA geno, and you can think of those as like links

4   on a chain or you can think of them as like boxcars on a train,

5   but, essentially, these STR regions in our DNA will vary so

6   much between individuals that when you examine multiple of them

7   together, you can create a DNA profile that is essentially

8   unique to an individual.

9   Q.    And why -- why is a short tandem repeat, the structure of

10  it, particularly useful for DNA analysis?

11  A.    There is a few things that I love about STRs.  One is

12  that the STRs that you are born with will be the same STRs you

13  have as an adult.  The numbers of the STRs in your DNA does not

14  change.  And, also, the STRs in all of your cells right now

15  will be the same.  Independent if it's from a skin cell or if

16  it's from a blood cell, all of your STR DNA is going to be the

17  same.

18  Q.    And are there -- are there different sequences of STRs at

19  different places in the human geno?

20  A.    Yes, there are.  And the specific testing kit that the

21  FBI uses will examine 15 different areas of our DNA of those

22  STR regions in addition to one location that will determine the

23  sex, whether it's male or female.

24  Q.    So what is a DNA profile, quote, unquote, for purposes of

25  forensic analysis?

1    A.    So, a DNA profile, at the end of the process, this

2    genetic analyzer machine will, with software, print out a DNA

3    profile on a sheet of paper, and that profile kind of looks

4    like an EKG, if you are familiar with that, a series of

5    peaks -- a series of peaks on a graph or a chart, and there is

6    a couple things that the DNA profile tells me.  One is whether

7    or not there is male or female DNA on the evidence, or maybe

8    there is both.  It can tell me the number of contributors on

9    the evidence profile because there is typically going to be

10   more than one person on evidence.  And then, also, you can tell

11   how much DNA someone is contributing over the other.  It is

12   possible to have a major contributor, someone who is

13   contributing the most DNA to that profile.

14   Q.    So is there some way to combine the frequency likelihood

15   for each STR to determine how likely it is -- a whole profile

16   is within a population?

17   A.    Yes.  So what we do know about these STRs, since they

18   have been around for about 20 years now, is we have looked at

19   how common or rare these STR repeats are in our DNA in

20   different populations throughout the United States.  If you

21   know how common or rare they are, you then, therefore, have a

22   frequency of those STRs and you can combine them and multiply

23   them to create very large numbers to statistically interpret a

24   match that could occur in a case.

25   Q.    One moment, please.

1          Mr. McCollum, I am showing you an exhibit marked as DNA

2     4.

3          Do you recognize what that shows, sir?

4     A.   Yes, I do.  This is a table that represents the

5     statistical interpretation numbers that I was talking about

6     before.

7     Q.   Okay.  So, you said "statistical interpretation."

8          So if there is a match, this -- what does this tell you

9     about the match?

10    A.   When -- well, when DNA matches, it's not good enough for

11    me to just tell you that DNA matches.  And the reason why that

12    is is because even though it could be very rare, it's possible

13    that someone else could coincidently match DNA evidence by

14    chance.  So the way that we statistically interpret that

15    coincidence is the use of this likelihood ratio, which is that

16    statistical interpretation I was telling you about.

17         The simplest way I can define the likelihood ratio for

18    you is that number is telling you, once a match occurs, how

19    much more likely the DNA evidence is if a given person is the

20    contributor than if some random, unknown, unrelated person out

21    there in the population is the contributor because of

22    coincidence.

23         So, as the likelihood ratio number increases, which if

24    you look on the -- on the slide here, if you have a value of

25    two, that qualitative equivalent would mean that there is only

1    weak support for that DNA match.

2          But if you go all the way down, you can see how high

3    these likelihood ratio numbers can get.  They can get even

4    above or below this FBI threshold of 700 billion, which would

5    then support for -- extremely strong support for that DNA

6    match.

7          And then there is -- there is one last threshold here

8    that's not listed.  When the likelihood ratio exceeds that

9    value of 700 billion, the FBI will just report that an

10   individual is the source of that DNA and we no longer use the

11   scale because that number has exceeded the world's population

12   multifold.

13   Q.    And you said -- you said a 700 billion number.

14         These numbers are based on individual population groups.

15   Correct?

16   A.    Yes.  That is correct.

17   Q.    So how does it work?  If it exceeds 700 billion in one

18   population group, is that what's required to be a source, or

19   something else?

20   A.    Whenever the statistical interpretation is done, we will

21   always generate a likelihood ratio statistic for the four main

22   population groups in the United States, which is the Caucasian

23   population, the African-American population, and then the

24   Southeastern Hispanics and then the Southwestern Hispanics.

25   The FBI will calculate all four of those population statistics,

1    but then we are only going to report the most conservative or

2    the lowest number.  So in order to have a source threshold or

3    anything -- any number that you see on this scale here, it must

4    have been the lowest of all of the populations to be the most

5    conservative in the reporting method.

6    Q.    So if -- you mentioned if you make a determination that

7    an individual was a source, then what does that mean in terms

8    of those four different populations you are referring to?

9    A.    That means that all of the other populations were either

10   equal to or they were probably greater.  As long as it reaches

11   that threshold of over 700 billion, then we will report source

12   to an individual.

13   Q.    Are there results other than a match that you can get

14   from DNA comparison?

15   A.    There is.

16   Q.    Okay.  What are those?

17   A.    Yes.  So, generally speaking, if an individual does not

18   match the DNA, they could be excluded from the DNA, which

19   simply means that that person could not have been a contributor

20   to that sample.

21         And there is also another category where if the number of

22   individuals in the evidence sample is five or more people, the

23   FBI will just not report any comparison.  It's essentially

24   unsuitable for comparison.

25   Q.    Are there separate processes that you go through when you

1  suspect that more than one person's DNA is in a sample?

2  A.    Yes.  Absolutely.  The more individuals that are in a DNA

3  evidence sample, the longer the interpretation takes because

4  it's -- it's much more complicated than just having one person

5  in that sample.

6        But, essentially, I will review the DNA profile that I

7  got from the evidence, determine is there male or female DNA.

8  I am looking at the ratios of the DNA to help determine the

9  number of people.  Also, basic genetic inheritance principles

10  allows me to determine the number of people on a sample also.

11  And then, at that point, when I have a person of interest to

12  compare to the evidence, I am going to see does that person

13  match or is that person possibly included?  Those are the same

14  terminology.

15  Q.    With respect to your investigation with respect to the

16  case of Tiba Conley, did you -- how many items of evidence did

17  you test for for DNA profiles?

18  A.    So, in DNA casework, eight different -- or eight total

19  items were tested for DNA.

20  Q.    Okay.  And what were the break down -- was a reference

21  sample tested?

22  A.    Yes.  So FBI lab item 15 would have been a known sample

23  taken from Mr. Tiba Conley.

24  Q.    All right.  And there were seven in addition to that

25  sample?

1   A.    Yes.  So the remaining were all -- all firearm related

2   evidence samples.

3   Q.    Do you know for how many of those seven evidence items

4   did you get DNA results that you considered a match?

5   A.    So, of those seven, five total matched to Mr. Conley.

6   Q.    Did you complete a laboratory report?

7   A.    Yes, I did.

8   Q.    In your laboratory report, did you determine -- you said

9   there were five samples that matched?

10  A.    Yes.  That's correct.

11  Q.    Which evidence items were those?

12  A.    Those would have been FBI Lab Item No. 1, which was

13  described as swabs from the Springfield pistol, FBI Lab Item

14  No. 6, which were swabs from a Masterpiece Arms pistol, FBI Lab

15  Item No. 8, which was swabs from a rifle, FBI Lab Item No. 10,

16  which were described as swabs from a magazine, and then the

17  final item was FBI Lab Item 13, which were swabs from

18  magazines, and magazines is plural.

19  Q.    Did you compare the DNA profiles for each of those

20  evidence items to the profile of the sample taken from Tiba

21  Conley?

22  A.    Yes.

23  Q.    What were the results for item one, the Springfield

24  pistol, item six, the Masterpiece Arms pistol, and item eight,

25  the unspecified rifle?

1    A.    In each of those three items, the DNA results were very

2    similar, so we grouped them together.  And in each of those

3    items, male DNA was obtained, and each of those evidence items

4    were consistent with originating from four different people.  I

5    compared the DNA for Mr. Conley to each of those items.  He

6    matches to that DNA.  And those DNA results means that he is

7    the source of the major contributor to items one, six, and

8    eight.

9    Q.    And as a source, that's a reference to that number that's

10   greater than 700 billion threshold?

11   A.    Yes.  Much greater.

12   Q.    What was the result from item ten, a magazine?

13   A.    In this instance, results were also very similar.  Male

14   DNA results were obtained, and the DNA was consistent with

15   originating from three different people, and in that instance,

16   Mr. Conley matches to the DNA, and he is the source of the

17   major contributor to that evidence sample.

18   Q.    And what was the result for item 13, the magazines,

19   plural?

20   A.    In this instance, male DNA was also obtained, but the DNA

21   was consistent with originating from two different people.  I

22   compared the DNA to Mr. Conley, and he matches to that evidence

23   sample.  And in this instance, the DNA results are at least 3.2

24   million times more likely if Mr. Conley and another unknown

25   unrelated individual are contributors than if two unknown

1    unrelated individuals are contributors.  And to remind you,

2    that likelihood ratio of 3.2 million provides extremely strong

3    support that Mr. Conley is a contributor to that sample.

4              MR. BALDWIN:  Your Honor, that concludes my direct.

5              THE COURT:  All right.  Cross.

6                        CROSS-EXAMINATION

7    BY MR. BURNHAM:

8    Q.    Good afternoon, Mr. McCollum.  I am Charles Burnham,

9    attorney for Tiba Conley.

10   A.    Good afternoon, sir.

11   Q.    Wouldn't you agree that if a person's DNA is on an item,

12   it does not necessarily mean that the person touched the item.

13   Correct?

14   A.    It is -- it is possible for DNA to be present on an item

15   other than it being touched, correct.

16   Q.    So another way to phrase that would be it's not part of

17   your job to decide who touched what; your job is just to decide

18   whose DNA is likely to be where.  Correct?

19   A.    Right.  I -- I agree with that.

20   Q.    Okay.  And there is even -- well, strike that.

21         There is a term in forensic DNA science called

22   "transference."  Right?

23   A.    Yes.

24   Q.    And transference, if I have it -- understand it right, is

25   the phenomenon whereby DNA from one contributor on an object

1  can be transferred, as the name suggests, to another object.
2  Right?
3  A.     Yeah.  You have it right.
4  Q.     Okay.  To just give a concrete example, let's say if I,
5  you know, take a drink of a beer and then someone else takes a
6  drink from the same beer, they might pick up my DNA on their
7  hands, let's say.  Correct?
8  A.     That is possible.
9  Q.     All right.  And, so, you have to rely on the
10 investigators in the various cases you work on to make sure
11 that the items you work with are delivered to you in a -- in a
12 condition where that kind of contamination hasn't happened.
13 Isn't that right?
14 A.     That's correct.  I do rely on that.
15 Q.     And you don't know anything or very little about the
16 investigation that led to the DNA samples that you analyzed and
17 testified about here today.  Correct?
18 A.     Right.  I can't speak to the nature of their collection.
19 I was not there when it was collected.
20 Q.     And those -- those other -- some items had two
21 contributors, some had three, some had four.
22        You didn't do any research to try figure out who those
23 other people were.  Correct?
24 A.     No.  I am limited to the comparisons of which I have
25 obtained known DNA standards, and in this case, I only received

McCollum - Cross/Redirect

1    a standard from Mr. Conley.

2              MR. BURNHAM:  Thank you.

3              THE COURT:  Redirect?

4                        REDIRECT EXAMINATION

5    BY MR. BALDWIN:

6    Q.    Mr. McCollum, transference depends on a lot of factors

7    involved in the environment where something is handled.

8    Correct?

9    A.    Yes.  There is a lot of factors that I could describe

10   that affect transference of DNA.

11   Q.    What are some of the factors?

12   A.    Simply put, the biology of the person that's transferring

13   that; in other words, how well you naturally shed your DNA,

14   when the last time was that you washed your hands, what the

15   type of surface is that you are transferring to, whether it's a

16   hard surface like this floor or a porous surface like this

17   jacket, how long the item is touched.  The list goes on and on.

18         There is a number of factors that dictate transfer, but

19   you can't rely on one of them to essentially explain what you

20   would expect the transfer to look like.  We just don't know

21   that.

22             MR. BALDWIN:  Thank you.

23             THE COURT:  Anything further?

24        Thank you, sir.  You may step down.  You are excused.

25        Next.

1          MR. BALDWIN:  Your Honor, could we take a brief

2    recess?

3          THE COURT:  Well, what do you mean by "brief"?

4          MR. BALDWIN:  Five to ten minutes, Your Honor.

5          THE COURT:  Give me -- you can do this openly.  How

6    much more do you have in terms of other witnesses?  And just

7    two more witnesses?  Three?  What?

8          MR. BALDWIN:  Two more witnesses, Your Honor.

9          THE COURT:  All right.  Wait until Theresa steps --

10   Theresa, we will take about a seven- or eight-minute break.  If

11   you will lead the jury back into the waiting room.

12         MR. BALDWIN:  Thank you, Your Honor.

13         (The jury panel exit the courtroom at 2:34 p.m.)

14         THE COURT:  All right.  We will be in recess for

15   seven or eight minutes.

16         MR. BALDWIN:  Thank you, Your Honor.

17         (Recess taken from 2:35 p.m. until 2:53 p.m.)

18         THE COURT:  Be seated, folks.  All right.

19         Mr. Baldwin, there was a chart with a summary of the

20   drugs subject to connecting up.  Are you calling somebody on

21   quantity?

22         MR. BALDWIN:  Yes, Your Honor.  That's about to be

23   the witness that's being called right now.

24         THE COURT:  I wanted to be sure because that was let

25   in provisionally --

1           MR. BALDWIN:  Yes, Your Honor.

2           THE COURT: -- subject to connecting up.

3       Are you ready to go then otherwise?

4           MR. BALDWIN:  I'm sorry?

5           THE COURT:  After we bring the jury in, are you ready

6   to go?

7           MR. BALDWIN:  Yes.

8           THE COURT:  Mr. Burnham, anything?

9           MR. BURNHAM:  I am ready to proceed.

10          THE COURT:  Please bring them in.

11      Counsel, as I indicated to you, we will meet this

12  afternoon after the jury leaves and talk about our -- have our

13  charge conference on the instructions.

14          THE DEPUTY CLERK:  Your Honor, are you ready?

15          THE COURT:  We are.

16      (The jury panel enter the courtroom at 2:55 p.m.)

17          THE COURT:  All right.  Are we ready?

18          MR. DRAUGHON:  The government calls Tiffany

19  Van De Mark.

20          THE DEPUTY CLERK:  Please stand right here to be

21  sworn.  Please raise your right hand.

22      TIFFANY VAN DE MARK, GOVERNMENT'S WITNESS, SWORN

23          THE DEPUTY CLERK:  Please have a seat in the witness

24  box.  Watch your step as you enter.

25      Please speak loudly and clearly into the microphone.  And

1  if you would please move a little closer in that chair?  State

2  your name for the record and spell each name.

3       THE WITNESS:  Tiffany Van De Mark.  T-I-F-F-A-N-Y,

4  V-A-N, D-E, M-A-R-K.

5       THE DEPUTY CLERK:  Thank you.

6       THE WITNESS:  My last name is three separate words,

7  and the "V," the "D," and the "M" are capitalized.

8       THE DEPUTY CLERK:  Very good.  Thank you.

9                    DIRECT EXAMINATION

10 BY MR. DRAUGHON:

11 Q.    Good afternoon.

12 A.    Good afternoon.

13 Q.    Are you currently employed?

14 A.    Yes, sir.

15 Q.    By whom are you employed?

16 A.    I am currently employed with the Drug Enforcement

17 Administration at the Mid-Atlantic Laboratory.

18 Q.    And what is your role with the Drug Enforcement

19 Administration?

20 A.    I am a senior forensic chemist.

21 Q.    What are your duties as a senior forensic chemist?

22 A.    Currently, I am a member of the quality group, so I

23 review all of the lab reports for the laboratory.  I also, when

24 I am not in the quality group, I analyze evidence, testify in

25 court when needed, and maintain the instrumentation in the

1   laboratory.

2   Q.    What is your area of practice?

3   A.    Drug analysis.

4   Q.    How long have you been in the field of drug analysis?

5   A.    Approximately nine years.

6   Q.    Is controlled substance examination another phrase to

7   describe that role?

8   A.    Yes, sir.

9   Q.    What is your educational background?

10  A.    I have a Bachelor of science in chemistry and Spanish

11  with a minor in mathematics from the University of Miami.  I

12  also have a Master of science and forensic science with a

13  concentration in forensic chemistry from Michigan State

14  University.

15  Q.    Have you had any teaching or research experience?

16  A.    I have.

17  Q.    Can you describe that?

18  A.    For my Master's degree, I analyzed ignitable liquids and

19  applied statistical analysis to those liquids in order to

20  determine whether or not that liquid could be -- could have

21  been associated with ignitable liquid in an arson

22  investigation.

23  Q.    What training have you received in the field of

24  controlled substance examination?

25  A.    Prior to coming to DEA, I worked at the Prince George's

Vant De3 - Direct

1   County Drug Analysis Laboratory.  There, I received training in

2   the field of drug analysis.  I also went to a 16-week training

3   course at DEA when I became employed there at Quantico in the

4   field of drug analysis.

5   Q.    Have you attended any conferences?

6   A.    I have.

7   Q.    And what are those conferences about?

8   A.    I am a member of the Mid-Atlantic Association of Forensic

9   Scientists, and I have attended one of the conferences in

10  Pittsburgh.  And previously, I -- I am a member of the American

11  Academy of Forensic Sciences, and I have attended one of their

12  conferences in Seattle and then one in Denver.

13  Q.    Do you have any certifications or professional

14  affiliations?

15  A.    I do.

16  Q.    What are your certifications?

17  A.    I am a fellow in the American Board of Criminalists in

18  drug analysis.

19  Q.    Approximately how many drug items have you analyzed?

20  A.    When I worked for Prince George's County, I analyzed

21  approximately 3,000 pieces of evidence.  Currently at DEA, I

22  have analyzed approximately 895 pieces of evidence.

23  Q.    And what types of drugs do you examine?

24  A.    Fentanyl, methamphetamine, cocaine, heroin, PCP, and

25  anything else that comes into the laboratory.

1    Q.    You have mentioned examining cocaine.

2          When you come across suspected cocaine, what do you do to

3    examine it?

4    A.    I perform gas chromatography, gas chromatography mass

5    spectrometry, and Fourier-transform infrared spectroscopy.

6    Q.    What is gas chromatography?

7    A.    It is a -- it's a separation technique where you can

8    separate components in a mixture.

9    Q.    And what is gas chromatography mass spectrometry?

10   A.    With gas chromatography mass spectrometry, you are

11   separating the components in a mixture, but you are also

12   getting a fragmentation pattern of the compounds that you have

13   separated.

14   Q.    And what is infrared spectroscopy?

15   A.    Infrared spectroscopy is where a sample is put on an

16   instrument, an IR light or infrared light is shined into that

17   sample, and then a spectrum is obtained.

18   Q.    How many times have you testified for your role in

19   examining controlled substances?

20   A.    Approximately 41 times.

21   Q.    Have you testified in federal court?

22   A.    I have.

23   Q.    Have you been qualified as an expert in those prior

24   proceedings?

25   A.    I have.

```
 1   Q.    Has there been an instance in which you were not
 2   qualified as an expert in controlled substance examination?
 3   A.    No.
 4         MR. DRAUGHON:  Your Honor, at this point, I move to
 5   qualify the witness as an expert in controlled substance
 6   examination.
 7         MR. BURNHAM:  No objection.
 8         THE COURT:  All right.  So approved.
 9   BY MR. DRAUGHON:
10   Q.    Are you familiar with case number 281 "D" as in "dog"
11   WF6796260?
12   A.    Yes.
13   Q.    And what did you do related to that case number?
14   A.    I analyzed exhibits submitted to the laboratory.
15   Q.    Did you produce reports?
16   A.    I did.
17   Q.    Prior to your testimony today, did you review what has
18   been marked as Government Exhibits DEA 13, DEA 14, DEA 15, DEA
19   16, DEA 18, DEA 19, and DEA 20?
20   A.    May I see those, please?
21   Q.    Sure.
22   A.    Thank you.
23         MR. DRAUGHON:  Your Honor, may I briefly approach the
24   witness?
25         THE COURT:  All right.
```

1                   THE WITNESS:  Yes.

2    BY MR. DRAUGHON:

3    Q.    Do you recognize those government exhibits?

4    A.    I do.

5    Q.    How do you recognize them?

6    A.    By the -- the electronic signature at the bottom of the

7    reports.

8    Q.    And what are those government exhibits?

9    A.    These are the chemical analysis reports.

10   Q.    I'd like to start with Government Exhibit DEA 13, so I am

11   going to put that up on screen.

12         Now showing you Government Exhibit DEA 13, and I am going

13   to zoom in on the top half, what exhibit or item is analyzed in

14   Government Exhibit DEA 13?

15   A.    Exhibit 1B13.

16   Q.    I'd like to have you come and look at a government

17   exhibit on the table.

18         I'd like to direct your attention to Government Exhibit

19   D13.

20         Do you recognize Government Exhibit D13?

21   A.    I do.

22   Q.    How do you recognize it?

23   A.    I recognize it by my signature on the evidence label as

24   well as my signature down here and my initials on the cut off

25   part that I took off.

1    Q.    And what is Government Exhibit D13?

2    A.    It is an evidence bag.

3    Q.    Is that the exhibit that's identified as 1B13 in your

4    report?

5    A.    It is.

6    Q.    When did you first come into contact with Government

7    Exhibit D13, or, in this case, item 1B13?

8    A.    I came into contact with it at the evidence vault in the

9    Mid-Atlantic Laboratory.

10   Q.    Upon receiving it, what did you do with it?

11   A.    I either took it to my bench for analysis or stored it in

12   my lockbox.

13   Q.    And what did you do after either taking it to your

14   lockbox or taking it into your desk for analysis?

15   A.    I took a gross weight and began my analysis.

16   Q.    Did you do anything else in addition to taking a gross

17   weight?

18   A.    Yes.  I opened the evidence bag and took a description of

19   the evidence as well.

20   Q.    And did you conduct an analysis of the item?

21   A.    I did.  I analyzed it by gas chromatography mass

22   spectrometry, gas chromatography, and Fourier-transform

23   infrared spectroscopy.

24   Q.    What conclusions did you draw based on your analysis?

25   A.    May I reference my report?

Van De Mark - Direct

1    Q.    Yes.

2    A.    May I take this with me?

3    Q.    Sure.

4    A.    I determined that the substance in the little plastic

5    baggie contained cocaine base and phenyl tetrahydro

6    imidazothiazole, also known as P.T. hit.

7    Q.    What is a P.T. hit?

8    A.    P.T. hit is an adulterant.

9    Q.    And what does that mean?

10   A.    An adulterant is something that is added to a controlled

11   substance to dilute it but also to exhibit physiological

12   effects on the body.

13   Q.    You also mentioned cocaine base.

14        What is cocaine base?

15   A.    Cocaine base is the compound cocaine, but it does not

16   have a salt form attached to it.

17   Q.    And how would you describe the physical composition of

18   cocaine base?

19   A.    It is, compared to cocaine hydrochloride, it has a lower

20   boiling point making it easier to smoke.

21   Q.    And if someone were to look at it, what -- is there a

22   structure that it's typically formed in?

23   A.    Would you repeat the question?

24   Q.    If one is looking at cocaine base, is there a structure

25   that you typically see it in based on your experience?

1  A.    I'm sorry.  I'm confused by your question.

2  Q.    I will ask it another way.

3        Would it be, for example, powder?  Rock like?  Some other

4  structure?  How would it typically appear?

5  A.    It is usually rock like, but cocaine hydrochloride can

6  also be rock like as well when I receive it into the

7  laboratory.

8  Q.    And how would you describe the color of cocaine base?

9  A.    I really don't base my analysis on color.  I base it on

10  my results.

11  Q.    Right.

12        What did you do with the exhibit after your examination?

13  A.    After my examination, I took a reserve weight, took a

14  description of reserve evidence, separated the original

15  packaging for fingerprint examination by the FBI, and then --

16  I'm sorry.  Separated the packaging, the original packaging for

17  fingerprint examination by the FBI, and then put everything

18  else back into the evidence bag.

19  Q.    So we just discussed Government Exhibit DEA 13.

20        We are about to discuss Government Exhibits DEA 14, 15,

21  16, 18, 19, and 20.

22        For the exhibits examined in those reports, did you

23  follow the process that you described with regard to the

24  handling and analysis of the exhibit described in DEA 13?

25  A.    I did.

Van De Mark - Direct

1   Q.    I am going to now direct your attention to Government

2   Exhibit DEA 14.

3   A.    Okay.

4   Q.    I am going to zoom in on the top half of this report.

5         For this report, what item or exhibit was analyzed?

6   A.    Exhibit 1B14.

7   Q.    I'd like you to come down to the table, and could you

8   bring back the exhibit you have and look at the next one?

9   A.    (Witness complies.)

10  Q.    Do you see Government Exhibit D14?

11  A.    I do.

12  Q.    Do you recognize that exhibit?

13  A.    I do.

14  Q.    How do you recognize it?

15  A.    In the same way I recognized the previous one, with my

16  signature right here, one of my signatures right here, and my

17  initials on the cut off slip of the evidence bag.

18  Q.    Is this the exhibit that you identified in your report as

19  Exhibit 1B14?

20  A.    Yes.

21  Q.    Did you analyze this exhibit?

22  A.    I did.

23  Q.    And what conclusions did you draw based on your analysis?

24  A.    I determined that the substance contained in this exhibit

25  contained cocaine base and P.T. hit.

Van De Mark - Direct

1   Q.    Thank you.

2         I am going to now direct you to Government Exhibit DEA

3   15.

4              THE COURT:  Are you going to ask her to stand down

5   for all this?

6              MR. DRAUGHON:  Sure.

7              THE COURT:  That's fine.  Just remain outside because

8   he's going to ask you to pick up exhibits one by one.

9              THE WITNESS:  Okay.  Yes, sir.

10             THE COURT:  Ask your question again.

11  BY MR. DRAUGHON:

12  Q.    All right.  So I am now showing you Government Exhibit

13  DEA 15.

14        What item or exhibit is analyzed in Government Exhibit

15  DEA 15?

16  A.    It is some more powder.

17  Q.    Directing you to Government Exhibit D15, which you are

18  holding, do you recognize that item?

19  A.    I do.

20  Q.    How do you recognize it?

21  A.    I recognize it by my signature up at the top, my other

22  signature at the bottom, my initials on the cut off slip.

23  Q.    Is that the item identified in Government Exhibit DEA 15

24  in your report?

25  A.    May I go grab the reports?

Van De Mark - Direct

1   Q.    Sure.

2   A.    Thank you so much.

3   Q.    And it's on the screen.

4   A.    It's too far away.

5         THE COURT:  I am not sure she can see it.

6         THE WITNESS:  I can't see it.  I'm sorry.

7         MR. BALDWIN:  Your Honor, may she just stand and

8   reference the reports instead of going back?

9         THE COURT:  Sure.

10        THE WITNESS:  Thank you so much, sir.

11        THE COURT:  Ask your question again, please.

12  BY MR. DRAUGHON:

13  Q.    Is Government Exhibit D15 the item that is identified as

14  Exhibit 1B15 in your report?

15  A.    It is.

16  Q.    Did you examine that item?

17  A.    I did.

18  Q.    And what conclusion did you draw based on your

19  examination?

20  A.    I determined that this exhibit contained cocaine HCl, or

21  cocaine hydrochloride, and P.T. hit.

22  Q.    And what is cocaine hydrochloride?

23  A.    Cocaine hydrochloride is the salt form of cocaine base.

24  Q.    And how does its appearance compare to cocaine base?

25  A.    Structurally, it has an extra hydrochloride attached to

1    it compared to cocaine base.  Cocaine base does not have that

2    hydrochloride attached to it.

3    Q.    I am going to now direct you to Government Exhibit DEA

4    16, and this is the report that is highlighted on the screen.

5         What exhibit or item was analyzed in Government Exhibit

6    DEA 16?

7    A.    It was Exhibit 1B16.

8    Q.    I'd like to now direct your attention to Government

9    Exhibit D16.

10        Do you recognize that item?

11   A.    I do.

12   Q.    How do you recognize it?

13   A.    By my signature at the top on the evidence label, by my

14   signature -- by my other signature right here at the bottom on

15   the label, as well as my initials on the evidence slip that I

16   cut off.

17   Q.    And is this the exhibit that you identified as Exhibit

18   1B16 in your report?

19   A.    It is.

20   Q.    Did you examine Exhibit 1B16?

21   A.    I did.

22   Q.    And upon doing your examination, what conclusions did you

23   draw?

24   A.    I determined that this exhibit contained cocaine base and

25   P.T. hit.

1  Q.    Right.  I am going to now direct your attention to

2  Government Exhibit DEA 18.

3         But before we talk about the report, I want to streamline

4  things a bit.

5         Can you look at Government Exhibit D18, D19, and D20, and

6  take a moment to see if you recognize it?

7  A.    I do.

8  Q.    How do you recognize those exhibits?

9  A.    In the same way I recognized the previous exhibits.

10 Q.    That is, there is a --

11 A.    There is a signature on the top on the evidence label,

12 there is another signature down at the bottom, and then my

13 initials are on the cut off slip.

14 Q.    Understood.

15        And that applies to the Government Exhibits D19 and D20

16 as well.  Correct?

17 A.    It does.

18 Q.    Now re-focusing you on Government Exhibit DEA 18.

19 A.    Yes.

20 Q.    Is Government Exhibit DEA 18 the exhibit that is

21 identified as Exhibit 1B18 in your report?

22 A.    It is.

23 Q.    Did you analyze Exhibit 1B18?

24 A.    I did.

25 Q.    And what was the conclusions that you made upon analyzing

Van De Mark - Direct

1  it?

2  A.    I determined that 1B18 contained cocaine hydrochloride

3  and P.T. hit.

4  Q.    Now direct your attention to Government Exhibit DEA 19.

5  Once again, I will zoom in on the top half of the report.

6        What exhibit or item is analyzed in DEA 19?

7  A.    1B19.

8  Q.    And is Government Exhibit D19 the exhibit referenced as

9  1B19 in your report?

10  A.    Yes.

11  Q.    Did you analyze this exhibit?

12  A.    I did.

13  Q.    And what conclusions did you draw?

14  A.    I determined that this exhibit contained cocaine

15  hydrochloride and P.T. hit.

16  Q.    Now going to direct your attention to Government Exhibit

17  DEA 20.

18        Focusing on the top half of the report, what exhibit or

19  item is analyzed in Government Exhibit DEA 20?

20  A.    It is 1B20.

21  Q.    And is Government Exhibit D20 the exhibit that you

22  identified as Exhibit 1B20 in your report?

23  A.    It is.

24  Q.    Did you analyze that exhibit?

25  A.    I did.

1  Q.    And what conclusions did you draw?

2  A.    I determined that this exhibit contained cocaine base and

3  P.T. hit.

4  Q.    When looking at the physical exhibits, are there any

5  exhibits that are in rock formation?

6  A.    All of them look like they have a rock-like formation.

7  Q.    Do any of them appear to be more in a powder formation?

8  A.    Unfortunately, I can posit them all into a powder, so I

9  can't really tell the difference between them.

10 Q.    Is there a reason, in your experience wise, some items

11 would remain in rock formation and some would appear to be in

12 powder formation?

13 A.    It depends on how compressed it was when it was received

14 by me.

15 Q.    Prior to your testimony today, did you review Government

16 Exhibit S1, summary chart?

17 A.    Yes, I did.

18 Q.    Based on your review, was the summary chart an accurate

19 summary of the drug items that you analyzed in this matter?

20 A.    Yes, it was.

21 Q.    I am going to show you Government Exhibit S1.

22        THE DEPUTY CLERK:  Does she need the Lavalier

23 anymore?

24        MR. DRAUGHON:  No.  She's not coming down anymore.

25 Thank you.

BY MR. DRAUGHON:

Q.    Directing you to the column that says "Trial Exhibit,"
are those the government exhibit item numbers that we just
discussed?

A.    They are.

Q.    Directing to you FBI number/DEA number, are those the
exhibits reflected in your reports?

A.    They are.

Q.    Directing you to the substance column, are those the
substances that you concluded were contained in the items in
your reports?

A.    They are.

Q.    Directing you to the weight column, are those the weights
that you measured after analyzing the substances in your
reports?

A.    Those are the weights I initially measured before
analysis.

Q.    Before your analysis?

A.    Before my analysis, yes.

          MR. DRAUGHON:  I have no further questions, Your
Honor.

          THE COURT:  Cross.

      Why don't you leave them there for now in case he is
going to make some reference to them.  Leave them there for
now.

1        Go ahead.

2             MR. BURNHAM:  May I proceed, Your Honor?

3             THE COURT:  You may.

4                       CROSS-EXAMINATION

5    BY MR. BURNHAM:

6    Q.   Good afternoon, Ms. Van De Mark.  I am Charles Burnham,

7    counsel for Mr. Conley.

8        Can you tell me the difference between net weight,

9    reserve weight, and gross weight, please?

10   A.   Gross weight is the entire evidence bag containing

11   everything in it --

12            THE COURT:  Would you lean in a little bit more

13   towards the mike?

14            THE WITNESS:  I'm so sorry.  Is this better?

15            THE COURT:  Yeah.

16            THE WITNESS:  Okay.  Gross weight is everything

17   contained in the evidence bag and the evidence bag, so it's

18   upon receipt of the evidence, I take a gross weight.

19       Net weight is the weight of the substance prior to

20   analysis.

21       And then reserve weight is the weight that I take after I

22   have done my analysis.

23   BY MR. BURNHAM:

24   Q.   You referred, in several of your answers to Mr. Draughon,

25   to a P.T. -- the concept of a P.T. hit.

1        You recall that.  Right?

2   A.     Yes.

3   Q.     And this is, as I understand, a substance that dilutes

4   the drug itself.  Correct?

5   A.     It's an adulterant that can be added, yes.

6   Q.     So if I wanted to buy the materials to -- to put a P.T.

7   hit in some cocaine, let's say, what would I buy at the store?

8   Baking soda, would that be one?

9   A.     Baking soda is not P.T. hit.

10  Q.     What would be some examples of some things I would

11  purchase if I wanted to --

12  A.     For P.T. hit, it would be tetramisole or levamisole.

13  There are other more -- there are other names for those as --

14  as well.

15  Q.     And do you know, was it part of your findings here to

16  identify what particular type of adulterant was included in

17  these samples?

18  A.     Yes.

19  Q.     Okay.  When you listed the -- the reserve weight in -- on

20  your reports and then in the chart, you didn't make an attempt

21  to separate out the controlled substance itself from the

22  adulterant.  Correct?

23  A.     I want to clarify first that the chart was the net

24  weight.

25  Q.     Thank you.

Van De Malek / Cross

1  A.    Could you please repeat your question again?

2  Q.    When you listed either the net weight or the reserve

3  weight or the results in the chart, you didn't make an attempt

4  to separate out the controlled substance from the adulterant.

5  Correct?

6  A.    No.  The weight is everything together.

7  Q.    So even if it's one part cocaine for 99 parts adulterant,

8  that would not change your final number.  Correct?

9         THE COURT:  Final number as to what?  Sorry.  Your

10  final number as to?

11         MR. BURNHAM:  Weight.

12         THE WITNESS:  I'm sorry.  Repeat the question.

13  BY MR. BURNHAM:

14  Q.    Even if -- let's just say you have a sample with one part

15  adulterant for 99 parts controlled substance and it weighs ten

16  grams, you will still list it in your finding as ten grams even

17  if it's one one-hundredth of a gram controlled substance.

18  Correct?

19  A.    If it was that weight, yes.

20         MR. BURNHAM:  No further questions.  Thank you.

21         THE COURT:  Redirect?

22                    REDIRECT EXAMINATION

23  BY MR. DRAUGHON:

24  Q.    Is it common to attempt to separate the cocaine and

25  cocaine base with the cutting agent?

1    A.    Repeat what you just said.  I'm sorry.

2    Q.    Is it common to attempt to separate the controlled

3    substance with the cutting agent?

4    A.    No.  It is only separated in my analysis.

5          MR. DRAUGHON:  I have no further questions, Your

6    Honor.

7          THE COURT:  Thank you, ma'am.  You may step down.

8    You are excused.

9          THE WITNESS:  Thank you, sir.

10         THE COURT:  Next witness.

11         MR. BALDWIN:  Thank you, Your Honor.  We are just

12   setting up some exhibits for the next witness.

13        Your Honor, this might be a good time for a stretch

14   break.  We are just setting out some exhibits for the next

15   witness.

16         THE COURT:  You need another?

17         MR. BALDWIN:  Five minutes.

18         THE COURT:  Seven, eight minutes, Theresa.  Lead them

19   back -- unless you want people to wait here.  Do you want to do

20   this while we sit?

21         MR. BALDWIN:  That's fine, Your Honor.

22         THE COURT:  Let's try and do it without breaking.

23         THE DEPUTY CLERK:  The jurors can stand up if you'd

24   like a stretch break.

25         THE COURT:  Ready to go?

1            MR. BALDWIN:  One moment, Your Honor.

2        Yes, Your Honor, we are ready.

3        And the government calls our next witness, Fernando

4  Jaramillo.

5            THE COURT:  All right.  Sir, remain standing outside

6  the witness box.  Just come a little closer this way.  Right

7  there is good.  Okay.

8            THE DEPUTY CLERK:  Please raise your right hand.

9        FERNANDO JARAMILLO, GOVERNMENT'S WITNESS, SWORN

10            THE DEPUTY CLERK:  Please have a seat in the jury

11  box.  Watch your step as you enter.  I mean, I'm sorry, the

12  witness box.

13            THE COURT:  Did you say "under the penalties of

14  perjury"?  Maybe I didn't hear it.

15            THE DEPUTY CLERK:  I'm sorry.  Come back.  Let's try

16  this again.  Rewind.  Please raise your right hand.

17        FERNANDO JARAMILLO, GOVERNMENT'S WITNESS, SWORN

18            THE DEPUTY CLERK:  Please have a seat in the witness

19  box and watch your step as you enter.

20            THE WITNESS:  Thank you.

21            THE DEPUTY CLERK:  You're welcome.

22        Please speak loudly and clearly into the microphone.

23  State your name for the record and spell each name.

24            THE WITNESS:  Yes, ma'am.  My name is Detective

25  Fernando Jaramillo, F-E-R-N-A-N-D-O, and my last name is

1  spelled J-A-R-A-M-I-L-L-O.

2          THE DEPUTY CLERK:  Thank you.

3                      DIRECT EXAMINATION

4  BY MR. BALDWIN:

5  Q.    Good afternoon, sir.

6  A.    Good afternoon.

7  Q.    Where do you work?

8  A.    I am a detective with Montgomery County Police.

9  Q.    And how long have you worked with the Montgomery County

10  Police Department?

11  A.    Over 22 years.

12  Q.    What's your current position there?

13  A.    I am a narcotics investigator.  I am assigned to the Drug

14  Enforcement Administration, DEA, High Intensity Drug

15  Trafficking Area Drug Task Force.

16  Q.    And do you investigate drug trafficking crimes around the

17  entire D.C. area?

18  A.    I do.

19  Q.    So, just briefly, when did you start as a detective in

20  the narcotics group in Montgomery County?

21  A.    I started as a detective in 2005.

22  Q.    And prior to that, what was your position in the

23  Montgomery County Police Department?

24  A.    Prior to that, I was assigned to the third district

25  Special Assignment Team.  It's a covert street-level

1    surveillance unit.

2    Q.    And what sort of things besides surveillance does the

3    Special Assignment Team do?

4    A.    The Special Assignment Team, we focus on street crimes.

5    We perform surveillance every day.  Street crimes such as

6    robberies, narcotics distributions, auto theft, crimes that you

7    would think that would happen to the general public.

8    Q.    How long were you with the Special Assignment Team?

9    A.    Approximately three years.

10   Q.    And before you were on the Special Assignment Team, what

11   was your post?

12   A.    Before that, I was a patrol officer, wore a uniform,

13   drove in my police car.

14   Q.    And what were your duties as a patrol officer?

15   A.    We answer calls for service.  I worked the midnight

16   shift, so handle accidents, just regular calls for service.

17   Q.    In your time as a patrol officer, did you have

18   opportunity to observe drug transactions?

19   A.    I did, yes.

20   Q.    And did you patrol areas where there was a lot of drug

21   activity?

22   A.    Yes.

23   Q.    So in your -- in your time as a detective since 2005,

24   what have been your duties in the Montgomery County Police

25   Department?

1    A.    Well, my initial assignment were the drug investigations

2    unit.  We handle low- to mid-level narcotics investigations.

3    We handle informants, doing controlled buys, doing undercover

4    work, applying for search warrants and executing the search

5    warrants and those arrest warrants.

6    Q.    What is a controlled buy?

7    A.    A controlled buy is -- it's an investigative method in

8    which you use an informant to purchase narcotics from a -- from

9    a drug target.

10   Q.    And what other sort -- what other investigative tools do

11   you utilize as a -- a detective in Montgomery County in the

12   drug trafficking area?

13   A.    We use a lot of investigative techniques.  Simple

14   investigative technique just as surveillance, to controlled

15   buy, to undercover work, electronic surveillance, tolls,

16   undercover work, if I mentioned that, to the -- the highest

17   level of what we think of as an investigative technique, which

18   is wiretap.

19   Q.    And do you still use all those techniques at this point

20   in your career?

21   A.    Yes.

22   Q.    And you say you are a member of the High Intensity Drug

23   Trafficking Area Task Force?

24   A.    Yes.

25   Q.    And, so, is the focus of your time on drug trafficking?

1  A.      Yes.

2  Q.      And how long has that been the case?

3  A.      Well, I have been assigned to this task force since 2013,

4  and prior to that, we worked with other federal agencies as

5  well.  What we do here is we target organizations and career

6  offenders, so it's a lengthier investigation, more in depth.

7  Q.      Have you executed search warrants with respect to

8  narcotics investigations?

9  A.      Yes, sir, numerous times.

10 Q.      Approximately how many times?

11 A.      Hundreds.

12 Q.      Have you searched residences for drug trafficking related

13 materials?

14 A.      Yes, sir.

15 Q.      What do you search for when you are searching a residence

16 for drug trafficking materials?

17 A.      Obviously, evidence of a crime, narcotics, documents,

18 money, weapons, and things that may lead you or -- through

19 other portions of the investigation or may take your

20 investigation in a different direction.

21 Q.      In your capacity, have you acted as an undercover in

22 narcotics investigations?

23 A.      Yes, I have.

24 Q.      In your capacity as an undercover, have you interacted

25 with drug distributors?

1   A.     I have.

2   Q.     Approximately how many times have you conducted a

3   purchase as an undercover?

4   A.     Hundreds.

5   Q.     Have you posed as a drug distributor?

6   A.     I have.

7   Q.     How many times have you done that?

8   A.     Not as many, but a few I have.

9   Q.     Have you had any training on the manufacture of crack

10  cocaine?

11  A.     Yes.

12  Q.     Have you seen crack cocaine manufactured?

13  A.     Yes.

14  Q.     What trainings have you had related to drug trafficking?

15  A.     The very basic training that I received in the Police

16  Academy and throughout my career where I attended numerous

17  classes put on by different federal agencies and organizations

18  that would tell you the current drug trend, how current drugs

19  are being distributed, how they are being cut, what they are

20  being cut with, certain areas of the country are seeing more of

21  a specific drug than others, prices, money laundering portion

22  of the drugs, importation from abroad, and then how some of

23  those monies are also being used to purchase illegal houses.

24  Q.     From your experience and training, are you familiar with

25  amounts typically purchased by street-level consumers?

Saran 1 - Direct

1   A.    Yes.

2   Q.    Are you familiar with the street purchase prices of user

3   amounts of cocaine and cocaine base?

4   A.    Yes.

5   Q.    Are you familiar with the distribution and distribution

6   amounts of cocaine in the greater Washington, D.C. Metropolitan

7   area?

8   A.    Yes.

9   Q.    Are you familiar with the distribution amounts of cocaine

10  base in the greater Washington Metropolitan area?

11  A.    Yes.

12  Q.    Have you previously arrested distributors?

13  A.    I have.

14  Q.    And were many of those distributors subsequently

15  convicted?

16  A.    Yes.

17  Q.    Have you debriefed drug distributors?

18  A.    Yes.

19  Q.    What kinds of things have you learned from drug

20  distributors about their business?

21  A.    Just how they -- how they perform their business, who

22  they engage with, how they avoid detection from law

23  enforcement, how they avoid detection from other rival

24  narcotics distributors, how they use their money, and where

25  they are going out to obtain their sources of supply.

1  Q.    And in your -- in your experience since 2005 as a

2  narcotics investigator, have you had an opportunity to observe

3  the interaction of drug trafficking with gun crime?

4  A.    Yes.

5  Q.    And are you familiar with -- have you encountered guns in

6  search warrants previously when you executed narcotics search

7  warrants?

8  A.    I have.

9  Q.    Have you investigated drug distributors that distribute

10 straight to street-level customers?

11 A.    Yes.

12 Q.    Have you investigated distributors that distribute to

13 others who then distribute the drugs further?

14 A.    I have.

15 Q.    Are you familiar with the different amounts of narcotics

16 that would be distributed at both of those levels of

17 distribution?

18 A.    Yes.

19 Q.    Have you ever been qualified as an expert in federal

20 court?

21 A.    I have.

22 Q.    How many times?

23 A.    Approximately three times.

24 Q.    In this courthouse?

25 A.    Yes.

1    Q.    Are -- has any judge ever refused to qualify you as an

2    expert?

3    A.    No.

4    Q.    Have you ever been accepted as a drug expert on drug

5    trafficking in state court?

6    A.    I have.

7    Q.    Are you familiar with cocaine and cocaine base and the

8    supply routes that come to -- by which it arrives in Maryland?

9    A.    Yes.

10              MR. BALDWIN:  Your Honor, the government offers

11   Detective Fernando Jaramillo as an expert in drug trafficking,

12   including the distribution of cocaine and cocaine base.

13              MR. BURNHAM:  No objection.

14              THE COURT:  So declared.

15   BY MR. BALDWIN:

16   Q.    Detective Jaramillo, can you tell me how -- how is

17   cocaine distributed at the street level in terms of amounts?

18   A.    So what we have is two portions, cocaine, cocaine ACL,

19   the typical pattern of cocaine and then cocaine base.  The

20   powder cocaine is generally distributed in the gram amounts for

21   street-level consumers.  The cocaine base, crack cocaine is

22   typically distributed in tenths of a gram for a consumer.

23   Q.    So how much -- how much money would someone charge for a

24   street-level amount of cocaine base?

25   A.    Cocaine base, to give you a good reference point, if you

1  picture a -- the top of an eraser head, that's generally going

2  to be a tenth of a gram that's valued anywhere from 20 to $30,

3  and that's typically what a -- a cocaine user is going to --

4  going to buy: small rock, rock cocaine, crack cocaine.

5  Q.    And so a tenth of a gram, 20 to $30?

6  A.    Yes, sir.

7  Q.    And that's current now?

8  A.    Yes, sir.

9  Q.    Back in 2016, was there any difference then?

10  A.    Not a significant -- not a significant difference, no.

11  Q.    So with respect to the distribution amount of one gram of

12  cocaine powder you were talking about, how much would that

13  cost?

14  A.    A gram would probably typically run you anywhere from $80

15  to 100.

16  Q.    So street-level cocaine distributor, what are the -- what

17  are the most typical amounts that that distributor would have

18  -- that they would be distributing on a regular basis?

19  A.    For street level?

20  Q.    Yes.

21  A.    Again, anywhere from, you know, an eighth of an ounce to

22  a quarter of an ounce to distribute to consumers, to

23  street-level consumers.  And, again, each little rock would

24  generally be about a tenth of a gram.

25  Q.    Okay.  So are you saying the distributor would be

1  carrying that much and they would -- and they would distribute

2  off a tenth of a gram off of that -- that amount?

3  A.    They would, but it would be packaged individually.

4  Q.    Okay.  So you'd expect to see individual packages of that

5  -- that tenth of a gram amount?

6  A.    Correct.

7  Q.    Now with respect to distribution at the next level, a

8  distributor who is distributing to -- to others who then

9  further distribute, what is the typical amount in that level of

10 distribution, mid-level distribution?

11 A.    To distribute to subjects who are themselves going to

12 distribute, probably half ounce to an ounce of crack cocaine.

13 Q.    And how many grams is in an ounce?

14 A.    An ounce, typically 29 grams usually.

15 Q.    So that's -- that's the amount -- a half ounce to a whole

16 ounce is the amount that would be distributed to someone else

17 who would then do further distribution?

18 A.    Correct.

19 Q.    Now, with respect to cocaine distributors, cocaine

20 distributors do -- is it possible for a cocaine distributor to

21 manufacture crack cocaine from powder cocaine?

22 A.    Yes.

23 Q.    And what is the process for doing that?

24 A.    It's -- it's not a very complicated process.  Typically,

25 if you are going to cook your crack, you are going to get

1  powder cocaine, and then depending on the quality of that

2  powder cocaine, you may dilute it or cut that powder cocaine so

3  you have more product.  Once you have your desired potency of

4  that powder cocaine, it's a process where you mix the powder

5  cocaine with baking soda, a little bit of water and usually in

6  a Pyrex bowl and some heating element, and the combination of

7  the baking soda and the cocaine hardens up and turns into

8  cocaine base, crack cocaine.

9  Q.    So what are you left with after you have done that

10 process?  What does it physically look like?

11 A.    It looks like a cookie sheet.  And from then on, you just

12 -- it depends on where you baked it.  It may take the shape of

13 the bowl that you had it on, and then it just becomes,

14 actually, a rock-like substance.

15 Q.    Now, you mentioned a cutting agent.

16       What is a cutting agent?

17 A.    Cutting agent is something you are going to use to,

18 again, dilute your product.  You know, you want to use -- you

19 want to gain as much money and you want to have your product

20 last as long as you can, and sometimes if you have a good

21 quality powder cocaine, you are going to dilute it in order for

22 you to have more -- more cocaine and make more money.

23 Q.    So what type of substances are used as cutting agents?

24 A.    For powder cocaine, typically what's used is Inositol

25 powder.  It's got the same substance and the same color as

1  powder cocaine, so when you mix the two together, it's -- they

2  look similar.

3  Q.    And when -- so you just physically mix the powder with

4  the Inositol?

5  A.    Correct.

6  Q.    And then what do you do with it?

7  A.    And then you just -- you mix it, and then you would

8  re-package that cocaine if -- if you want to actually sell it

9  as powder cocaine, or you could also bake it using the baking

10 soda and convert it into crack cocaine.

11 Q.    Is that -- and when you say "crack cocaine," what are you

12 referring to?  What kind of cocaine is that?

13 A.    Cocaine base.

14 Q.    And crack is a common way to refer to cocaine base.  Is

15 that correct?

16 A.    Say it again.

17 Q.    Is crack the common way to refer to cocaine base?

18 A.    Yes.

19 Q.    So with respect to users of the cocaine, the street-level

20 users of the cocaine, do they put Inositol in their cocaine?

21 A.    No.

22 Q.    Why not?

23 A.    Because you wouldn't get your money's worth.  You would

24 be diluting your own product.  It wouldn't be as potent.

25 Q.    So, in your investigations, how do you distinguish

1  between someone who is a user and someone who is a distributor?

2  A.    A user typically is not going to have large amounts of

3  narcotics.  They are going to have a -- an amount that they are

4  going to -- they are going to be able to use for personal use

5  for themselves.  They are not going to have large amounts of

6  narcotics or money or other paraphernalia that would indicate

7  that they are distributors.

8  Q.    And what sort of things would, basically, would you

9  expect a distributor to have?

10 A.    A distributor would have, again, cutting agents for

11 powder cocaine, like Inositol.  If you are baking it into crack

12 cocaine, baking soda.  You are going to need a scale.  You are

13 going to need, obviously, baggies, and just some paraphernalia

14 for you to mix the -- the -- the cocaine together.

15 Q.    I'm sorry.  Could you repeat that last point you said?

16 A.    Items that you would need to mix both the cocaine with

17 the Inositol or just paraphernalia or a heating element or a

18 Pyrex for you to bake your cocaine base in.

19 Q.    What's the purpose of a scale?

20 A.    A scale is -- if you are a distributor and you are

21 distributing narcotics of cocaine or crack cocaine to other

22 people who are distributing cocaine, you want to make sure that

23 you are giving them the correct amount of weight that they are

24 buying from you.  So if you are selling them a half ounce or

25 you are going to sell them an ounce, you need to weigh that to

1   make sure that that's what they are buying, that's what you are
2   selling them.
3   Q.    What's the consequences if you don't -- if you don't have
4   the appropriate amount of cocaine?
5   A.    Well, the consequences vary.  You know, it could be, you
6   know, you end up losing money, you end up losing business,
7   simple as that, or, you know, it can be as severe as people
8   retaliating against you because you are constantly shorting
9   them and you are not giving them what they want.
10  Q.    When people are buying and selling crack cocaine, do they
11  -- do they use checks, personal checks?
12  A.    No.
13  Q.    How is -- how is it that people generally pay for crack
14  cocaine?
15  A.    Drug trafficking is a cash-based business.
16  Q.    So what would -- would you expect in terms of a
17  distributor to have cash on hand?
18  A.    Yes.
19  Q.    What would someone cooking crack cocaine have in their
20  residence?
21  A.    Again, you need cocaine, what you need is baking soda,
22  Pyrex bowl, and then a spoon to mix the two up, and then, you
23  know, some sort of heating element, microwave or stove.
24  Q.    What part, if any, do firearms play in narcotics
25  trafficking?

A.     Firearms play a large -- a large portion of narcotics
trafficking.  Narcotics trafficking itself, it's a violent --
it's a violent thing.  It's having a firearm, displaying a
firearm, not even using it, just displaying a firearm sometimes
could prevent -- prevent you from being robbed or being shorted
an amount of money.  You know, like I said, drug trafficking is
violent.  It's a cash-based business.  Narcotics traffickers
would have handguns -- guns on them to prevent other rivals
from robbing you from the proceeds or from your narcotics.

Q.     With respect to -- with respect to residence, what would
be the use of a firearm in a residence for a drug trafficker?

A.     Again, being that it is a violent -- violent business,
typically, in your residence, you are going to have your place
with your cash, you are going to have your narcotics that you
packaged for distribution.  Having firearms in your home, you
are going to protect yourself from home invasion robberies by
rival drug dealers and people who would want to steal your
drugs and your money.

Q.     If I could, I'd ask the witness to step down.  If we
could supply a Lavalier?

       THE COURT:  Step down, if you would, from the box,
sir.

       (Witness exits the witness stand.)

       MR. BALDWIN:  Thank you.  Your Honor, may I approach?
Thank you.

1   BY MR. BALDWIN:

2   Q.   Detective Jaramillo, I'd like to look at some items that

3   have been --

4           THE COURT:  Does the Lavalier need to be on higher?

5           THE DEPUTY CLERK:  I'm not sure what's going on.

6           THE COURT:  Try it again.

7           MR. BALDWIN:  Your Honor, in the interest of time, I

8   am just going to continue from the podium for right now.

9           THE COURT:  Good idea.

10  BY MR. BALDWIN:

11  Q.   Detective, if you could look there at the table, and

12  there is some packaging there.  If you could take a look at

13  that, can you identify what those materials are, what they

14  appear to be to you?

15  A.   They appear to be crack cocaine.

16          THE COURT:  Go ahead.

17  BY MR. BALDWIN:

18  Q.   You are going to have to speak right into that Lavalier.

19          It appears to be crack cocaine.  That amount of crack

20  cocaine you are looking at there, can you describe the cocaine?

21  A.   It appears to be cocaine for redistribution, not personal

22  use.

23  Q.   And why do you say that?

24  A.   Because of the amount of it and the -- the size of the

25  rocks -- the size of the rock -- the size of the rock in the

1   bag.

2   Q.    Could you just hold that up so the jury -- just get close

3   to the Plexiglas here and hold it up and point out the rocks

4   that you were talking about in the bag there?

5   A.    So you see this -- the bag, there is numerous sized rocks

6   in here, and the larger rock, the smaller rocks, and you can

7   tell the off-white color of the crack base, crack cocaine, and

8   the different -- the different sized rocks that are in the bag.

9   Q.    Thank you.

10        Now I am going to put it on the ELMO.  Thank you.  I am

11  putting it on the ELMO so we can have the other jurors see it.

12  Is that better?

13        So this is -- can you see the screen over here over my

14  shoulder?  You can see it?

15  A.    I do, yes.

16  Q.    Thank you.  I am pointing now.

17        Is this the portion you were pointing out that were the

18  rocks in this section?

19  A.    Yes, sir.

20  Q.    And some of these over here are crushed.

21        Have you seen drugs that come back from the DEA before?

22  A.    Yes.

23  Q.    And is this what it looks like after samples have been

24  crushed?

25  A.    At times, yes.  The change is because of the way it was

Jaramillo - Direct

1    packaged and it's been handled and submitted to the lab and

2    returned from the lab.

3    Q.    Okay.  Thank you.  Thank you, Detective Jaramillo.

4    A.    Sure.

5    Q.    Now I am showing you some additional -- this has been

6    marked as Government Exhibit D15.

7         Could you tell me what that looks like to you?

8    A.    This looks like cocaine you see, powder cocaine.  What

9    you typically see is white powder cocaine, and there are some

10   rocks in here, but keep in mind that, initially, the cocaine

11   will come in a chunk, and you would scale it off, shave it off,

12   and then you would add your Inositol powder, your cutting agent

13   on there.

14   Q.    Is this -- what you are looking at there in that exhibit,

15   would that be an amount you would expect to see in a user or

16   distributor?

17   A.    In a distributor.  Not -- this is not personal use, not

18   for a user.

19   Q.    Thank you.

20        Now I am going to direct you -- I am going to direct you

21   to Government Exhibit D14.

22             THE DEPUTY CLERK:  I'm sorry.  It turned off again.

23   Mr. Baldwin, which microphone is that?  Is it one or two?

24             MR. BALDWIN:  One.

25   BY MR. BALDWIN:

Saraff - Direct

1   Q.    I am directing you -- which Government's Exhibit is that,

2   D number?  No.  D14?

3   A.    D14.

4   Q.    And what's in D14?  Do you recognize that?

5   A.    It appears to be larger rocks of crack cocaine, cocaine

6   base.

7   Q.    And, again, how do you identify that?  What makes you

8   think it's cocaine base?

9   A.    Well, number one, the color, and, two, the -- the shape

10  of it.  Powder cocaine typically is going to be -- it's going

11  to be white.  It's not going to be beige, off-white like this

12  -- this crack cocaine is.

13  Q.    Thank you.  I am going to walk this around to the other

14  side.

15        Again, in this exhibit that we were just looking at, this

16  D14, would this be an amount you'd expect to find held by a

17  user or a distributor?

18  A.    Not for a user.  For a distributor.  A distributor.

19  Probably for a person who, again, is going to distribute this

20  amount.

21  Q.    Again, and I am going you now what's been marked as

22  Government Exhibit SW9.

23        Do you recognize what that is?

24  A.    Yes.  It's a can of Inositol powder.

25  Q.    Is that the Inositol powder you were referring to

1  earlier?

2  A.    It is.

3  Q.    Used as a cutting agent?

4  A.    It is.

5  Q.    And just to be clear, you weren't involved at all in the

6  investigation of the case -- the case that we are talking about

7  here?

8  A.    I was not.

9  Q.    And you weren't there for the execution of the search

10 warrant at all?

11 A.    I was not.

12 Q.    I am showing you what's been marked as Government Exhibit

13 D5.

14 A.    Yes, sir.

15 Q.    Yes.  Can you tell me what this implement would be used

16 for in terms of drug trafficking?

17 A.    In drug trafficking, like I said, this is a Pyrex bowl

18 with different -- different amounts that you see on the Pyrex

19 bowl, and you would use it to cook powder cocaine into cocaine

20 base, into crack cocaine.

21 Q.    Thank you.  I am going to walk that over to the other

22 side.

23       Now I want to draw your attention to what's been marked

24 as Government's Exhibit D7 in this case.

25       Can you tell me if you recognize what that is?

1   A.    Yeah.  It's a digital scale.

2   Q.    And what would that be used for in terms of drug

3   trafficking?

4   A.    A digital scale, again, you would need it for measuring

5   out the amount of narcotics that you would weigh out for

6   distribution.

7   Q.    And would you expect to see that in the residence of a

8   user?

9   A.    No, not in the residence of a user.

10  Q.    Thank you.

11        I want to draw your attention to several exhibits here at

12  the end of this table, including D11 that has some packaging in

13  it.

14  A.    Yes.

15  Q.    And D8 as well.

16  A.    Yes.

17  Q.    Are you familiar with that packaging like that?

18  A.    It looks consistent to be -- it's plastic baggies that

19  look consistent for packaging of cocaine and crack cocaine.

20  Q.    Let me ask you, are -- is cocaine and cocaine base always

21  distributed in Ziploc bags?

22  A.    Not in Ziploc bags.  It's -- you can distribute it in

23  torn off baggies and tied back up.  Just different ways --

24  different ways you want to market your -- your product, the way

25  you want to sell it.

1    Q.    Have you encountered previously in executing search

2    warrants at a drug trafficking residence cocaine that's wrapped

3    in loose plastic?

4    A.    Yes.

5    Q.    Thank you.

6          Now I want to direct your attention here to some of these

7    items on the floor.

8          Do you see this, sir?

9    A.    I do, yes.

10   Q.    Okay.  And what -- do you know what model firearm that

11   is?

12   A.    It's a handgun.  It appears to be.

13   Q.    That's okay.

14         You can't tell by looking at it, I guess?

15   A.    Right.

16   Q.    That's okay.

17         So I guess my question for you is -- if you can go back

18   to your seat.  I think we need to give the Lavalier back to

19   Ms. Derro.

20              THE COURT:  How much more on direct?

21              MR. BALDWIN:  Just a few more minutes, Your Honor.

22              THE DEPUTY CLERK:  Thank you.

23   BY MR. BALDWIN:

24   Q.    Detective, up on the screen, you should see an exhibit

25   previously marked as P12.

1      Do you see that?

2   A.    I do.

3   Q.    And this is a picture taken from the residence where a

4   search warrant was executed.

5      Is there any value to having a firearm in close proximity

6   to drugs for a drug trafficker?

7   A.    Yes.

8   Q.    And what is the value of that?

9   A.    Again, you want to protect yourself, you want to protect

10  your product, you want to protect your proceeds.

11          MR. BALDWIN:  No further questions, Your Honor.

12          THE COURT:  All right.  Some idea of the extent of

13  your cross?  How much time?

14          MR. BURNHAM:  I'm sorry.  I didn't hear you, Your

15  Honor.

16          THE COURT:  How much time do you think you might

17  need?

18          MR. BURNHAM:  Probably up to ten minutes.

19          THE COURT:  The question is whether we should take a

20  break now or after.

21          MR. BURNHAM:  Court's discretion.  A short cross --

22          THE COURT:  Let's try to do our cross now then.

23          MR. BURNHAM:  All right.  The Court's indulgence.  I

24  am consulting with Mr. Conley here.

25                     CROSS-EXAMINATION

Saran 1 - Direct

1   BY MR. BURNHAM:

2   Q.    Good afternoon.  I am Charles Burnham.  I have a few

3   questions.

4   A.    Good afternoon to you, sir.

5   Q.    Isn't it true that, as a general statement, the more

6   controlled substances you buy, the cheaper the per unit price

7   is likely to be.  Correct?

8   A.    Generally, sometimes, yes.

9   Q.    Another way to say that would be the more grams you are

10  buying, the less the -- the smaller the per gram price is

11  likely to be?

12  A.    Correct.

13  Q.    You described the process on direct examination of

14  converting powder cocaine to crack cocaine.

15        You recall that.  Right?

16  A.    Yes, sir.

17  Q.    Isn't it true that there is no reason why a user, a pure

18  user of cocaine might not convert some powder cocaine they had

19  purchased into crack cocaine and then used the crack cocaine?

20  A.    Say that again.

21  Q.    A user of cocaine might themselves convert powder to

22  crack cocaine if that's what they wanted to smoke.  Correct?

23  A.    Yes.  In theory, yes.  But, typically, you are not going

24  -- you are going to purchase either/or.  You are going to

25  purchase your cocaine HCl, your powder cocaine, or you are

1  going to purchase your cocaine base, your crack.

2  Q.   And you testified that the process for making crack

3  cocaine from powder is not complicated.  It wouldn't take long

4  to learn if you wanted to learn it.  Right?

5  A.   Correct.

6  Q.   Wouldn't you also agree that many drug dealers, not all,

7  but many will have a preference for doing drug transactions in

8  a location other than where they live.  Right?

9  A.   Correct.

10  Q.   So, for example, they might meet a customer, or, if they

11  are buying cocaine, meet the seller at a gas station, perhaps,

12  or a parking lot.  Right?

13  A.   Again, you got to -- it depends on who you are dealing

14  with.  If you are going to deal with somebody who is new, you

15  are not going to invite him over your house, but if this person

16  has been a customer for quite some time and you feel

17  comfortable with him, you might invite him over your house.

18  Yeah.

19  Q.   Isn't it true that a drug purchaser might also have an

20  interest in having a scale to make sure they weren't getting

21  ripped off by the seller?

22  A.   I guess you could.  But, typically, I don't see that very

23  often.

24       MR. BURNHAM:  Thank you.  No further questions.

25       THE COURT:  Redirect.

```
 1                    REDIRECT EXAMINATION
 2  BY MR. BALDWIN:
 3  Q.    Detective, in your experience, how often, if at all, have
 4  you found a drug user who had four scales in their residence?
 5  A.    Not for a drug user, no.
 6              MR. BALDWIN:  Thank you.  No further questions, Your
 7  Honor.
 8              THE COURT:  All right.  Thank you, sir.  You may step
 9  down and you are excused.
10              THE WITNESS:  Thank you, sir.
11              THE COURT:  Do you have further witnesses,
12  Mr. Baldwin?
13              MR. BALDWIN:  No, Your Honor.  The government rests.
14              THE COURT:  All right, folks.  I am going to ask you
15  to go out of the courtroom now and take about a 10- to
16  15-minute break.  Leave your materials, and I will call you
17  back in here shortly.
18         (The jury panel exit the courtroom at 4:11 p.m.)
19              THE COURT:  Let's take a short break ourselves, come
20  back, and then we will take a Rule 29 motion and indicate one
21  way or another whether the defendant --
22              MR. BURNHAM:  I couldn't hear you.  You want to do a
23  Rule 29 now?
24              THE COURT:  Did you not hear me?
25              MR. BURNHAM:  I heard a reference to a Rule 29.
```

Varnum - Redirect

```
 1              THE COURT:  I will take the Rule 29 motion after we

 2   recess ourselves, take about five minutes, and come back in.

 3   And then I want to inquire about whether the defendant is going

 4   to testify so that I can question him about that.

 5              MR. BURNHAM:  Okay.

 6              THE COURT:  We will do that before we go further.

 7              MR. BURNHAM:  Thank you, Your Honor.

 8              THE COURT:  Let's take about a five-minute break or

 9   seven-minute break on our own, come back, and we will address

10   those matters.

11              MR. BURNHAM:  Thank you, Your Honor.

12         (Recess taken from 4:13 p.m. until 4:38 p.m.)

13              THE COURT:  Have a seat folks, please.

14         All right.  Let's start with the Rule 29 motion,

15   Mr. Burnham.

16              MR. BURNHAM:  Thank you, Your Honor.

17              THE DEFENDANT:  Can I say something?

18              THE COURT:  I don't know why he's raising his hand.

19              MR. BURNHAM:  I will address that.

20              THE COURT:  I'm sorry.  Did you hear what I said?

21   Your client is raising his hand as if he wants to talk to you.

22              MR. BURNHAM:  I know what it's about, Your Honor, and

23   I will briefly state it is Mr. Conley's interpretation of Rule

24   29 with its references to, quote, the defendant, he interprets

25   that to mean that he personally gets to argue the Rule 29
```

1  motion, so my understanding of the rule is not the same.

2      I understand Your Honor has denied his request to proceed

3  pro se either at Rule 29 or any other stage, and so that's why

4  he was raising his hand.  We were just discussing that.  But I

5  am prepared to -- this is his request.  He wants to argue it

6  himself.  So I guess, on his behalf, I will submit it to Your

7  Honor, and if Your Honor wants to proceed that way or

8  Mr. Baldwin?

9          MR. BALDWIN:  Your Honor, I believe that Mr. Burnham

10  is now acting as counsel for the defendant, and so it would be

11  inappropriate to have the defendant argue the motion.

12          THE COURT:  Let me say that so much of the law, much

13  of the law in this country refers to the defendant, the

14  defendant has this right or that right, but when there is a

15  defendant represented by counsel, that does not mean that the

16  individual defendant gets to step away and himself act pro se

17  for various reasons, which I don't need to re -- which I

18  reaffirm but don't need to restate.

19      I am not going to permit Mr. Conley to make any argument,

20  but, by all means, if you want to preserve this issue for

21  appeal, you may.  And, so, you may not make the argument,

22  Mr. Conley.

23      If you wish to make the argument, I assume you will,

24  Mr. Burnham, please do.

25          MR. BURNHAM:  Thank you, Your Honor.

1          THE COURT:  Rule 29.

2          MR. BURNHAM:  I make a motion for judgment of

3   acquittal under Rule 29 as to every element of all three of the

4   charges.

5          As to the charges for possession with intent to

6   distribute and felon in possession of a firearm, I will submit

7   on the record, but I will make some comments as to the 924(c)

8   charge.

9          As to that one, the government, as the Court has been

10  clear, has presented evidence of a search warrant and where

11  three -- I'm sorry, four firearms were recovered in the

12  vicinity of alleged controlled substances and paraphernalia and

13  so on.  They haven't submitted any evidence of Mr. Conley

14  carrying the guns, using them, displaying them, or anything

15  affirmative, any affirmative use of the guns to aid the alleged

16  drug trafficking.

17         Of course, I am aware of the cases that say that a jury

18  can infer from the presence of guns and drugs in the same

19  vicinity that there is a connection between the two, but I

20  think what's unique about this case to distinguish it from that

21  line of cases is the total lack of any kind of a context.

22         There is really no evidence in the record, other than the

23  little snapshot from the search itself, about the nature of the

24  alleged drug trafficking activity that Mr. Conley engaged in.

25  To the extent we have any context at all, it tends to cut the

 1  other way and suggests that there wasn't a connection between

 2  the guns and the drugs.

 3       It was a nice apartment complex, according to testimony

 4  we have heard, not in a high crime area, not in a high crime

 5  neighborhood.  To the extent we have heard evidence of any

 6  investigation other than the search warrant itself, it's been

 7  surveillance, and that didn't show drug customers coming or

 8  going from the apartment or Mr. Conley meeting with customers

 9  or really anything at all other than just him coming and going

10  from the apartment itself.

11       For all of those reasons, we'd ask the Court to dismiss

12  that charge.

13            THE COURT:  All right.  Mr. Baldwin.

14            MR. BALDWIN:  Thank you, Your Honor.

15       Your Honor, I believe the record fully supports each

16  element of all three charges.  Possession with intent to

17  distribute, there is ample evidence of distribution amounts of

18  cocaine and crack cocaine that were present in the residence,

19  including the paraphernalia, that are now in evidence.  In

20  addition, numerous witnesses testified what they look for for

21  drug trafficking when they are doing search warrants for drug

22  trafficking, and that's exactly the sort of evidence that was

23  found in the place.

24       And, of course, our expert, the last witness,

25  Mr. Jaramillo, testified -- Detective Jaramillo testified to

1    the amounts, looking at the amounts and the bags in his hands,

2    and said those were distribution amounts from which the jury

3    could infer that the -- the -- he possessed all these amounts

4    with intent to distribute.

5         In terms of possession, everything in the residence was

6    in a single bedroom residence where the lease was signed by

7    Mr. Conley.  Several witnesses testified that he was the -- he

8    was the only person there.  And, furthermore, it looked like

9    there was only one person occupying the residence.

10        So just by virtue of that, Your Honor, I believe the

11   possession of everything in the apartment has been demonstrated

12   and everywhere possession is required.

13        Clearly, utilization of the drugs, going back to the

14   first count, weighing it, the residue of powder on the scales,

15   multiple packages of it are indicative of -- of knowing that --

16   that they are, in fact, drugs, as are the implements of baking

17   powder and Inositol suggests that he knows what he's doing in

18   the drug business, the drug trafficking based on the testimony.

19        The felon in possession, Your Honor, I will submit on

20   that.  I will just point out that we have a stipulation on the

21   elements going to the prior conviction and his knowledge of it

22   and his lack of a pardon.  And, in addition, we have the

23   evidence with respect to the firearms are all in, and we have

24   interstate nexus testimony with respect to the firearms.  Many

25   of them were made overseas, as was the ammunition.

1        With respect to the 924(c) count, which counsel just

2    addressed, there is, at the very least, a handgun in very close

3    proximity to drugs in this residence.  And I think that more

4    than meets the requirement, Your Honor, of having guns in close

5    proximity to drugs, particularly given the testimony by

6    multiple witnesses they look for guns in drug trafficking

7    places when they are executing search warrants, and the direct

8    testimony by our expert witness on drug trafficking who

9    testified in that respect.

10        That's just the gun that's in the -- in the kitchen by

11    itself, Your Honor, so close to these -- so close to these

12    items, the drug items that were recovered there that have now

13    been proved and shown by the chemist to be cocaine base and

14    cocaine.

15        And finally, Your Honor, even the firearms that were in

16    the bedroom, based on the testimony that was provided by the

17    expert, go to the need to protect one's stash and protect the

18    house, and that those are implements of the drug trade and it's

19    a dangerous business.  There is also enough evidence for the

20    jury to conclude, beyond a reasonable doubt, that those guns

21    are also possessed at least in part in furtherance of a drug

22    trafficking crime, Your Honor.

23            THE COURT:  Any response, Mr. Burnham, beyond that?

24    Mr. Burnham, any response beyond that?

25            MR. BURNHAM:  No, Your Honor.

1           THE COURT:  All right.  Well, under Rule 29, before

2   the case is submitted to the jury -- would you please hold your

3   tongue, sir?  I am not going to hear from you.  Stop talking.

4   I am making my ruling at this point.  I am going to -- I am

5   going to tell you one more time, sir, if you -- if you are

6   going to start disrupting now, I am going to remove you from

7   the courtroom.  I'm sorry.  We have made this clear, but we are

8   not going to get into anymore disruption.  Just hold your

9   tongue, please.

10          Under Rule 29, if there is insufficient evidence to

11  sustain a conviction on any count, the Court is obliged to

12  enter a motion -- to grant a motion for judgment of acquittal.

13  And the standard that the Court applies is, viewing the

14  evidence in the light most favorable to the government, whether

15  a rational trier of fact judging credibility and drawing

16  reasonable inferences could find beyond a reasonable doubt that

17  the government has proved each element of the crime or crimes

18  charged.

19          Now, as to the first crime, which is the possession

20  crime, obviously, we have got, and I don't need to recite all

21  the evidence on each of the elements, just whether there is

22  sufficient evidence to justify going forward, but, clearly,

23  there is ample evidence that drugs were found on the premises

24  that was leased to the defendant with no apparent presence of

25  anyone else there, and that they were found in such an amount

1    that they would suggest distribution rather than personal use.

2    That's enough to take that issue to the jury.

3         On the second count about -- let's go to the third count

4    first, the issue of whether he was a felon in possession of a

5    weapon.  Clearly, he was a felon.  That's been stipulated, that

6    he was previously convicted of a felony carrying a punishment

7    of more than one year and he knew that he was.  This was at the

8    time of the alleged possession of the weapon.

9         So the question is whether there is evidence, A, of

10   possession of a weapon, and, B, whether there is evidence that

11   it was in furtherance of a drug crime.

12        Clearly, there were weapons that were found, multiple

13   weapons that were found, again, on the premises, in his name

14   only, with no evidence of anybody else living there, so,

15   clearly, he possessed a weapon, at least there is evidence to

16   be argued.

17        The issue is whether it can fairly be argued that there

18   was -- there is evidence, sufficient evidence of whether the

19   gun was in furtherance of a drug crime.  And you have got the

20   issue of, first of all, the physical evidence of drugs and guns

21   in close proximity, multiple guns, and you have that alone can

22   suggest, where it's a solely occupied premises, that the person

23   is using the drugs in connection with the -- using the gun in

24   connection with the drug activity.

25        But you have testimony from the expert, Mr. Jaramillo, at

1   the end made that express statement that guns are maintained

2   often to protect the drug activities that were going on and

3   protect others from coming in and threatening with regard to

4   the drug activity, and those are all fair arguments.

5        So there is no basis under Rule 29 to grant a motion for

6   judgment.  All the elements, as far as the Court is concerned,

7   do have sufficient evidence from which the Trier of Fact can

8   find the defendant guilty beyond a reasonable doubt.  So the

9   motion for judgment of acquittal is denied.

10       Now, the other issue that remains is about the defendant

11  testifying in the case since there was some indication by you,

12  Mr. Burnham, that he may wish to do that.

13       What is your position on that now?

14            MR. BURNHAM:  He wishes to testify.

15            THE COURT:  All right.  If he wishes to testify,

16  then, I need to say a number of things to you in that regard

17  since you wish to testify.  You need to pay close attention,

18  Mr. Conley.  Are you paying attention?

19            THE DEFENDANT:  I am listening.

20            THE COURT:  Number one, you will be sworn to tell the

21  truth under penalties of perjury, so you need to understand

22  that if you, in fact, do lie, you could potentially be

23  prosecuted for perjury or it may have some effect on your

24  sentence, number one.

25       Number two, when you testify, you can't limit your

1    testimony to just what you want to talk about.  If you are

2    going to talk about why you feel, for example, you were

3    threatened, you are going to open the door to the government

4    asking a lot about what you have done in this case.  And,

5    again, you are under penalties of perjury, so whatever you say,

6    you are going to open the door to extensive cross-examination,

7    and you can be impeached and you can be impeached based on your

8    prior convictions, that they can finally come into evidence to

9    demonstrate that perhaps you should not be believed in the

10   case.

11        These are all very serious risks that you run, but you

12   will not be able to say that you stand on your Fifth Amendment

13   rights if you start to testify about any aspect of this trial.

14        Now understand this --

15              THE DEFENDANT:  What about --

16              THE COURT: -- understand this, and stop talking when

17   I am talking.  You have a right under the Constitution, the

18   Fifth Amendment, not to testify at all, and you are entitled to

19   have me instruct the jury that they may not draw any inference

20   on the fact that you chose not to testify, and the prosecutor

21   is prohibited from making any statement in the case about your

22   failure to testify.

23        But if you do testify, you could find yourself subject

24   and very likely would find yourself subject to the prosecution

25   arguing in effect that you have testified, that you are not

1    telling the truth, and that you are convicted of certain crimes

2    and so on and so forth.  And he's going to ask you very

3    specifically, Did you deal drugs?  So that's what I am telling

4    you the risk is, and if, notwithstanding that, do you choose to

5    -- let me finish my statement -- if you, notwithstanding that,

6    choose to testify, that is something that you are doing.

7         So I am willing to accept that you have a right to

8    testify or not to testify as long as you understand that you

9    are subject to impeachment and so on.  Go ahead.

10              THE DEFENDANT:  Okay.  But since -- since -- since I

11   have been going on with this case, all you do is getting on me.

12   You don't get on nothing that they are doing.  They presenting

13   false evidence right now.  They ain't tell the jury nothing

14   about the controlled buys that they executed the warrant far.

15              THE COURT:  Okay.

16              THE DEFENDANT:  They didn't tell the jury none of

17   that.  They kicked my door in for four controlled buys and

18   didn't show it yet.  I am about to get convicted without them

19   showing the controlled buys.  That's not fair on my behalf.

20        And my lawyer, he is not doing nothing.  I am telling him

21   to do everything for me now.  He just keep -- I been telling

22   him since Monday.  He just look at me.  I am not doing that, I

23   am not doing that.  So how can I beat the lawyer, the

24   prosecutor, and the judge?

25              THE COURT:  Okay.  Now you need to be quiet.

1          THE DEFENDANT:  That's the physical evidence for them

2    getting in my house.

3          THE COURT:  Now you need to stop talking because I am

4    going to talk.

5       I have told you several times in this case that with

6    regard to the controlled buy by someone, that's not part of

7    where we are today.  I decided that twice.

8          THE DEFENDANT:  Okay.  But it's physical evidence.

9          THE COURT:  I want you to stop talking.  You need to

10   listen to me because you talk and you don't hear the words.

11   Listen.

12      I told you twice that the issue of whether someone made a

13   controlled buy or not from you is not before this Court now.

14   It was before me.  I believed the testimony when I looked at it

15   that, in fact, someone made a controlled buy.  If you remember,

16   someone apparently made an affidavit that they were searched

17   before they went in and made a buy from you, they had money,

18   they had no drugs.  Then they went to see you and came out with

19   drugs and no money.

20         THE DEFENDANT:  Okay.

21         THE COURT:  And on that basis, the determination was

22   made that there was a controlled buy.

23         THE DEFENDANT:  Okay.

24         THE COURT:  In any event -- stop talking.  In any

25   event, that was the basis for my decision.  It is not before

1    this jury now.

2         You can appeal that if, in fact, you are convicted in

3    this case.

4              THE DEFENDANT:  Okay.  But --

5              THE COURT:  You can appeal that.  But it is not part

6    of this.

7              THE DEFENDANT:  I know I am going to be convicted.

8    Everybody know that.

9              THE COURT:  You seem to think that every time I rule

10   against you, it's because I have a bias or prejudice.

11             THE DEFENDANT:  I know it is.  It is.

12             THE COURT:  The fact of the matter is the law is

13   there and you must comply with it just as --

14             THE DEFENDANT:  It's not law, though.

15             THE COURT:  I don't have to believe anything you say

16   in this case, and so far, it's been a challenge for me to

17   believe anything that you say.

18             THE DEFENDANT:  You denied everything I say.  You --

19             THE COURT:  I think that's the end of it.  I don't

20   want you talking.  If, when the jury comes back, you testify

21   and you are out of line, if you act disrespectfully to the

22   Court, you assault -- if you assault the Court -- if you assail

23   the Court in words or otherwise, if you do the same to the

24   prosecution, I am going to remove you from the courtroom.

25        This is not a license for you to ram about what's going

1    on.  I am not going to -- listen to me again because you need

2    to know this before I oust you from the courtroom if it comes

3    to that.  You are not to argue to this jury that you don't like

4    the fact that there was a finding about a controlled buy in

5    connection with the warrant.

6              THE DEFENDANT:  Okay.

7              THE COURT:  There is no issue of that before the

8    Court.  I am not going to let you talk about it.  I am going to

9    tell you --

10             THE DEFENDANT:  This is the last thing I got to say

11   before I proceed.

12             THE COURT:  Listen to what I am telling you.  I am

13   running this show and you simply have to follow my rules.  And,

14   again, if you don't like the outcome, you can take an appeal.

15             THE DEFENDANT:  I already know the outcome.  I

16   already got my appeal ready.

17             THE COURT:  All right.  I want you to -- listen,

18   Mr. Conley.  You need to understand if you act disrespectfully

19   to the Court, to the prosecution, to your own attorney --

20             THE DEFENDANT:  I am not going to act

21   disrespectfully.

22             THE COURT: -- I am going to oust you from the Court.

23             THE DEFENDANT:  I ain't act disrespectful yet.

24             THE COURT:  The evidence is there and the jury will

25   determine what they determine.

1          THE DEFENDANT:  This is all I got to say -- this is
2    going to close it.
3          THE COURT:  Stop talking.
4          THE DEFENDANT:  This is the last thing.
5          THE COURT:  You are way beyond the bounds.  Stop
6    talking.
7          THE DEFENDANT:  It's physical -- the controlled buys
8    was physical evidence.  That's what they used to execute the
9    warrant for my house.
10          THE COURT:  I have told you --
11          THE DEFENDANT:  It says that the prosecutor --
12    anything gathered in the investigation, the prosecutor have to
13    provide to the defense the opportunity to examine it.
14          THE COURT:  I want you to stop.
15          THE DEFENDANT:  This is basic law, and you know that.
16          THE COURT:  I want you to stop right now, and I am
17    not going to let you argue that to the jury.
18          THE DEFENDANT:  I am about to get convicted without
19    them showing their physical evidence.
20          THE COURT:  You may well be convicted based on the
21    evidence.
22          THE DEFENDANT:  I know I am going to be convicted.  I
23    know what I am dealing with.
24          THE COURT:  Mr. Burnham, anything more you need to
25    say about it?  I need it to be clear to you and to him if he

1  continues on this line, if he tries to argue this to the jury

2  and will not cease, I am going to put him out of the courtroom.

3       The marshal, is there an ability for him to watch this on

4  the TV screen downstairs?

5            I.T. TECHNICIAN:  Yes, sir.

6            THE COURT:  Because that's what we will do.  We are

7  not going to put up with any kind of activity like that.  All

8  right.  Let's bring the jury in.

9            THE DEFENDANT:  As long as it's on record.

10            THE COURT:  Let's bring the jury in.  I am satisfied

11  that the defendant has waived his Fifth Amendment right if he

12  chooses to testify.

13            MR. BURNHAM:  Your Honor, before the jury comes in,

14  Your Honor isn't expecting for me to call Mr. Conley this

15  evening, I don't take it?  It will happen tomorrow.

16            THE COURT:  Expecting what?

17            MR. BURNHAM:  Is Your Honor expecting me to proceed

18  with my case with Mr. Conley's testimony this evening?

19            THE COURT:  Your Rule 29 motion has been denied.  You

20  have to put on a case and you can say Mr. Conley has chosen to

21  testify.

22            MR. BURNHAM:  I just mean, in view of the time, it's

23  5:00, if this might not be better taken up tomorrow.

24            THE COURT:  No.  We are going to finish the evidence

25  now.  We will see where we are.

1      Are you ready to go today?

2           MR. BURNHAM:  Yes, Your Honor.

3           THE COURT:  Do you want him to think about it

4    overnight or what?

5           MR. BURNHAM:  I'd prefer to start tomorrow.  I mean,

6    I -- I think I can say on the record it's -- it's against my

7    advice that he's testifying, so my preference would be given

8    the hour --

9           THE COURT:  Hold on a second, Theresa.  It is 5:00.

10   Mr. Baldwin, I can wait until tomorrow.

11          MR. BALDWIN:  Your Honor, I have no objection until

12   waiting until tomorrow morning.

13          THE COURT:  We will put him on first thing in the

14   morning, and he can think about it.  Try and talk to him some

15   more tonight.

16        All right.  Let's bring the jury -- bring them in and I

17   will let them go.

18        Counsel, we will convene again shortly after.

19        (The jury panel enter the courtroom at 4:59 p.m.)

20          THE COURT:  All right, folks.  I am going to let you

21   go for the day and have you back here shortly before ten

22   tomorrow morning and we should be close to winding up.  And I

23   am going instruct you then appropriately on the law of the

24   case, and you will hear closing argument of counsel, and then

25   you will be able to begin your deliberations.

1          So with that, folks, you are excused for today.  Don't

2    discuss the case with anyone in any fashion.  Leave your

3    materials.

4          Do you want them next door or here, Theresa?

5               THE DEPUTY CLERK:  Here is fine, Your Honor.

6               THE COURT:  Leave your materials on your seats here,

7    and you may step out with Theresa now.

8          (The jury panel exit the courtroom at 5:00 p.m.)

9               THE COURT:  All right.  Counsel, this charging

10   conference is ordinarily not on the record because it's just

11   arguing legal points back and forth, but I explained to you

12   what my procedure is in this regard, that we will discuss

13   whether we give the instructions as written, modify them, or

14   not give other instructions that have been requested.

15         And then once I indicate that to you, we will have the

16   final clean copies prepared by the government tonight with a

17   copy of the written instructions as we modify them for each of

18   them tomorrow.  And then after I give the instructions, we will

19   have the jury step into the waiting area, the deliberation area

20   next door, and then counsel can note their objections on the

21   record, that is, as to instructions given, not given, or

22   modified, and that's the way the record is preserved for

23   purposes of appeal.

24         So, with that in mind, there is no need for the defendant

25   to be here since this is just legal argument back and forth.

1          Anything more you want to say about that, Mr. Burnham?

2              MR. BURNHAM:  No, Your Honor.

3              THE COURT:  All right.  Mr. Baldwin?

4              MR. BALDWIN:  No, Your Honor.

5              THE COURT:  All right.  Well, give me about five

6    minutes to get organized back in chambers and then we will come

7    back out here and start.  Okay.

8          (The proceedings were concluded at 5:02 p.m.)

9

10                        - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                   INDEX TO TESTIMONY

2

3   GOVERNMENT'S WITNESSES:

4   ANDREW GRILL                                    PAGE

5       Direct examination by Mr. Draughon           18
        Cross-examination by Mr. Burnham             24
6       Redirect examination by Mr. Draughon         26

7   HOWARD PERKINS                                  PAGE

8       Direct examination by Mr. Baldwin            30

9   JOSHUA ROTHMAN                                  PAGE

10      Direct examination by Mr. Baldwin            33
        Cross-examination by Mr. Burnham             73
11
    BRANDON McCOLLUM                                PAGE
12
        Direct examination by Mr. Baldwin            77
13      Cross-examination by Mr. Burnham             94
        Redirect examination by Mr. Baldwin          96
14
    TIFFANY VAN DE MARK                             PAGE
15
        Direct examination by Mr. Draughon           99
16      Cross-examination by Mr. Burnham            116
        Redirect examination by Mr. Draughon        118
17
    FERNANDO JARAMILLO                              PAGE
18
        Direct examination by Mr. Baldwin           121
19      Cross-examination by Mr. Burnham            144
        Redirect examination by Mr. Baldwin         146
20

21

22

23

24

25
</pre>

1                        C E R T I F I C A T E

2              I, Renee A. Ewing, an Official Court Reporter for

3    the United States District Court for the District of Maryland,

4    do hereby certify that the foregoing is a true and correct

5    transcript of the stenographically reported proceedings taken

6    on the date and time previously stated in the above matter;

7    that the testimony of witnesses and statements of the parties

8    were correctly recorded in machine shorthand by me and

9    thereafter transcribed under my supervision with computer-aided

10   transcription to the best of my ability; and that I am neither

11   of counsel nor kin to any party in said action, nor interested

12   in the outcome thereof.

13

14

                       Renee A  Ewing

15                     _____

                       Renee A. Ewing, RPR, RMR, CRR
16                     Official Court Reporter
                       August 10, 2021
17

18

19

20

21

22

23

24

25

## $

**$1,236** [1] - 62:2
**$30** [2] - 129:2, 129:5
**$80** [1] - 129:14

## 1

**1** [5] - 20:25, 29:1, 75:23, 76:2, 92:12
**10** [3] - 92:15, 146:15, 167:16
**100** [2] - 34:1, 129:15
**11** [1] - 77:22
**116** [1] - 166:16
**118** [1] - 166:16
**11:15** [2] - 1:11, 2:2
**11:38** [1] - 16:23
**12** [1] - 33:12
**121** [1] - 166:18
**12:36** [1] - 54:21
**12:39** [1] - 57:3
**13** [14] - 21:17, 21:20, 22:11, 48:12, 49:10, 92:17, 93:18, 103:18, 104:10, 104:12, 104:14, 107:19, 107:24
**14** [5] - 22:16, 49:13, 103:18, 107:20, 108:2
**1424** [1] - 1:20
**144** [1] - 166:19
**146** [1] - 166:19
**15** [13] - 22:19, 49:17, 55:13, 71:9, 81:15, 86:21, 91:22, 103:18, 107:20, 109:3, 109:13, 109:15, 109:23
**15-minute** [1] - 146:16
**16** [7] - 22:22, 23:1, 49:21, 103:19, 107:21, 111:4, 111:6
**16-week** [1] - 101:2
**16th** [1] - 61:20
**17** [2] - 23:1, 49:25
**18** [9] - 23:4, 50:3, 76:5, 103:19, 107:21, 112:2, 112:18, 112:20, 166:5
**19** [10] - 18:16, 21:17, 21:21, 23:7, 48:13, 50:6, 103:19, 107:21, 113:4, 113:6
**19th** [3] - 59:19, 60:6, 84:15
**1:00** [1] - 53:21
**1:31** [1] - 57:3

**1:33** [1] - 58:16
**1A** [1] - 20:25
**1B** [1] - 20:25
**1B13** [3] - 104:15, 105:3, 105:7
**1B14** [2] - 108:6, 108:19
**1B15** [1] - 110:14
**1B16** [3] - 111:7, 111:18, 111:20
**1B18** [3] - 112:21, 112:23, 113:2
**1B19** [2] - 113:7, 113:9
**1B20** [2] - 113:20, 113:22

## 2

**2** [5] - 20:25, 29:1, 58:24, 59:9, 76:11
**20** [15] - 51:11, 51:23, 52:3, 53:23, 54:9, 54:23, 56:19, 57:2, 87:18, 103:19, 107:21, 113:17, 113:19, 129:2, 129:5
**20-year** [1] - 19:2
**200** [2] - 19:9, 24:14
**20005** [1] - 1:20
**20011** [1] - 53:16
**2005** [3] - 121:21, 122:23, 127:1
**2013** [1] - 124:3
**2016** [19] - 8:1, 15:3, 18:4, 19:16, 21:8, 31:11, 31:20, 34:24, 35:6, 36:4, 59:19, 60:6, 60:23, 61:20, 63:4, 63:7, 76:3, 76:6, 129:9
**2017** [1] - 61:20
**202** [1] - 1:21
**2020** [1] - 1:11
**2021** [1] - 167:16
**20770** [1] - 1:16
**20th** [2] - 60:23, 61:19
**21** [2] - 22:13, 76:2
**21-second** [1] - 66:13
**21st** [4] - 34:24, 35:6, 36:4, 76:6
**22** [2] - 22:17, 121:11
**23** [1] - 1:11
**24** [1] - 166:5
**25** [1] - 54:9
**25th** [4] - 19:16, 21:8, 31:11, 63:4
**26** [1] - 166:6
**27** [1] - 22:20
**28** [1] - 22:24
**281** [1] - 103:10

**29** [16] - 23:2, 130:14, 146:20, 146:23, 146:25, 147:1, 147:14, 147:24, 147:25, 148:3, 149:1, 149:3, 153:1, 153:10, 155:5, 162:19
**2:34** [1] - 97:13
**2:35** [1] - 97:17
**2:53** [1] - 97:17
**2:55** [1] - 98:16
**2A** [1] - 20:25
**2B** [1] - 20:25

## 3

**3** [4] - 1:10, 20:25, 59:20, 61:16
**3,000** [1] - 101:21
**3.2** [2] - 93:23, 94:2
**30** [2] - 55:19, 166:8
**301** [2] - 1:17, 1:24
**3016** [5] - 34:13, 34:20, 34:23, 52:16, 61:12
**3016TC** [1] - 61:11
**32** [1] - 23:5
**33** [1] - 166:10
**344-3227** [1] - 1:24
**344-4433** [1] - 1:17
**35** [1] - 23:8
**386-6920** [1] - 1:21
**39** [1] - 23:3
**3A** [1] - 21:1
**3B** [1] - 21:1

## 4

**4** [2] - 21:1, 88:2
**41** [1] - 102:20
**4120** [1] - 53:8
**45** [4] - 22:21, 23:5, 54:5, 54:8
**4:11** [1] - 146:18
**4:13** [1] - 147:12
**4:38** [1] - 147:12
**4:59** [1] - 163:19

## 5

**5.56** [1] - 22:24
**5565** [1] - 69:23
**5655** [1] - 70:20
**5739** [1] - 53:16
**59/66** [1] - 23:3
**5:00** [3] - 162:23, 163:9, 164:8
**5:02** [1] - 165:8
**5th** [1] - 53:16

## 6

**6** [2] - 61:21, 92:14
**60** [1] - 55:10
**600** [2] - 78:25, 79:5
**63087122** [3] - 31:10, 63:3, 64:7
**631255655** [3] - 31:19, 63:6, 64:10
**6406** [1] - 1:15

## 7

**7** [2] - 28:13, 28:25
**7.26** [1] - 23:3
**700** [6] - 89:4, 89:9, 89:13, 89:17, 90:11, 93:10
**73** [1] - 166:10
**77** [1] - 166:12

## 8

**8** [4] - 63:10, 63:17, 63:19, 92:15
**800** [1] - 1:16
**895** [1] - 101:22
**8th** [2] - 31:20, 63:7

## 9

**921** [1] - 76:6
**924(c** [3] - 9:22, 149:7, 152:1
**94** [1] - 166:13
**96** [1] - 166:13
**99** [3] - 118:7, 118:15, 166:15

## A

**A.M** [1] - 1:11
**a.m** [1] - 16:23
**A1** [1] - 21:1
**A2** [1] - 21:1
**ability** [4] - 10:5, 79:21, 162:3, 167:10
**able** [10] - 2:18, 17:6, 22:5, 53:21, 66:5, 67:25, 68:1, 133:4, 156:12, 163:25
**abroad** [1] - 125:22
**absence** [1] - 3:4
**absolutely** [1] - 91:2
**Academy** [3] - 19:1, 101:11, 125:16
**accept** [2] - 8:9, 157:7
**accepted** [2] - 84:16, 128:4
**access** [1] - 31:2

**accessible** [1] - 30:25
**accidents** [1] - 122:16
**according** [1] - 150:3
**accurate** [4] - 5:1, 64:13, 64:16, 114:18
**ACL** [1] - 128:18
**ACP** [1] - 22:21
**acquittal** [3] - 149:3, 153:12, 155:9
**act** [6] - 83:22, 148:16, 159:21, 160:18, 160:20, 160:23
**acted** [1] - 124:21
**acting** [1] - 148:10
**action** [1] - 167:11
**activities** [2] - 12:7, 155:2
**activity** [8] - 13:7, 13:8, 122:21, 149:24, 154:24, 155:4, 162:7
**actual** [8] - 9:3, 34:5, 35:4, 50:21, 51:7, 64:3, 80:6, 81:9
**add** [2] - 14:9, 138:12
**added** [2] - 106:10, 117:5
**addition** [4] - 38:10, 39:3, 43:10, 86:22, 91:24, 105:16, 150:20, 151:22
**additional** [3] - 10:8, 42:19, 138:5
**address** [6] - 53:10, 53:13, 53:14, 53:15, 147:9, 147:19
**addressed** [2] - 3:13, 152:2
**addressing** [1] - 68:14
**adds** [1] - 12:18
**adequately** [1] - 58:8
**adjacent** [1] - 42:20
**Administration** [3] - 99:17, 99:19, 121:14
**admissibility** [1] - 11:8
**admissible** [1] - 76:11
**adult** [1] - 86:13
**adulterant** [8] - 106:8, 106:10, 117:5, 117:16, 117:22, 118:4, 118:7, 118:15
**advance** [1] - 29:18
**advice** [1] - 163:7
**advise** [1] - 13:25
**advised** [1] - 4:23
**affect** [2] - 10:5, 96:10
**affidavit** [1] - 158:16
**affiliations** [1] - 101:14

**afford** [1] - 13:11
**African** [1] - 89:23
**African-American** [1]
- 89:23
**afternoon** [17] - 30:15,
33:7, 33:8, 73:9,
73:10, 77:13, 77:14,
94:8, 94:10, 98:12,
99:11, 99:12, 116:6,
121:5, 121:6, 144:2,
144:4
**afterwards** [1] - 65:6
**agencies** [2] - 124:4,
125:17
**agency** [1] - 80:3
**Agent** [17] - 43:2,
47:16, 48:10, 52:5,
52:14, 54:13, 57:21,
58:21, 62:14, 63:16,
65:15, 66:22, 67:17,
69:3, 70:5, 71:21,
73:9
**agent** [11] - 33:15,
44:1, 45:14, 73:19,
118:25, 119:3,
131:15, 131:16,
131:17, 138:12,
140:3
**agents** [3] - 73:20,
131:23, 133:10
**ago** [3] - 24:13, 25:24,
77:20
**agree** [8] - 2:11, 4:20,
11:23, 74:21, 83:8,
94:11, 94:19, 145:6
**agreed** [3] - 75:17,
75:18, 76:1
**agreeing** [1] - 2:20
**agrees** [1] - 4:2
**ahead** [13] - 6:22,
7:20, 8:13, 28:19,
29:25, 30:12, 65:12,
68:7, 75:20, 83:21,
116:1, 136:16, 157:9
**aid** [1] - 149:15
**AIDED** [1] - 1:25
**aided** [1] - 167:9
**ain't** [2] - 157:13,
160:23
**allegation** [1] - 9:8
**alleged** [8] - 10:7,
10:11, 16:10, 74:8,
149:12, 149:15,
149:24, 154:8
**allows** [2] - 79:17,
91:10
**alluded** [1] - 13:23
**alone** [1] - 154:21
**alongside** [5] - 17:13,
17:14, 32:18, 32:19,

76:19
**alternates** [1] - 8:24
**ambiguous** [2] - 7:5,
7:14
**Amendment** [3] -
156:12, 156:18,
162:11
**America** [1] - 75:24
**AMERICA** [1] - 1:5
**American** [3] - 89:23,
101:10, 101:17
**ammunition** [7] -
19:20, 19:25, 22:3,
40:14, 41:3, 76:10,
151:25
**amount** [21] - 41:18,
61:24, 62:1, 128:24,
129:11, 130:2,
130:5, 130:9,
130:15, 130:16,
133:3, 133:23,
134:4, 135:6,
136:19, 136:24,
138:15, 139:16,
139:20, 141:5,
153:25
**amounts** [16] - 125:25,
126:3, 126:6, 126:9,
127:15, 128:17,
128:20, 129:17,
133:2, 133:5,
140:18, 150:17,
151:1, 151:2, 151:3
**ample** [2] - 150:17,
153:23
**analysis** [27] - 79:4,
79:5, 84:17, 86:1,
86:10, 86:25, 100:3,
100:4, 100:19,
101:2, 101:4,
101:18, 104:9,
105:11, 105:14,
105:15, 105:20,
105:24, 107:9,
107:24, 108:23,
115:17, 115:18,
115:19, 116:20,
116:22, 119:4
**Analysis** [1] - 101:1
**analyze** [6] - 85:7,
99:24, 108:21,
112:23, 113:11,
113:24
**analyzed** [15] - 78:23,
95:16, 100:18,
101:19, 101:20,
101:22, 103:14,
104:13, 105:21,
108:5, 109:14,
111:5, 113:6,

113:19, 114:19
**analyzer** [1] - 87:2
**analyzing** [2] - 112:25,
115:14
**AND** [1] - 1:11
**Andrew** [2] - 17:11,
17:22
**ANDREW** [3] - 17:15,
17:22, 164:4
**angles** [1] - 20:13
**announced** [1] - 10:24
**answer** [8] - 3:15, 5:6,
5:20, 6:19, 7:1, 7:18,
41:17, 122:15
**answering** [1] - 7:6
**answers** [1] - 116:24
**apartment** [29] - 15:2,
35:19, 35:22, 36:9,
36:10, 37:3, 39:15,
39:20, 41:13, 41:18,
42:1, 43:9, 60:21,
61:3, 61:6, 61:9,
61:12, 61:13, 62:19,
69:7, 70:16, 72:17,
74:20, 74:21, 150:3,
150:8, 150:10,
151:11
**Apartment** [4] - 34:13,
34:23, 52:16, 61:13
**Apartments** [1] - 61:5
**apologies** [2] - 16:25,
17:5
**apologize** [1] - 66:1
**apparent** [2] - 38:18,
153:24
**appeal** [6] - 148:21,
159:2, 159:5,
160:14, 160:16,
164:23
**appear** [6] - 67:19,
107:4, 114:7,
114:11, 136:14,
136:15
**appearance** [5] -
37:15, 39:6, 39:13,
43:9, 110:24
**appeared** [6] - 36:15,
39:12, 41:5, 41:12,
41:18, 41:20
**Applicant's** [2] -
59:11, 59:22
**application** [3] -
52:15, 52:23, 52:25
**applicator** [1] - 51:20
**applied** [1] - 100:19
**applies** [2] - 2:23,
112:15, 153:13
**applying** [1] - 123:4
**approach** [3] - 48:7,
103:23, 135:24

**appropriate** [4] - 54:1,
54:6, 56:23, 134:4
**appropriately** [1] -
163:23
**approved** [1] - 103:8
**approximate** [1] -
54:24
**April** [10] - 19:16,
21:8, 31:11, 34:23,
35:5, 36:4, 61:20,
63:4, 76:2, 76:6
**AR** [2] - 40:11, 40:13
**area** [12] - 37:1, 41:25,
54:14, 83:13, 100:2,
121:17, 123:12,
126:7, 126:10,
150:4, 164:19
**Area** [2] - 121:15,
123:23
**areas** [4] - 85:25,
86:21, 122:20,
125:20
**argue** [8] - 13:1, 13:3,
147:25, 148:5,
148:11, 160:3,
161:17, 162:1
**argued** [2] - 154:16,
154:17
**arguing** [3] - 13:18,
156:25, 164:11
**argument** [8] - 11:7,
12:12, 12:25,
148:19, 148:21,
148:23, 163:24,
164:25
**arguments** [2] - 11:5,
155:4
**armed** [1] - 4:17
**Arms** [3] - 22:21,
92:14, 92:24
**arrest** [1] - 123:5
**arrested** [1] - 126:12
**arrived** [1] - 19:19
**arrives** [1] - 128:8
**arson** [1] - 100:21
**aspect** [2] - 82:5,
156:13
**assail** [1] - 159:22
**assault** [6] - 40:11,
40:12, 40:13, 40:15,
159:22
**assigned** [8] - 18:11,
19:23, 33:16, 33:19,
78:11, 121:13,
121:24, 124:3
**Assignment** [5] -
121:25, 122:3,
122:4, 122:8, 122:10
**assignment** [1] -
123:1

**assist** [1] - 18:20
**assisted** [2] - 18:18,
19:6
**associated** [4] - 31:7,
31:9, 31:18, 100:21
**Association** [1] -
101:8
**assume** [3] - 24:17,
25:3, 148:23
**assurance** [2] - 79:25,
82:15
**Atlantic** [3] - 99:17,
101:8, 105:9
**attached** [3] - 106:16,
110:25, 111:2
**attempt** [4] - 67:7,
67:9, 117:20, 118:3,
118:24, 119:2
**attended** [4] - 101:5,
101:9, 101:11,
125:16
**attention** [16] - 8:14,
20:24, 21:16, 58:23,
59:20, 104:18,
108:1, 111:8, 112:1,
113:4, 113:16,
140:23, 141:11,
142:6, 155:17,
155:18
**attorney** [2] - 94:9,
160:19
**ATTORNEY** [1] - 1:14
**audiotape** [7] - 66:3,
66:20, 67:15, 68:10,
70:3, 70:24, 71:19
**August** [1] - 167:16
**authenticated** [1] -
28:13
**authentication** [1] -
15:18
**authorization** [4] -
2:19, 3:5, 5:16, 7:16
**authorize** [7] - 4:24,
5:2, 5:13, 5:21, 5:24,
7:6, 7:10
**authorizing** [4] - 5:7,
6:11, 6:12, 6:15
**auto** [1] - 122:6
**available** [1] - 85:15
**avoid** [3] - 6:6, 126:22,
126:23
**aware** [5] - 8:1, 28:24,
29:3, 29:15, 149:17

### B

**B-R-A-N-D-O-N** [1] -
77:4
**Bachelor** [1] - 100:10
**background** [2] -

84:7, 100:9
**badge** [1] - 23:16
**bag** [17] - 39:4, 39:5, 39:6, 39:8, 51:21, 105:2, 105:18, 107:18, 108:17, 116:10, 116:17, 137:1, 137:4, 137:5, 137:8
**baggie** [1] - 106:5
**baggies** [3] - 133:13, 141:18, 141:23
**bags** [4] - 37:13, 141:21, 141:22, 151:1
**bake** [2] - 132:9, 133:18
**baked** [1] - 131:12
**baking** [11] - 37:9, 72:19, 117:8, 117:9, 131:5, 131:7, 132:9, 133:11, 133:12, 134:21, 151:16
**balance** [1] - 13:13
**BALDWIN** [135] - 1:14, 2:5, 7:9, 10:2, 14:22, 15:8, 15:10, 15:16, 16:15, 16:18, 16:21, 27:17, 27:25, 28:4, 28:11, 28:21, 29:21, 30:11, 30:14, 32:9, 32:16, 33:6, 40:3, 40:5, 41:16, 43:1, 43:17, 43:19, 43:20, 44:1, 44:3, 45:13, 46:14, 47:12, 47:14, 47:15, 48:7, 48:9, 53:20, 53:23, 54:3, 55:4, 55:9, 55:11, 55:17, 55:20, 55:25, 56:12, 56:14, 56:17, 56:21, 57:1, 57:7, 57:11, 57:19, 57:24, 58:19, 58:20, 60:14, 60:15, 63:13, 63:15, 64:18, 65:2, 65:5, 65:13, 65:14, 65:23, 65:25, 66:4, 66:21, 67:3, 67:7, 67:12, 67:16, 68:3, 68:8, 68:11, 68:18, 69:1, 69:2, 69:19, 69:20, 70:4, 70:25, 71:20, 72:22, 72:25, 73:3, 75:4, 75:9, 75:21, 76:14, 77:9, 77:12, 84:24, 85:5, 85:6, 94:4, 96:5, 96:22, 97:1, 97:4, 97:8, 97:12, 97:16, 97:22,

98:1, 98:4, 98:7, 110:7, 119:11, 119:17, 119:21, 120:1, 121:4, 128:10, 128:15, 135:24, 136:1, 136:7, 136:10, 136:17, 138:24, 138:25, 142:21, 142:23, 143:11, 146:2, 146:6, 146:13, 148:9, 150:14, 163:11, 165:4
**Baldwin** [29] - 2:4, 8:10, 10:1, 11:6, 14:20, 28:11, 28:15, 28:19, 28:22, 29:23, 46:12, 53:19, 57:6, 58:18, 75:13, 75:18, 97:19, 138:23, 146:12, 148:8, 150:13, 163:10, 165:3, 166:8, 166:10, 166:12, 166:13, 166:18, 166:19
**base** [37] - 106:5, 106:13, 106:14, 106:15, 106:18, 106:24, 107:8, 107:9, 108:25, 110:23, 110:24, 111:1, 111:24, 114:2, 118:25, 126:3, 126:10, 128:7, 128:12, 128:19, 128:21, 128:24, 128:25, 131:8, 132:13, 132:14, 132:17, 133:18, 137:7, 139:6, 139:8, 140:20, 141:20, 145:1, 152:13
**based** [17] - 28:25, 41:11, 72:6, 84:17, 85:17, 89:14, 105:24, 106:25, 108:23, 110:18, 114:18, 134:15, 135:7, 151:18, 152:16, 156:7, 161:20
**basic** [3] - 91:9, 125:15, 161:15
**basis** [6] - 12:11, 27:3, 129:18, 155:5, 158:21, 158:25
**bear** [3] - 17:1, 17:8,

43:10
**bearing** [1] - 11:7
**beat** [1] - 157:23
**became** [2] - 78:6, 101:3
**become** [6] - 44:16, 79:8, 79:10, 80:9, 80:14, 81:11
**becomes** [2] - 38:18, 131:13
**becoming** [1] - 80:17
**bedroom** [5] - 36:10, 39:14, 41:6, 151:6, 152:16
**beer** [2] - 95:5, 95:6
**BEFORE** [1] - 1:10
**began** [3] - 35:13, 61:19, 105:15
**begin** [2] - 78:15, 163:25
**beginning** [1] - 61:19
**behalf** [12] - 2:12, 2:20, 3:4, 4:9, 4:25, 5:7, 5:21, 6:1, 6:16, 148:6, 157:19
**beige** [1] - 139:11
**believes** [2] - 4:8, 11:2
**belong** [1] - 72:1
**below** [1] - 89:4
**bench** [2] - 27:19, 105:11
**benefit** [1] - 49:9
**best** [6] - 5:17, 7:17, 25:5, 25:15, 28:8, 167:10
**bet** [1] - 77:7
**better** [5] - 14:1, 46:1, 116:14, 137:12, 162:23
**between** [10] - 26:8, 69:16, 76:2, 82:22, 86:6, 114:9, 116:8, 133:1, 149:19, 150:1
**beyond** [9] - 10:12, 55:16, 55:17, 152:20, 152:23, 152:24, 153:16, 155:8, 161:5
**bias** [1] - 159:10
**billion** [6] - 89:4, 89:9, 89:13, 89:17, 90:11, 93:10
**biological** [2] - 78:18, 83:25
**biologist** [6] - 78:7, 79:12, 79:13, 80:2, 80:21, 81:4
**biologist/technician** [6] - 78:16, 78:21, 79:8, 79:24, 80:10,

80:14
**biologists** [2] - 78:14, 84:5
**biology** [2] - 82:5, 96:12
**bit** [11] - 2:2, 7:14, 65:3, 73:15, 73:16, 77:6, 79:11, 85:21, 112:4, 116:12, 131:5
**black** [1] - 38:13
**block** [1] - 60:24
**blocked** [1] - 66:1
**blood** [1] - 86:16
**Board** [1] - 101:17
**board** [3] - 80:23, 81:10, 81:13
**body** [1] - 106:12
**boiling** [1] - 106:20
**booking** [1] - 31:4
**born** [1] - 86:12
**bottom** [11] - 37:11, 39:8, 40:25, 59:9, 59:20, 62:6, 75:23, 104:6, 109:22, 111:14, 112:12
**bought** [1] - 48:1
**bounds** [1] - 161:5
**bowl** [5] - 131:6, 131:13, 134:22, 140:17, 140:19
**box** [16] - 17:13, 17:17, 30:5, 32:19, 32:24, 37:9, 45:14, 48:15, 76:20, 76:25, 98:24, 120:6, 120:11, 120:12, 120:19, 135:21
**boxcars** [1] - 86:4
**boxes** [2] - 21:3, 25:21
**BRANDON** [2] - 76:23, 166:11
**Brandon** [4] - 55:9, 75:10, 77:3, 84:25
**break** [9] - 91:20, 97:10, 119:14, 119:24, 143:20, 146:16, 146:19, 147:8, 147:9
**breaking** [1] - 119:22
**brief** [3] - 27:19, 97:1, 97:3
**briefly** [4] - 42:23, 103:23, 121:19, 147:23
**bring** [9] - 16:20, 58:14, 98:5, 98:10, 108:8, 162:8, 162:10, 163:16
**bringing** [1] - 57:14
**broad** [1] - 12:4

**brought** [5] - 15:18, 20:2, 20:10, 22:2, 51:16
**buccal** [1] - 51:18
**Building** [2] - 34:20, 61:10
**building** [2] - 61:12, 70:17
**bullet** [2] - 58:25, 59:1
**burden** [2] - 6:2, 12:15
**Bureau** [2] - 33:10, 33:13
**Burnham** [44] - 2:7, 2:15, 4:8, 4:23, 6:15, 7:15, 8:7, 8:10, 8:11, 11:1, 11:4, 14:1, 15:7, 15:21, 16:4, 24:11, 29:9, 54:25, 55:13, 56:6, 58:3, 58:5, 58:8, 73:6, 73:9, 73:11, 76:12, 94:8, 98:8, 116:6, 144:2, 147:15, 148:9, 148:24, 152:23, 152:24, 155:12, 161:24, 165:1, 166:5, 166:10, 166:13, 166:16, 166:19
**BURNHAM** [73] - 1:19, 1:19, 2:16, 3:2, 3:11, 6:21, 7:21, 7:24, 8:12, 8:14, 9:14, 11:5, 13:22, 14:9, 14:15, 14:18, 24:10, 26:14, 26:25, 27:2, 27:5, 28:6, 29:11, 29:15, 29:19, 32:12, 41:14, 55:1, 55:15, 56:8, 58:5, 58:10, 73:8, 73:13, 73:17, 73:18, 75:2, 85:3, 94:7, 96:2, 98:9, 103:7, 116:2, 116:5, 116:23, 118:11, 118:13, 118:20, 128:13, 143:14, 143:18, 143:21, 143:23, 144:1, 145:24, 146:22, 146:25, 147:5, 147:7, 147:11, 147:16, 147:19, 147:22, 148:25, 149:2, 152:25, 155:14, 162:13, 162:17, 162:22, 163:2, 163:5, 165:2
**business** [9] - 61:4, 126:20, 126:21,

4

134:6, 134:15, 135:7, 135:12, 151:18, 152:19
**buttons** [1] - 14:6
**buy** [13] - 117:6, 117:7, 123:6, 123:7, 123:15, 129:4, 144:6, 158:6, 158:13, 158:15, 158:17, 158:22, 160:4
**buying** [5] - 133:24, 134:1, 134:10, 144:10, 145:11
**buys** [5] - 123:3, 157:14, 157:17, 157:19, 161:7
**BY** [57] - 1:14, 1:15, 1:19, 18:1, 20:23, 23:22, 24:10, 26:17, 27:9, 30:14, 33:6, 40:5, 41:16, 43:1, 43:20, 44:3, 45:13, 46:14, 47:15, 48:9, 58:20, 60:15, 63:15, 65:14, 66:4, 66:21, 67:16, 69:2, 69:20, 70:4, 70:25, 71:20, 73:8, 73:18, 77:12, 85:6, 94:7, 96:5, 99:10, 103:9, 104:2, 109:11, 110:12, 115:1, 116:5, 116:23, 118:13, 118:23, 121:4, 128:15, 136:1, 136:10, 136:17, 138:25, 142:23, 144:1, 146:2

**C**

**calculate** [1] - 89:25
**caliber** [1] - 23:6
**camera** [1] - 75:22
**cannot** [1] - 3:25
**capable** [1] - 41:3
**capacity** [4] - 2:12, 83:22, 124:21, 124:24
**capitalized** [1] - 99:7
**caption** [1] - 75:24
**car** [2] - 70:14, 122:13
**career** [5] - 19:2, 19:7, 123:20, 124:5, 125:16
**carrying** [4] - 7:25, 130:1, 149:14, 154:6
**case** [50] - 4:7, 9:3, 9:11, 10:10, 10:25,

12:1, 13:11, 16:2, 17:2, 19:23, 20:9, 25:17, 56:16, 68:24, 69:15, 72:7, 73:5, 74:1, 75:24, 78:10, 78:11, 78:13, 81:5, 85:16, 85:20, 87:24, 91:16, 95:25, 103:10, 103:13, 105:7, 115:23, 124:2, 140:6, 140:24, 149:20, 153:2, 155:11, 156:4, 156:10, 156:21, 157:11, 158:5, 159:3, 159:16, 162:18, 162:20, 163:24, 164:2
**Case** [1] - 77:23
**cases** [11] - 3:25, 4:7, 24:17, 78:23, 78:25, 79:5, 81:5, 95:10, 149:17, 149:21
**casework** [4] - 78:7, 81:9, 84:3, 91:18
**cash** [4] - 134:15, 134:17, 135:7, 135:14
**cash-based** [2] - 134:15, 135:7
**catch** [1] - 6:19
**category** [1] - 90:21
**Caucasian** [1] - 89:22
**caught** [1] - 72:12
**caused** [1] - 15:1
**causes** [1] - 11:15
**cease** [1] - 162:2
**cell** [2] - 86:15, 86:16
**cells** [1] - 86:14
**cellular** [6] - 34:8, 36:20, 42:5, 42:12, 42:19, 43:8
**Center** [3] - 28:14, 30:17, 30:21
**center** [2] - 29:3, 29:7
**certain** [2] - 125:20, 157:1
**certainly** [3] - 12:24, 13:3, 80:19
**certification** [2] - 28:25, 83:11
**certifications** [3] - 56:2, 101:13, 101:16
**certified** [3] - 15:17, 28:24
**certify** [1] - 167:4
**chain** [2] - 49:2, 86:4
**chair** [1] - 99:1
**challenge** [1] - 159:16

**chamber** [1] - 20:18
**chambers** [2] - 14:23, 165:6
**chance** [5] - 8:23, 36:7, 39:14, 41:5, 88:14
**Chaney** [2] - 19:19, 21:8
**change** [6] - 26:8, 26:11, 26:18, 86:14, 118:8, 137:25
**changed** [1] - 26:6
**changes** [1] - 15:20
**characterize** [1] - 68:23
**charge** [8] - 9:10, 9:22, 73:19, 73:20, 98:13, 128:23, 149:8, 150:12
**charged** [2] - 9:22, 153:18
**charges** [6] - 3:16, 8:18, 61:22, 149:4, 149:5, 150:16
**charging** [1] - 164:9
**CHARLES** [1] - 1:19
**Charles** [5] - 24:11, 73:9, 94:8, 116:6, 144:2
**chart** [7] - 87:5, 97:19, 114:16, 114:18, 117:20, 117:23, 118:3
**chat** [1] - 14:2
**cheaper** [1] - 144:6
**checked** [2] - 44:21, 49:3
**checks** [2] - 134:11
**cheek** [1] - 51:19
**chemical** [1] - 104:9
**chemist** [3] - 99:20, 99:21, 152:13
**chemistry** [2] - 100:10, 100:13
**chief** [1] - 9:4
**choose** [2] - 157:4, 157:6
**chooses** [1] - 162:12
**chose** [1] - 156:20
**chosen** [1] - 162:20
**chromatography** [7] - 102:4, 102:6, 102:9, 102:10, 105:21, 105:22
**chunk** [1] - 138:11
**circle** [1] - 47:17
**circled** [3] - 42:12, 46:4, 53:13
**circles** [1] - 6:10
**circling** [2] - 47:11,

53:12
**circumstances** [1] - 14:21
**City** [5] - 34:14, 34:23, 52:16, 61:14, 74:20
**civil** [3] - 8:3, 58:1, 76:8
**claim** [1] - 10:9
**clarify** [2] - 5:16, 117:23
**classes** [1] - 125:17
**clean** [2] - 25:12, 164:16
**clear** [9] - 6:14, 39:8, 48:1, 65:1, 74:25, 140:5, 149:10, 153:7, 161:25
**clearer** [1] - 72:8
**clearing** [1] - 45:24
**clearly** [11] - 17:18, 30:6, 32:25, 77:1, 98:25, 120:22, 151:13, 153:22, 154:5, 154:12, 154:15
**Clerk** [3] - 17:14, 29:25, 32:20
**clerk** [1] - 32:20
**CLERK** [48] - 14:4, 17:16, 17:20, 17:24, 24:5, 27:22, 28:18, 29:13, 30:2, 30:4, 30:10, 32:21, 32:23, 33:4, 40:1, 40:4, 43:15, 43:18, 45:11, 46:12, 54:7, 57:13, 57:17, 73:11, 73:14, 75:13, 76:16, 76:22, 76:24, 77:5, 77:8, 98:14, 98:20, 98:23, 99:5, 99:8, 114:22, 119:23, 120:8, 120:10, 120:15, 120:18, 120:21, 121:2, 136:5, 138:22, 142:22, 164:5
**client** [7] - 2:9, 2:11, 12:20, 13:10, 14:1, 14:8, 147:21
**clip** [18] - 64:18, 64:19, 65:15, 65:16, 65:17, 65:19, 66:2, 66:5, 66:7, 66:11, 66:13, 66:19, 67:13, 69:21, 70:1, 70:19, 71:15, 71:16
**clips** [5] - 63:9, 64:6, 64:9, 64:12
**close** [14] - 8:24,

38:21, 40:24, 45:11, 137:2, 143:5, 152:2, 152:4, 152:11, 154:21, 155:17, 161:2, 163:22
**close-up** [2] - 38:21, 40:24
**closed** [1] - 51:20
**closer** [8] - 30:18, 43:15, 60:12, 72:9, 76:20, 77:6, 99:1, 120:6
**closest** [1] - 40:13
**closet** [4] - 39:21, 39:22, 39:23, 40:25
**closets** [2] - 41:6, 41:9
**closing** [2] - 11:7, 163:24
**clothes** [3] - 41:18, 41:19, 41:21
**cocaine** [151] - 37:10, 37:11, 37:16, 37:19, 38:11, 38:12, 39:5, 39:6, 39:7, 39:13, 72:11, 101:24, 102:1, 102:2, 106:5, 106:13, 106:14, 106:15, 106:18, 106:19, 106:24, 107:5, 107:8, 108:25, 110:20, 110:21, 110:22, 110:23, 110:24, 111:1, 111:24, 113:2, 113:14, 114:2, 117:7, 118:7, 118:24, 118:25, 125:10, 125:12, 126:3, 126:6, 126:9, 128:7, 128:12, 128:17, 128:18, 128:19, 128:20, 128:21, 128:24, 128:25, 129:3, 129:4, 129:12, 129:16, 130:12, 130:19, 130:20, 130:21, 131:1, 131:2, 131:4, 131:5, 131:7, 131:8, 131:21, 131:22, 131:24, 132:1, 132:8, 132:9, 132:10, 132:11, 132:12, 132:13, 132:14, 132:17, 132:19, 132:20, 133:11, 133:12, 133:14, 133:16, 133:18, 133:21,

5

133:22, 134:4,
134:10, 134:14,
134:19, 134:21,
136:15, 136:19,
136:20, 136:21,
137:7, 138:8, 138:9,
138:10, 139:5,
139:8, 139:10,
139:12, 140:19,
140:20, 141:19,
141:20, 142:2,
144:14, 144:18,
144:19, 144:21,
144:22, 144:25,
145:1, 145:3,
145:11, 150:18,
152:13, 152:14
**coincidence** [2] -
88:15, 88:22
**coincidently** [1] -
88:13
**cold** [2] - 54:2, 54:11
**colleagues** [2] -
81:15, 81:18
**collected** [6] - 35:15,
35:16, 51:18, 52:9,
52:12, 95:19
**collecting** [1] - 51:19
**collection** [7] - 18:21,
25:11, 51:16, 51:17,
51:20, 84:1, 95:18
**color** [5] - 107:8,
107:9, 131:25,
137:7, 139:9
**column** [3] - 115:2,
115:9, 115:13
**combination** [1] -
131:6
**combine** [2] - 87:14,
87:22
**comfortable** [1] -
145:17
**coming** [8] - 15:15,
15:16, 57:15,
100:25, 114:24,
150:7, 150:9, 155:3
**comments** [1] - 149:7
**common** [6] - 87:19,
87:21, 118:24,
119:2, 132:14,
132:17
**commonly** [3] - 37:10,
37:19, 38:10
**communicated** [4] -
9:6, 9:18, 12:3,
14:10
**communication** [1] -
14:4
**compare** [5] - 85:15,
85:18, 91:12, 92:19,

110:24
**compared** [4] - 93:5,
93:22, 106:19, 111:1
**comparison** [4] - 83:3,
90:14, 90:23, 90:24
**comparisons** [1] -
95:24
**competency** [4] -
79:16, 79:19, 79:20,
81:1
**complete** [3] - 29:2,
80:20, 92:6
**completed** [1] - 8:15
**complex** [3] - 74:20,
74:21, 150:3
**complicated** [3] -
91:4, 130:24, 145:3
**complies** [3] - 43:14,
53:13, 108:9
**comply** [1] - 159:13
**components** [2] -
102:8, 102:11
**composition** [1] -
106:17
**compound** [1] -
106:15
**compounds** [1] -
102:12
**compressed** [1] -
114:13
**COMPUTER** [1] - 1:25
**computer** [2] - 68:19,
167:9
**computer-aided** [1] -
167:9
**COMPUTER-AIDED**
[1] - 1:25
**concentration** [1] -
100:13
**concept** [1] - 116:25
**concerned** [3] - 11:18,
54:17, 155:6
**conclude** [1] - 152:20
**concluded** [2] -
115:10, 165:8
**concludes** [1] - 94:4
**conclusion** [2] -
41:12, 110:18
**conclusions** [6] -
105:24, 108:23,
111:22, 112:25,
113:13, 114:1
**concrete** [1] - 95:4
**condition** [2] - 19:25,
95:12
**conduct** [2] - 34:12,
105:20
**conducted** [1] - 125:2
**conducting** [1] - 35:18
**conference** [4] -

27:19, 83:17, 98:13,
164:10
**conferences** [4] -
101:5, 101:7, 101:9,
101:12
**conferring** [1] - 14:8
**confines** [1] - 37:25
**confirmed** [1] - 65:7
**confirms** [1] - 63:1
**confused** [1] - 107:1
**confusing** [1] - 67:10
**CONLEY** [1] - 1:8
**Conley** [69] - 2:18, 3:8,
3:14, 7:25, 8:5, 8:18,
8:21, 9:6, 9:19, 12:3,
12:6, 13:24, 14:9,
15:21, 19:11, 31:7,
31:16, 31:25, 32:7,
34:10, 34:13, 34:16,
34:20, 35:12, 35:22,
35:23, 51:13, 53:2,
53:9, 59:6, 59:17,
60:2, 60:4, 61:1,
62:13, 62:15, 62:22,
63:1, 66:10, 69:6,
70:10, 71:6, 72:1,
75:25, 76:3, 85:9,
91:16, 91:23, 92:5,
92:21, 93:5, 93:16,
93:22, 93:24, 94:3,
94:9, 96:1, 116:7,
143:24, 148:19,
148:22, 149:13,
149:24, 150:8,
151:7, 155:18,
160:18, 162:14,
162:20
**Conley's** [11] - 3:4,
8:16, 11:24, 15:1,
32:3, 65:7, 65:21,
66:18, 72:3, 147:23,
162:18
**connecting** [2] -
97:20, 98:2
**connection** [7] - 9:23,
12:16, 149:19,
150:1, 154:23,
154:24, 160:5
**connections** [1] -
10:11
**conscientious** [1] -
25:14
**consequences** [2] -
134:3, 134:5
**conservative** [2] -
90:1, 90:5
**considerably** [3] -
12:21, 13:11, 13:15
**considered** [2] -
83:24, 92:4

**consist** [3] - 79:19,
81:3, 82:4
**consistent** [19] -
36:15, 37:15, 39:5,
39:6, 39:7, 39:13,
41:19, 41:20, 43:8,
66:18, 70:10, 71:6,
72:2, 81:8, 93:4,
93:14, 93:21,
141:18, 141:19
**consistently** [1] -
82:21
**constantly** [2] - 26:6,
134:8
**Constitution** [1] -
156:17
**consulting** [1] -
143:24
**consumed** [3] - 50:20,
50:22, 51:2
**consumer** [1] - 128:22
**consumers** [4] -
125:25, 128:21,
129:22, 129:23
**contact** [2] - 105:6,
105:8
**contain** [1] - 51:7
**contained** [12] - 44:14,
63:9, 106:5, 108:24,
108:25, 110:20,
111:24, 113:2,
113:14, 114:2,
115:10, 116:17
**container** [3] - 25:21,
37:18, 72:19
**containing** [2] - 51:1,
116:10
**contamination** [6] -
26:10, 26:13, 26:19,
26:21, 27:11, 95:12
**contents** [1] - 83:9
**context** [5] - 50:18,
64:23, 65:12,
149:21, 149:25
**continue** [1] - 136:8
**continues** [1] - 162:1
**continuous** [1] - 83:15
**continuously** [1] -
83:15
**contract** [7] - 59:2,
59:7, 60:21, 60:22,
61:2, 61:3, 61:17
**contributing** [2] -
87:11, 87:13
**contributor** [9] -
83:10, 87:12, 88:20,
88:21, 90:19, 93:7,
93:17, 94:3, 94:25
**contributors** [4] -
87:8, 93:25, 94:1,

95:21
**control** [6] - 11:15,
16:2, 44:21, 49:3,
49:4, 82:11
**controlled** [27] - 74:8,
100:6, 100:24,
102:19, 103:2,
103:5, 106:10,
117:21, 118:4,
118:15, 118:17,
119:2, 123:3, 123:6,
123:7, 123:14,
144:6, 149:12,
157:14, 157:17,
157:19, 158:6,
158:13, 158:15,
158:22, 160:4, 161:7
**controls** [3] - 69:17
**convene** [1] - 163:18
**conversation** [5] -
15:24, 64:23, 67:20,
69:4, 71:22
**conversations** [1] -
62:25
**conversion** [1] - 38:11
**convert** [4] - 37:19,
132:10, 144:18,
144:21
**converting** [2] - 37:10,
144:14
**convicted** [20] - 3:21,
4:3, 4:13, 4:17, 4:20,
6:7, 7:25, 8:2, 58:1,
76:4, 76:7, 126:15,
154:6, 157:1,
157:18, 159:2,
159:7, 161:18,
161:20, 161:22
**conviction** [7] - 2:10,
2:21, 2:23, 76:1,
76:9, 151:21, 153:11
**convictions** [1] -
156:8
**cook** [2] - 130:25,
140:19
**cookie** [1] - 131:11
**cooking** [5] - 38:11,
72:9, 72:10, 72:12,
134:19
**copies** [2] - 52:15,
164:16
**copy** [2] - 56:8, 164:17
**corner** [2] - 39:10,
43:3
**correct** [72] - 24:19,
25:7, 27:12, 40:18,
45:5, 49:11, 49:12,
49:15, 49:16, 49:19,
49:20, 49:23, 49:24,
50:1, 50:2, 50:4,

50:5, 50:7, 50:8, 50:11, 50:12, 50:14, 50:17, 51:7, 51:8, 51:25, 52:11, 61:8, 63:22, 63:23, 63:24, 64:1, 64:4, 71:12, 71:17, 72:20, 73:23, 74:2, 74:3, 74:6, 74:14, 74:18, 74:19, 75:1, 89:15, 89:16, 92:10, 94:13, 94:15, 94:18, 95:7, 95:14, 95:17, 95:23, 96:8, 112:16, 117:4, 117:22, 118:5, 118:8, 118:18, 130:6, 130:18, 132:5, 132:15, 133:23, 144:7, 144:12, 144:22, 145:5, 145:9, 167:4

**correctly** [1] - 167:8

**cost** [1] - 129:13

**counsel** [16] - 2:13, 16:1, 16:25, 27:4, 27:24, 28:3, 98:11, 116:7, 148:10, 148:15, 152:1, 163:18, 163:24, 164:9, 164:20, 167:11

**Counsel** [1] - 14:8

**count** [5] - 151:14, 152:1, 153:11, 154:3

**counter** [3] - 72:16, 72:17, 72:20

**country** [2] - 125:20, 148:13

**County** [18] - 18:7, 18:9, 19:1, 19:18, 28:14, 30:17, 30:21, 48:23, 50:11, 101:1, 101:20, 121:8, 121:9, 121:20, 121:23, 122:24, 123:11

**county** [2] - 74:23, 74:24

**couple** [2] - 55:6, 87:6

**course** [9] - 5:25, 12:15, 38:11, 46:19, 46:24, 57:12, 101:3, 149:17, 150:24

**COURT** [228] - 1:1, 1:23, 2:1, 2:14, 3:1, 3:7, 3:13, 5:4, 5:6, 5:9, 5:11, 5:23, 6:19, 6:24, 7:1, 7:4, 7:15, 7:22, 8:4, 8:13, 9:12, 10:1, 11:4, 11:9,

13:25, 14:13, 14:16, 14:20, 15:6, 15:9, 15:13, 15:20, 15:25, 16:16, 16:20, 16:22, 16:24, 17:12, 23:21, 24:8, 26:15, 27:1, 27:4, 27:8, 27:14, 27:21, 28:1, 28:5, 28:7, 28:15, 28:19, 29:9, 29:12, 29:17, 29:20, 29:23, 30:12, 32:11, 32:13, 32:18, 41:15, 47:10, 47:13, 53:18, 53:22, 53:25, 54:5, 54:8, 54:22, 55:3, 55:8, 55:10, 55:13, 55:16, 55:19, 55:23, 56:5, 56:10, 56:13, 56:15, 56:18, 56:24, 57:2, 57:4, 57:9, 57:12, 57:15, 57:18, 57:22, 58:3, 58:7, 58:11, 58:14, 58:17, 60:12, 63:12, 64:21, 65:4, 65:10, 65:24, 66:23, 67:5, 67:9, 67:14, 67:24, 68:4, 68:7, 68:15, 68:21, 69:13, 72:24, 73:2, 73:4, 73:15, 75:3, 75:5, 75:8, 75:15, 76:13, 76:15, 76:18, 77:10, 85:2, 85:4, 94:5, 96:3, 96:23, 97:3, 97:5, 97:9, 97:14, 97:18, 97:24, 98:2, 98:5, 98:8, 98:10, 98:15, 98:17, 103:8, 103:25, 109:4, 109:7, 109:10, 110:5, 110:9, 110:11, 115:22, 116:3, 116:12, 116:15, 118:9, 118:21, 119:7, 119:10, 119:16, 119:18, 119:22, 119:25, 120:5, 120:13, 128:14, 135:21, 136:4, 136:6, 136:9, 136:16, 142:20, 143:12, 143:16, 143:19, 143:22, 145:25, 146:8, 146:11, 146:14, 146:19, 146:24, 147:1, 147:6, 147:8, 147:13, 147:18, 147:20, 148:12,

149:1, 150:13, 152:23, 153:1, 155:15, 155:20, 156:16, 157:15, 157:25, 158:3, 158:9, 158:21, 158:24, 159:5, 159:9, 159:12, 159:15, 159:19, 160:7, 160:12, 160:17, 160:22, 160:24, 161:3, 161:5, 161:10, 161:14, 161:16, 161:20, 161:24, 162:6, 162:10, 162:16, 162:19, 162:24, 163:3, 163:9, 163:13, 163:20, 164:6, 164:9, 165:3, 165:5

**Court** [26] - 2:25, 15:5, 17:1, 28:12, 28:24, 29:3, 34:13, 34:23, 52:16, 61:13, 84:22, 149:9, 150:11, 153:11, 153:13, 155:6, 158:13, 159:22, 159:23, 160:8, 160:19, 160:22, 167:2, 167:3, 167:16

**court** [7] - 2:7, 76:3, 84:11, 99:25, 102:21, 127:20, 128:5

**court's** [1] - 143:21

**Court's** [1] - 143:23

**courthouse** [1] - 127:24

**courtroom** [14] - 16:23, 35:23, 54:21, 58:16, 97:13, 98:16, 146:15, 146:18, 153:7, 159:24, 160:2, 162:2, 163:19, 164:8

**Courts** [2] - 84:16, 84:20

**cover** [1] - 19:3

**covered** [1] - 8:10

**covering** [1] - 3:3

**covers** [2] - 57:23, 57:24

**covert** [1] - 121:25

**crack** [40] - 37:11, 37:16, 37:19, 38:12, 39:7, 39:13, 72:11, 125:9, 125:12, 128:21, 129:4,

130:12, 130:21, 130:25, 131:8, 132:10, 132:11, 132:14, 132:17, 133:11, 133:21, 134:10, 134:13, 134:19, 136:15, 136:19, 137:7, 139:5, 139:12, 140:20, 141:19, 144:14, 144:19, 144:22, 145:1, 145:2, 150:18

**craft** [1] - 20:10

**create** [5] - 31:5, 31:13, 31:22, 86:7, 87:23

**created** [3] - 31:15, 31:24, 45:4

**credibility** [1] - 153:15

**crime** [39] - 3:24, 4:3, 4:5, 4:12, 6:2, 7:25, 8:2, 10:14, 10:17, 18:11, 18:17, 18:20, 18:23, 19:4, 19:5, 19:6, 19:8, 24:14, 24:18, 24:22, 24:25, 25:1, 25:3, 33:20, 58:1, 74:25, 76:4, 76:7, 124:17, 127:3, 150:4, 152:22, 153:17, 153:19, 153:20, 154:11, 154:19

**crimes** [9] - 6:3, 18:19, 24:24, 121:16, 122:4, 122:5, 122:6, 153:17, 157:1

**CRIMINAL** [1] - 1:5

**Criminal** [1] - 18:19

**Criminalists** [1] - 101:17

**cross** [20] - 10:8, 12:4, 12:19, 13:6, 24:8, 26:10, 26:13, 26:19, 26:21, 27:11, 32:11, 32:12, 54:24, 73:4, 94:5, 115:22, 143:13, 143:21, 143:22, 156:6

**Cross** [5] - 166:5, 166:10, 166:13, 166:16, 166:19

**CROSS** [5] - 24:9, 73:7, 94:6, 116:4, 143:25

**cross-contamination** [5] - 26:10, 26:13, 26:19, 26:21, 27:11

**Cross-examination** [5] - 166:5, 166:10, 166:13, 166:16, 166:19

**CROSS-EXAMINATION** [5] - 24:9, 73:7, 94:6, 116:4, 143:25

**cross-examination** [5] - 12:4, 12:19, 13:6, 32:12, 156:6

**CRR** [2] - 1:24, 167:15

**crushed** [2] - 137:20, 137:24

**current** [5] - 83:19, 121:12, 125:18, 129:7

**custody** [1] - 49:3

**customer** [2] - 145:10, 145:16

**customers** [3] - 127:10, 150:7, 150:8

**cut** [6] - 104:24, 108:17, 109:22, 111:16, 112:13, 125:19, 125:20, 131:2, 149:25

**cutting** [9] - 118:25, 119:3, 131:15, 131:16, 131:17, 131:23, 133:10, 138:12, 140:3

**Cyber** [2] - 77:16, 77:18

## D

**D.C** [3] - 53:16, 121:17, 126:6

**D10** [2] - 44:7, 45:25

**D11** [3] - 44:7, 46:5, 141:12

**D12** [2] - 44:7, 46:21

**D13** [4] - 104:19, 104:20, 105:1, 105:7

**D14** [6] - 108:10, 138:21, 139:2, 139:3, 139:4, 139:16

**D15** [3] - 109:17, 110:13, 138:6

**D16** [1] - 111:9

**D18** [1] - 112:5

**D19** [3] - 112:5, 112:15, 113:8

**D20** [3] - 112:5, 112:15, 113:21

**D5** [1] - 140:13

**D6** [2] - 44:7, 45:17

**D7** [4] - 44:7, 46:11, 46:16, 140:24

7

**D8** [3] - 44:7, 47:1, 141:15
**D9** [2] - 44:7, 47:7
**dangerous** [1] - 152:19
**dash** [1] - 61:12
**data** [1] - 52:7
**date** [5] - 52:9, 59:18, 60:5, 60:22, 167:6
**DAY** [1] - 1:10
**DC** [1] - 1:20
**DE** [3] - 98:22, 99:4, 166:14
**De** [4] - 55:18, 98:19, 99:3, 116:6
**DEA** [36] - 44:22, 44:23, 55:18, 100:25, 101:3, 101:21, 103:18, 103:19, 104:10, 104:12, 104:14, 107:19, 107:20, 107:24, 108:2, 109:2, 109:13, 109:15, 109:23, 111:3, 111:6, 112:2, 112:18, 112:20, 113:4, 113:6, 113:17, 113:19, 121:14, 137:21
**deal** [2] - 145:14, 157:3
**dealers** [2] - 135:17, 145:6
**dealing** [2] - 145:13, 161:23
**debriefed** [1] - 126:17
**decide** [4] - 8:7, 16:3, 94:17
**decided** [1] - 158:7
**decision** [1] - 158:25
**declared** [2] - 85:4, 128:14
**defendant** [26] - 4:2, 10:15, 11:18, 13:7, 13:16, 16:6, 58:4, 64:23, 75:19, 75:20, 76:3, 76:6, 146:21, 147:3, 147:24, 148:10, 148:11, 148:13, 148:14, 148:15, 148:16, 153:24, 155:8, 155:10, 162:11, 164:24
**Defendant** [1] - 1:9
**DEFENDANT** [38] - 1:18, 5:3, 5:5, 5:8, 5:10, 5:22, 6:17, 6:20, 6:25, 7:3,

15:24, 147:17, 155:19, 156:15, 157:10, 157:16, 158:1, 158:8, 158:20, 158:23, 159:4, 159:7, 159:11, 159:14, 159:18, 160:6, 160:10, 160:15, 160:20, 160:23, 161:1, 161:4, 161:7, 161:11, 161:15, 161:18, 161:22, 162:9
**defendant's** [4] - 10:4, 14:25, 15:14, 76:8
**defendants** [1] - 4:19
**defense** [8] - 2:13, 8:16, 8:17, 9:10, 9:22, 10:22, 13:1, 161:13
**define** [1] - 88:17
**defined** [1] - 76:5
**degree** [3] - 84:8, 84:10, 100:18
**degrees** [1] - 84:8
**delay** [2] - 16:25, 17:5
**deliberation** [1] - 164:19
**deliberations** [1] - 163:25
**delivered** [1] - 95:11
**demonstrate** [1] - 156:9
**demonstrated** [1] - 151:11
**denied** [4] - 148:2, 155:9, 159:18, 162:19
**Denver** [1] - 101:12
**deny** [1] - 13:13
**Department** [4] - 48:23, 121:10, 121:23, 122:25
**department** [1] - 19:3
**depicted** [4] - 36:23, 38:24, 40:6, 42:10
**depth** [1] - 124:6
**DEPUTY** [48] - 14:4, 17:16, 17:20, 17:24, 24:5, 27:22, 28:18, 29:13, 30:2, 30:4, 30:10, 32:21, 32:23, 33:4, 40:1, 40:4, 43:15, 43:18, 45:11, 46:12, 54:7, 57:13, 57:17, 73:11, 73:14, 75:13, 76:16, 76:22, 76:24, 77:5, 77:8, 98:14, 98:20, 98:23,

99:5, 99:8, 114:22, 119:23, 120:8, 120:10, 120:15, 120:18, 120:21, 121:2, 136:5, 138:22, 142:22, 164:5
**Derro** [1] - 142:19
**describe** [9] - 22:5, 37:7, 64:22, 96:9, 100:7, 100:17, 106:17, 107:8, 136:20
**described** [5] - 92:13, 92:16, 107:23, 107:24, 144:13
**describes** [1] - 61:12
**describing** [1] - 72:6
**description** [2] - 105:18, 107:14
**design** [1] - 85:14
**desired** [1] - 131:3
**desk** [1] - 105:14
**details** [1] - 85:22
**detainee** [3] - 31:7, 31:15, 31:24
**detainee's** [2] - 31:13, 31:22
**detainees** [4] - 29:8, 30:25, 31:2, 31:3
**detection** [2] - 126:22, 126:23
**Detective** [6] - 120:24, 128:11, 128:16, 136:2, 138:3, 150:25
**detective** [9] - 14:18, 121:8, 121:19, 121:21, 122:23, 123:11, 136:11, 142:24, 146:3
**detectives** [1] - 18:18
**Detention** [3] - 28:14, 30:17, 30:21
**detention** [2] - 29:3, 29:7
**determination** [4] - 5:19, 68:22, 90:6, 158:21
**determine** [12] - 3:19, 44:24, 85:11, 86:22, 87:15, 91:7, 91:8, 91:10, 92:8, 100:20, 160:25
**determined** [7] - 106:4, 108:24, 110:20, 111:24, 113:2, 113:14, 114:2
**detriment** [1] - 12:20
**develop** [1] - 20:18
**device** [1] - 74:5

**devices** [1] - 14:5
**dictate** [2] - 84:5, 96:18
**dictates** [1] - 82:16
**difference** [5] - 69:16, 114:9, 116:8, 129:9, 129:10
**different** [31] - 5:11, 5:12, 5:24, 16:12, 20:13, 21:23, 25:1, 79:21, 80:23, 82:22, 83:16, 83:20, 84:8, 86:18, 86:19, 86:21, 87:20, 90:8, 91:18, 93:4, 93:15, 93:21, 124:20, 125:17, 127:15, 137:8, 140:18, 141:23, 141:24
**digital** [2] - 141:1, 141:4
**digits** [2] - 53:6, 70:20
**dilute** [4] - 106:11, 131:2, 131:18, 131:21
**dilutes** [1] - 117:3
**diluting** [1] - 132:24
**direct** [21] - 10:5, 20:24, 21:16, 24:13, 53:18, 58:23, 94:4, 104:18, 108:1, 109:2, 111:3, 111:8, 112:1, 113:4, 113:16, 138:20, 142:6, 142:20, 144:13, 152:7
**DIRECT** [6] - 17:25, 30:13, 33:5, 77:11, 99:9, 121:3
**Direct** [6] - 166:5, 166:8, 166:10, 166:12, 166:15, 166:18
**directed** [1] - 49:4
**directing** [8] - 59:20, 73:22, 109:17, 115:2, 115:6, 115:9, 115:13, 139:1
**direction** [2] - 38:2, 124:20
**directs** [1] - 78:10
**discipline** [1] - 85:17
**discretion** [1] - 143:21
**discuss** [6] - 2:3, 17:1, 17:3, 107:20, 164:2, 164:12
**discussed** [5] - 2:9, 55:5, 83:12, 107:19, 115:4
**discussing** [1] - 148:4

**discussion** [1] - 29:22
**discussions** [1] - 16:1
**disk** [11] - 63:10, 63:19, 63:21, 63:25, 68:16, 68:19, 69:14, 69:16, 69:17, 72:24, 73:4
**dismiss** [1] - 150:11
**displaying** [4] - 44:2, 135:3, 135:4, 149:14
**disrespectful** [1] - 160:23
**disrespectfully** [3] - 159:21, 160:18, 160:21
**disrupting** [1] - 153:6
**disruption** [1] - 153:8
**distinguish** [2] - 132:25, 149:20
**distribute** [13] - 127:9, 127:12, 127:13, 129:22, 130:1, 130:9, 130:11, 130:12, 139:19, 141:22, 149:6, 150:17, 151:4
**distributed** [7] - 125:19, 127:16, 128:17, 128:20, 128:22, 130:16, 141:21
**distributing** [4] - 129:18, 130:8, 133:21, 133:22
**distribution** [18] - 4:17, 12:11, 12:17, 126:5, 126:9, 127:17, 128:12, 129:11, 130:7, 130:10, 130:17, 135:15, 141:6, 150:17, 151:2, 154:1
**distributions** [1] - 122:6
**distributor** [16] - 125:5, 129:16, 129:17, 129:25, 130:8, 130:20, 133:1, 133:9, 133:10, 133:20, 134:17, 138:16, 138:17, 139:17, 139:18
**distributors** [11] - 124:25, 126:12, 126:14, 126:17, 126:20, 126:24, 127:9, 127:12, 130:19, 130:20, 133:7

8

**DISTRICT** [3] - 1:1, 1:2, 1:11
**district** [1] - 121:24
**District** [2] - 167:3
**DIVISION** [1] - 1:3
**division** [2] - 18:12, 19:8
**Division** [1] - 18:20
**DNA** [126] - 18:22, 19:21, 20:14, 20:15, 20:17, 21:17, 21:20, 21:23, 22:2, 22:5, 22:11, 22:16, 22:19, 22:22, 23:1, 23:4, 23:7, 25:9, 48:12, 48:20, 49:10, 49:13, 49:17, 49:21, 49:25, 50:3, 50:6, 50:18, 50:19, 50:21, 51:1, 51:11, 51:13, 51:16, 51:18, 51:23, 52:3, 55:7, 74:8, 74:17, 77:23, 77:24, 78:6, 78:10, 78:12, 78:20, 78:24, 78:25, 79:6, 82:12, 83:3, 83:21, 84:2, 84:11, 84:16, 85:1, 85:8, 85:12, 85:13, 85:14, 85:17, 85:18, 85:19, 86:1, 86:2, 86:3, 86:5, 86:7, 86:10, 86:13, 86:16, 86:21, 86:24, 87:1, 87:2, 87:6, 87:7, 87:11, 87:13, 87:19, 88:1, 88:10, 88:11, 88:13, 88:19, 89:1, 89:5, 89:10, 90:14, 90:18, 91:1, 91:2, 91:6, 91:7, 91:8, 91:17, 91:18, 91:19, 92:4, 92:19, 93:1, 93:3, 93:5, 93:6, 93:14, 93:16, 93:20, 93:22, 93:23, 94:11, 94:14, 94:18, 94:21, 94:25, 95:6, 95:16, 95:25, 96:10, 96:13
**document** [6] - 25:25, 60:8, 60:18, 62:3, 62:4, 75:22
**documents** [3] - 15:14, 52:18, 124:17
**Docusigned** [1] - 62:10
**dog** [1] - 103:10
**done** [9] - 4:1, 7:16, 16:10, 53:21, 89:20, 116:22, 125:7,

131:9, 156:4
**Donna** [1] - 8:18
**door** [14] - 12:4, 12:18, 13:6, 16:5, 35:11, 37:2, 38:2, 57:16, 71:11, 156:3, 156:6, 157:17, 164:4, 164:20
**doubt** [3] - 152:20, 153:16, 155:8
**down** [26] - 14:6, 20:11, 20:19, 27:15, 32:13, 42:23, 48:5, 49:4, 50:19, 54:13, 55:10, 59:9, 67:4, 75:6, 89:2, 91:20, 96:24, 104:24, 108:7, 109:4, 112:12, 114:24, 119:7, 135:19, 135:21, 146:9
**downstairs** [2] - 56:9, 162:4
**Draughon** [5] - 116:24, 166:5, 166:6, 166:15, 166:16
**DRAUGHON** [24] - 1:15, 17:10, 18:1, 20:23, 23:18, 23:22, 24:6, 26:17, 27:9, 27:13, 98:18, 99:10, 103:4, 103:9, 103:23, 104:2, 109:6, 109:11, 110:12, 114:24, 115:1, 115:20, 118:23, 119:5
**draw** [9] - 105:24, 108:23, 110:18, 111:23, 113:13, 114:1, 140:23, 141:11, 156:19
**drawer** [6] - 38:15, 38:16, 38:17, 38:22, 39:10, 39:23
**drawers** [1] - 40:24
**drawing** [1] - 153:15
**drink** [2] - 95:5, 95:6
**drop** [1] - 67:4
**drove** [1] - 122:13
**drug** [72] - 9:9, 9:23, 9:25, 10:10, 10:13, 10:17, 12:7, 12:11, 33:21, 33:24, 34:9, 73:25, 100:3, 100:4, 101:2, 101:4, 101:18, 101:19, 114:19, 117:4, 121:16, 122:18,

122:20, 123:1, 123:9, 123:12, 123:25, 124:12, 124:16, 124:25, 125:5, 125:14, 125:18, 125:21, 126:17, 126:19, 127:3, 127:9, 128:4, 128:11, 134:15, 135:6, 135:11, 135:17, 140:16, 140:17, 141:2, 142:2, 143:6, 145:6, 145:7, 145:19, 146:4, 146:5, 149:16, 149:24, 150:7, 150:21, 151:18, 152:6, 152:8, 152:12, 152:18, 152:21, 154:11, 154:19, 154:24, 155:2, 155:4
**Drug** [7] - 99:16, 99:18, 101:1, 121:13, 121:14, 121:15, 123:22
**drugs** [23] - 4:15, 4:17, 12:17, 97:20, 101:23, 125:18, 125:22, 127:13, 135:18, 137:21, 143:6, 149:18, 150:2, 151:13, 151:16, 152:3, 152:5, 153:23, 154:20, 154:23, 157:3, 158:18, 158:19
**dry** [1] - 20:16
**DTI-16** [1] - 22:24
**dubious** [1] - 15:4
**due** [1] - 2:16
**duration** [1] - 54:8
**during** [7] - 9:3, 11:19, 24:25, 34:16, 36:4, 41:22, 79:24
**duties** [5] - 18:17, 78:8, 99:21, 122:14, 122:24
**DWIGHT** [1] - 1:15

## E

**ear** [1] - 28:8
**earphones** [1] - 68:20
**easier** [2] - 17:3, 106:20
**easily** [1] - 19:8
**easy** [3] - 25:5, 26:21, 27:10

**echo** [2] - 28:3, 28:7
**education** [3] - 82:16, 83:15, 84:17
**educational** [2] - 84:7, 100:9
**effect** [4] - 4:6, 6:7, 155:23, 156:25
**effects** [1] - 106:12
**effort** [1] - 74:7
**eight** [10] - 64:19, 65:16, 80:11, 91:18, 92:24, 93:8, 97:10, 97:15, 119:18
**eight-minute** [1] - 97:10
**eight-second** [2] - 64:19, 65:16
**eighth** [1] - 129:21
**either** [9] - 2:20, 66:25, 67:6, 80:2, 90:9, 105:11, 105:13, 118:2, 148:3
**either/or** [1] - 144:24
**EKG** [1] - 87:4
**electronic** [2] - 104:6, 123:15
**element** [6] - 6:2, 57:23, 131:6, 133:17, 134:23, 149:3, 150:16, 153:17
**elements** [5] - 2:21, 3:23, 151:21, 153:21, 155:6
**Ellicott** [6] - 34:14, 34:23, 52:16, 61:4, 61:14, 74:20
**ELMO** [7] - 45:7, 47:6, 47:10, 52:2, 63:16, 137:10, 137:11
**emphasis** [1] - 14:12
**employed** [6] - 18:4, 18:6, 99:13, 99:15, 99:16, 101:3
**encountered** [2] - 127:5, 142:1
**end** [14] - 8:24, 13:24, 20:8, 38:15, 56:15, 69:23, 83:4, 85:14, 87:1, 134:6, 141:12, 155:1, 159:19
**End** [1] - 29:22
**ended** [1] - 72:15
**Enforcement** [3] - 99:16, 99:18, 121:14
**enforcement** [6] - 9:15, 18:15, 25:9, 35:19, 35:21, 126:23
**engage** [1] - 126:22
**engaged** [1] - 149:24

**engages** [1] - 82:19
**ensure** [3] - 63:22, 64:13, 81:7
**enter** [15] - 7:20, 16:23, 17:17, 30:5, 32:24, 35:6, 37:3, 58:16, 76:25, 98:16, 98:24, 120:11, 120:19, 153:12, 163:19
**entered** [11] - 35:8, 35:10, 35:20, 35:22, 38:3, 49:2, 51:22, 61:18, 62:19, 71:9, 72:17
**entering** [2] - 34:20, 39:20
**entire** [3] - 82:15, 116:10, 121:17
**entitled** [2] - 60:20, 156:18
**entry** [1] - 35:13
**envelope** [8] - 22:7, 23:19, 47:18, 50:13, 50:18, 51:21, 51:24, 52:8
**envelopes** [8] - 21:17, 21:22, 23:9, 23:17, 44:19, 44:20, 48:20, 48:24
**environment** [1] - 96:7
**equal** [1] - 90:10
**equivalent** [1] - 88:25
**eraser** [1] - 129:1
**ESQUIRE** [3] - 1:14, 1:15, 1:19
**essentially** [7] - 7:12, 81:14, 86:5, 86:7, 90:23, 91:6, 96:19
**estimate** [1] - 24:21
**evening** [2] - 162:15, 162:18
**event** [4] - 12:23, 13:16, 158:24, 158:25
**events** [3] - 4:21, 6:8, 69:7
**everywhere** [1] - 151:12
**evidence** [130] - 3:17, 6:3, 9:21, 11:10, 15:3, 15:9, 15:13, 16:5, 16:7, 17:2, 18:21, 18:22, 19:4, 21:10, 21:24, 22:2, 23:14, 25:2, 25:9, 26:7, 35:15, 35:16, 41:22, 42:1, 42:2, 42:4, 42:24, 43:10, 44:19, 44:20, 44:25,

47:17, 49:3, 49:4, 50:10, 51:3, 51:21, 51:22, 51:23, 56:24, 69:14, 72:17, 73:1, 76:11, 78:10, 78:12, 78:13, 78:14, 78:15, 79:17, 79:21, 80:4, 80:6, 81:5, 81:6, 82:14, 82:17, 83:25, 84:1, 85:20, 87:7, 87:9, 87:10, 88:13, 88:19, 90:22, 91:3, 91:7, 91:12, 91:16, 92:2, 92:3, 92:11, 92:20, 93:3, 93:17, 93:22, 99:24, 101:21, 101:22, 104:23, 105:2, 105:8, 105:18, 105:19, 107:14, 107:18, 108:17, 111:13, 111:15, 112:11, 116:10, 116:17, 116:18, 124:17, 149:10, 149:13, 149:22, 150:5, 150:17, 150:19, 150:22, 151:23, 152:19, 153:10, 153:14, 153:21, 153:22, 153:23, 154:9, 154:10, 154:14, 154:15, 154:18, 154:20, 155:7, 156:8, 157:13, 158:1, 158:8, 160:24, 161:8, 161:19, 161:21, 162:24
**evidence-like** [1] - 80:4
**evidentiary** [5] - 36:11, 37:4, 38:6, 38:23, 39:17
**Ewing** [4] - 1:24, 167:2, 167:14, 167:15
**exact** [1] - 61:12
**exactly** [2] - 7:22, 150:22
**exam** [1] - 80:7
**examination** [33] - 12:4, 12:19, 13:6, 24:13, 32:12, 83:5, 100:6, 100:24, 103:2, 103:6, 107:12, 107:13, 107:15, 107:17, 110:19, 111:22,

144:13, 156:6, 166:5, 166:5, 166:6, 166:8, 166:10, 166:10, 166:12, 166:13, 166:13, 166:15, 166:16, 166:16, 166:18, 166:19, 166:19
**Examination** [1] - 77:19
**EXAMINATION** [15] - 17:25, 24:9, 26:16, 30:13, 33:5, 73:7, 77:11, 94:6, 96:4, 99:9, 116:4, 118:22, 121:3, 143:25, 146:1
**examinations** [5] - 78:15, 79:14, 79:16, 79:22, 80:23
**examine** [7] - 86:6, 86:21, 101:23, 102:3, 110:16, 111:20, 161:13
**examined** [2] - 86:1, 107:22
**examiner** [24] - 78:1, 78:2, 78:5, 78:6, 78:8, 78:9, 79:2, 79:9, 80:3, 80:15, 80:18, 80:22, 80:25, 81:11, 81:20, 81:23, 81:25, 82:24, 83:2, 83:8, 83:14, 84:2, 84:12, 85:1
**examining** [2] - 102:1, 102:19
**example** [5] - 68:5, 95:4, 107:3, 145:10, 156:2
**examples** [2] - 25:8, 117:10
**exams** [1] - 79:17
**exceeded** [1] - 89:11
**exceeding** [4] - 57:25, 58:1, 76:5, 76:8
**exceeds** [2] - 89:8, 89:17
**except** [1] - 80:21
**excluded** [2] - 11:21, 90:18
**excuse** [1] - 45:9
**excused** [5] - 32:14, 96:24, 119:8, 146:9, 164:1
**execute** [2] - 51:12, 161:8
**executed** [9] - 33:21, 33:24, 70:17, 71:10, 71:13, 124:7, 127:6, 143:4, 157:14

**executing** [4] - 34:2, 123:4, 142:1, 152:7
**execution** [5] - 34:22, 35:1, 35:4, 35:5, 140:9
**exercises** [1] - 80:24
**Exhibit** [73] - 21:17, 22:11, 22:16, 22:19, 22:22, 23:4, 23:7, 36:22, 39:25, 40:3, 45:17, 45:25, 46:5, 46:11, 46:15, 46:20, 47:6, 49:13, 50:6, 51:23, 52:20, 58:22, 58:24, 59:9, 60:11, 60:16, 104:10, 104:12, 104:14, 104:15, 104:18, 104:20, 105:1, 105:7, 107:19, 108:2, 108:6, 108:10, 108:19, 109:2, 109:12, 109:14, 109:17, 109:23, 110:13, 110:14, 111:3, 111:5, 111:7, 111:9, 111:17, 111:20, 112:2, 112:5, 112:18, 112:20, 112:21, 112:23, 113:4, 113:8, 113:16, 113:19, 113:21, 113:22, 114:16, 114:21, 115:2, 138:6, 138:21, 139:1, 139:22, 140:12, 140:24
**exhibit** [51] - 22:6, 28:24, 43:23, 45:4, 45:5, 45:20, 46:7, 46:18, 46:23, 47:8, 50:4, 50:7, 51:9, 51:10, 52:2, 52:4, 52:22, 57:8, 58:22, 59:21, 88:1, 104:13, 104:17, 105:3, 106:11, 107:12, 107:24, 108:5, 108:8, 108:12, 108:18, 108:21, 108:24, 109:14, 110:20, 111:5, 111:17, 111:24, 112:20, 113:6, 113:8, 113:11, 113:14, 113:18, 113:21, 113:24, 114:2, 115:3,

138:14, 139:15, 142:24
**exhibits** [37] - 20:20, 21:2, 21:3, 21:6, 21:13, 21:18, 43:5, 43:21, 43:23, 44:6, 44:11, 44:14, 45:6, 47:16, 48:4, 48:11, 48:15, 48:17, 48:20, 49:7, 49:11, 49:22, 50:1, 50:9, 103:14, 104:3, 104:8, 107:22, 109:8, 112:8, 112:9, 114:4, 114:5, 115:7, 119:12, 119:14, 141:11
**Exhibits** [8] - 20:25, 21:20, 43:3, 44:7, 48:12, 103:18, 107:20, 112:15
**exit** [4] - 54:21, 97:13, 146:18, 164:8
**exiting** [1] - 34:20
**exits** [3] - 20:22, 42:25, 135:23
**expand** [2] - 10:23, 13:15
**expands** [2] - 12:21, 13:11
**expansion** [1] - 10:9
**expect** [8] - 2:18, 96:20, 130:4, 133:9, 134:16, 138:15, 139:16, 141:7
**expecting** [3] - 162:14, 162:16, 162:17
**experience** [9] - 4:19, 38:16, 84:18, 100:15, 106:25, 114:10, 125:24, 127:1, 146:3
**expert** [15] - 55:7, 84:20, 84:22, 84:25, 102:23, 103:2, 103:5, 127:19, 128:2, 128:4, 128:11, 150:24, 152:8, 152:17, 154:25
**explain** [2] - 85:23, 96:19
**explained** [1] - 164:11
**explanation** [1] - 9:24
**explanations** [1] - 13:19
**express** [1] - 155:1
**extensive** [3] - 12:6, 80:19, 156:6

**extent** [3] - 143:12, 149:25, 150:5
**extra** [1] - 110:25
**extremely** [3] - 8:23, 89:5, 94:2

## F

**face** [1] - 3:16
**facilitate** [1] - 68:23
**facing** [2] - 37:2, 38:1
**Fact** [1] - 155:7
**fact** [17] - 2:23, 3:18, 4:18, 12:21, 38:17, 38:21, 63:21, 74:1, 74:12, 151:16, 153:15, 155:22, 156:20, 158:15, 159:2, 159:12, 160:4
**factors** [4] - 96:6, 96:9, 96:11, 96:18
**faculty** [1] - 83:22
**fail** [1] - 82:9
**failure** [1] - 156:22
**fair** [7] - 5:19, 16:8, 25:15, 25:16, 27:8, 155:4, 157:19
**fairly** [1] - 154:17
**false** [1] - 157:13
**familiar** [18] - 19:10, 19:13, 47:20, 50:15, 62:14, 62:17, 62:18, 82:23, 87:4, 103:10, 125:24, 126:2, 126:5, 126:9, 127:5, 127:15, 128:7, 141:17
**far** [9] - 9:20, 11:17, 15:22, 54:17, 55:1, 110:4, 155:6, 157:14, 159:16
**fashion** [1] - 164:2
**favorable** [1] - 153:14
**FBI** [35] - 45:2, 49:5, 50:19, 51:16, 51:22, 77:16, 77:22, 78:10, 79:1, 79:9, 79:17, 80:1, 80:6, 81:8, 81:9, 82:12, 82:15, 82:18, 83:17, 83:23, 83:24, 86:21, 89:4, 89:9, 89:25, 90:23, 91:22, 92:12, 92:13, 92:14, 92:15, 92:17, 107:15, 107:17, 115:6
**FBI's** [1] - 83:25
**February** [5] - 15:3, 59:19, 60:6, 60:23, 61:19

**Federal** [2] - 33:10, 33:13
**federal** [5] - 84:11, 102:21, 124:4, 125:17, 127:19
**feedback** [3] - 28:1, 28:5, 28:6
**fellow** [1] - 101:17
**felon** [6] - 3:16, 3:24, 149:6, 151:19, 154:4, 154:5
**felony** [5] - 3:22, 4:3, 4:21, 6:8, 154:6
**female** [8] - 67:23, 68:13, 71:24, 71:25, 72:9, 86:23, 87:7, 91:7
**fentanyl** [1] - 101:24
**Fernando** [4] - 55:21, 120:3, 120:25, 128:11
**FERNANDO** [4] - 120:9, 120:17, 120:25, 166:17
**few** [8] - 19:20, 48:4, 86:11, 125:8, 142:21, 144:2
**field** [5] - 33:10, 100:4, 100:23, 101:2, 101:4
**fifteen** [1] - 81:19
**Fifth** [3] - 156:12, 156:18, 162:11
**figure** [1] - 95:22
**file** [2] - 78:13, 83:9
**filled** [1] - 19:23
**final** [7] - 79:16, 81:1, 92:17, 118:8, 118:9, 118:10, 164:16
**finally** [6] - 23:7, 37:17, 39:8, 47:6, 152:15, 156:8
**findings** [2] - 83:4, 117:15
**fine** [4] - 76:21, 109:7, 119:21, 164:5
**fingerprint** [4] - 19:22, 25:9, 107:15, 107:17
**fingerprints** [1] - 44:25
**finish** [5] - 11:10, 11:13, 56:19, 157:5, 162:24
**firearm** [20] - 3:17, 3:19, 3:21, 3:24, 9:23, 10:16, 10:17, 10:19, 10:20, 11:3, 19:20, 76:10, 92:1, 135:3, 135:4, 135:11, 142:10, 143:5, 149:6

**firearms** [16] - 9:7, 9:24, 19:19, 19:24, 22:3, 34:6, 48:21, 74:16, 134:24, 135:1, 135:15, 149:11, 151:23, 151:24, 152:15
**first** [21] - 2:10, 5:1, 9:3, 16:18, 17:9, 20:24, 54:13, 57:16, 58:24, 59:1, 62:18, 72:15, 77:3, 79:11, 105:6, 117:23, 151:14, 153:19, 154:4, 154:20, 163:13
**five** [12] - 18:14, 19:7, 53:22, 55:2, 90:22, 92:5, 92:9, 97:4, 119:17, 147:2, 147:8, 165:5
**five-minute** [1] - 147:8
**flip** [5] - 42:20, 45:18, 45:25, 46:6, 47:2
**flipped** [1] - 47:17
**flipping** [3] - 46:11, 46:21, 47:7
**floor** [2] - 96:16, 142:7
**focus** [4] - 12:23, 46:22, 122:4, 123:25
**focusing** [2] - 112:18, 113:18
**folks** [11] - 2:1, 54:10, 54:22, 57:4, 58:14, 58:17, 97:18, 146:14, 147:13, 163:20, 164:1
**follow** [6] - 28:20, 38:18, 54:19, 67:6, 107:23, 160:13
**follow-on** [1] - 38:18
**following** [4] - 27:7, 27:23, 37:12, 76:9
**foot** [1] - 62:6
**FOR** [3] - 1:2, 1:13, 1:18
**Force** [2] - 121:15, 123:23
**force** [2] - 33:19, 124:3
**foregoing** [1] - 167:4
**Forensic** [2] - 101:8, 101:11
**forensic** [32] - 77:23, 78:1, 78:2, 78:5, 78:6, 78:8, 79:2, 79:9, 80:3, 80:14, 80:17, 80:22, 81:11, 81:20, 81:25, 82:24, 83:2, 83:13, 83:21,

84:2, 84:9, 84:12, 85:1, 85:17, 85:20, 86:1, 86:25, 94:21, 99:20, 99:21, 100:12, 100:13
**forgetting** [1] - 57:12
**form** [3] - 19:23, 106:16, 110:23
**formal** [1] - 84:7
**format** [1] - 37:10
**formation** [5] - 114:5, 114:6, 114:7, 114:11, 114:12
**formed** [1] - 106:22
**forth** [4] - 64:25, 157:2, 164:11, 164:25
**forward** [3] - 6:12, 16:2, 153:22
**foundation** [1] - 65:3
**four** [13] - 19:19, 25:17, 25:23, 53:6, 70:20, 89:21, 89:25, 90:8, 93:4, 95:21, 146:4, 149:11, 157:17
**Fourier** [2] - 102:5, 105:22
**Fourier-transform** [2] - 102:5, 105:22
**fragmentation** [1] - 102:12
**frankly** [4] - 4:1, 12:5, 13:16, 16:7
**frequency** [2] - 87:14, 87:22
**frequently** [1] - 25:2
**front** [5] - 17:13, 37:2, 38:2, 44:6, 77:6
**full** [3] - 11:11, 61:10
**fully** [1] - 150:15
**fuming** [1] - 20:18
**fundamentally** [1] - 10:13
**furtherance** [5] - 10:13, 10:17, 152:21, 154:11, 154:19
**furthermore** [1] - 151:8

## G

**G-R-I-L-L** [1] - 17:23
**gain** [1] - 131:19
**game** [2] - 11:14, 13:14
**gang** [2] - 12:13, 33:19
**garb** [1] - 3:8

**gas** [8] - 102:4, 102:6, 102:9, 102:10, 105:21, 105:22, 145:11
**gather** [1] - 45:6
**gathered** [1] - 161:12
**geared** [1] - 82:6
**general** [3] - 85:11, 122:7, 144:5
**generally** [7] - 37:2, 90:17, 128:20, 129:1, 129:24, 134:13, 144:8
**generate** [1] - 89:21
**genetic** [2] - 87:2, 91:9
**geno** [2] - 86:3, 86:19
**gentlemen** [4] - 16:24, 69:13, 75:15
**George's** [9] - 18:7, 18:9, 18:25, 19:18, 48:23, 50:10, 100:25, 101:20
**given** [12] - 3:10, 8:20, 10:16, 10:23, 11:2, 24:22, 71:9, 88:19, 152:5, 163:7, 164:21
**gloves** [6] - 25:13, 26:5, 26:8, 26:11, 26:18, 51:17
**GOROKHOV** [1] - 1:19
**Government** [53] - 20:24, 21:17, 21:20, 22:11, 22:15, 22:19, 22:22, 23:4, 23:7, 36:22, 39:24, 40:3, 46:20, 52:20, 60:11, 60:16, 103:18, 104:10, 104:12, 104:14, 104:18, 104:20, 105:1, 105:6, 107:19, 107:20, 108:1, 108:10, 109:2, 109:12, 109:14, 109:17, 109:23, 110:13, 111:3, 111:5, 111:8, 112:2, 112:5, 112:15, 112:18, 112:20, 113:4, 113:8, 113:16, 113:19, 113:21, 114:15, 114:21, 138:6, 138:21, 139:22, 140:12
**government** [32] - 2:6, 3:18, 3:20, 4:7, 4:11, 6:2, 6:12, 7:4, 10:2, 17:10, 21:6, 24:6,

27:17, 28:22, 29:16, 32:16, 75:9, 75:20, 84:24, 98:18, 104:3, 104:8, 104:16, 115:3, 120:3, 128:10, 146:13, 149:9, 153:14, 153:17, 156:3, 164:16
**GOVERNMENT'S** [8] - 17:15, 30:3, 32:22, 76:23, 98:22, 120:9, 120:17, 166:3
**Government's** [17] - 37:21, 38:19, 40:6, 40:20, 42:6, 42:14, 42:15, 44:7, 45:17, 45:24, 46:5, 46:10, 46:15, 47:1, 47:6, 139:1, 140:24
**government's** [6] - 2:22, 9:3, 9:8, 10:25, 12:15, 56:15
**grab** [1] - 109:25
**gram** [11] - 118:17, 128:20, 128:22, 129:2, 129:5, 129:11, 129:14, 129:24, 130:2, 130:5, 144:10
**grams** [5] - 118:16, 130:13, 130:14, 144:9
**grant** [2] - 153:12, 155:5
**graph** [1] - 87:5
**greater** [5] - 90:10, 93:10, 93:11, 126:6, 126:10
**green** [1] - 39:9
**Green** [4] - 34:13, 34:23, 52:16, 61:13
**GREENBELT** [1] - 1:12
**Greenbelt** [1] - 1:16
**Grill** [4] - 17:11, 17:22, 24:5, 24:11
**GRILL** [2] - 17:15, 166:4
**grocery** [1] - 48:2
**gross** [6] - 105:15, 105:16, 116:9, 116:10, 116:16, 116:18
**group** [4] - 89:18, 99:22, 99:24, 121:20
**grouped** [1] - 93:2
**groups** [2] - 89:14, 89:22
**Grove** [1] - 61:4

**guess** [8] - 11:22, 26:24, 27:6, 34:1, 142:14, 142:17, 145:22, 148:6
**guessing** [1] - 27:2
**guidance** [2] - 25:4, 25:8
**guilty** [1] - 155:8
**gum** [1] - 51:19
**gun** [6] - 12:16, 72:20, 127:3, 152:10, 154:19, 154:23
**Gun** [9] - 20:25, 21:1
**guns** [22] - 4:16, 12:10, 12:15, 13:1, 13:9, 13:19, 25:17, 69:11, 74:18, 127:5, 135:8, 149:14, 149:15, 149:18, 150:2, 152:4, 152:6, 152:20, 154:20, 154:21, 155:1

## H

**half** [7] - 104:13, 108:4, 113:5, 113:18, 130:12, 130:15, 133:24
**hand** [16] - 14:2, 30:2, 32:21, 39:10, 43:3, 62:8, 66:24, 68:1, 76:22, 98:21, 120:8, 120:16, 134:17, 147:18, 147:21, 148:4
**handcuffs** [1] - 35:12
**handed** [1] - 48:10
**handgun** [6] - 22:14, 22:21, 36:17, 38:13, 142:12, 152:2
**handguns** [1] - 135:8
**handle** [5] - 25:11, 81:17, 122:16, 123:2, 123:3
**handled** [2] - 96:7, 138:1
**handling** [1] - 107:24
**hands** [3] - 95:7, 96:14, 151:1
**hard** [6] - 37:14, 37:18, 39:6, 39:12, 56:19, 96:16
**hardens** [1] - 131:7
**harmful** [1] - 13:16
**HCl** [2] - 110:20, 144:25
**head** [2] - 8:9, 129:1
**hear** [26] - 4:12, 4:16, 10:4, 11:14, 17:2,

27:1, 27:4, 28:2, 28:3, 28:4, 28:6, 29:12, 30:19, 66:5, 66:14, 68:16, 70:5, 71:1, 120:14, 143:14, 146:22, 146:24, 147:20, 153:3, 158:10, 163:24
**heard** [12] - 10:4, 13:7, 14:18, 14:23, 15:4, 16:8, 16:9, 16:11, 64:24, 146:25, 150:4, 150:5
**hearing** [1] - 28:8
**hearsay** [1] - 9:20
**heating** [3] - 131:6, 133:17, 134:23
**held** [3] - 10:20, 43:21, 139:16
**help** [5] - 4:18, 34:12, 67:5, 68:5, 91:8
**helpful** [2] - 13:10, 64:22
**helps** [2] - 6:13, 20:18
**hereby** [1] - 167:4
**heroin** [1] - 101:24
**high** [4] - 74:25, 89:2, 150:4
**High** [2] - 121:14, 123:22
**higher** [1] - 136:4
**highest** [1] - 146:7
**highlighted** [1] - 111:4
**himself** [5] - 4:9, 13:24, 62:21, 148:6, 148:16
**Hispanics** [1] - 89:24
**hit** [14] - 55:22, 106:6, 106:7, 106:8, 108:25, 110:21, 111:25, 113:3, 113:15, 114:3, 116:25, 117:7, 117:9, 117:12
**hold** [12] - 14:6, 27:22, 30:1, 32:19, 43:12, 75:13, 84:4, 137:2, 137:3, 153:2, 153:8, 163:9
**holding** [1] - 109:18
**home** [2] - 135:15, 135:16
**Honor** [138] - 2:5, 2:6, 6:22, 7:9, 7:13, 10:2, 10:12, 13:22, 13:23, 14:22, 15:8, 15:11, 15:16, 16:15, 16:21, 17:10, 24:7, 27:17, 27:19, 27:25, 28:4,

28:11, 28:21, 29:5, 29:15, 29:21, 30:11, 32:10, 32:16, 47:12, 48:7, 53:20, 53:24, 54:3, 55:4, 55:9, 55:11, 55:20, 55:25, 56:17, 56:22, 57:1, 57:7, 57:11, 57:19, 57:24, 58:5, 58:10, 58:13, 58:19, 60:14, 63:13, 64:20, 65:2, 65:13, 65:23, 66:1, 66:2, 67:3, 67:7, 67:8, 67:13, 68:3, 68:8, 68:11, 68:18, 68:19, 69:1, 69:19, 72:22, 72:25, 73:1, 73:3, 75:4, 75:7, 75:9, 75:11, 75:21, 75:23, 76:14, 76:16, 77:9, 84:24, 85:5, 94:4, 97:1, 97:4, 97:8, 97:12, 97:16, 97:22, 98:1, 98:14, 103:4, 103:23, 110:7, 115:21, 116:2, 119:6, 119:11, 119:13, 119:21, 120:1, 120:2, 128:10, 135:24, 136:7, 142:21, 143:11, 143:15, 146:7, 146:13, 147:7, 147:11, 147:16, 147:22, 148:2, 148:7, 148:9, 148:25, 150:14, 150:15, 151:10, 151:19, 152:4, 152:11, 152:15, 152:22, 152:25, 162:13, 162:14, 162:17, 163:2, 163:11, 164:5, 165:2, 165:4
**HONORABLE** [1] - 1:10
**hook** [1] - 67:3
**hour** [1] - 163:8
**hours** [1] - 81:17
**house** [7] - 71:9, 71:10, 145:15, 145:17, 152:18, 158:2, 161:9
**houses** [1] - 125:23
**HOWARD** [3] - 30:3, 30:8, 166:7
**Howard** [5] - 27:18, 28:14, 30:8, 30:17,

30:21
**human** [1] - 86:19
**hundreds** [2] - 124:11, 125:4
**hundredth** [1] - 118:17
**hurts** [1] - 4:18
**husher** [1] - 29:24
**hydrochloride** [9] - 106:19, 107:5, 110:21, 110:22, 110:23, 110:25, 111:2, 113:2, 113:15

## I

**I.D** [3] - 21:11, 23:16, 31:4
**I.T** [5] - 28:2, 28:16, 68:6, 162:5
**idea** [4] - 54:22, 80:19, 136:9, 143:12
**identification** [5] - 10:3, 29:2, 31:10, 31:19, 69:25
**identified** [8] - 73:1, 105:3, 108:18, 109:23, 110:13, 111:17, 112:21, 113:22
**identifies** [1] - 62:20
**identify** [7] - 35:25, 38:9, 39:1, 62:5, 117:16, 136:13, 139:7
**ignitable** [2] - 100:18, 100:21
**illegal** [4] - 34:7, 36:16, 72:18, 125:23
**imidazothiazole** [1] - 106:6
**immediately** [1] - 61:6
**impeached** [2] - 156:7
**impeachment** [1] - 157:9
**implement** [1] - 140:15
**implements** [2] - 151:16, 152:18
**important** [3] - 26:8, 82:13, 82:14
**importation** [1] - 125:22
**imprisonment** [2] - 76:4, 76:7
**IN** [1] - 1:1
**in-service** [1] - 19:2
**inappropriate** [1] - 148:11
**Inc** [1] - 61:4

**incarceration** [2] - 3:23, 8:1
**inclined** [1] - 11:23
**include** [1] - 34:5
**included** [5] - 8:19, 36:9, 81:10, 91:13, 117:16
**including** [4] - 76:9, 128:12, 141:12, 150:19
**increases** [1] - 88:23
**independent** [2] - 12:21, 86:15
**independently** [5] - 78:25, 79:14, 79:17, 81:23, 83:7
**INDEX** [1] - 166:1
**indicate** [1] - 45:19, 46:2, 46:6, 46:17, 46:22, 46:23, 47:3, 47:8, 47:18, 53:12, 133:6, 146:20, 164:15
**indicated** [3] - 7:13, 55:23, 98:11
**indicates** [1] - 34:4
**Indicating** [5] - 46:4, 46:8, 46:19, 46:24, 47:5
**indicating** [6] - 34:7, 37:9, 38:13, 38:13, 41:1, 42:20, 47:9
**indicating)** [1] - 42:21
**indication** [6] - 2:19, 3:5, 4:5, 20:4, 47:11, 155:11
**indicative** [1] - 151:15
**individual** [13] - 35:21, 53:1, 73:22, 85:12, 86:8, 89:10, 89:14, 90:7, 90:12, 90:17, 93:25, 130:4, 148:16
**individual's** [1] - 85:19
**individually** [1] - 130:3
**individuals** [6] - 85:15, 85:18, 86:6, 90:22, 91:2, 94:1
**indulgence** [1] - 143:23
**infer** [2] - 149:18, 151:3
**inference** [1] - 156:19
**inferences** [1] - 153:16
**informant** [1] - 123:8
**informants** [1] - 123:3
**information** [2] - 8:17, 63:1

**infrared** [5] - 102:5, 102:14, 102:15, 102:16, 105:23
**inheritance** [1] - 91:9
**inherited** [1] - 81:5
**initial** [1] - 123:1
**initialled** [2] - 23:15, 64:1
**initials** [7] - 21:11, 23:20, 104:24, 108:17, 109:22, 111:15, 112:13
**Inositol** [9] - 131:24, 132:4, 132:20, 133:11, 133:17, 138:12, 139:24, 139:25, 151:17
**inquire** [1] - 147:3
**inquired** [1] - 8:25
**inside** [4] - 21:4, 23:11, 37:1, 51:19
**instance** [5] - 93:13, 93:15, 93:20, 93:23, 103:1
**instead** [1] - 110:8
**instruct** [2] - 156:19, 163:23
**instruction** [2] - 3:9, 3:12
**instructions** [6] - 98:13, 164:13, 164:14, 164:17, 164:18, 164:21
**instructor** [1] - 83:24
**instrument** [1] - 102:16
**instrumentation** [2] - 82:18, 99:25
**insufficient** [1] - 153:10
**insurance** [1] - 82:20
**integrity** [1] - 82:14
**Intelligence** [2] - 77:17, 77:18
**intends** [1] - 29:16
**intense** [2] - 80:21, 81:14
**Intensity** [2] - 121:14, 123:22
**intent** [3] - 149:5, 150:16, 151:4
**interacted** [1] - 124:24
**interaction** [1] - 127:3
**interest** [14] - 4:2, 4:11, 4:12, 5:17, 7:17, 36:11, 37:4, 38:6, 38:23, 39:17, 72:14, 91:11, 136:7, 145:20
**interested** [1] - 167:11

**intermittent** [1] - 81:24
**internal** [1] - 83:16
**international** [1] - 83:17
**interpret** [3] - 81:6, 87:23, 88:14
**interpretation** [7] - 82:6, 88:5, 88:7, 88:16, 89:20, 91:3, 147:23
**interprets** [1] - 147:24
**interstate** [1] - 151:24
**introduce** [1] - 10:25
**invasion** [1] - 135:16
**investigate** [1] - 121:16
**investigated** [3] - 24:14, 127:9, 127:12
**investigates** [1] - 33:20
**investigating** [1] - 18:19
**investigation** [19] - 18:12, 19:8, 19:10, 34:10, 34:12, 52:14, 73:19, 73:20, 73:22, 85:8, 91:15, 95:16, 100:22, 124:6, 124:19, 124:20, 140:6, 150:6, 161:12
**Investigation** [2] - 18:19, 33:10
**Investigations** [1] - 33:14
**investigations** [9] - 18:24, 33:22, 33:25, 47:22, 123:1, 123:2, 124:8, 124:22, 132:25
**investigative** [5] - 123:7, 123:10, 123:13, 123:14, 123:17
**investigator** [6] - 18:11, 18:17, 19:5, 25:1, 121:13, 127:2
**investigators** [1] - 95:10
**invite** [2] - 145:15, 145:17
**involved** [8] - 12:6, 12:10, 17:2, 34:9, 34:10, 67:19, 96:7, 140:5
**involvement** [1] - 34:4
**involving** [2] - 12:7, 85:8
**IR** [1] - 102:16
**irrelevant** [1] - 11:1

**issue** [13] - 2:24, 8:10, 8:12, 81:7, 83:4, 148:20, 154:2, 154:4, 154:17, 154:20, 155:10, 158:12, 160:7
**issues** [9] - 2:3, 2:16, 3:4, 9:1, 11:7, 13:15, 17:1, 28:23, 57:23
**Item** [3] - 92:12, 92:13, 92:15, 92:17
**item** [40] - 20:11, 20:14, 20:15, 22:5, 22:9, 22:12, 22:13, 22:17, 26:7, 26:9, 26:12, 37:9, 37:18, 39:12, 91:22, 92:17, 92:23, 92:24, 93:12, 93:18, 94:11, 94:12, 94:14, 96:17, 104:13, 105:7, 105:20, 108:5, 109:14, 109:18, 109:23, 110:13, 110:16, 111:5, 111:10, 113:6, 113:19, 115:3
**items** [55] - 19:13, 19:15, 19:20, 19:22, 19:24, 20:1, 20:4, 20:7, 20:8, 20:9, 20:17, 20:18, 21:7, 21:12, 21:13, 21:23, 22:2, 23:24, 25:2, 25:12, 36:11, 36:15, 37:4, 38:6, 38:23, 39:17, 41:2, 42:10, 42:17, 51:4, 79:6, 79:21, 80:4, 91:16, 91:19, 92:3, 92:11, 92:20, 93:1, 93:3, 93:5, 93:7, 95:11, 95:20, 101:19, 114:10, 114:19, 115:10, 133:16, 136:2, 142:7, 152:12
**itself** [11] - 35:4, 36:10, 50:20, 50:21, 117:4, 117:21, 135:2, 149:23, 150:6, 150:10, 152:11
**Ivy** [1] - 1:15

**J**

**J-A-R-A-M-I-L-L-O** [1] - 121:1
**jacket** [1] - 96:17
**Jaramillo** [10] - 55:21,

120:4, 120:25, 128:11, 128:16, 136:2, 138:3, 150:25, 154:25
**JARAMILLO** [3] - 120:9, 120:17, 166:17
**job** [7] - 19:1, 78:9, 79:9, 79:11, 83:1, 94:17
**Joseph** [2] - 28:11, 28:21
**JOSEPH** [1] - 1:14
**Joshua** [2] - 32:17, 33:2
**JOSHUA** [3] - 32:22, 33:2, 166:9
**journals** [1] - 83:19
**JR** [1] - 1:15
**judge** [2] - 128:1, 157:24
**JUDGE** [1] - 1:11
**judging** [1] - 153:15
**judgment** [4] - 149:2, 153:12, 155:6, 155:9
**jump** [1] - 5:15
**jumpsuit** [1] - 36:3
**juror** [1] - 11:24
**jurors** [6] - 8:20, 8:21, 10:6, 67:6, 119:23, 137:11
**jurors'** [1] - 53:25
**jury** [63] - 3:18, 4:11, 8:15, 8:19, 9:2, 10:4, 11:11, 11:19, 16:20, 16:23, 27:24, 30:19, 43:12, 43:13, 43:22, 44:2, 47:18, 49:9, 54:21, 57:11, 57:14, 58:16, 65:11, 66:3, 66:20, 66:23, 67:15, 67:24, 68:10, 68:16, 70:3, 70:24, 71:19, 85:23, 97:11, 97:13, 98:5, 98:12, 98:16, 120:10, 137:2, 146:18, 149:17, 151:2, 152:20, 153:2, 154:2, 156:19, 157:13, 157:16, 159:1, 159:20, 160:3, 160:24, 161:17, 162:1, 162:8, 162:10, 162:13, 163:16, 163:19, 164:8, 164:19
**JURY** [2] - 1:10, 1:11
**justify** [1] - 153:22

**K**

**keep** [5] - 12:23, 57:12, 68:25, 138:10, 157:21
**kicked** [2] - 71:11, 157:17
**kill** [1] - 14:11
**killed** [1] - 14:16
**kin** [1] - 167:11
**kind** [6] - 24:24, 87:3, 95:12, 132:12, 149:21, 162:7
**kinds** [1] - 126:19
**kit** [3] - 51:16, 51:17, 86:20
**kitchen** [3] - 36:12, 42:3, 152:10
**kitchenette** [4] - 35:13, 36:10, 37:1, 38:1
**knock** [1] - 55:5
**knowing** [1] - 151:15
**knowledge** [7] - 2:21, 9:1, 10:14, 72:6, 74:7, 74:10, 151:21
**known** [11] - 13:9, 40:12, 77:16, 77:23, 78:7, 80:1, 85:15, 85:18, 91:22, 95:25, 106:6
**knows** [2] - 51:4, 151:17

**L**

**L1** [4] - 52:21, 58:22, 58:24, 59:10
**L2** [2] - 60:11, 60:17
**lab** [7] - 74:12, 79:22, 82:11, 91:22, 99:23, 138:1, 138:2
**Lab** [5] - 92:12, 92:13, 92:14, 92:15, 92:17
**label** [5] - 50:10, 104:23, 111:13, 111:15, 112:11
**labeled** [1] - 60:24
**Laboratory** [6] - 44:22, 44:23, 99:17, 101:1, 105:9
**laboratory** [15] - 49:5, 50:20, 50:24, 78:14, 83:5, 83:6, 84:5, 92:6, 92:8, 99:23, 100:1, 101:25, 103:14, 107:7
**lack** [2] - 149:21, 151:22
**ladies** [3] - 16:24,

13

69:13, 75:15
**laid** [1] - 20:10
**Landover** [1] - 19:17
**Lane** [1] - 1:15
**language** [1] - 59:3
**large** [5] - 87:23,
133:2, 133:5, 135:1
**larger** [8] - 21:3,
64:13, 64:19, 66:12,
66:13, 71:16, 137:6,
139:5
**last** [14] - 53:6, 56:10,
62:3, 70:20, 77:4,
89:7, 96:14, 99:6,
120:25, 131:20,
133:15, 150:24,
160:10, 161:4
**late** [6] - 2:2, 10:3,
10:24, 11:12, 11:14,
13:14
**latent** [3] - 18:22,
20:18, 24:1
**latex** [1] - 51:17
**laughed** [1] - 72:12
**laundering** [1] -
125:21
**Lavalier** [5] - 114:22,
135:20, 136:4,
136:18, 142:18
**law** [13] - 9:15, 10:21,
18:15, 25:9, 35:19,
35:21, 126:22,
148:12, 148:13,
159:12, 159:14,
161:15, 163:23
**lawyer** [2] - 157:20,
157:23
**laying** [1] - 42:20
**lead** [6] - 3:18, 10:8,
10:9, 97:11, 119:18,
124:18
**leafy** [1] - 39:9
**lean** [5] - 30:18, 73:15,
73:17, 116:12
**leaning** [1] - 39:22
**learn** [2] - 145:4
**learned** [2] - 9:17,
126:19
**lease** [13] - 15:2, 15:9,
15:10, 15:11, 15:15,
52:15, 59:2, 60:21,
60:22, 61:17, 61:19,
151:6
**leased** [1] - 153:24
**least** [9] - 7:25, 11:12,
24:17, 74:16, 81:19,
93:23, 152:2,
152:21, 154:15
**leave** [10] - 3:9, 54:14,
54:16, 73:4, 115:23,

115:24, 146:16,
164:2, 164:6
**leaves** [1] - 98:12
**leaving** [1] - 8:6
**led** [1] - 95:16
**ledgers** [3] - 34:6,
73:24, 74:1
**left** [7] - 37:8, 39:10,
40:10, 43:3, 58:25,
62:8, 131:9
**left-hand** [3] - 39:10,
43:3, 62:8
**legal** [3] - 17:1,
164:11, 164:25
**legible** [1] - 61:11
**length** [1] - 17:4
**lengthier** [1] - 124:6
**lengthy** [1] - 85:13
**less** [2] - 11:22,
144:10
**levamisole** [1] -
117:12
**level** [15] - 121:25,
123:2, 123:17,
125:25, 127:10,
128:17, 128:21,
128:24, 129:16,
129:19, 129:23,
130:7, 130:9,
130:10, 132:19
**levels** [1] - 127:16
**license** [1] - 159:25
**lie** [1] - 155:22
**life** [3] - 9:6, 15:1,
84:10
**lifetime** [1] - 4:1
**light** [3] - 102:16,
153:14
**likelihood** [8] - 87:14,
88:15, 88:17, 88:23,
89:3, 89:8, 89:21,
94:2
**likely** [7] - 87:15,
88:19, 93:24, 94:18,
144:7, 144:11,
156:24
**limit** [1] - 155:25
**limited** [1] - 95:24
**line** [6] - 51:19, 53:9,
81:17, 149:21,
159:21, 162:1
**link** [1] - 27:21
**links** [1] - 86:3
**liquid** [2] - 100:20,
100:21
**liquids** [2] - 100:18,
100:19
**list** [4] - 8:19, 55:21,
96:17, 118:16
**listed** [3] - 89:8,

117:19, 118:2
**listen** [6] - 69:15,
158:10, 158:11,
160:1, 160:12,
160:17
**listened** [9] - 62:20,
62:22, 63:3, 63:6,
64:12, 65:7, 65:17,
66:15, 70:21
**listening** [4] - 67:17,
70:2, 72:8, 155:19
**live** [1] - 145:8
**living** [3] - 36:9, 41:12,
154:14
**loaded** [3] - 40:14,
40:15, 40:17
**located** [4] - 19:17,
35:25, 37:17, 45:21
**location** [10] - 22:9,
22:17, 22:20, 22:24,
23:2, 23:5, 23:8,
50:13, 86:22, 145:8
**locations** [1] - 25:2
**lockbox** [2] - 105:12,
105:14
**look** [29] - 10:10,
20:19, 39:14, 41:5,
42:23, 44:6, 55:21,
61:16, 61:21, 73:25,
78:11, 78:13, 83:16,
88:24, 96:20,
104:16, 106:21,
108:8, 112:5, 114:6,
131:10, 132:2,
136:2, 136:11,
136:12, 141:19,
150:20, 152:6,
157:22
**looked** [12] - 38:3,
49:11, 49:14, 49:18,
49:22, 50:1, 50:4,
50:7, 63:21, 87:18,
151:8, 158:14
**looking** [10] - 45:17,
58:21, 91:8, 106:24,
114:4, 136:20,
138:14, 139:15,
142:14, 151:1
**looks** [9] - 35:18,
50:10, 79:11, 87:3,
131:11, 137:23,
138:7, 138:8, 141:18
**loose** [1] - 142:3
**lose** [1] - 11:15
**losing** [2] - 13:3,
134:6
**loud** [1] - 28:3
**loudly** [6] - 17:18,
30:6, 32:25, 77:1,
98:25, 120:22

**love** [1] - 86:11
**low** [1] - 123:2
**lower** [2] - 38:15,
106:19
**lowest** [2] - 90:2, 90:4
**lunch** [3] - 53:25,
54:1, 54:10, 54:17

## M

**M-A-R-K** [1] - 99:4
**M-C-C-O-L-L-U-M** [1] -
77:4
**ma'am** [3] - 17:19,
119:7, 120:24
**Mac-10** [3] - 23:8,
39:23, 41:1
**machine** [2] - 87:2,
167:8
**Madam** [3] - 17:14,
29:25, 32:20
**magazine** [6] - 23:6,
40:13, 40:14, 40:16,
92:16, 93:12
**magazines** [10] -
19:20, 19:25, 22:4,
22:18, 23:8, 24:2,
41:2, 92:18, 93:18
**main** [3] - 12:23,
69:14, 89:21
**maintain** [2] - 79:23,
99:25
**maintained** [1] - 155:1
**major** [4] - 18:19,
87:12, 93:7, 93:17
**male** [19] - 41:20,
65:19, 66:14, 66:17,
66:18, 67:23, 68:12,
68:14, 71:3, 71:24,
71:25, 72:1, 72:2,
86:23, 87:7, 91:7,
93:3, 93:13, 93:20
**manage** [2] - 30:22,
84:5
**managed** [1] - 78:25
**manages** [1] - 78:10
**manners** [1] - 62:18
**manufacture** [2] -
125:9, 130:21
**manufactured** [1] -
125:12
**March** [1] - 8:1
**MARK** [2] - 98:22,
166:14
**Mark** [4] - 55:18,
98:19, 99:3, 116:6
**marked** [29] - 31:10,
31:19, 36:21, 37:21,
38:19, 39:24, 40:19,
42:6, 42:15, 45:10,

45:23, 45:24, 46:10,
46:15, 46:20, 47:1,
49:10, 52:2, 52:20,
60:16, 63:10, 75:23,
88:1, 103:18, 138:6,
139:21, 140:12,
140:23, 142:25
**market** [1] - 141:24
**marshal** [1] - 162:3
**MARYLAND** [2] - 1:2,
1:12
**Maryland** [6] - 1:16,
18:8, 19:18, 74:23,
128:8, 167:3
**mass** [4] - 102:4,
102:9, 102:10,
105:21
**Master** [1] - 100:12
**Master's** [2] - 84:8,
100:18
**Masterpiece** [3] -
22:21, 92:14, 92:24
**match** [6] - 87:24,
88:8, 88:9, 88:13,
88:18, 89:1, 89:6,
90:13, 90:18, 91:13,
92:4
**matched** [2] - 92:5,
92:9
**matches** [5] - 88:10,
88:11, 93:6, 93:16,
93:22
**materials** [8] - 54:15,
117:6, 124:13,
124:16, 136:13,
146:16, 164:3, 164:6
**mathematics** [1] -
100:11
**matter** [7] - 8:11,
19:15, 75:16,
114:19, 159:12,
167:6
**matters** [1] - 147:10
**McCollum** [13] - 55:9,
75:10, 76:15, 76:23,
77:3, 77:5, 77:13,
84:25, 85:7, 88:1,
94:8, 96:6, 166:11
**MDL** [1] - 23:3
**mean** [15] - 7:19, 13:2,
26:23, 50:18, 74:24,
88:25, 90:7, 94:12,
97:3, 106:9, 120:11,
147:25, 148:15,
162:22, 163:5
**means** [8] - 73:21,
74:11, 83:7, 85:18,
90:9, 90:19, 93:6,
148:20
**measured** [2] -

14

115:14, 115:16
measuring [1] - 141:4
meet [3] - 98:11,
  145:10, 145:11
meeting [1] - 150:8
meets [1] - 152:4
member [5] - 83:22,
  99:22, 101:8,
  101:10, 123:22
mentioned [12] - 20:7,
  23:23, 26:18, 32:6,
  39:4, 40:10, 73:24,
  90:6, 102:1, 106:13,
  123:16, 131:15
mentorship [3] -
  79:12, 79:15, 80:22
MESSITTE [1] - 1:10
methamphetamine [1]
  - 101:24
method [2] - 90:5,
  123:7
Metropolitan [2] -
  126:6, 126:10
Miami [1] - 100:11
Michigan [1] - 100:13
microphone [13] -
  17:18, 29:14, 30:6,
  30:18, 32:25, 45:12,
  46:13, 73:12, 77:1,
  77:6, 98:25, 120:22,
  138:23
microphones [2] -
  14:6, 14:7
microwave [2] - 38:10,
  134:23
mid [2] - 123:2, 130:10
Mid [3] - 99:17, 101:8,
  105:9
Mid-Atlantic [3] -
  99:17, 101:8, 105:9
mid-level [2] - 123:2,
  130:10
midnight [2] - 61:20,
  122:15
might [12] - 10:5,
  10:19, 67:5, 95:6,
  119:13, 143:16,
  144:18, 144:21,
  145:10, 145:17,
  145:19, 162:23
mike [3] - 60:12, 67:4,
  116:13
million [2] - 93:24,
  94:2
mind [3] - 43:11,
  138:10, 164:24
minimal [1] - 25:12
minor [1] - 100:11
minute [3] - 97:10,
  147:8, 147:9

minutes [17] - 53:22,
  53:24, 54:5, 54:8,
  54:24, 55:2, 55:10,
  55:19, 71:9, 97:4,
  97:15, 119:17,
  119:18, 142:21,
  143:18, 147:2, 165:6
Miscellaneous [5] -
  28:13, 28:25, 63:10,
  63:17, 63:19
mislabeled [1] - 63:25
mix [7] - 131:4, 132:1,
  132:3, 132:7,
  133:14, 133:16,
  134:22
mixture [2] - 102:8,
  102:11
mock [4] - 79:20,
  80:24, 81:6
mock-like [2] - 79:20,
  81:6
model [1] - 142:10
modified [1] - 164:22
modify [2] - 164:13,
  164:17
moment [9] - 24:13,
  48:5, 48:6, 63:14,
  75:14, 85:5, 87:25,
  112:6, 120:1
Monday [1] - 157:22
MONDAY [1] - 1:11
money [14] - 34:8,
  69:11, 124:18,
  125:21, 126:24,
  128:23, 131:19,
  131:22, 133:6,
  134:6, 135:6,
  135:18, 158:17,
  158:19
money's [1] - 132:23
monies [1] - 125:23
monitor [4] - 45:9,
  45:10, 45:16, 46:17
Montgomery [6] -
  121:8, 121:9,
  121:20, 121:23,
  122:24, 123:11
month [1] - 61:24,
  72:9, 77:20
months [1] - 80:12
morning [11] - 2:22,
  15:19, 16:24, 18:2,
  18:3, 24:11, 24:12,
  63:21, 163:12,
  163:14, 163:22
most [6] - 4:19, 87:13,
  90:1, 90:4, 129:17,
  153:14
mother [7] - 8:18,
  8:22, 10:4, 11:17,

11:24, 14:13, 14:25
motion [11] - 146:20,
  147:1, 147:14,
  148:1, 148:11,
  149:2, 153:12,
  155:5, 155:9, 162:19
motive [1] - 9:7
move [10] - 15:1, 17:6,
  43:15, 46:12, 68:24,
  69:18, 73:11, 77:6,
  99:1, 103:4
MR [228] - 2:5, 2:16,
  3:2, 3:11, 6:21, 7:9,
  7:21, 7:24, 8:12,
  8:14, 9:14, 10:2,
  11:5, 13:22, 14:9,
  14:15, 14:18, 14:22,
  15:8, 15:10, 15:16,
  16:15, 16:18, 16:21,
  17:10, 18:1, 20:23,
  23:18, 23:22, 24:6,
  24:10, 26:14, 26:17,
  26:25, 27:2, 27:5,
  27:9, 27:13, 27:17,
  27:25, 28:4, 28:6,
  28:11, 28:21, 29:11,
  29:15, 29:19, 29:21,
  30:11, 30:14, 32:9,
  32:12, 32:16, 33:6,
  40:3, 40:5, 41:14,
  41:16, 43:1, 43:17,
  43:19, 43:20, 44:1,
  44:3, 45:13, 46:14,
  47:12, 47:14, 47:15,
  48:7, 48:9, 53:20,
  53:23, 54:3, 55:1,
  55:4, 55:9, 55:11,
  55:15, 55:17, 55:20,
  55:25, 56:8, 56:12,
  56:14, 56:17, 56:21,
  57:1, 57:7, 57:11,
  57:19, 57:24, 58:5,
  58:10, 58:19, 58:20,
  60:14, 60:15, 63:13,
  63:15, 64:18, 65:2,
  65:5, 65:13, 65:14,
  65:23, 65:25, 66:4,
  66:21, 67:3, 67:7,
  67:12, 67:16, 68:3,
  68:8, 68:11, 68:18,
  69:1, 69:2, 69:19,
  69:20, 70:4, 70:25,
  71:20, 72:22, 72:25,
  73:3, 73:8, 73:13,
  73:17, 73:18, 73:25,
  75:4, 75:9, 75:21,
  76:14, 77:9, 77:12,
  84:24, 85:3, 85:5,
  85:6, 94:4, 94:7,
  96:2, 96:5, 96:22,
  97:1, 97:4, 97:8,

97:12, 97:16, 97:22,
  98:1, 98:4, 98:7,
  98:9, 98:18, 99:10,
  103:4, 103:7, 103:9,
  103:23, 104:2,
  109:6, 109:11,
  110:7, 110:12,
  114:24, 115:1,
  115:20, 116:2,
  116:5, 116:23,
  118:11, 118:13,
  118:20, 118:23,
  119:5, 119:11,
  119:17, 119:21,
  120:1, 121:4,
  128:10, 128:13,
  128:15, 135:24,
  136:1, 136:7,
  136:10, 136:17,
  138:24, 138:25,
  142:21, 142:23,
  143:11, 143:14,
  143:18, 143:21,
  143:23, 144:1,
  145:24, 146:2,
  146:6, 146:13,
  146:22, 146:25,
  147:5, 147:7,
  147:11, 147:16,
  147:19, 147:22,
  148:9, 148:25,
  149:2, 150:14,
  152:25, 155:14,
  162:13, 162:17,
  162:22, 163:2,
  163:5, 163:11,
  165:2, 165:4
muffled [1] - 68:13
multifold [1] - 89:12
multiple [9] - 36:15,
  81:5, 81:12, 86:6,
  151:15, 152:6,
  154:12, 154:21
multiply [1] - 87:22
multistep [1] - 85:13
must [2] - 90:3,
  159:13
mute [1] - 14:7

**N**

name [34] - 8:19,
  15:14, 17:20, 17:21,
  17:22, 30:7, 30:8,
  32:3, 33:1, 52:24,
  52:25, 59:6, 59:14,
  59:22, 60:1, 60:25,
  66:9, 77:2, 77:3,
  77:4, 95:1, 99:2,
  99:6, 120:23,
  120:24, 120:25,

154:13
named [1] - 31:7
names [3] - 59:2, 59:7,
  117:13
narcotics [33] - 34:2,
  34:5, 34:6, 34:8,
  36:16, 44:14, 44:18,
  44:24, 45:1, 47:22,
  72:18, 121:13,
  121:20, 122:6,
  123:2, 123:8, 124:8,
  124:17, 124:22,
  126:24, 127:2,
  127:6, 127:15,
  133:3, 133:6,
  133:21, 134:24,
  135:1, 135:2, 135:7,
  135:9, 135:14, 141:5
naturally [1] - 96:13
nature [4] - 17:7, 69:3,
  95:18, 149:23
NE [1] - 53:16
necessarily [2] - 13:2,
  94:12
need [48] - 6:9, 6:13,
  6:14, 8:8, 16:2,
  16:16, 17:1, 27:4,
  28:1, 28:15, 28:20,
  29:18, 55:21, 56:3,
  56:20, 56:22, 56:25,
  57:11, 67:10, 69:15,
  114:22, 119:16,
  133:12, 133:13,
  133:16, 133:25,
  134:21, 136:4,
  141:4, 142:18,
  143:17, 148:17,
  148:18, 152:17,
  153:20, 155:16,
  155:17, 155:21,
  157:25, 158:3,
  158:9, 160:1,
  160:18, 161:24,
  161:25, 164:24
needed [1] - 99:25
needs [4] - 7:15,
  47:13, 65:11, 78:13
neighborhood [1] -
  150:5
net [4] - 116:8, 116:19,
  117:23, 118:2
never [2] - 71:8, 74:12
new [3] - 26:7, 45:3,
  145:14
next [25] - 22:15, 23:1,
  26:9, 26:12, 27:16,
  27:20, 32:15, 38:18,
  40:14, 53:22, 54:20,
  55:3, 55:6, 59:11,
  75:8, 96:25, 108:8,

119:10, 119:12, 119:14, 120:3, 130:7, 164:4, 164:20
**nexus** [1] - 151:24
**nice** [4] - 74:21, 74:24, 150:3
**night** [7] - 14:11, 14:17, 15:23, 41:23, 62:19, 71:8, 71:13
**nine** [3] - 78:3, 81:22, 100:5
**NO** [1] - 1:5
**nobody** [1] - 74:16
**none** [4] - 8:20, 67:6, 75:4, 157:16
**Northeast** [1] - 53:16
**note** [3] - 3:7, 57:19, 164:20
**notes** [1] - 17:8
**NOTES** [1] - 1:25
**nothing** [4] - 9:25, 157:12, 157:13, 157:20
**noticed** [1] - 63:25
**notify** [1] - 28:12
**notion** [1] - 14:24
**notwithstanding** [2] - 157:4, 157:5
**Number** [2] - 53:4, 53:7
**number** [39] - 10:18, 21:11, 23:16, 31:4, 47:25, 51:10, 60:24, 61:7, 61:9, 61:10, 69:23, 80:23, 83:19, 87:8, 88:18, 88:23, 89:11, 89:13, 90:2, 90:3, 90:21, 91:9, 91:10, 93:9, 96:18, 103:10, 103:13, 115:6, 118:8, 118:9, 118:10, 139:2, 139:9, 155:16, 155:20, 155:24, 155:25
**number/DEA** [1] - 115:6
**numbered** [1] - 64:10
**numbers** [6] - 86:13, 87:23, 88:5, 89:3, 89:14, 115:3
**numerous** [5] - 19:20, 124:9, 125:16, 137:5, 150:20
**NW** [1] - 1:20

## O

**Oak** [4] - 34:13, 34:23, 52:16, 61:13

**object** [3] - 27:6, 94:25, 95:1
**objecting** [1] - 27:5
**objection** [11] - 26:25, 27:3, 27:4, 29:17, 29:19, 41:14, 85:2, 85:3, 103:7, 128:13, 163:11
**objections** [2] - 11:22, 164:20
**objects** [2] - 10:2, 21:9
**obliged** [1] - 153:11
**observations** [1] - 41:8
**observe** [8] - 34:16, 34:19, 36:7, 36:8, 39:17, 39:19, 122:18, 127:2
**observed** [5] - 34:20, 35:12, 40:16, 41:20, 48:22
**observing** [1] - 25:15
**obtain** [1] - 126:25
**obtained** [8] - 52:15, 81:7, 85:19, 93:3, 93:14, 93:20, 95:25, 102:17
**obviously** [7] - 17:1, 67:6, 72:8, 82:14, 124:17, 133:13, 153:20
**occasion** [3] - 4:14, 12:8, 12:24
**occasions** [1] - 4:18
**occupants** [1] - 52:23
**occupied** [1] - 154:22
**occupying** [2] - 41:19, 151:9
**occur** [2] - 24:24, 87:24
**occurred** [1] - 69:7
**occurring** [1] - 35:14
**occurs** [1] - 88:18
**OF** [5] - 1:2, 1:5, 1:10, 1:14, 1:25
**off-white** [4] - 37:14, 39:13, 137:7, 139:11
**offenders** [1] - 124:6
**offense** [1] - 9:23
**offer** [1] - 84:25
**offered** [5] - 2:10, 2:22, 3:17, 4:6, 15:5
**offering** [3] - 9:16, 72:24, 72:25
**offers** [1] - 128:10
**OFFICE** [1] - 1:14
**office** [2] - 19:17, 33:10
**officer** [6] - 14:19,

18:7, 18:10, 122:12, 122:14, 122:17
**officers** [2] - 18:18, 25:14
**OFFICIAL** [1] - 1:23
**Official** [1] - 167:2
**official** [1] - 167:16
**often** [8] - 24:21, 47:23, 48:1, 82:2, 145:23, 146:3, 155:2
**on-the-job** [1] - 19:1
**once** [11] - 23:9, 23:11, 39:2, 44:22, 59:17, 60:2, 79:14, 88:18, 113:5, 131:3, 164:15
**one** [105] - 2:9, 3:16, 3:22, 3:23, 4:1, 4:4, 4:21, 6:9, 7:25, 8:17, 10:14, 10:15, 10:16, 10:18, 11:2, 12:18, 14:23, 15:17, 20:15, 20:16, 22:20, 22:24, 23:2, 23:5, 23:12, 24:1, 26:9, 26:11, 28:12, 28:23, 37:13, 40:24, 42:12, 42:19, 43:11, 48:5, 48:6, 49:11, 49:14, 49:18, 49:22, 50:1, 54:9, 55:6, 56:2, 57:25, 58:1, 60:24, 65:3, 65:7, 67:23, 71:25, 72:1, 72:2, 73:20, 73:24, 76:5, 76:8, 77:20, 79:25, 85:5, 86:11, 86:22, 87:6, 87:10, 87:25, 89:7, 89:17, 91:1, 91:4, 92:23, 93:7, 94:25, 96:19, 101:9, 101:11, 101:12, 106:24, 108:8, 108:15, 108:16, 109:8, 117:8, 118:7, 118:14, 118:17, 120:1, 129:11, 138:23, 138:24, 139:9, 146:20, 149:9, 151:9, 153:5, 154:7, 155:20, 155:24
**one's** [1] - 152:17
**one-hundredth** [1] - 118:17
**ones** [2] - 49:14, 49:18
**open** [9] - 2:6, 12:18, 13:5, 21:3, 38:21, 40:25, 71:11, 156:3, 156:6

**opened** [4] - 23:15, 51:16, 51:18, 105:18
**opening** [1] - 16:5
**openly** [1] - 97:5
**opens** [1] - 12:4
**opinion** [1] - 84:16
**opinions** [1] - 84:25
**opportunity** [6] - 13:4, 36:8, 48:12, 122:18, 127:2, 161:13
**opposed** [1] - 24:22
**opposite** [1] - 38:1
**oral** [2] - 81:10, 81:13
**orange** [1] - 36:2
**order** [5] - 44:24, 55:14, 90:2, 100:19, 131:21
**ordinarily** [2] - 11:20, 164:10
**organizations** [2] - 124:5, 125:17
**organized** [1] - 165:6
**original** [6] - 2:20, 44:23, 50:24, 51:3, 107:14, 107:16
**originally** [1] - 51:4
**originating** [3] - 93:4, 93:15, 93:21
**otherwise** [3] - 54:1, 98:3, 159:23
**ought** [2] - 4:12, 53:21
**ounce** [10] - 129:21, 129:22, 130:12, 130:13, 130:14, 130:15, 130:16, 133:24, 133:25
**ourselves** [2] - 146:19, 147:2
**oust** [2] - 160:2, 160:22
**outcome** [3] - 160:14, 160:15, 167:12
**outgoing** [1] - 66:8
**outside** [5] - 27:23, 76:17, 80:3, 109:7, 120:5
**oven** [1] - 38:10
**overall** [2] - 18:15, 73:21
**overnight** [1] - 163:4
**overseas** [1] - 151:25
**own** [9] - 4:2, 4:9, 9:19, 49:2, 68:22, 81:23, 132:24, 147:9, 160:19

## P

**P-E-R-K-I-N-S** [1] - 30:9

**p.m** [14] - 54:21, 57:3, 58:16, 97:13, 97:17, 98:16, 146:18, 147:12, 163:19, 164:8, 165:8
**P.T** [14] - 106:6, 106:7, 106:8, 108:25, 110:21, 111:25, 113:3, 113:15, 114:3, 116:25, 117:6, 117:9, 117:12
**P12** [3] - 37:21, 38:7, 142:25
**P13** [2] - 42:7, 42:11
**P16** [2] - 42:14, 42:16
**P39** [3] - 39:25, 40:3, 40:6
**P44** [2] - 36:22, 37:5
**P46** [2] - 38:19, 38:24
**P47** [1] - 40:20
**package** [4] - 26:2, 51:2, 51:3, 132:8
**packaged** [2] - 130:3, 135:15, 138:1
**packages** [2] - 130:4, 151:15
**packaging** [35] - 20:12, 20:13, 21:10, 25:13, 25:23, 34:7, 44:14, 44:16, 44:24, 45:1, 45:3, 45:4, 45:18, 45:19, 45:20, 46:2, 46:6, 46:18, 46:23, 47:3, 47:8, 47:18, 47:20, 47:24, 47:25, 50:16, 50:24, 107:15, 107:16, 136:12, 141:12, 141:17, 141:19
**PAGE** [6] - 166:4, 166:7, 166:9, 166:11, 166:14, 166:17
**page** [8] - 58:22, 58:24, 58:25, 59:9, 59:20, 62:3, 62:4, 62:6
**panel** [8] - 16:23, 54:21, 58:16, 97:13, 98:16, 146:18, 163:19, 164:8
**paper** [2] - 20:10, 87:3
**paragraph** [2] - 61:16, 61:21
**paraphernalia** [6] - 74:9, 133:6, 133:13, 133:17, 149:12, 150:19
**pardon** [2] - 56:2, 151:22

**pardoned** [1] - 8:3
**parking** [2] - 70:14, 145:12
**part** [18] - 12:20, 19:12, 34:12, 52:14, 74:23, 74:24, 82:25, 83:14, 94:16, 104:25, 117:15, 118:7, 118:14, 134:24, 152:21, 158:6, 159:5
**participant** [1] - 63:1
**participants** [2] - 67:19, 71:21
**participate** [1] - 12:14
**participated** [2] - 12:14, 62:23
**participating** [1] - 62:23
**particular** [9] - 10:6, 33:16, 43:23, 48:20, 50:25, 64:6, 75:16, 85:12, 117:16
**particularly** [4] - 37:8, 64:22, 86:10, 152:5
**parties** [5] - 60:25, 75:15, 75:17, 76:2, 167:7
**parts** [3] - 34:6, 118:7, 118:15
**party** [5] - 9:15, 60:25, 61:2, 61:3, 167:11
**pass** [1] - 58:6
**pass/fail** [1] - 82:7
**patrol** [4] - 122:12, 122:14, 122:17, 122:20
**pattern** [3] - 85:17, 102:12, 128:19
**pattern-based** [1] - 85:17
**pay** [2] - 134:13, 155:17
**paying** [1] - 155:18
**PCP** [1] - 101:24
**peaks** [2] - 87:5
**peer** [2] - 83:6, 83:18
**peer-reviewed** [1] - 83:18
**penalties** [4] - 6:4, 120:13, 155:21, 156:5
**penalty** [1] - 4:13
**pending** [1] - 25:13
**Penn** [2] - 84:9, 84:10
**people** [19] - 14:10, 16:7, 41:5, 41:12, 82:17, 82:22, 90:22, 91:9, 91:10, 93:4, 93:15, 93:21, 95:23,

119:19, 133:22, 134:7, 134:10, 134:13, 135:17
**peppering** [1] - 81:16
**per** [3] - 61:24, 144:6, 144:10
**perfect** [1] - 10:22
**perform** [4] - 79:13, 102:4, 122:5, 126:21
**performing** [2] - 35:3, 77:23
**perhaps** [3] - 68:15, 145:11, 156:9
**period** [1] - 35:1
**perjury** [4] - 120:14, 155:21, 155:23, 156:5
**Perkins** [2] - 27:18, 30:8
**PERKINS** [2] - 30:3, 166:7
**permission** [1] - 9:10
**permit** [3] - 13:17, 41:15, 148:19
**person** [17] - 28:2, 41:19, 87:10, 88:19, 88:20, 90:19, 91:4, 91:11, 91:12, 91:13, 94:12, 96:12, 139:19, 145:15, 151:8, 151:9, 154:22
**person's** [2] - 91:1, 94:11
**personal** [5] - 133:4, 134:11, 136:21, 138:17, 154:1
**personally** [4] - 42:2, 147:25
**PETER** [1] - 1:10
**phenomenon** [1] - 94:25
**phenyl** [1] - 106:5
**phone** [2] - 30:22, 42:20
**phones** [1] - 43:13
**photograph** [2] - 37:5, 38:7
**photographed** [3] - 20:11, 20:13, 35:17
**photographer** [1] - 35:14
**photographing** [1] - 18:21
**photographs** [4] - 19:21, 25:25, 26:3, 35:14
**phrase** [2] - 94:16, 100:6
**phrases** [1] - 31:4
**physical** [11] - 20:20,

21:2, 21:3, 106:17, 114:4, 154:20, 158:1, 158:8, 161:7, 161:8, 161:19
**physically** [4] - 35:15, 37:1, 131:10, 132:3
**physiological** [1] - 106:11
**pick** [6] - 23:12, 54:11, 57:5, 95:6, 109:8
**picture** [26] - 35:17, 36:23, 37:8, 37:11, 37:13, 37:17, 37:22, 38:12, 38:15, 38:18, 38:21, 38:22, 39:2, 39:8, 40:11, 40:12, 40:17, 40:21, 40:24, 40:25, 42:8, 42:18, 47:4, 129:1, 143:3
**pictures** [2] - 48:22, 72:18
**piece** [1] - 68:20
**pieces** [2] - 101:21, 101:22
**pin** [4] - 31:13, 31:15, 31:22, 31:24
**pistol** [8] - 39:23, 41:1, 41:2, 41:4, 92:13, 92:14, 92:24
**Pittsburgh** [1] - 101:10
**PJM-16-403** [1] - 1:5
**place** [6] - 25:20, 27:23, 35:17, 48:2, 135:13, 150:23
**placed** [5] - 20:17, 21:22, 26:2, 44:19, 51:17
**places** [2] - 86:19, 152:7
**placing** [1] - 75:22
**Plaintiff** [1] - 1:6
**plaintiff** [1] - 75:19
**PLAINTIFF** [1] - 1:13
**plastic** [4] - 48:1, 106:4, 141:18, 142:3
**play** [18] - 56:22, 63:12, 63:13, 64:18, 64:24, 65:10, 65:15, 65:23, 66:11, 66:19, 67:12, 67:13, 70:19, 70:23, 71:15, 73:5, 134:24, 135:1
**played** [7] - 66:3, 66:20, 67:15, 68:10, 70:3, 70:24, 71:19
**playing** [2] - 64:24, 68:9
**plays** [1] - 65:8
**Plexiglas** [1] - 43:16,

137:3
**PLLC** [1] - 1:19
**plural** [2] - 92:18, 93:19
**podium** [1] - 136:8
**point** [21] - 12:22, 14:12, 17:6, 18:16, 34:17, 35:15, 45:20, 59:1, 67:10, 79:1, 79:14, 83:20, 91:11, 103:4, 106:20, 123:19, 128:25, 133:15, 137:3, 151:20, 153:4
**pointed** [2] - 23:19, 23:20
**pointing** [2] - 137:16, 137:17
**points** [2] - 58:25, 164:11
**Police** [6] - 19:1, 19:18, 48:23, 121:8, 121:10, 121:23, 122:24, 125:15
**police** [8] - 14:19, 18:7, 18:9, 25:4, 69:10, 71:11, 122:13
**policy** [1] - 60:9
**population** [9] - 87:16, 88:21, 89:11, 89:14, 89:18, 89:22, 89:23, 89:25
**populations** [4] - 87:20, 90:4, 90:8, 90:9
**porous** [1] - 96:16
**portion** [11] - 58:23, 60:7, 60:9, 66:12, 69:21, 70:19, 71:16, 72:14, 125:21, 135:1, 137:17
**portions** [4] - 64:9, 64:13, 124:19, 128:18
**posed** [1] - 125:5
**posing** [1] - 69:11
**posit** [1] - 114:8
**position** [8] - 2:24, 33:13, 77:25, 78:4, 80:21, 121:12, 121:22, 155:13
**positive** [1] - 3:5
**possess** [2] - 9:7, 76:9
**possessed** [4] - 3:21, 151:3, 152:21, 154:15
**possession** [15] - 3:17, 3:19, 3:24, 10:13, 149:5, 149:6, 150:16, 151:5,

151:11, 151:12, 151:19, 153:19, 154:4, 154:8, 154:10
**possibility** [3] - 12:18, 26:13, 26:19
**possible** [12] - 11:25, 13:18, 20:15, 21:23, 22:2, 25:5, 25:12, 87:12, 88:12, 94:14, 95:8, 130:20
**possibly** [1] - 91:13
**post** [1] - 122:11
**potency** [1] - 131:3
**potent** [1] - 132:24
**potentially** [2] - 9:21, 155:22
**pouring** [1] - 48:2
**powder** [41] - 37:10, 37:15, 37:19, 38:11, 39:4, 39:5, 72:10, 107:3, 109:16, 114:7, 114:8, 114:12, 128:20, 129:12, 130:21, 131:1, 131:2, 131:4, 131:21, 131:24, 131:25, 132:1, 132:3, 132:9, 133:11, 138:8, 138:9, 138:12, 139:10, 139:24, 139:25, 140:19, 144:14, 144:18, 144:21, 144:25, 145:3, 151:14, 151:17
**powdery** [2] - 37:12, 37:14
**practice** [1] - 100:2
**practices** [1] - 25:15
**preclude** [1] - 13:18
**prefer** [2] - 67:7, 163:5
**preference** [3] - 3:2, 145:7, 163:7
**prejudice** [1] - 159:10
**prejudicial** [1] - 10:25
**premises** [4] - 15:14, 153:23, 154:13, 154:22
**prepackaged** [1] - 20:2
**prepare** [1] - 80:24
**prepared** [5] - 3:20, 4:8, 12:22, 148:5, 164:16
**presence** [5] - 9:13, 9:24, 27:23, 149:18, 153:24
**present** [9] - 9:2, 11:21, 17:4, 25:3,

27:24, 34:22, 76:3, 94:14, 150:18
**presentation** [1] - 68:23
**presented** [2] - 51:4, 149:10
**presenting** [1] - 157:12
**preservation** [1] - 84:1
**preserve** [2] - 25:9, 148:20
**preserved** [1] - 164:22
**pretty** [2] - 81:14, 85:13
**prevent** [3] - 135:5, 135:8
**previous** [2] - 108:15, 112:9
**previously** [12] - 3:22, 4:13, 39:4, 40:19, 78:17, 101:10, 126:12, 127:6, 142:1, 142:25, 154:6, 167:6
**price** [2] - 144:6, 144:10
**prices** [2] - 125:21, 126:2
**Prince** [9] - 18:7, 18:9, 18:25, 19:17, 19:18, 48:22, 50:10, 100:25, 101:20
**principles** [1] - 91:9
**print** [3] - 24:1, 56:8, 87:2
**printed** [3] - 21:12, 59:22, 60:1
**prints** [4] - 18:22, 20:18, 23:24, 23:25
**prison** [1] - 3:8
**privilege** [1] - 2:16
**pro** [2] - 148:3, 148:16
**probability** [1] - 10:8
**problem** [2] - 12:1, 12:4
**procedure** [2] - 51:15, 164:12
**procedures** [2] - 80:4, 82:23
**proceed** [9] - 29:16, 30:11, 77:9, 98:9, 116:2, 148:2, 148:7, 160:11, 162:17
**proceeding** [2] - 5:25, 11:16
**proceedings** [3] - 102:24, 165:8, 167:5
**PROCEEDINGS** [1] - 1:10
**proceeds** [2] - 135:9,

143:10
**process** [19] - 20:8, 25:1, 25:5, 50:20, 50:23, 72:10, 78:20, 80:17, 83:11, 85:13, 85:14, 87:1, 107:23, 130:23, 130:24, 131:4, 131:10, 144:13, 145:2
**processed** [7] - 20:7, 21:7, 21:14, 22:3, 23:23, 35:13, 79:6
**processes** [1] - 90:25
**processing** [12] - 18:20, 18:21, 19:4, 19:12, 19:14, 19:21, 19:22, 20:9, 20:10, 20:17, 25:13
**produce** [2] - 2:18, 103:15
**product** [7] - 83:3, 131:3, 131:18, 131:19, 132:24, 141:24, 143:10
**professional** [1] - 101:13
**proffer** [1] - 15:4
**proffers** [2] - 14:23, 84:24
**proficiency** [5] - 79:23, 80:1, 81:24, 82:5, 82:9
**profile** [12] - 85:14, 86:7, 86:24, 87:1, 87:3, 87:6, 87:9, 87:13, 87:15, 91:6, 92:20
**profiles** [2] - 91:17, 92:19
**program** [4] - 66:2, 80:20, 82:11, 82:16
**Program** [1] - 77:17
**prohibited** [1] - 156:21
**proof** [1] - 6:13
**proper** [4] - 13:13, 25:11, 25:13, 80:7
**property** [3] - 21:12, 22:7, 22:8
**proportion** [1] - 24:17
**proposed** [1] - 11:17
**prosecuted** [1] - 155:23
**prosecution** [3] - 156:24, 159:24, 160:19
**prosecutor** [4] - 156:20, 157:24, 161:11, 161:12
**prospect** [1] - 11:14

**prospective** [2] - 8:20, 11:24
**protect** [8] - 135:16, 143:9, 143:10, 152:17, 155:2, 155:3
**protocols** [1] - 82:23
**prove** [2] - 3:20, 16:9
**proved** [2] - 152:13, 153:17
**proven** [1] - 75:17
**provide** [6] - 9:10, 25:4, 62:25, 65:3, 80:3, 161:13
**provided** [3] - 14:5, 48:22, 152:16
**provides** [1] - 94:2
**providing** [1] - 68:12
**proving** [1] - 6:2
**provisionally** [1] - 97:25
**proximity** [4] - 143:5, 152:3, 152:5, 154:21
**public** [2] - 9:2, 122:7
**publish** [1] - 52:1
**pulled** [1] - 39:23
**pulling** [1] - 57:7
**punishable** [7] - 3:22, 4:3, 4:21, 6:4, 6:8, 76:4, 76:7
**punishment** [2] - 4:5, 154:6
**purchase** [8] - 117:11, 123:8, 125:3, 125:23, 126:2, 144:24, 144:25, 145:1
**purchased** [2] - 125:25, 144:19
**purchaser** [1] - 145:19
**pure** [1] - 144:17
**purpose** [1] - 133:19
**purposes** [2] - 86:24, 164:23
**push** [1] - 56:18
**put** [22] - 6:3, 6:13, 23:11, 23:15, 51:20, 51:21, 55:10, 56:25, 64:25, 96:12, 102:15, 104:11, 107:17, 117:6, 125:17, 132:20, 137:10, 162:2, 162:7, 162:20, 163:13
**putting** [2] - 47:6, 137:11
**Pyrex** [7] - 37:18, 72:19, 131:6, 133:18, 134:22, 140:17, 140:18

### Q

**qualification** [3] - 80:17, 81:21, 81:22
**qualified** [13] - 79:8, 79:10, 79:12, 80:9, 80:14, 80:22, 82:19, 83:8, 84:20, 84:25, 102:23, 103:2, 127:19
**qualify** [3] - 84:22, 103:5, 128:1
**qualifying** [1] - 80:13
**qualitative** [1] - 88:25
**quality** [8] - 79:25, 82:11, 82:15, 82:19, 99:22, 99:24, 131:1, 131:21
**Quantico** [2] - 49:5, 101:3
**quantity** [1] - 97:21
**quarter** [1] - 129:22
**questioned** [1] - 2:7
**questioning** [2] - 8:20, 81:17
**questions** [18] - 2:8, 10:9, 24:7, 26:14, 27:13, 32:9, 45:15, 65:6, 72:23, 75:2, 81:16, 115:20, 118:20, 119:5, 143:11, 144:3, 145:24, 146:6
**quickly** [1] - 17:6
**quiet** [1] - 157:25
**quite** [4] - 12:5, 25:2, 25:24, 145:16
**quote** [3] - 76:4, 86:24, 147:24

### R

**R-O-T-H-M-A-N** [1] - 33:3
**R1** [2] - 31:10, 63:25
**R11** [8] - 64:3, 64:6, 64:18, 65:15, 65:17, 65:23, 66:2, 66:5
**R12** [6] - 64:3, 64:6, 66:11, 66:19, 67:13, 68:9
**R2** [4] - 31:19, 63:25, 69:22, 69:25
**R21** [4] - 64:3, 64:9, 69:21, 70:1
**R22** [5] - 64:3, 64:9, 70:19, 70:21
**R23** [3] - 64:4, 64:9, 71:15
**raise** [8] - 30:2, 32:21,

66:24, 68:1, 76:22, 98:21, 120:8, 120:16
**raising** [4] - 14:2, 147:18, 147:21, 148:4
**ram** [1] - 159:25
**random** [1] - 88:20
**rare** [3] - 87:19, 87:21, 88:12
**rate** [1] - 26:1
**rather** [2] - 45:7, 154:1
**ratio** [7] - 88:15, 88:17, 88:23, 89:3, 89:8, 89:21, 94:2
**rational** [1] - 153:15
**ratios** [1] - 91:8
**re** [3] - 112:18, 132:8, 148:17
**re-focusing** [1] - 112:18
**re-package** [1] - 132:8
**reaches** [1] - 90:10
**read** [12] - 51:10, 52:22, 52:24, 52:25, 53:14, 57:21, 59:1, 59:5, 60:25, 75:11, 75:15, 75:18
**reading** [1] - 83:18
**ready** [17] - 16:16, 16:18, 16:20, 29:23, 54:19, 57:5, 76:15, 98:3, 98:5, 98:9, 98:14, 98:17, 119:25, 120:2, 160:16, 163:1
**reaffirm** [1] - 148:18
**real** [1] - 14:11
**realize** [1] - 8:19
**really** [10] - 3:14, 4:14, 4:16, 7:6, 13:10, 15:20, 107:9, 114:9, 149:22, 150:9
**reason** [7] - 10:15, 10:19, 10:20, 11:2, 88:11, 114:10, 144:17
**reasonable** [4] - 152:20, 153:16, 155:8
**reasons** [5] - 10:12, 10:16, 10:18, 148:17, 150:11
**rebutted** [1] - 16:11
**rebutting** [1] - 10:9
**receipt** [1] - 116:18
**receive** [2] - 78:11, 107:6
**received** [10] - 19:24, 20:12, 25:17, 25:22, 48:24, 95:25,

100:23, 101:1,
114:13, 125:15
**receiving** [2] - 49:2,
105:10
**Recess** [3] - 57:3,
97:17, 147:12
**recess** [5] - 54:1, 54:3,
97:2, 97:14, 147:2
**recite** [1] - 153:20
**recognize** [38] - 21:6,
21:9, 21:20, 36:23,
37:22, 38:20, 40:6,
40:21, 42:8, 42:17,
43:5, 44:11, 48:17,
48:19, 63:18, 63:19,
65:21, 66:17, 70:7,
71:5, 88:3, 104:3,
104:5, 104:20,
104:22, 104:23,
108:12, 108:14,
109:18, 109:20,
109:21, 111:10,
111:12, 112:6,
112:8, 139:4,
139:23, 140:25
**recognized** [2] -
108:15, 112:9
**record** [26] - 3:5, 4:4,
17:20, 23:18, 30:7,
33:1, 44:1, 45:10,
45:23, 47:10, 47:13,
52:2, 57:20, 60:7,
75:12, 77:2, 99:2,
120:23, 149:7,
149:22, 150:15,
162:9, 163:6,
164:10, 164:21,
164:22
**recorded** [3] - 31:2,
66:8, 167:8
**recording** [21] - 31:9,
31:11, 31:14, 31:18,
31:23, 56:23, 63:3,
63:6, 64:7, 64:10,
64:19, 66:5, 66:12,
66:13, 66:14, 67:17,
67:22, 68:12, 69:22,
71:1, 71:17
**Recording** [2] - 29:1
**recordings** [17] -
28:14, 29:1, 29:2,
29:8, 30:22, 31:6,
32:2, 32:5, 32:6,
53:20, 56:22, 62:20,
62:22, 63:9, 63:22,
64:3, 64:14
**records** [3] - 31:6,
31:9, 31:18
**recover** [1] - 23:25
**recovered** [10] - 22:6,

22:10, 22:12, 22:13,
23:10, 24:1, 50:19,
74:9, 149:11, 152:12
**recovery** [9] - 20:15,
22:8, 22:17, 22:20,
22:24, 23:2, 23:5,
23:8, 50:13
**Redirect** [4] - 166:6,
166:13, 166:16,
166:19
**redirect** [5] - 26:15,
75:3, 96:3, 118:21,
145:25
**REDIRECT** [4] - 26:16,
96:4, 118:22, 146:1
**redistribution** [1] -
136:21
**refer** [2] - 132:14,
132:17
**reference** [8] - 72:13,
91:20, 93:9, 105:25,
110:8, 115:24,
128:25, 146:25
**referenced** [1] - 113:8
**references** [3] - 69:6,
69:9, 147:24
**referred** [3] - 49:19,
49:23, 116:24
**referring** [12] - 46:3,
51:23, 69:10, 70:11,
70:13, 70:15, 71:7,
72:4, 72:10, 90:8,
132:12, 139:25
**refers** [1] - 148:13
**reflect** [3] - 23:18,
47:10, 47:13
**reflected** [1] - 115:7
**refused** [2] - 84:22,
128:1
**regard** [7] - 2:16,
19:14, 107:23,
155:3, 155:16,
158:6, 164:12
**regarding** [2] - 76:1,
84:16
**regions** [2] - 86:5,
86:22
**register** [1] - 31:3
**regular** [3] - 12:11,
122:16, 129:18
**related** [4] - 92:1,
103:13, 124:12,
125:14
**relates** [2] - 18:23,
83:25
**relatively** [2] - 74:20,
74:24
**release** [1] - 83:10
**relevance** [1] - 11:6
**relevant** [3] - 4:14,

4:16, 12:3
**rely** [4] - 28:13, 95:9,
95:14, 96:19
**remain** [1] - 109:7,
114:11, 120:5
**remaining** [1] - 92:1
**remains** [2] - 2:24,
155:10
**remember** [5] - 4:1,
14:19, 25:24, 36:19,
158:15
**remind** [1] - 94:1
**remove** [2] - 153:6,
159:24
**removed** [2] - 20:12,
125:15
**Renee** [4] - 1:24,
167:2, 167:14,
167:15
**rent** [2] - 61:22, 61:24
**rental** [2] - 52:23, 60:9
**repeat** [14] - 5:20,
30:19, 32:4, 67:1,
67:10, 85:23, 85:25,
86:2, 86:9, 106:23,
118:1, 118:12,
119:1, 133:15
**repeats** [1] - 87:19
**reply** [1] - 11:4
**report** [25] - 80:5,
81:8, 83:4, 83:5,
89:9, 90:1, 90:11,
90:23, 92:6, 92:8,
105:4, 105:25,
108:4, 108:5,
108:18, 109:24,
110:14, 111:4,
111:18, 112:3,
112:21, 113:5,
113:9, 113:18,
113:22
**reported** [1] - 167:5
**REPORTER** [1] - 1:23
**Reporter** [2] - 167:2,
167:16
**reporting** [2] - 82:6,
90:5
**reports** [13] - 81:7,
83:6, 99:23, 103:15,
104:7, 104:9,
107:22, 109:25,
110:8, 115:7,
115:11, 115:15,
117:20
**represented** [2] -
15:25, 148:15
**represents** [2] - 58:9,
88:4
**request** [5] - 2:6,
19:23, 21:8, 148:2,

148:5
**requested** [2] - 66:9,
164:14
**requesting** [3] - 3:11,
19:21, 24:25
**required** [4] - 82:25,
83:15, 89:18, 151:12
**requirement** [2] -
10:14, 152:4
**requirements** [2] -
79:25, 83:14
**research** [2] - 95:22,
100:15
**reserve** [6] - 107:13,
107:14, 116:9,
116:21, 117:19,
118:2
**residence** [22] - 35:6,
35:8, 35:10, 35:11,
35:18, 36:5, 38:4,
124:15, 134:20,
135:10, 135:11,
135:13, 141:7,
141:9, 142:2, 143:3,
146:4, 150:18,
151:5, 151:6, 151:9,
152:3
**residences** [1] -
124:12
**residents** [2] - 52:23,
59:2
**residue** [2] - 37:12,
37:18, 151:14
**respect** [21] - 2:8,
2:10, 2:20, 10:7,
50:15, 80:8, 85:8,
91:15, 124:7,
129:11, 130:7,
130:19, 132:19,
135:10, 151:23,
151:24, 152:1, 152:9
**respond** [1] - 2:14
**response** [10] - 7:5,
7:8, 14:22, 15:6,
27:1, 29:10, 29:11,
83:25, 152:23,
152:24
**responsibilities** [2] -
80:25, 83:1
**responsibility** [1] -
73:21
**rest** [1] - 54:14
**restate** [1] - 148:18
**restored** [3] - 8:3,
58:2, 76:10
**rests** [1] - 146:13
**result** [3] - 50:23,
93:12, 93:18
**results** [16] - 78:24,
80:5, 80:7, 81:7,

81:8, 83:10, 90:13,
92:4, 92:23, 93:1,
93:6, 93:13, 93:14,
93:23, 107:10, 118:3
**retakes** [1] - 58:15
**retaliating** [1] - 134:8
**return** [1] - 45:14
**returned** [2] - 50:21,
138:2
**returns** [1] - 50:24
**review** [11] - 31:9,
31:18, 48:12, 52:18,
69:21, 83:11, 91:6,
99:23, 103:17,
114:15, 114:18
**reviewed** [4] - 60:18,
83:6, 83:8, 83:18
**revised** [1] - 2:22
**rewind** [1] - 120:16
**rid** [1] - 50:22
**rifle** [8] - 22:25, 23:3,
40:11, 40:12, 40:13,
40:15, 92:15, 92:25
**rifles** [1] - 39:22
**rights** [4] - 8:3, 58:2,
76:8, 156:13
**ripped** [1] - 145:21
**risk** [1] - 157:4
**risks** [1] - 156:11
**rival** [2] - 126:23,
135:17
**rivals** [1] - 135:8
**RMR** [2] - 1:24, 167:15
**robbed** [1] - 135:5
**robberies** [2] - 122:6,
135:16
**robbery** [1] - 4:17
**robbing** [1] - 135:9
**rock** [14] - 39:7, 107:3,
107:5, 107:6, 114:5,
114:6, 114:11,
129:4, 129:23,
131:14, 136:25,
137:6
**rock-like** [3] - 39:7,
114:6, 131:14
**rocks** [8] - 136:25,
137:3, 137:5, 137:6,
137:8, 137:18,
138:10, 139:5
**role** [7] - 18:9, 18:13,
19:5, 84:6, 99:18,
100:7, 102:18
**room** [6] - 9:2, 36:9,
39:21, 54:16, 54:20,
97:11
**rooms** [3] - 20:10,
36:7, 36:8
**Rothman** [22] - 32:17,
33:2, 43:2, 47:16,

48:10, 52:5, 52:14,
57:10, 57:21, 58:21,
62:14, 63:16, 65:15,
66:22, 67:17, 69:3,
70:5, 70:21, 71:1,
71:21, 73:9, 75:5
**ROTHMAN** [2] - 32:22,
166:9
**rough** [1] - 34:1
**routes** [1] - 128:8
**RPR** [2] - 1:24, 167:15
**rule** [4] - 8:25, 11:20,
148:1, 159:9
**Rule** [14] - 146:20,
146:23, 146:25,
147:1, 147:14,
147:23, 147:25,
148:3, 149:1, 149:3,
153:1, 153:10,
155:5, 162:19
**rules** [1] - 160:13
**ruling** [3] - 13:20,
15:21, 153:4
**run** [3] - 81:5, 129:14,
156:11
**running** [1] - 160:13

# S

**S1** [2] - 114:16, 114:21
**safe** [1] - 74:4
**Safe** [1] - 33:19
**safety** [1] - 9:6
**SAKURI** [1] - 1:8
**Sakuri** [1] - 75:24
**salt** [2] - 106:16,
110:23
**sample** [21] - 51:7,
51:12, 51:15, 52:10,
85:12, 90:20, 90:22,
91:1, 91:3, 91:5,
91:10, 91:21, 91:22,
91:25, 92:20, 93:17,
93:23, 94:3, 102:15,
102:17, 118:14
**samples** [8] - 78:20,
82:12, 85:8, 92:2,
92:9, 95:16, 117:17,
137:23
**Saran** [1] - 48:1
**satisfactory** [1] - 3:12
**satisfied** [4] - 7:4,
57:22, 58:8, 162:10
**saw** [6] - 36:15, 36:16,
36:18, 41:11
**scale** [9] - 89:11, 90:3,
133:12, 133:19,
133:20, 138:11,
141:1, 141:4, 145:20
**scales** [6] - 36:16,

37:12, 39:3, 146:4,
151:14
**scene** [13] - 18:11,
18:12, 18:17, 18:23,
19:5, 19:8, 24:18,
24:22, 24:25, 25:3,
38:3, 74:11, 74:16
**scenes** [6] - 18:20,
19:4, 19:6, 24:14,
25:1, 25:5
**scheduling** [2] - 13:23
**science** [7] - 83:13,
84:9, 84:10, 94:21,
100:10, 100:12
**Sciences** [1] - 101:11
**Scientists** [1] - 101:9
**scope** [1] - 10:24
**scratched** [1] - 64:1
**screen** [7] - 53:12,
104:11, 110:3,
111:4, 137:13,
142:24, 162:4
**scrolled** [1] - 59:9
**se** [2] - 148:3, 148:16
**seal** [1] - 23:16
**sealed** [3] - 23:11,
23:14, 48:24
**Sean** [3] - 55:23,
56:10, 56:13
**search** [32] - 4:15,
31:6, 33:21, 33:24,
34:2, 34:22, 35:1,
35:18, 38:17, 41:22,
44:18, 51:12, 62:19,
70:17, 71:10, 71:13,
73:25, 74:9, 123:4,
124:7, 124:15,
127:6, 140:9, 142:1,
143:4, 149:10,
149:23, 150:6,
150:21, 152:7
**searched** [4] - 32:3,
32:7, 124:12, 158:16
**searching** [3] - 34:3,
34:4, 124:15
**seat** [13] - 2:1, 17:16,
24:3, 30:4, 32:23,
35:12, 57:4, 76:24,
98:23, 120:10,
120:18, 142:18,
147:13
**seated** [1] - 97:18
**seats** [1] - 164:6
**Seattle** [1] - 101:12
**second** [11] - 29:5,
40:16, 53:9, 58:22,
61:11, 64:19, 65:10,
65:16, 83:7, 154:3,
163:9
**Section** [1] - 76:6

**section** [4] - 52:25,
53:3, 61:11, 137:18
**secure** [1] - 74:4
**secured** [2] - 35:11,
35:12
**security** [1] - 82:17
**Security** [2] - 53:4,
53:6
**see** [50] - 21:2, 21:3,
21:18, 35:23, 36:11,
36:14, 37:4, 39:3,
42:10, 43:2, 43:13,
44:9, 45:16, 45:25,
46:21, 57:2, 59:11,
59:22, 61:6, 61:22,
61:24, 62:8, 62:10,
76:18, 81:17, 89:2,
90:3, 91:12, 103:20,
106:25, 108:10,
110:5, 110:6, 112:6,
130:4, 137:5,
137:11, 137:13,
137:14, 138:8,
138:9, 138:15,
140:18, 141:7,
142:8, 142:24,
143:1, 145:22,
158:18, 162:25
**seeing** [1] - 125:20
**seem** [1] - 159:9
**seize** [2] - 41:22,
41:25
**seized** [5] - 42:2,
42:10, 42:17, 43:9,
44:18
**seizure** [2] - 4:15,
44:15
**selected** [2] - 8:21,
10:5
**selection** [4] - 8:15,
9:2, 11:11, 11:19
**self** [1] - 13:1
**sell** [3] - 132:8,
133:25, 141:25
**seller** [2] - 145:11,
145:21
**selling** [3] - 133:24,
134:2, 134:10
**send** [3] - 49:4, 49:5,
68:19
**senior** [2] - 99:20,
99:21
**sense** [1] - 7:10
**sent** [6] - 44:21, 45:1,
45:3, 50:19, 50:25,
74:12
**sentence** [1] - 155:24
**separate** [7] - 90:25,
99:6, 102:8, 117:21,
118:4, 118:24, 119:2

**separated** [5] - 44:16,
102:13, 107:14,
107:16, 119:4
**separately** [1] - 45:2
**separates** [1] - 44:23
**separating** [1] -
102:11
**separation** [1] - 102:7
**SEPTEMBER** [1] -
1:11
**sequences** [2] - 86:2,
86:18
**Sergeant** [2] - 19:19,
21:8
**series** [4] - 79:16,
79:20, 87:4, 87:5
**serious** [3] - 12:1,
12:19, 156:11
**serve** [1] - 81:20
**service** [3] - 19:2,
122:15, 122:16
**set** [2] - 54:17, 58:25
**setting** [2] - 119:12,
119:14
**setup** [1] - 56:20
**seven** [7] - 91:24,
92:3, 92:5, 97:10,
97:15, 119:18, 147:9
**seven-minute** [1] -
147:9
**several** [11] - 19:12,
19:14, 20:13, 31:4,
35:3, 36:20, 44:5,
116:24, 141:11,
151:7, 158:5
**severe** [1] - 134:7
**sex** [1] - 86:23
**shape** [2] - 131:12,
139:9
**shared** [1] - 73:21
**shave** [1] - 138:11
**Shaw** [1] - 8:18
**shed** [1] - 96:13
**sheet** [3] - 48:2, 87:3,
131:11
**shift** [2] - 19:16,
122:16
**shined** [1] - 102:16
**short** [5] - 85:23,
85:25, 86:9, 143:21,
146:19
**shorted** [1] - 135:5
**shorthand** [1] - 167:8
**shorting** [1] - 134:8
**shortly** [4] - 35:10,
146:17, 163:18,
163:21
**shoulder** [1] - 137:14
**show** [15] - 9:17,
12:16, 36:21, 38:19,

39:24, 40:19, 42:6,
45:7, 52:9, 52:21,
124:1, 124:21,
150:7, 157:18,
160:13
**showed** [1] - 50:9
**showing** [31] - 6:4,
37:21, 42:14, 42:15,
45:9, 45:10, 45:23,
46:10, 46:15, 46:20,
47:1, 47:11, 49:9,
49:13, 49:17, 49:21,
49:25, 50:3, 50:6,
52:2, 52:20, 60:11,
60:16, 63:16, 88:1,
104:12, 109:12,
138:5, 140:12,
157:19, 161:19
**shown** [3] - 40:9,
60:22, 152:13
**shows** [1] - 88:3
**sic)** [1] - 69:8
**side** [10] - 23:19,
38:12, 39:21, 40:11,
43:3, 43:13, 58:25,
62:8, 139:14, 140:22
**sidebar** [2] - 27:23,
29:22
**sign** [12] - 2:9, 2:12,
2:19, 3:3, 4:24, 5:2,
6:23, 55:25, 56:6,
59:2, 78:17
**signature** [19] - 2:18,
43:10, 59:18, 59:24,
60:3, 62:5, 62:8,
62:12, 104:6,
104:23, 104:24,
108:16, 109:21,
109:22, 111:13,
111:14, 112:11,
112:12
**Signature** [1] - 59:12
**signatures** [1] -
108:16
**signed** [8] - 15:3,
55:5, 56:3, 57:20,
58:3, 76:12, 78:17,
151:6
**significant** [2] -
129:10
**similar** [6] - 74:4,
80:20, 81:4, 93:2,
93:13, 132:2
**simple** [3] - 6:16,
123:13, 134:7
**simplest** [1] - 88:17
**simply** [8] - 4:4, 4:20,
6:6, 12:16, 16:9,
90:19, 96:12, 160:13
**single** [5] - 36:10,

41:19, 82:21, 82:22, 151:6
**sit** [1] - 119:20
**sitting** [2] - 36:2, 81:15
**situation** [1] - 81:14
**six** [3] - 80:11, 92:24, 93:7
**sixth** [2] - 62:4, 62:6
**size** [3] - 136:24, 136:25
**sized** [2] - 137:5, 137:8
**skin** [1] - 86:15
**SKS** [2] - 40:12, 40:15
**slide** [1] - 88:24
**slightly** [1] - 54:10
**slip** [4] - 108:17, 109:22, 111:15, 112:13
**small** [1] - 129:4
**smaller** [3] - 39:5, 137:6, 144:10
**smoke** [2] - 106:20, 144:22
**snapshot** [1] - 149:23
**Social** [2] - 53:4, 53:6
**soda** [9] - 37:9, 72:19, 117:8, 117:9, 131:5, 131:7, 132:10, 133:12, 134:21
**software** [1] - 87:2
**solely** [1] - 154:22
**someone** [18] - 11:3, 14:24, 74:17, 78:9, 87:11, 87:12, 88:13, 95:5, 106:21, 128:23, 130:16, 133:1, 134:19, 158:6, 158:12, 158:15, 158:16
**sometimes** [4] - 16:25, 131:20, 135:4, 144:8
**somewhere** [2] - 80:11, 83:18
**sorry** [31] - 2:17, 4:11, 5:4, 15:11, 15:25, 23:1, 28:15, 29:9, 29:12, 32:4, 40:1, 45:11, 54:7, 63:18, 98:4, 107:1, 107:16, 110:6, 116:14, 118:9, 118:12, 119:1, 120:11, 120:15, 133:15, 138:22, 143:14, 147:20, 149:11, 153:7
**sort** [9] - 11:15, 29:18,

156:12
**standard** [2] - 96:1, 153:13
**standards** [1] - 95:25
**standing** [1] - 120:5
**start** [11] - 2:2, 2:3, 22:11, 28:20, 104:10, 121:19, 147:14, 153:6, 156:13, 163:5, 165:7
**started** [3] - 11:13, 16:17, 121:21
**starting** [2] - 37:8, 39:2
**stash** [1] - 152:17
**State** [3] - 84:9, 84:10, 100:13
**state** [10] - 17:20, 18:8, 30:7, 33:1, 66:9, 77:2, 99:1, 120:23, 128:5, 147:23
**statement** [10] - 5:2, 5:12, 9:16, 9:20, 27:7, 60:9, 144:5, 155:1, 156:21, 157:5
**statements** [1] - 167:7
**States** [4] - 75:24, 87:20, 89:22, 167:3
**STATES** [4] - 1:1, 1:5, 1:11, 1:14
**station** [2] - 20:3, 145:11
**statistic** [1] - 89:21
**statistical** [5] - 88:5, 88:7, 88:16, 89:20, 100:19
**statistically** [2] - 87:23, 88:14
**statistics** [1] - 89:25
**stay** [2] - 44:5, 83:19
**staying** [1] - 83:21
**steal** [1] - 135:17
**steel** [1] - 20:11
**stenographically** [1] - 167:5
**STENOTYPE** [1] - 1:25
**step** [26] - 17:12, 17:14, 17:17, 20:19, 27:14, 30:5, 32:13, 32:19, 32:24, 42:23, 48:5, 54:13, 75:6, 76:19, 76:25, 96:24, 98:24, 119:7, 120:11, 120:19, 135:19, 135:21, 146:8, 148:16, 164:7, 164:19
**steps** [1] - 97:9

**sterile** [3] - 21:23, 21:25, 25:13
**sticker** [4] - 22:8, 50:15, 50:25
**stickers** [1] - 21:12
**sticks** [1] - 51:6
**still** [8] - 29:24, 50:24, 51:3, 56:18, 57:11, 68:1, 118:16, 123:19
**Stip** [1] - 75:23
**stipulate** [4] - 4:10, 4:20, 5:17, 6:7
**stipulated** [2] - 76:2, 154:5
**stipulation** [29] - 2:9, 2:12, 2:20, 2:22, 3:3, 4:6, 4:25, 5:14, 5:21, 5:25, 6:6, 6:15, 7:20, 7:23, 7:24, 8:5, 55:4, 56:1, 56:3, 56:5, 56:6, 57:20, 75:12, 75:16, 75:18, 75:22, 76:1, 76:11, 151:20
**stipulations** [1] - 2:8
**stop** [10] - 66:23, 153:3, 156:16, 158:3, 158:9, 158:24, 161:3, 161:5, 161:14, 161:16
**storage** [1] - 74:5
**store** [2] - 48:2, 117:7
**stored** [3] - 48:21, 51:5, 105:11
**stove** [1] - 134:23
**STR** [8] - 86:5, 86:16, 86:22, 87:15, 87:19
**straight** [1] - 127:10
**streamline** [1] - 112:3
**Street** [2] - 1:20, 53:16
**street** [16] - 53:14, 53:15, 72:10, 121:25, 122:4, 122:5, 125:25, 126:2, 127:10, 128:17, 128:21, 128:24, 129:16, 129:19, 129:23, 132:19
**street-level** [8] - 121:25, 125:25, 127:10, 128:21, 128:24, 129:16, 129:23, 132:19
**Streets** [1] - 33:19
**strength** [1] - 15:5
**stress** [1] - 16:4
**stretch** [2] - 119:13, 119:24
**strike** [1] - 94:20

**strong** [2] - 89:5, 94:2
**STRs** [9] - 86:1, 86:11, 86:12, 86:13, 86:14, 86:18, 87:17, 87:22
**structurally** [1] - 110:25
**structure** [4] - 86:9, 106:22, 106:24, 107:4
**style** [6] - 39:23, 40:11, 40:12, 40:13, 40:15, 41:1
**subject** [5] - 97:20, 98:2, 156:23, 156:24, 157:9
**subjects** [1] - 130:11
**submit** [4] - 68:11, 148:6, 149:6, 151:19
**submitted** [5] - 23:10, 103:14, 138:1, 149:13, 153:2
**subsequently** [1] - 126:14
**substance** [22] - 10:7, 37:14, 39:9, 62:25, 100:6, 100:24, 103:2, 103:5, 106:4, 106:11, 108:24, 115:9, 116:19, 117:3, 117:21, 118:4, 118:15, 118:17, 119:3, 131:14, 131:25
**substances** [9] - 39:7, 44:17, 74:9, 102:19, 115:10, 115:14, 131:23, 144:6, 149:12
**substantially** [1] - 2:24
**sufficient** [4] - 6:22, 153:22, 154:18, 155:7
**suggest** [2] - 154:1, 154:22
**suggestion** [2] - 12:2, 15:21
**suggests** [3] - 95:1, 150:1, 151:17
**Suite** [1] - 1:16
**summary** [5] - 9:5, 97:19, 114:16, 114:18, 114:19
**supervise** [1] - 84:2
**supervision** [1] - 167:9
**supervisor** [1] - 84:4
**supervisory** [1] - 84:6
**supply** [3] - 126:25, 128:8, 135:20

21

**support** [5] - 8:17, 89:1, 89:5, 94:3
**supports** [1] - 150:15
**surface** [3] - 96:15, 96:16
**surveillance** [12] - 34:13, 34:16, 35:2, 35:3, 70:15, 70:16, 122:1, 122:2, 122:5, 123:14, 123:15, 150:7
**suspect** [1] - 91:1
**suspected** [2] - 12:14, 102:2
**sustain** [1] - 153:11
**sustained** [2] - 27:8
**SW6** [2] - 43:3, 43:23
**SW7** [2] - 43:3, 43:23
**SW8** [2] - 43:3, 43:24
**SW9** [1] - 139:22
**swab** [5] - 22:5, 22:15, 50:19, 50:20, 50:21
**swabbed** [3] - 20:14, 74:12, 74:16
**swabbing** [3] - 21:23, 21:25, 26:3
**swabs** [15] - 20:15, 21:23, 21:25, 22:9, 23:10, 23:11, 48:21, 51:1, 51:7, 74:11, 92:13, 92:14, 92:15, 92:16, 92:17
**swear** [2] - 29:25, 32:20
**SWORN** [7] - 17:15, 30:3, 32:22, 76:23, 98:22, 120:9, 120:17
**sworn** [2] - 98:21, 155:20
**symposium** [1] - 83:17
**system** [7] - 30:22, 30:25, 31:3, 32:7, 51:22, 81:6, 82:7
**systems** [1] - 31:2

**T**

**table** [12] - 20:11, 21:2, 42:24, 43:3, 44:9, 56:24, 81:15, 88:4, 104:17, 108:7, 136:11, 141:12
**tables** [1] - 26:2
**tactical** [1] - 35:10
**tampered** [1] - 20:5
**tandem** [3] - 85:23, 85:25, 86:9
**tape** [7] - 21:10, 23:14, 23:19, 23:20, 43:10,

51:3, 67:11
**target** [2] - 123:9, 124:5
**task** [2] - 33:19, 124:3
**Task** [2] - 121:15, 123:23
**teaching** [1] - 100:15
**team** [3] - 35:11, 77:16, 83:25
**Team** [5] - 121:25, 122:3, 122:4, 122:8, 122:10
**technical** [1] - 11:22
**TECHNICIAN** [2] - 68:6, 162:5
**technician** [1] - 78:7
**technicians** [1] - 78:18
**technique** [3] - 102:7, 123:14, 123:17
**techniques** [3] - 25:11, 123:13, 123:19
**technology** [2] - 83:19, 83:21
**telephones** [6] - 34:8, 36:20, 42:5, 42:13, 42:19, 43:8
**ten** [8] - 11:13, 55:2, 93:12, 97:4, 118:15, 118:16, 143:18, 163:21
**tends** [1] - 149:25
**tens** [1] - 78:22
**tenth** [5] - 129:2, 129:5, 129:24, 130:2, 130:5
**tenths** [1] - 128:22
**term** [7] - 57:25, 61:17, 61:19, 72:10, 76:5, 76:8, 94:21
**terminated** [1] - 61:20
**terminology** [1] - 91:14
**terms** [11] - 16:7, 71:12, 72:4, 85:11, 90:7, 97:6, 128:17, 134:16, 140:16, 141:2, 151:5
**test** [9] - 79:16, 79:19, 79:20, 80:2, 81:1, 82:5, 82:9, 85:22, 91:17
**tested** [6] - 45:1, 51:2, 78:13, 79:21, 91:19, 91:21
**testified** [13] - 24:13, 25:18, 84:11, 95:17, 102:18, 102:21, 145:2, 150:20,

150:25, 151:7, 152:9, 156:25
**testify** [21] - 9:18, 12:6, 13:17, 56:1, 99:24, 147:4, 155:14, 155:15, 155:17, 155:25, 156:13, 156:18, 156:20, 156:22, 156:23, 157:6, 157:8, 159:20, 162:12, 162:21
**testifying** [5] - 9:19, 13:24, 52:4, 155:11, 163:7
**TESTIMONY** [1] - 166:1
**testimony** [23] - 9:5, 9:9, 10:6, 11:12, 11:14, 12:25, 27:7, 48:13, 80:24, 84:16, 103:17, 114:15, 150:3, 151:18, 151:24, 152:5, 152:8, 152:16, 154:25, 156:1, 158:14, 162:18, 167:9
**testing** [16] - 44:22, 49:6, 50:21, 50:23, 74:8, 77:24, 78:24, 79:24, 80:1, 80:4, 81:11, 81:24, 82:15, 84:17, 85:13, 86:20
**tests** [2] - 80:23, 82:12
**tetrahydro** [1] - 106:5
**tetramisole** [1] - 117:12
**THE** [338] - 1:1, 1:2, 1:10, 1:13, 1:14, 1:18, 2:1, 2:14, 3:1, 3:7, 3:13, 5:3, 5:4, 5:5, 5:6, 5:8, 5:9, 5:10, 5:11, 5:22, 5:23, 6:17, 6:19, 6:20, 6:24, 6:25, 7:1, 7:3, 7:4, 7:15, 7:22, 8:4, 8:13, 9:12, 10:1, 11:4, 11:9, 13:25, 14:4, 14:13, 14:16, 14:20, 15:6, 15:9, 15:13, 15:20, 15:24, 15:25, 16:16, 16:20, 16:22, 16:24, 17:12, 17:16, 17:19, 17:20, 17:22, 17:24, 23:21, 24:5, 24:8, 26:15, 27:1, 27:4, 27:8, 27:14, 27:21, 27:22, 28:1, 28:5, 28:7,

28:15, 28:18, 28:19, 29:9, 29:12, 29:13, 29:17, 29:20, 29:23, 30:2, 30:4, 30:8, 30:10, 30:12, 32:11, 32:13, 32:18, 32:21, 32:23, 33:2, 33:4, 40:1, 40:4, 41:15, 43:15, 43:18, 45:11, 46:12, 47:10, 47:13, 53:18, 53:22, 53:25, 54:5, 54:7, 54:8, 54:22, 55:3, 55:8, 55:10, 55:13, 55:16, 55:19, 55:23, 56:5, 56:10, 56:13, 56:15, 56:18, 56:24, 57:2, 57:4, 57:9, 57:12, 57:13, 57:15, 57:17, 57:18, 57:22, 58:3, 58:7, 58:11, 58:13, 58:14, 58:17, 60:12, 63:12, 64:21, 65:4, 65:10, 65:24, 66:23, 67:5, 67:9, 67:14, 67:24, 68:4, 68:7, 68:15, 68:21, 69:13, 72:24, 73:2, 73:4, 73:11, 73:14, 73:15, 75:3, 75:5, 75:7, 75:8, 75:13, 75:15, 76:13, 76:15, 76:16, 76:18, 76:22, 76:24, 77:3, 77:5, 77:7, 77:8, 77:10, 85:2, 85:4, 94:5, 96:3, 96:23, 97:3, 97:5, 97:9, 97:14, 97:18, 97:24, 98:2, 98:5, 98:8, 98:10, 98:14, 98:15, 98:17, 98:20, 98:23, 99:3, 99:5, 99:6, 99:8, 103:8, 103:25, 104:1, 109:4, 109:7, 109:9, 109:10, 110:5, 110:6, 110:9, 110:10, 110:11, 114:22, 115:22, 116:3, 116:12, 116:14, 116:15, 116:16, 118:9, 118:12, 118:21, 119:7, 119:9, 119:10, 119:16, 119:18, 119:22, 119:23, 119:25, 120:5, 120:8, 120:10, 120:13, 120:15, 120:18, 120:20, 120:21,

120:24, 121:2, 128:14, 135:21, 136:4, 136:5, 136:6, 136:9, 136:16, 138:22, 142:20, 142:22, 143:12, 143:16, 143:19, 143:22, 145:25, 146:8, 146:10, 146:11, 146:14, 146:19, 146:24, 147:1, 147:6, 147:8, 147:13, 147:17, 147:18, 147:20, 148:12, 149:1, 150:13, 152:23, 153:1, 155:15, 155:19, 155:20, 156:15, 156:16, 157:10, 157:15, 157:16, 157:25, 158:1, 158:3, 158:8, 158:9, 158:20, 158:21, 158:23, 158:24, 159:4, 159:5, 159:7, 159:9, 159:11, 159:12, 159:14, 159:15, 159:18, 159:19, 160:6, 160:7, 160:10, 160:12, 160:15, 160:17, 160:20, 160:22, 160:23, 160:24, 161:1, 161:3, 161:4, 161:5, 161:7, 161:10, 161:11, 161:14, 161:15, 161:16, 161:18, 161:20, 161:22, 161:24, 162:6, 162:9, 162:10, 162:16, 162:19, 162:24, 163:3, 163:9, 163:13, 163:20, 164:5, 164:6, 164:9, 165:3, 165:5
**theft** [1] - 122:6
**themselves** [6] - 34:6, 44:24, 61:4, 130:11, 133:5, 144:21
**theory** [2] - 4:10, 144:23
**thereafter** [1] - 167:9
**therefore** [1] - 87:21
**thereof** [1] - 167:12
**Theresa** [12] - 28:2, 28:7, 54:6, 54:17, 54:20, 97:9, 97:10,

119:18, 163:9, 164:4, 164:7

**third** [5] - 9:14, 13:8, 39:6, 121:24, 154:3

**thousands** [3] - 78:22, 79:7

**threat** [9] - 9:6, 9:12, 9:16, 10:12, 12:3, 14:10, 14:12, 14:25, 16:6

**threatened** [3] - 15:22, 16:6, 156:3

**threatening** [1] - 155:3

**threats** [1] - 12:9

**three** [18] - 8:23, 42:5, 42:12, 43:8, 58:2, 70:15, 71:23, 78:16, 93:1, 93:15, 95:21, 97:7, 99:6, 122:9, 127:23, 149:3, 149:11, 150:16

**threshold** [5] - 89:4, 89:7, 90:2, 90:11, 93:10

**throughout** [7] - 19:1, 19:3, 19:7, 36:5, 87:20, 125:16

**TIBA** [1] - 1:8

**Tiba** [33] - 19:10, 31:7, 31:16, 31:25, 32:3, 32:7, 34:10, 51:13, 53:2, 53:9, 59:6, 59:17, 60:2, 60:4, 61:1, 62:13, 62:14, 62:22, 65:7, 65:21, 66:10, 66:18, 70:10, 71:6, 72:1, 72:2, 75:24, 76:3, 85:8, 91:16, 91:23, 92:20, 94:9

**tie** [1] - 48:3

**tied** [1] - 141:23

**Tiffany** [3] - 55:17, 98:18, 99:3

**TIFFANY** [3] - 98:22, 99:3, 166:14

**timing** [1] - 72:4

**title** [2] - 52:22, 84:4

**titled** [2] - 60:8, 60:9

**TO** [1] - 166:1

**today** [14] - 3:9, 11:10, 14:23, 15:4, 35:23, 48:13, 56:19, 84:15, 95:17, 103:17, 114:15, 158:7, 163:1, 164:1

**together** [5] - 86:7, 93:2, 118:6, 132:1, 133:14

**tolls** [1] - 123:15

**tomorrow** [7] - 162:15, 162:23, 163:5, 163:10, 163:12, 163:22, 164:18

**tongue** [2] - 153:3, 153:9

**tonight** [2] - 163:15, 164:16

**took** [11] - 27:23, 51:17, 69:11, 80:20, 81:22, 104:25, 105:11, 105:15, 105:18, 107:13

**tool** [1] - 159:10

**top** [15] - 23:20, 39:2, 39:10, 48:3, 52:7, 58:22, 58:24, 104:13, 108:4, 109:21, 111:13, 112:11, 113:5, 113:18, 129:1

**topics** [1] - 81:12

**torn** [1] - 141:23

**total** [4] - 78:3, 91:18, 92:5, 149:21

**touch** [1] - 26:6

**touched** [4] - 94:12, 94:15, 94:17, 96:17

**touching** [1] - 26:9

**towards** [3] - 37:2, 82:6, 116:13

**track** [1] - 11:13

**trade** [3] - 34:5, 34:9, 152:18

**trafficker** [2] - 135:11, 143:6

**traffickers** [1] - 135:7

**trafficking** [34] - 9:9, 9:23, 9:25, 10:13, 10:17, 33:22, 33:25, 34:5, 121:16, 123:12, 123:25, 124:12, 124:16, 125:14, 127:3, 128:5, 128:11, 134:15, 134:25, 135:2, 135:6, 140:16, 140:17, 141:3, 142:2, 149:16, 149:24, 150:21, 150:22, 151:18, 152:6, 152:8, 152:22

**Trafficking** [2] - 121:15, 123:23

**train** [1] - 86:4

**training** [3] - 18:23, 18:25, 19:1, 19:2,

83:12, 83:16, 84:17, 100:23, 101:1, 101:2, 125:9, 125:15, 125:24

**trainings** [1] - 125:14

**transactions** [3] - 34:7, 122:18, 145:7

**transcribed** [1] - 167:9

**transcript** [2] - 68:4, 167:5

**TRANSCRIPT** [1] - 1:10

**transcription** [1] - 167:10

**TRANSCRIPTION** [1] - 1:25

**transfer** [2] - 96:18, 96:20

**transference** [4] - 94:22, 94:24, 96:6, 96:10

**transferred** [2] - 77:20, 95:1

**transferring** [2] - 96:12, 96:15

**transform** [2] - 102:5, 105:22

**transported** [1] - 44:20

**trend** [1] - 125:18

**trends** [1] - 83:21

**trial** [7] - 2:11, 10:24, 11:11, 12:21, 13:15, 16:12, 156:13

**TRIAL** [1] - 1:10

**Trial** [1] - 115:2

**trials** [1] - 16:25

**Trier** [1] - 155:7

**trier** [2] - 3:18, 153:15

**tries** [1] - 162:1

**trouble** [1] - 28:8

**true** [5] - 11:18, 144:5, 144:17, 145:19, 167:4

**truth** [3] - 9:17, 155:21, 157:1

**try** [9] - 28:19, 67:3, 68:7, 95:22, 119:22, 120:15, 136:6, 143:22, 163:14

**trying** [4] - 5:16, 12:23, 25:11, 68:25

**turned** [2] - 72:11, 138:22

**turns** [1] - 131:7

**TV** [1] - 162:4

**twice** [3] - 82:3, 158:7, 158:12

**twist** [1] - 48:2

**two** [34] - 2:7, 3:23,

20:15, 22:18, 23:8, 28:14, 28:23, 37:11, 37:13, 39:3, 39:22, 42:19, 43:11, 62:18, 67:21, 71:25, 73:20, 80:20, 81:16, 81:22, 84:8, 88:25, 93:21, 93:25, 95:20, 97:7, 97:8, 128:18, 132:1, 134:22, 138:23, 139:9, 149:19, 155:25

**type** [8] - 10:14, 25:23, 42:4, 47:20, 67:22, 96:15, 117:16, 131:23

**types** [3] - 79:22, 82:17, 101:23

**typical** [3] - 128:19, 129:17, 130:9

**typically** [17] - 87:9, 106:22, 106:25, 107:4, 125:25, 128:22, 129:3, 129:14, 130:14, 130:24, 131:24, 133:2, 135:13, 138:9, 139:10, 144:23, 145:22

## U

**U.S.C** [1] - 76:5

**UDR** [1] - 61:4

**umbrella** [2] - 82:20

**under** [18] - 14:21, 16:6, 53:9, 53:14, 59:3, 61:6, 79:12, 79:15, 80:21, 120:13, 149:3, 153:1, 153:10, 155:5, 155:21, 156:5, 156:17, 167:9

**undercover** [6] - 123:3, 123:15, 123:16, 124:21, 124:24, 125:3

**undergo** [1] - 81:24

**undergraduate** [1] - 84:10

**underneath** [2] - 82:19

**understood** [3] - 7:10, 67:25, 112:14

**unfortunately** [1] - 114:8

**uniform** [1] - 122:12

**unintelligible** [1] - 67:2

**unique** [3] - 31:4,

86:8, 149:20

**unit** [11] - 19:19, 25:2, 44:21, 49:3, 49:4, 77:23, 77:25, 78:4, 122:1, 123:2, 144:6

**Unit** [3] - 77:17, 77:19, 77:23

**United** [4] - 75:24, 87:20, 89:22, 167:3

**UNITED** [4] - 1:1, 1:5, 1:11, 1:14

**University** [2] - 100:11, 100:14

**unknown** [3] - 88:20, 93:24, 93:25

**unless** [1] - 119:19

**unlike** [1] - 11:18

**unlikely** [4] - 8:22, 8:23, 11:23

**unquote** [2] - 76:5, 86:24

**unrelated** [3] - 88:20, 93:25, 94:1

**unspecified** [1] - 92:25

**unsuitable** [1] - 90:24

**up** [56] - 5:8, 5:9, 5:12, 5:13, 7:12, 7:18, 8:7, 13:24, 20:8, 21:3, 21:17, 23:12, 27:21, 28:16, 38:21, 39:22, 40:24, 41:2, 43:12, 43:21, 44:5, 48:6, 50:22, 51:18, 54:11, 54:17, 56:19, 57:5, 57:8, 57:16, 58:6, 67:4, 76:19, 76:20, 95:6, 97:20, 98:2, 104:11, 109:8, 109:21, 119:12, 119:23, 131:7, 134:6, 134:22, 137:2, 137:3, 141:23, 142:24, 143:18, 162:7, 162:23, 163:22

**useful** [1] - 86:10

**user** [15] - 126:2, 129:3, 133:1, 133:2, 138:15, 138:18, 139:17, 139:18, 141:8, 141:9, 144:17, 144:18, 144:21, 146:4, 146:5

**users** [2] - 132:19, 132:20

**uses** [1] - 86:21

**utilization** [1] - 151:13

**utilize** [1] - 123:11

## V

**value** [5] - 44:25, 88:24, 89:9, 143:5, 143:8
**valued** [1] - 129:2
**VAN** [3] - 98:22, 99:4, 166:14
**Van** [4] - 55:18, 98:19, 99:3, 116:6
**various** [2] - 95:10, 148:17
**vary** [2] - 86:5, 134:5
**vault** [1] - 105:8
**vehicle** [1] - 34:21
**vicinity** [2] - 149:12, 149:19
**video** [1] - 30:23
**view** [1] - 162:22
**viewing** [1] - 153:13
**violence** [2] - 10:11, 12:13
**violent** [6] - 33:20, 135:2, 135:3, 135:7, 135:12
**virtually** [2] - 3:25, 4:19
**virtue** [1] - 151:10
**visits** [1] - 30:23
**voice** [25] - 62:14, 62:17, 62:21, 65:8, 65:19, 65:21, 66:8, 66:14, 66:17, 66:18, 67:23, 68:12, 68:13, 68:14, 70:7, 70:9, 70:10, 71:1, 71:3, 71:5, 71:6, 72:3
**voices** [9] - 64:25, 67:22, 71:24, 71:25, 72:1, 72:2
**vs** [1] - 75:24

## W

**wait** [3] - 97:9, 119:19, 163:10
**waiting** [4] - 54:14, 97:11, 163:12, 164:19
**waived** [1] - 162:11
**walk** [7] - 36:4, 43:12, 43:17, 43:18, 45:7, 139:13, 140:21
**walked** [2] - 35:11, 39:21
**wants** [5] - 14:2, 73:5, 147:21, 148:5, 148:7
**warrant** [19] - 34:22, 35:2, 35:4, 35:5, 41:22, 44:19, 51:12,

62:19, 70:17, 71:10, 71:13, 73:25, 140:10, 143:4, 149:10, 150:6, 157:14, 160:5, 161:9
**warrants** [12] - 33:21, 33:24, 34:2, 123:4, 123:5, 124:7, 127:6, 127:7, 142:2, 150:21, 152:7
**Wash** [1] - 53:16
**washed** [1] - 96:14
**Washington** [4] - 1:20, 33:10, 126:6, 126:10
**watch** [8] - 17:17, 30:5, 32:24, 76:25, 98:24, 120:11, 120:19, 162:3
**watching** [1] - 79:13
**water** [1] - 131:5
**Watson** [4] - 55:24, 56:4, 56:10, 56:13
**ways** [3] - 83:20, 141:23, 141:24
**weak** [1] - 89:1
**weapon** [4] - 154:5, 154:8, 154:10, 154:15
**weapons** [4] - 12:7, 124:18, 154:12, 154:13
**wear** [1] - 26:5
**wearing** [3] - 36:1, 36:2, 41:20
**weeks** [2] - 35:3, 70:15
**weigh** [2] - 133:25, 141:5
**weighing** [1] - 151:14
**weighs** [1] - 118:15
**weight** [23] - 11:6, 105:15, 105:17, 107:13, 115:13, 116:8, 116:9, 116:10, 116:16, 116:18, 116:19, 116:21, 117:19, 117:24, 118:2, 118:3, 118:6, 118:11, 118:19, 133:23
**weights** [2] - 115:13, 115:16
**welcome** [1] - 120:21
**wet** [1] - 20:16
**WF6796260** [1] - 103:11
**whereby** [1] - 94:25
**white** [11] - 37:12,

37:13, 37:14, 37:18, 39:4, 39:5, 39:13, 137:7, 138:9, 139:11
**whole** [2] - 87:15, 130:15
**willing** [3] - 4:24, 5:2, 157:7
**winding** [1] - 163:22
**wiretap** [1] - 123:18
**wise** [1] - 114:10
**wish** [4] - 8:16, 148:23, 155:12, 155:17
**wishes** [2] - 155:14, 155:15
**withdrawn** [2] - 72:5, 79:4
**Witness** [3] - 43:14, 53:13, 108:9
**witness** [66] - 8:16, 9:1, 9:11, 10:3, 11:17, 11:19, 12:5, 13:14, 15:12, 15:19, 16:19, 17:9, 17:13, 17:16, 20:22, 23:19, 27:5, 27:16, 28:12, 28:24, 29:6, 30:4, 32:15, 32:19, 32:23, 42:25, 45:14, 48:7, 48:15, 54:12, 54:24, 55:3, 56:11, 56:13, 56:14, 56:20, 57:9, 58:15, 64:22, 67:1, 68:15, 68:23, 69:16, 75:8, 76:19, 76:20, 76:24, 97:23, 98:23, 103:5, 103:24, 119:10, 119:12, 119:15, 120:3, 120:6, 120:12, 120:18, 135:19, 135:23, 150:24, 152:8
**WITNESS** [28] - 17:15, 17:19, 17:22, 30:3, 30:8, 32:22, 33:2, 58:13, 75:7, 76:23, 77:3, 77:7, 98:22, 99:3, 99:6, 104:1, 109:9, 110:6, 110:10, 116:14, 116:16, 118:12, 119:9, 120:9, 120:17, 120:20, 120:24, 146:10
**WITNESSES** [1] - 166:3
**witnesses** [15] - 11:20, 12:5, 12:12, 13:9, 16:17, 55:6,

55:16, 97:6, 97:7, 97:8, 146:11, 150:20, 151:7, 152:6, 167:7
**Woe** [1] - 5:15
**words** [4] - 96:13, 99:6, 158:10, 159:23
**wore** [1] - 122:12
**world** [1] - 80:23
**world's** [1] - 89:11
**worth** [1] - 132:23
**Wrap** [1] - 48:1
**wrapped** [1] - 142:2
**written** [7] - 50:13, 52:7, 59:3, 59:11, 80:23, 164:13, 164:17

## X

**XD** [1] - 22:14

## Y

**year** [12] - 3:22, 4:4, 4:21, 6:5, 6:9, 8:1, 57:25, 58:1, 76:5, 76:8, 82:3, 154:7
**yearly** [1] - 19:2
**years** [15] - 18:14, 18:16, 19:7, 25:24, 33:12, 77:22, 78:3, 78:16, 80:20, 81:22, 81:23, 87:18, 100:5, 121:11, 122:9
**yellow** [1] - 47:11
**yes-or-no** [1] - 3:15
**yesterday** [5] - 2:25, 3:10, 9:3, 28:25, 55:24
**yesterday's** [1] - 3:12
**yourself** [6] - 24:18, 26:1, 135:16, 143:9, 156:23, 156:24

## Z

**Ziploc** [2] - 141:21, 141:22
**zoom** [3] - 104:13, 108:4, 113:5