```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                      SOUTHERN DIVISION

3
   UNITED STATES OF AMERICA        )
4                                  )
            Plaintiff,             )
5                                  ) Case Number: 8:16-cr-0403-PJM
            vs.                    )
6                                  )
   TIBA SAKURI CONLEY,             )
7                                  )
            Defendant.             )
8
   TRANSCRIPT OF PROCEEDINGS - ATTY INQUIRY - PRETRIAL CONFERENCE
9              BEFORE THE HONORABLE PETER MESSITTE
                 UNITED STATES DISTRICT JUDGE
10            TUESDAY, JULY 21, 2020; 3:00 P.M.
                    GREENBELT, MARYLAND
11
                 A P P E A R A N C E S
12
   FOR THE PLAINTIFF:
13
        OFFICE OF THE UNITED STATES ATTORNEY
14             BY:  JOSEPH RONALD BALDWIN, ESQUIRE
               6500 CHERRYWOOD LANE, SUITE 200
15             GREENBELT, MARYLAND 20770
               (301) 344-4516
16
               BY:  DWIGHT JOHN DRAUGHON, JR., ESQUIRE
17             6406 IVY LANE
               GREENBELT, MARYLAND 20770
18             (301) 344-0863

19
   ALSO PRESENT: Anthony Farrar - Agent
20
        ***Proceedings Recorded by Mechanical Stenography***
21             Produced By Computer-Aided Transcription

22  _____
              MARLENE KERR, RPR, RMR, CRR, FCRR
23             FEDERAL OFFICIAL COURT REPORTER
               6500 CHERRYWOOD LANE, STE 200
24             GREENBELT, MARYLAND 20770
                    (301)344-3499
25
```

1                          A P P E A R A N C E S
                                (continued)
2

3    FOR THE DEFENDANT:

4         BURNHAM & GOROKHOV, PLLC
                   BY:  CHARLES BURNHAM, ESQUIRE
5                  1424 K. STREET, NW
                   WASHINGTON, D.C. 20005
6                  (202) 386-6920

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      P R O C E E D I N G S

2           (Call to Order of the Court.)

3                THE LAW CLERK:  All rise.

4                THE COURTROOM DEPUTY:  The matter now pending before

5      the Court is Criminal Action PJM-16-403, the United States of

6      America versus Tiba Sakuri Conley.  The matter now comes before

7      this Court for an attorney inquiry.

8                THE COURT:  All right.  Government counsel, identify

9      yourselves, please.

10               MR. BALDWIN:  Yes, Your Honor.  Joseph Baldwin for

11     the United States.  With me is Dwight Draughon, also for the

12     United States.  And to let Your Honor know, the case agent is

13     here, FBI Special Agent Anthony Farrar.

14               THE COURT:  Okay.  And at least to this point,

15     counsel for defendant until we make a ruling, Mr. Burnham.

16               MR. BURNHAM:  Yes.  Good afternoon, Your Honor.

17     Charlie Burnham here with Mr. Conley.

18               THE COURT:  All right.

19          Well, ostensibly this is a motion to withdraw or, in the

20     alternative, an attorney inquiry hearing, and I know -- I've

21     looked at your papers, Mr. Burnham, and I know you've asked to

22     be relieved, and you're saying your client does not want you to

23     represent him as well.  And as far as you understand it, he

24     wishes to proceed pro se?

25               MR. BURNHAM:  Yes, that's correct.
```

 1           THE COURT:  All right.

 2      Mr. Conley, that's correct?

 3           THE DEFENDANT:  Correct.

 4           THE COURT:  All right.

 5      Now, Mr. Burnham, are you willing to serve as standby

 6  counsel?  I mean, I had that in mind, but if he does represent

 7  himself, and it looks likely that he will, ordinarily we try to

 8  have somebody standing by, not to direct his actions but at

 9  least to provide some sort of recourse to try to let him

10  understand what's going on.  What about that?

11           MR. BURNHAM:  I'm happy to continue serving as

12  standby counsel.  Mr. Conley and I have disagreements about

13  case strategy but personally we get along pretty good.

14           THE COURT:  Okay.  Now, we do have a trial date, do

15  we not, Mr. Baldwin?

16           MR. BALDWIN:  Yes, Your Honor.  We had September 8th,

17  but I alerted the Court that there were some issues with

18  witnesses, but I finally tracked down the one that we have had

19  a problem with.  He was actually going to be out of the country

20  but now he can't fly.  So he's available on November -- excuse

21  me, September 8th and 9th for trial.

22           THE COURT:  So we can go on those days?

23           MR. BALDWIN:  Yes, Your Honor.

24           THE COURT:  Okay, okay.

25      Well, Mr. Conley, we've been through this so many times

1  already.  I'm convinced that you aren't prepared to represent

2  yourself.  Whether you're prepared or not, we'll see, but you

3  will represent yourself.  There's not going to be any further

4  appointment of counsel for you in this case, but I think it

5  needs to be clear what that means.

6      Mr. Burnham will not be opening -- make opening argument

7  for you.  He will not make objections during trial.  He will

8  not make closing argument.  You're on your own in that regard.

9  He's there to, I suppose, answer some questions that you might

10  have as the proceeding goes on, but it's not a matter of you

11  simply turning around and asking him what to do and then you

12  doing it.  He's there generally to give you some orientation.

13  Do you understand that?

14          THE DEFENDANT:  I understand.

15          THE COURT:  Okay.  And do you object to him serving

16  in that capacity?

17          THE DEFENDANT:  You say do I do what?

18          THE COURT:  Do you object that he is standby, just to

19  be consulted if need be?  During the trial, he would stand

20  right -- be right by you but you'll represent yourself.

21          THE DEFENDANT:  I'm okay with it.

22          THE COURT:  Is that okay?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Okay.

25      Now, there are some things then to clear up, and there was

1   a memorandum, I know, Mr. Baldwin, that was submitted by the

2   government when I asked about what things in particular needed

3   to be considered when we have a pro se defendant.  Did you get

4   a copy of that, Mr. Burnham?

5           MR. BURNHAM:  I did.

6           THE COURT:  And did you send a copy to Mr. Conley?

7           MR. BURNHAM:  He just read it today here.  It was

8   filed today so he read it before court started.

9           THE COURT:  Okay.  I had some other questions, but if

10  you want to say something at this point, Mr. Baldwin, by all

11  means.

12          MR. BALDWIN:  Yes, Your Honor.  And this is -- there

13  were three memoranda requested.  This is the first of the

14  three, and I plan to have the other two filed by the end of the

15  week.  This particular one addresses the in-court procedures.

16  They are pretty straightforward and commonsensical.  There is

17  one bullet point I did leave off there, Your Honor, with

18  respect to a particular procedure I think we should use and

19  that is -- in this courthouse, particularly Judge Hazel in a

20  prior trial -- if the defendant chooses to testify, which is,

21  obviously, his choice, it will be done by question and answer.

22  The reason for that -- the defendant would ask the question and

23  then proceed with the answer, and the reason for that would be

24  that the government would have an opportunity to object.

25          THE COURT:  Well, let me ask you this.  Who would ask

1    the questions?

2          MR. BALDWIN:  Well, I've seen it done, Your Honor, or

3    I've heard that it's been done that the defendant would ask the

4    questions of themselves and then they would answer the

5    question.  So it, you know, basically would be an outline, and

6    they would go through the questions, Mr. Conley would, rather

7    than having a narrative response, Your Honor, where the

8    government could be standing up and objecting in the middle of

9    every sentence.

10         THE COURT:  What are the other memos you're

11   submitting?

12         MR. BALDWIN:  Say that again, Your Honor -- oh, yes,

13   Your Honor.  The other two -- one was Your Honor asked what

14   could the Court do if the defendant became unruly, the exact

15   contours of it.  Basically, Your Honor, the research is done

16   and essentially under *Illinois v. Allen*, essentially the Court

17   can do everything up to removing the defendant from the

18   courtroom and appointing counsel in his place if he should

19   become unruly.  There's all kinds of steps up to that including

20   contempt.

21      The Illinois --

22         THE COURT:  Okay, but you're saying you're going to

23   submit a memo on that?

24         MR. BALDWIN:  I am, Your Honor.

25         THE COURT:  Okay, well, that's fine.  What was the

1   other?

2          MR. BALDWIN:  The other issue had to do with what are

3   the limitations regarding redaction of documents and -- with

4   respect to the Court, and, Your Honor, that appears to be

5   simply the 16(e) standard or the Rule 16 standard to the

6   various categories and I'll address that; but it's basically a

7   showing of materiality as the basis of the particular

8   articulable issue.

9          THE COURT:  All right.  I think maybe what we should

10  do at this point is to talk through, from the beginning so that

11  Mr. Conley understands, how the trial will proceed.

12         MR. BALDWIN:  Yes, Your Honor.

13         THE COURT:  And at least not be in a position to be

14  simply told time and again you're beyond where we're going to

15  be in this case.

16         MR. BALDWIN:  Yes, Your Honor.

17         THE COURT:  Okay.  Have a seat and I will talk this

18  through one by one.

19         MR. BALDWIN:  Thank you, Your Honor.

20         THE COURT:  First of all, let me say this is a case

21  in which Mr. Conley is charged with three counts, one for

22  possession with intent to distribute a controlled substance,

23  one with possession of a firearm or firearms in furtherance of

24  a drug trafficking crime, and third is a felon in possession of

25  firearms and ammunition.  Those are the charges.  That's what

1  the case is about.

2      Now, for first things, Mr. Conley, I need to say this to

3  you, and it's something you're simply going to have to accept

4  for present purposes.  You may not like it but it's so.  We are

5  not here in this trial to litigate the issue of whether there

6  was probable cause for the agents to search your house, your

7  apartment.  That was something that I decided.  In fact, we did

8  it twice as I recall.  We had two hearings identical.  That's a

9  decision I make.  This jury does not get into that issue so you

10  will not be permitted to argue those points to the jury.  The

11  issue is not whether there was probable cause to issue a search

12  warrant to search your apartment.

13      The issue is whether you're guilty of those three crimes

14  that I've just recited.  So that's for starters.  So if you get

15  up in the course of the trial and you start talking about

16  whether there was probable cause to conduct the search of your

17  apartment, I'm going to cut you off because it's not what this

18  trial is about.  As I said, again, you may not like it.

19      And one of the reasons why one often benefits from having

20  an attorney is the attorney can tell you that, that any issue

21  you've got with whether there was fair probable cause to search

22  your apartment is separate and apart.  The record has already

23  been made on that, and so you need to understand that as we go,

24  and if you don't like it, I'm going to be in a position of

25  having to tell you I'm not going to let you get into that.

1    I don't know that we need to debate that at this point

2  because that's the law.  That's the way it works.  So that's

3  for starters.  Do you have a question about that?

4          THE DEFENDANT:  No.

5          THE COURT:  All right.

6    So we get to then the issue of jury selection, and we have

7  to take into account we're in a somewhat different situation

8  these days about how jury trials go forward.  Obviously, you're

9  aware of all of the plexiglass here and all of that.  The

10  way -- I have not had a jury trial yet since the pandemic and

11  all of these conditions have been imposed.

12    The idea is that the jury will be seated out in the

13  audience.  The seats have been -- the benches have been removed

14  in the first two rows -- I think it's the first two rows -- and

15  there will be seats where the jurors can sit at least six feet

16  apart.  So -- is it the first two rows?  I can't see from here.

17  Is that what it is?  Two rows.  So there will be seats like the

18  seats in the jury box where the jurors will sit individually.

19  That's the jury.  That's where the argument is made.  They will

20  not be seated in the jury box, number one.  Okay?

21    And then when there is deliberation, they will move to the

22  courtroom next door, which -- where the whole audience -- the

23  courtroom will be closed next door, and the whole courtroom

24  will be the jury deliberation room where they're effectively

25  sitting in the seats where observers would be who will not be

1  permitted.  That's the jury deliberation room, and they will

2  have an opportunity to be six feet apart and so on and do their

3  deliberations there.  So that's the general argument.

4       And, of course, if you're making opening argument to the

5  jury, it's made here to the jury behind the bar; and if you're

6  making closing argument, same thing.  The jury then deliberates

7  next door.

8       Now, there are issues -- and this is something we should

9  talk about right now.  There are issues of what do you do with

10  exhibits?  How do you pass them out and around?  Now, much of

11  what I think -- and let me anticipate some of it.  Much of it I

12  think can be done by video, using the Elmo, and the screen can

13  be shown so the jury would have -- I don't know.  Are they

14  putting monitors in the new jury deliberation area?  Do you

15  know that, Brian?

16            THE COURTROOM DEPUTY:  I think it's being more

17  fleshed out on Friday.

18            THE COURT:  It's what?

19            THE COURTROOM DEPUTY:  It's being more -- it's being

20  more fleshed out on Friday.  We will have more answers.

21            THE COURT:  Okay.  Well, we'll have to see.  I mean,

22  I'm assuming that there will be for each juror, as there is in

23  the jury box, a monitor to see an exhibit, but you need to

24  think about exhibits and how they get shown to the jury.  For

25  the most part, I think when we've done this with juries in the

1   past, we've used the monitor, and they can visualize what's

2   there.

3        I don't know that there is any tangible evidence that's

4   going to be passed around.  Is there some; do you know?

5             MR. BALDWIN:  Your Honor, well, there's guns and

6   drugs and typically we just display that.

7             THE COURT:  We don't send them back usually anyway,

8   do we?

9             MR. BALDWIN:  We don't send them back typically, Your

10  Honor.  Typically we would just sort of publish it by holding

11  it up so they can see it.

12            THE COURT:  Okay.  Well, you can certainly do that.

13  You can show it that way; that's fine.

14       I think I need to say this, though.  I don't want -- one

15  of the requests that's made is that the defendant should not be

16  able to roam around the courtroom.  So whether we have the

17  defendant walking up and down in front of the jury is a

18  question.  I need to be very cautious about that because I'm

19  not quite sure whether that's going to be needed or not.

20       The general proposition in the first memo that was

21  submitted to me, Mr. Baldwin, was that the parties, counsel and

22  the defense -- defendant, speak from their places.  So in that

23  instance, it would be, I suppose, turn to the jury where you

24  are.

25            MR. BALDWIN:  Yes, Your Honor.

1          THE COURT:  And I think -- you have to think through

2     the logistics of this now, too.

3          And, Brian, I don't know.  We may need to sort of give

4     some thought to this about how that's going to work exactly

5     because all of their mics are pitched towards me; whereas, if

6     you're going to address the jury, it's backwards, backwards.

7     So how we're going to do that we need to think that out.

8          But I'm assuming that we will have TV monitors for the

9     jurors back behind the bar and that you can address them by

10    turning them and maybe you need to have another -- think about

11    this, too, Brian.  I'm not sure.  You need to have another

12    place where you put your microphone where they can take their

13    mic and turn it around and then talk in the direction toward

14    the back of the courtroom.  That's one of the issues, though.

15             MR. BALDWIN:  Your Honor, if I might?

16             THE COURT:  Yes.

17             MR. BALDWIN:  I mean, one -- I mean, I think that

18    this central console, you can turn it around.

19             THE COURT:  Are you talking about the Elmo or the --

20             MR. BALDWIN:  The entire --

21             THE COURT:  Are you talking about the screen?  You're

22    talking about the podium?

23             MR. BALDWIN:  Yes, Your Honor.  I think the podium

24    might be able to turn around, and we can address them as

25    normal.

1          THE COURT:  All right.  Well, at different points

2     you'll be addressing the Court, but, yeah, it probably is more

3     likely that you'll have to face the jury, and you'll have more

4     time talking to the jury than you will to me.  Again,

5     logistically maybe, Brian, we can give some thought as to how

6     that's going to work specifically.

7          All right.  Well, let's talk about jury selection then,

8     and this goes also to the issue of discovery because the

9     question really is to what extent -- and I put this question to

10    you, Mr. Baldwin, and I know what Mr. Conley's likely response

11    will be.  To what extent does he get to on his own look at,

12    keep the jury list, engage in the voir dire?  And then the

13    second part of that is to what extent does he get discovery on

14    these matters, including certain other matters?  So we need to

15    talk that through.

16         So let's talk first -- and then we have, obviously,

17    standby counsel here.  Let's talk first -- we would presumably

18    call up enough jurors to have 12 on the basic panel and maybe,

19    let's say, two alternates, whatever that number comes to.

20         Do you know how many they're sending up now, Brian, on

21    that?  I don't know whether they've changed the number or not.

22              THE COURTROOM DEPUTY:  I'm not sure.

23              THE COURT:  Well, it's probably -- if it's ten and

24    six -- is that right? -- plus 12; 28 plus maybe another 10.  So

25    usually it's 41 or 42, isn't it, that they send up on a

1  criminal case?  Something like that.  I'm not sure how many

2  they are going to send up, but whatever the number is, they

3  would all be in here in the audience.

4       So then the usual practice where counsel is involved is

5  that there is a list of the names of the jurors, their age, the

6  nature of their occupation, whether or not married, and the

7  spouse's occupation, and I think the city where they live

8  without an address.  That's what is there, and ordinarily, in

9  my experience, that goes to counsel for the defendant who can

10 then look at it together with the defendant, but the defendant

11 or counsel neither can take the list with them.  They have to

12 hand it back, and they can't take notes on how to contact

13 jurors and so on.

14      Is that your understanding of the normal practice?

15           MR. BALDWIN:  Yes, Your Honor.

16           THE COURT:  All right.  The question being then, with

17 Mr. Conley being pro se, how you would propose to handle the

18 jury list.

19           MR. BALDWIN:  Well, Your Honor, with respect to the

20 list, I mean, I assume when defense counsel is ordinarily

21 talking to the defendant, the defendant is looking at all of

22 that material anyway.

23           THE COURT:  Well, he's not -- we have standby

24 counsel.  Are you asking that standby counsel consult with him

25 for purposes of the jury selection?

1          MR. BALDWIN:  What I'm saying, Your Honor -- well, he

2   can obviously ask a question to the standby counsel, I think,

3   in the appropriate case, but I guess my concern is going more

4   towards, Your Honor, I think the defendants in the ordinary

5   course see the data about jurors.  So I'm not -- you know, the

6   concern is that the data may be taken out of here and that

7   doesn't happen.

8          THE COURT:  But he can't take it with him.

9          MR. BALDWIN:  Exactly.

10          THE COURT:  All right.

11          MR. BALDWIN:  So I think in terms of providing a list

12   and working through the -- you know, seeing who answers what

13   question, I think that's pretty much the same.

14          THE COURT:  All right.

15          MR. BALDWIN:  I do have some suggestions for actual

16   individual questions.

17          THE COURT:  Well, I think we're at the next point.

18   We've got now the jurors.  We've got the number of strikes.

19   And then I'll explain to you -- and, Mr. Burnham, this is the

20   kind of thing you can explain further -- to you, Mr. Conley.

21   When you've got a pool of jurors, we end up with 12 basic

22   jurors deliberating, and in this case, I think we'll carry two

23   alternates, which means the people who would substitute in if

24   one of the regular jurors was somehow not available, got sick

25   or whatever.

1          So there is a certain number of automatic challenges you

2   have to the jurors, and there are other challenges that you can

3   make which are called "for cause."  If a juror knows you, knows

4   about your background, has some belief against you or in your

5   favor, they would ordinarily not be permitted to serve.  They

6   would be removed from the list right there.  If they have a

7   relative who is charged with the same kind of crimes that

8   you're charged with, they would presumably be asked to be

9   removed, too.

10          So you end up with a list, and you'll have a certain

11   amount of automatic strikes.  You'll have six automatic strikes

12   and then an unlimited amount of strikes for cause, meaning if

13   there is a real reason to suspect that somebody cannot act

14   fairly and impartially, they would be excused.

15          And the government has likewise as well.  So they have

16   fewer strikes than you do.  Is that right?  Ten to six.  I

17   think that's right.

18                MR. BALDWIN:  Yes, Your Honor.

19                THE COURT:  They have six and you have ten.  All

20   right, that's where we are.

21          Now, questions to the juror, how that gets handled.

22   Again, let me explain to Mr. Conley what that involves.  When

23   the jury -- ordinarily when the jury is brought in, they are

24   sworn to answer questions that are put to them by the Court

25   fairly and honestly.  They are sworn so that every time the

1   Court asks a question -- and I think we have some proposed

2   questions that were already submitted, Mr. Baldwin, back in

3   December.

4           MR. BALDWIN:  Yes.

5           THE COURT:  Make sure that -- Mr. Burnham, I don't

6   know whether you've seen those or not.  Have you?

7           MR. BURNHAM:  I might have seen them.

8           THE COURT:  Would you make sure, Mr. Baldwin, that

9   the proposed voir dire also goes to Mr. Burnham to send to

10  Mr. Conley?

11          MR. BALDWIN:  Yes, sir.  It's in the file, the court

12  file, Your Honor.

13          THE COURT:  Oh, okay.  Those are the instructions but

14  what about voir dire?  Okay.  Jury instructions.  Here it is.

15  All right, this was jointly proposed at the time that -- who

16  was counsel at the time?  Was it Mr. Montemarano?  Oh, Jennifer

17  Wicks.  Okay.  Well, I haven't looked at those recently but

18  we'll look at those again.  You look at them as well.  Can they

19  be accessed?  Are they filed then, do we know?  Can you access

20  them, Mr. Burnham, and see that Mr. Conley gets them?

21          MR. BURNHAM:  Certainly.

22          THE COURT:  All right.  And the same would be true

23  with regard to proposed instructions, proposed verdict sheet,

24  and so on.

25       Okay.  So we get to the point where there is a jury list

1   out there.  The jurors have been sworn.  They can answer most

2   of their questions just where they stand out loud.

3       Now, you always get to the point in the course of asking

4   questions where you want to have a bench conference; that is, a

5   closed conference with the proposed juror out of the hearing of

6   the other jurors.  Again, suppose there is a prospective juror

7   that says I hate all police and I'll never render a verdict

8   that favors the police; or the reverse, I hate drug dealers and

9   I want to see them all get punished.  You can't have that

10  person on the jury, but you don't want them also saying that

11  out loud because it's the kind of thing that can taint a jury

12  to hear somebody rattling on about one thing or another.

13      So the question then becomes how do we handle the

14  conferences of the prospective jurors at the bench?  One

15  proposal that I saw in your memo was just do individual voir

16  dire for each prospective juror so that nothing is closed off.

17  That is the -- I guess once you -- well, that's a hard

18  prospect.  I guess all of them are waiting next door and one at

19  a time they come over and go through the whole voir dire?  I

20  guess that's possible.  It will take about probably four hours

21  but that's one approach.

22      Tell me how else and I'll hear from either of you on how

23  you might do that.

24          MR. BALDWIN:  Yes, Your Honor.  My notion was

25  typically we do the first half of the -- or, you know, half of

1    the -- pose the questions to the entire panel, which I think

2    Your Honor is still thinking that we'll do.

3              THE COURT:  Right.

4              MR. BALDWIN:  And then for the individual approaches,

5    I think that it's -- for one thing, the defendant is going to

6    be up there, and it may make -- it may -- it's close quarters

7    so I don't think it's very effective in terms of COVID for us

8    all to be standing --

9              THE COURT:  Well, I don't want the defendant moving

10   up and down to the bench.

11             MR. BALDWIN:  I'm sorry, Your Honor?

12             THE COURT:  I don't want the defendant moving up and

13   down to the bench and being in close proximity to the jurors.

14             MR. BALDWIN:  Yes, Your Honor, and I'm concerned with

15   that too.  So for both those reasons, I think that's an issue.

16   We can't do it the way it's always been done.

17        Judge Hazel had a trial I believe it was last year, a pro

18   se defendant, where they went back in chambers.  I don't know

19   which one it was.  So everyone was sort of sitting, you know,

20   judge at the end of the table, prosecution on one side,

21   defendant on the other, marshals sitting, you know, in a chair

22   like on the back wall behind the defendant, and then each juror

23   was brought in individually to like a chambers or conference

24   room.

25             THE COURT:  Just to answer the questions that were --

1 could not have been answered openly?

2    MR. BALDWIN:  For the individual questions that we

3 typically do for individual jurors to come up.

4   Alternatively, Your Honor, the same thing.  I mean, so

5 long as it's one space, if everyone else is out of this

6 courtroom, obviously, one juror will come in one by one and

7 they could just stand right here and we could ask the questions

8 or they could stand back there.

9    THE COURT:  Well, one way -- one possible suggestion

10 was that there be written voir dire, that the questions first

11 would be written as much as possible and then certain other

12 questions could be limited to say these questions will be asked

13 individually of the prospective juror, the answer to this

14 question.

15   And then when we have the written answers, we would have

16 the jurors complete the forms here, complete the forms in the

17 courtroom, hand them up, and then I guess we could recess for a

18 while, while we then isolate which of the questions are the

19 ones that are going to require individual inquiry, because most

20 of them would not.  That's another way and maybe a less

21 cumbersome way to do it so that for everybody who -- let's say

22 you get this question:  Have you ever been -- this is a

23 standard question.  "Have you ever been charged with, convicted

24 of, a witness to a crime?"

25   Now, people who -- not convicted, likely, but charged and

1  witnesses may not want to say that out loud.  It's the kind of

2  thing they say at the bench.  So then when the person is called

3  to the bench, you say, What exactly is your response?  I was

4  convicted of child molesting in 1999, and I served whatever,

5  all those answers, and you've got that.

6      Then you may want to call that kind of person in

7  separately at a different point and ask questions about what

8  effect, if any, that would have on that person's ability to

9  answer fairly and properly.

10      My -- I favor -- and this would put the burden, I think,

11  on the government, Mr. Baldwin -- a written questionnaire to

12  the jurors of the standard questions, which I think you

13  formulated in your joint voir dire, let the prospective pool,

14  the whole group answer the questions, and then as to certain

15  questions which we know will be sensitive -- if the answer, for

16  example, is I've never been a witness to and never been charged

17  with a crime, we don't need to talk to that person.  What we

18  need to do is talk to the people who may have answered "yes" to

19  that.

20      And then we can, if we leave the jurors, put them in the

21  courtroom next door, bring them over one by one to answer in

22  the open courtroom the questions that were more delicate to be

23  asked.  I think I would prefer to do that that way.

24      So I'm going to ask the government to prepare written voir

25  dire to the defendants with the understanding that with respect

1    to some of the more delicate questions, and there are always

2    are a few, that you say answer this question -- you may answer

3    this -- not answer this question.  Let's think about this for a

4    minute.  If your answer to this question would be "yes," we

5    will call you into the courtroom separately to inquire.

6    Something like that.  See what you can do with some prospective

7    written voir dire that way.

8              MR. BALDWIN:  Yes, Your Honor.  And so the answer

9    would be "yes" or "no," and if it's "yes," you may --

10             THE COURT:  Well, if the answer is "no," then we

11   don't need to worry about it; but if the answer is "yes,"

12   that's the point where they don't need to write that because

13   the defendant is going to have access to the answers.

14             MR. BALDWIN:  Yes, Your Honor.

15             THE COURT:  Right?  And then we will then call the

16   person up and ask them -- this is more not to taint the rest of

17   the jury by having that person give answers.  The rest of the

18   jury will not know what the person's answer is.  We will know

19   when we call that person and people like that person into this

20   courtroom one by one and ask the follow-up questions.

21             MR. BALDWIN:  Yes, Your Honor.

22             THE COURT:  So let's do it that way.  Let's have the

23   written voir dire.  Get that as soon as you can, you know, and

24   then we'll make sure that a copy of it goes to Mr. Conley.

25             MR. BALDWIN:  Yes, Your Honor.

1          THE COURT:  So that would then take care of the

2   questions.

3          And then you will see, Mr. Conley, that once we've got our

4   jury selected, you will have your opportunity to exercise ten

5   strikes without explaining why, and the government can exercise

6   its six strikes.  You will be given a list.  You have to hand

7   the list back to the Court, and the clerk will then indicate

8   which jurors have been left standing, in effect, who the first

9   12 are as far as the basic jury and who the alternates are.

10         Okay.  Once you've got the jury selected, you've got

11  opening.  I'll have some remarks to the jury as usual about how

12  the Court -- how the proceeding will go forward.  Then you'll

13  have opening statements.  Mr. Conley, you will be permitted to

14  make an opening statement about the case.  Okay?

15         Do you have a comment?

16         THE DEFENDANT:  I was talking to Mr. Burnham

17  upstairs.  We -- my family, they -- I don't know if he told

18  y'all, but my family is in the process of hiring a habeas

19  lawyer, habeas corpus.  I don't know how that's going to

20  delay --

21         THE COURT:  Nothing is going to delay this

22  proceeding.

23         THE DEFENDANT:  Okay.

24         THE COURT:  Nothing is delaying this proceeding.

25         You'll have a chance to make an opening statement.  The

1  thing we need to be cautious about is what you say in opening

2  statement, not evidence in the case.  What you say in closing,

3  not evidence.

4       Evidence will be, if you choose to take the witness stand

5  and be sworn, that is, under penalties of perjury, then what

6  you say, if it's relevant, can be taken as evidence in the

7  case; but merely standing before a jury and saying this is what

8  really happened, folks, they're not going to be able to

9  consider that unless you say the same thing on the stand under

10 oath.

11      That's important, an important distinction to make.  It's

12 not testimony when you simply get up and say as opening

13 statement this is what the evidence is, or in closing, unless

14 you could have said the same thing under oath.  So that's

15 important.  But you can make a statement.  In the opening, you

16 can say whatever you choose to say, but it's not evidence

17 unless you take the stand.

18      And if you say, for example -- and I don't know if this is

19 the case or not -- "It never happened; I wasn't there," if you

20 say that, you can't argue it unless at the end -- unless you

21 take the stand and you say that it didn't happen; I wasn't

22 there.

23      And then you should understand -- I don't mean to dissuade

24 you -- and maybe Mr. Burnham can tell you this.  You will be

25 subject to cross-examination if you take the stand by the

1  government.  They can ask you questions to impeach you,

2  including potentially going into your past criminal history.

3  There is that.

4      Now, if you don't take the stand, and you entirely have

5  the right not to, you should understand that the government

6  cannot say to this jury this man is guilty because he didn't

7  testify.  The right to silence means you don't have to testify,

8  and the government cannot say that to the judge or jury that

9  there's any inference of guilt that can be taken from the fact

10 that you did not testify.

11     But if you testify, you're like any other witness.  You

12 can be impeached by the government.  Again, that's something

13 you need to think about.  Maybe Mr. Burnham will tell you

14 something about that if you care to talk to him, but that's an

15 important thing to bear in mind.

16     All right.  Mr. Baldwin.

17         MR. BALDWIN:  Yes, Your Honor, just briefly.  In the

18 memorandum that I filed earlier today at page 4 to 5, there is

19 a Third Circuit standard instruction for someone who is pro se,

20 a pro se instruction that's given prior --

21         THE COURT:  Right.  And I will do that for sure.  The

22 jury needs to understand that.

23     By the way, and this is an important point, too.  I sort

24 of got a little ahead of myself.  What about discovery?

25 Mr. Conley has asked to look at whatever ordinarily defense

1  counsel would be entitled to look at, and I know that that

2  presents an issue often for the government.  So you need to

3  tell me about that.  I know -- I suspect that heretofore prior

4  counsel has been given some discovery in this case, but I don't

5  know what the current state is, and I don't know what your

6  position is about providing discovery to him, which I mean

7  discovery materials, names, et cetera.

8          MR. BALDWIN:  Yes, Your Honor.  So with respect to

9  discovery, my understanding was that standby counsel was going

10  to provide materials to Mr. Conley.  He's asked for additional

11  matters, and I said, here, you can provide him with everything

12  that's on this list, with the exception of a couple things.

13  One of those was the redacted search warrants that were part of

14  the motions practice that we had earlier in the case, and I

15  can't remember any other major outstanding items, but my

16  understanding is that standby counsel is providing that stuff

17  to --

18          THE COURT:  Mr. Burnham, what do you say about that?

19          MR. BURNHAM:  That's right.  I received that list

20  that Mr. Baldwin referred to and provided Mr. Conley with all

21  of the materials minus the ones that have been identified as

22  things the government didn't want him to have.

23          THE COURT:  You provided him the materials or did you

24  intend that or what?

25          MR. BALDWIN:  Yes, Your Honor, for everything else

1    that I was fine with.

2           THE COURT:  There was one particular more

3    confidential matter?

4           MR. BURNHAM:  I'm sorry?  I didn't hear Your Honor's

5    question.

6           THE COURT:  I'm asking both of you.  Was there one

7    matter that you were asking that it not be disclosed directly

8    to the defendant or what?

9           MR. BALDWIN:  Well, it had been previously disclosed

10   to the defendant in the context of motion dates, and it's

11   basically the search warrants that were --

12          THE COURT:  Okay.  Well, I'm not sure how that's

13   going to come into evidence anyway but --

14          MR. BALDWIN:  He's seen them before.  That's the one

15   outstanding item, Your Honor, that we do need to organize and

16   bring the defendant back for a day and have the marshals here

17   so he can observe the physical evidence should he desire to do

18   so.  Obviously, he wouldn't be allowed to touch the firearm.

19          THE COURT:  Well, the physical evidence is the drugs

20   and the gun?

21          MR. BALDWIN:  Yes, Your Honor.

22          THE COURT:  I mean, they can be shown to him.

23   They're not going to be handed to him.

24          MR. BALDWIN:  Yes, Your Honor.  It would be --

25          THE COURT:  Are you saying they need to be shown

1  before trial or they're going to be shown at trial?  How would

2  you do that before trial?

3              MR. BURNHAM:  Usually we do go to -- as lawyers, we

4  go to the counsel's office and go in a conference room and look

5  at the guns and drugs.

6              THE COURT:  Well, counsel can.  What about the

7  defendant?

8              MR. BURNHAM:  It seems to me he should have a right

9  to do that, and it sounds like the government is willing to

10 accommodate it if he wants to.  I don't know what his -- if

11 he's going to request --

12             THE COURT:  Mr. Baldwin, it's up to you.

13             MR. BALDWIN:  Yes, Your Honor.  I think we can --

14             THE COURT:  All right.  Well, just make sure then the

15 discovery goes to standby counsel and then -- go ahead.

16             MR. BALDWIN:  I apologize, Your Honor.

17             THE COURT:  I'm waiting.

18             MR. BALDWIN:  The idea would be that the defendant,

19 we would bring him here or to the, you know, to an office in

20 Baltimore in a place that's a controlled environment.  We have

21 the courthouse personnel there, the case agent.  So the

22 defendant can view the things, but he can't physically touch

23 them.

24             THE COURT:  All right.  Well, that's fine as long as

25 you're prepared to do it that way.  Do that so we know where we

1  are.

2          MR. BALDWIN:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. BURNHAM:  Your Honor, one other issue on

5  discovery.  I don't know how much *Jencks* there's going to be in

6  this case, but when that's produced, he's going to have to see

7  it somehow and I don't know if that's something --

8          THE COURT:  What is that?

9          MR. BURNHAM:  I'm sorry?

10         THE COURT:  What sort of evidence?

11         MR. BURNHAM:  When the *Jencks* is produced.  Typically

12  the government produces the *Jencks* a week or two before

13  trial --

14         THE COURT:  Oh, the *Jencks* material, yeah.

15         MR. BURNHAM:  And he's going to need to see that and

16  that's going to be a little difficult because I don't know -- I

17  haven't been to the jail, and D.C. jail is not that well

18  equipped to let you share documents.

19         THE COURT:  Well, when you provide *Jencks* material,

20  is that not -- is that something you take back, or is that

21  something that you can leave with counsel?

22         MR. BALDWIN:  Typically we leave that with counsel,

23  Your Honor, with the understanding that copies are not going to

24  be provided to the defendants.  Many times it's things of a

25  sensitive nature.  In this case, I have to review it.  There

1   may be some statements, some things that have been redacted

2   that, in all fairness, the defendant should have an opportunity

3   to look at, but they don't rise to the level of discovery for

4   purposes of the case.

5          THE COURT:  Well, but can you not make that available

6   to Mr. Burnham?  And, Mr. Burnham, the corollary is you can't

7   let the defendant know what it consists of without actually

8   sharing.

9          MR. BURNHAM:  I would have to go to the jail and sit

10  there with him for -- sometimes it can be seven, eight hours.

11  I don't know how much there is, which is not something that

12  I've done yet during the pandemic at D.C. jail.  I suppose I

13  could if it really came to that.

14         THE COURT:  Presumably will you have some *Jencks*

15  material?  I don't know.

16         MR. BALDWIN:  Yes, Your Honor, I think we will.  I

17  don't think there is a large amount because we got a week from

18  trial previously, and we didn't have a lot of material, as I

19  recall.  So I will verify that.  I didn't check that --

20         THE COURT:  Do that rather quickly because I'm going

21  to proceed on the assumption that you can make the *Jencks*

22  material available maybe a little sooner than usual rather than

23  later and then so that would give Mr. Burnham an opportunity

24  perhaps even to do it by distance or however else, mail it or

25  -- not mail it.  Whatever your position would be on that

1  without actually handing it over.

2          MR. BURNHAM:  I may be able to do that.  I think

3  there is a procedure where he can be taken here to the

4  courthouse and I can meet with him there.

5          THE COURT:  All right, well, that may be the way to

6  do it.  Give him enough time before trial to do that.

7          MR. BALDWIN:  Yes, Your Honor.  It might just be an

8  overlap with the same day of viewing the physical evidence.

9          THE COURT:  Okay, that makes sense but your

10 responsibility.

11         MR. BALDWIN:  Yes, Your Honor.

12         THE COURT:  All right.  So we've talked about

13 exhibits.

14     Bench conferences with counsel.  Now, same issue really.

15 Let us suppose what may be happening, I'm not blaming

16 Mr. Conley for this, but suppose he wants to talk about

17 something that he just shouldn't be talking about.  Suppose he

18 wants to go back and tell this jury about how he disagrees with

19 whether there was evidence to conduct the searches, and I have

20 to say "I'm not going to let you do that; that's not part of

21 the case."  Now, I guess I can say that from the bench.

22     Sometimes there are things you have to say like "Don't go

23 into that.  You don't want to do that."  If the jury is sitting

24 there, they're going to hear all of that unless you come

25 forward.  I think bench conferences with counsel is one thing

 1  we're still trying to work through here on how we do that, even

 2  with the pandemic how we do that.

 3       My assumption will have to be that anything that I need to

 4  say to either counsel, to the prosecutor or the defendant, will

 5  be done in open court, will not necessarily have to be done at

 6  the bench; and if that occasion arises where I think I do need

 7  to say something -- marshals, I need to sort of ask you this.

 8  This would be Mr. Conley approaching the bench together with

 9  government counsel to have a screened discussion with the Court

10  under husher, whether escorting him up here would be something

11  convenient to be done.

12       I understand that, you know, having marshals trailing in

13  and walking around is not the best of all procedures, but there

14  is really no alternative.  I'm not going to have him walking

15  around the courtroom.

16       So, marshals, we need to think about that, about whether

17  if we get to that point, we would escort him from where he sits

18  to here in front of the bench, have a breach conference, and

19  then escort him back.  That's something that the marshals need

20  to be prepared to do if possible.

21            THE DEPUTY MARSHAL:  Your Honor, I've seen in the

22  past they use like the earpiece, the microphone back and forth.

23            THE COURT:  You're talking about the husher?

24            THE DEPUTY MARSHAL:  Yes.

25            THE COURT:  That's another way to do it with the

1    husher.

2          THE DEPUTY MARSHAL:  We've used that with defendants

3    that we won't let them move.

4          THE COURT:  All right, well, that may be the way to

5    do it, to use the husher and have him participate from his

6    place with the earphones.  Yeah, I think that would work.

7    Okay, just as long as we walk through and understand that is

8    one possible way in which it's going to develop.

9          MR. BALDWIN:  Yes, Your Honor.  I guess my question

10   is will the husher work to mute out the microphone?  Obviously,

11   in the standard case -- so the defendant can say things into

12   the mic and that will be hushed.  My understanding is the

13   husher doesn't work that well from back in this area and,

14   actually, when you -- the husher cuts out this microphone

15   circuit.  So you're not going to be able to hear the defendant.

16         THE COURT:  Brian, I don't know where we are on that.

17   We've been talking about that, about how we're going to handle

18   bench conferences.

19         THE COURTROOM DEPUTY:  That's something else we'll

20   need to figure out on Friday.

21         THE COURT:  All right.  We'll have to come back to

22   that and figure out how we're going to do that.

23         THE COURTROOM DEPUTY:  I believe what Mr. Baldwin is

24   saying is currently it would cut out the defendant's microphone

25   when the husher is on is my understanding.

1          THE COURT:  It does?  Well, okay.  We need to then

2    look at that and see how we would do that.

3          THE COURTROOM DEPUTY:  Yes, Your Honor.

4          THE COURT:  If it's a matter of physically bringing

5    the defendant up here, we may need to do it that way.  I'm not

6    sure there's any other alternative.

7          MR. BURNHAM:  Your Honor, I don't know if the Court

8    has gotten into this yet, but there has been some talk about

9    maybe using phones.

10          THE COURT:  Yeah.  Well, you mean to talk to your

11    client?

12          MR. BURNHAM:  To talk to the client, but I don't see

13    why that wouldn't work for bench conferences as well if we want

14    to do it that way.

15          THE COURT:  But I assume that you would only be

16    standby here.  You would not be the person who is making the

17    call.

18          MR. BURNHAM:  That's right.  It would have to be

19    Mr. Conley.

20          THE COURT:  Brian will look into that.  I mean,

21    that's something that we need to see how that would work in

22    terms of bench conferences.  Right now I would think, for the

23    most part, things can be said out loud in the courtroom, but

24    we'll see whether there is something sensitive enough that

25    needs to be taken up at the bench.

1      All right.  Then we go through the case, Mr. Conley.  The

2   government will call witnesses and ask questions.  You have a

3   right to object to evidence that you think is irrelevant,

4   immaterial, and so on.  You don't get a chance to object to

5   evidence you don't like.  It has to be evidence that has

6   nothing to do with the case.

7      And then when you call your own witnesses, if you have

8   any, they would be subject to being sworn to tell the truth and

9   they would be subject to questions asked by you and answers,

10  and they could be cross-examined by the government the same

11  way.  At the end of all the evidence -- and the government has

12  the last opportunity to call witnesses.  It's called rebuttal

13  testimony.

14     We would formulate the proposed instructions to the jury,

15  and I do have a set of instructions, Mr. Baldwin, that were

16  presented at the end of December.  Make sure Mr. Burnham has

17  those.  The jury is instructed by me on the issues.

18     And then you are in a position to make closing argument.

19  Mr. Baldwin for the government would argue first.  You, as

20  defendant, could argue -- let me finish my sentence and then

21  you can ask.  You would argue second and the government would

22  have the right to make the final rebuttal argument.

23     Yes?

24          THE DEFENDANT:  So basically if I became -- I thought

25  it was already understood December 17th that I was pro se and

1  trial start in one month.  That's, what, six weeks?  I don't

2  even have -- I don't have nothing prepared.  I don't -- it's

3  been, what, eight months now?  I don't have nothing to prepare

4  my defense.  How fair is that?  I've been asking for my whole

5  discovery.  I haven't even got it.

6               THE COURT:  Well, I don't --

7               THE DEFENDANT:  Then trial starting.  So basically I

8  got one month and I can't even look at the search warrants or

9  nothing and I just still got to start trial without looking at

10 nothing.  How fair is that?

11              THE COURT:  Well, the government has said that it's

12 made the discovery available to your prior attorneys and to

13 Mr. Burnham.

14              THE DEFENDANT:  I can't -- I didn't review nothing.

15 I haven't reviewed it since December.  I ain't see no search

16 warrant or nothing.

17              THE COURT:  Well, search warrants are not in the case

18 anymore.  We're not talking about search warrants.  That's --

19              THE DEFENDANT:  That's the main part of the case.

20              THE COURT:  No, but I told you that, that that's not

21 what this trial is about.  The trial is whether you distributed

22 drugs and had a firearm.

23              THE DEFENDANT:  But I put in motions -- I put in a

24 motion for dismissal for the search warrant.  I haven't got a

25 response on that yet.

1          THE COURT:  Yeah, okay, but the search warrants, I

2    don't know whether you got them or not.  I think you did.  They

3    were available at the two hearings, but it's not part of this

4    trial.  I need to emphasize that to you.

5          THE DEFENDANT:  I know.  It's a part of my case,

6    though.  This what led them to come.  So basically what you

7    saying is if it's not a part of the trial, it basically -- any

8    police agency can go in anybody's house and then we ain't got

9    -- we don't have to use the probable cause.  We can just start

10   the trial.

11         THE COURT:  No.  This is what I told you --

12         THE DEFENDANT:  That's basically what you're saying.

13         THE COURT:  What I told you was I made the decision

14   twice that they had rightful cause to go into your --

15         THE DEFENDANT:  But they never showed --

16         THE COURT:  Listen.  Listen to me.  I made that

17   decision.  That's been made already.  This part of your case is

18   whether you distributed drugs and had firearms.  That's what

19   we're talking about, not whether there was probable cause to

20   arrest you or search your residence.

21         THE DEFENDANT:  But that was the probable cause to

22   get in my house.  So they got to show that.  They saying they

23   got all of that on surveillance.  They got to show that.  You

24   can't start trial without showing that.

25         THE COURT:  You're not hearing me, Mr. Conley.  I've

```
1    said I decided those issues already.  If you're going to appeal
2    the case, and I assume you will, you take that up and you say
3    the judge was wrong in the decision he made.  That's what you
4    do.  But as far as the jury deciding whether you are a drug
5    dealer, deciding whether you had a firearm, an AK or whatever
6    in your --
7              THE DEFENDANT:  That's contradictive, though.
8              THE COURT:  -- apartment, that's for this jury to
9    decide.  They're not here to talk --
10             THE DEFENDANT:  That's contradictive, though.  It's
11   contradictive.  You go on -- basically that's not -- the
12   whole -- I've been here 51 months on this case.  That's not
13   law.  The way that y'all running this case is not law.  I can't
14   even get -- if I'm my own lawyer, I'm supposed to get
15   everything that the prosecutors get.  I can't even get -- how
16   am I going to prepare my own defense without seeing nothing?
17   The trial start next month.  I'm just gonna come in here and
18   start trial without having no discovery?  You might as well
19   sentence me now.  I'll go through my appeal, and you can
20   sentence me now.
21             THE COURT:  Well, as I said, I understood that
22   discovery had been --
23             THE DEFENDANT:  You can give me my time now.  I been
24   telling you --
25             THE COURT:  You're going to have to stop talking when
```

1  I talk --

2          THE DEFENDANT:  You're wasting my time.

3          THE COURT:  You're going to have to stop talking when

4  I talk because you're not hearing me.

5          THE DEFENDANT:  Take me back.  I'm ready.  Take me

6  back.

7          THE COURT:  All right -- no, I think you'd better sit

8  down, Mr. Conley.

9          THE DEFENDANT:  I ain't got nothing else to say.

10         THE COURT:  All right.  Sit down, Mr. Conley.

11     Mr. Burnham, are you satisfied that you've been given some

12 discovery in the case?  Is there more discovery that you're

13 waiting on?

14         MR. BURNHAM:  Mr. Conley is correct that the search

15 warrants, I was not authorized to provide him those, and I

16 think there might have been some CDs with contact information I

17 believe and so he doesn't have those.  I've reviewed the search

18 warrants with him, but he does not have copies of them.

19         THE COURT:  Well, but do you understand what more

20 he's asking for?

21         MR. BURNHAM:  I think I understand him to be asking

22 for the search warrants.

23         THE COURT:  Okay.  And has he seen those?

24         MR. BURNHAM:  He has.

25         THE COURT:  He has seen them.

1          THE DEFENDANT:  But if I'm preparing my own defense,

2    how am I -- anybody can see them.  I need to sit and study them

3    just like I need to sit and study -- I need to sit and study.

4    And then I swear to the penalties of perjury that I didn't do

5    no controlled buy.  So I'm not even supposed to be in jail.  If

6    I didn't never do no controlled buys, this what got them into

7    my house --

8          THE COURT:  You can testify to that at trial, that

9    you never did any buys, including --

10          THE DEFENDANT:  But I put in the motion for dismissal

11    for that, though, and it got sent back.

12          THE COURT:  No, no --

13          THE DEFENDANT:  They know there's no controlled buys.

14    He know that.

15          THE COURT:  No, they don't.  No, they don't.

16          THE DEFENDANT:  He said --

17          THE COURT:  They don't -- look, Mr. Conley --

18          THE DEFENDANT:  If I pled for a speedy trial in 2016

19    and haven't been brought to trial yet, that should end my

20    argument right there.

21          THE COURT:  Okay.

22          THE DEFENDANT:  They know what they doing.  They

23    don't have it.

24          THE COURT:  All right.  I'm going to let you go

25    downstairs momentarily.  I just want to make for the record --

1    THE DEFENDANT:  I already see what's going on.

2          THE COURT:  I want for the record to make a

3    statement.

4          THE DEFENDANT:  I already see what's going on.

5          THE COURT:  You can't keep talking over me.  You're

6    not going to advance your case by doing that.

7       So let me just state for the record I'm satisfied that

8    with regard to the search warrants that you wanted to -- want

9    to see, number one, you've already seen them; number two, they

10   are not part of this case at this stage.  It's another issue.

11         THE DEFENDANT:  I only seen them --

12         THE COURT:  Number three --

13         THE DEFENDANT:  -- for a little bit of time.

14         THE COURT:  Just listen.  Listen.  Stop talking.

15      Number three, if somebody is called as a witness to say

16   they made a controlled buy from you, if they're called as a

17   witness in this case, you can cross-examine them.  You can also

18   take the stand under penalties of perjury and say I never did

19   it, and the jury has to decide who they believe.  So you will

20   have a chance to challenge it if you want to.  It's not over.

21   It's not a big deal if you say I never did it, but you've had

22   ample time to go forward.  You've had six attorneys in this

23   case, one twice.

24         THE DEFENDANT:  What about the speedy trial then?

25         THE COURT:  Well, there are explanations -- I've

1 already ruled on that.  You were out for a year during a
2 competency evaluation, if you recall.
3          THE DEFENDANT:  That was two months.
4          THE COURT:  You discharged your attorney after
5 attorney, and every attorney needs to tool up again and get
6 ready to try your case, and they can't --
7          THE DEFENDANT:  He wasn't doing nothing.
8          THE COURT:  They can't do it the next day.
9     Look, I'm satisfied -- all right, final word and then I'll
10 let you go.  I'm satisfied I made the correct decisions in this
11 case.  If you aren't and you're convicted, by all means appeal.
12     With regard to the search warrants --
13          THE DEFENDANT:  I know I'm being convicted.  I see
14 what's going on.
15          THE COURT:  With regard to the search warrants, if
16 you think the Court decided incorrectly, appeal it, but you are
17 not going to stop this case from going forward.
18     All right.  Take him down, marshals.
19          THE DEFENDANT:  I'm trying to --
20          THE COURT:  I'm not going to have it.  I don't need
21 to hear anymore.
22          THE DEFENDANT:  I already know how it's going to go.
23          THE COURT:  Well, you may be right.
24          THE DEFENDANT:  I know what y'all doing.
25          THE COURT:  You may be right.

1          THE DEFENDANT:  I know what you doing.  I rather

2    appeal your finding.  I know what you doing.

3         (The defendant is escorted out of the courtroom.)

4          THE COURT:  All right.  Any further thoughts,

5    Mr. Baldwin?

6          MR. BALDWIN:  No, Your Honor.  I will endeavor to

7    work out the *Jencks* material and the physical review with the

8    defendant and have a come-up to have him come to the courthouse

9    so he can take a look at those material.

10          THE COURT:  All right.  Well, good luck, Mr. Burnham,

11    at least in trying to explain, if you can, some of this -- I'm

12    sure you've tried -- to Mr. Conley.  He seems to be stuck on

13    the search warrants but --

14          MR. BURNHAM:  Thank you, Your Honor.

15          THE COURT:  -- so be it.

16       All right.  Thank you, Counsel.  We'll look to get that

17    information from you, Mr. Baldwin.

18          MR. BALDWIN:  Yes, Your Honor.

19          THE COURT:  Make sure Mr. Burnham has it as well.

20    Thank you, Counsel.

21          THE LAW CLERK:  All rise.

22          THE DEPUTY CLERK:  This Honorable Court now stands in

23    recess.

24         (Recess taken, 4:06 P.M.)

25

1        I, Marlene Kerr, FCRR, RPR, CRR, RMR, certify that the

2    foregoing is a correct transcript of the stenographic record of

3    proceedings in the above-entitled matter.

4

5                    Dated this 23rd day of August, 2021.

6

7                    _____
                                   /s/
                             Marlene Kerr
8                     Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25